No. 22-3076

# United States Court of Appeals
# for the Third Circuit

FERNANDO NUÑEZ, JR.,

*Plaintiff–Appellant,*

v.

TOM M. WOLF, GEORGE LITTLE, TABB BICKELL,

*Defendants–Appellees.*

Appeal from the United States District Court
for the Middle District of Pennsylvania,
No. 3:15-cv-01573
(Judge Jennifer P. Wilson)

## JOINT APPENDIX – VOLUME II, Pages JA020-JA327

Nicholas R. Reaves
YALE LAW SCHOOL
FREE EXERCISE CLINIC
1919 Pennsylvania Ave. N.W.
Suite 400
Washington, D.C. 20006
Tel.: (202) 955-0095
nicholas.reaves@yale.edu

Gordon D. Todd
Ellen Crisham Pellegrini
Cody L. Reaves
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
Tel.: (202) 736-8000
Fax: (202) 736-8711
epellegrini@sidley.com

Aaron J. King
SIDLEY AUSTIN LLP
1000 Louisiana Street
Houston, TX 77002
Tel.: (713) 495-4500
Fax: (713) 495-7799
aaron.king@sidley.com

*Counsel for Fernando Nuñez, Jr.*

# TABLE OF CONTENTS

**Page**

**Volume I: JA001-JA019**

Doc. 113 Memorandum Opinion (Sep. 30, 2022).............................. JA001

Doc. 114 Order granting Defendants' motion for Summary Judgment (Sep. 30, 2022)................................................................... JA017

Doc. 115 Notice of Appeal (Nov. 02, 2022)...................................... JA018

**Volume II: JA020-JA327**

Docket Entries from the United States District Court for the Middle District of Pennsylvania, Case No. 3:15-cv-01573 .......................... JA020

Doc. 1 Form To Be Used by a Prisoner in Filing a Civil Rights Complaint (Aug. 12, 2015) ....................................................... JA032

Doc. 16 Order granting motion for leave to proceed In Forma Pauperis (Oct. 16, 2018) ................................................................. JA039

Doc. 34 Amended Complaint (Apr. 9, 2019) ................................... JA040

Doc. 63 Memorandum Opinion signed by Judge Malachy E. Mannion (Nov. 13, 2020) ................................................................. JA063

Doc. 64 Order denying defendants' motion to dismiss Mr. Nunez's RLUIPA claims concerning denial of conjugal visitation, congregational prayer during contract visits, and religious circumcision surgery  JA086

Doc. 66 Answer to Plaintiff's Amended Complaint (Dec. 3, 2020) . JA088

Doc. 78 Defendants' Brief in Support of Motion for Summary Judgment (Jun. 30, 2021) ................................................................. JA115

Doc. 79 Defendants' Statement of Material Facts Pursuant to Local Rule 56 (Jun. 30, 2021)...................................................... JA143

Doc. 80 Appendix to Defendant's Brief in Support of Motion for Summary Judgment (Jun. 30, 2021) ..................................................... JA156

Doc. 80-1 Religious Accommodation Request Documents.... JA159

Doc. 80-2 Grievance 564319 (regarding conjugal visits) ...... JA183

Doc. 80-3 PA Department of Corrections Policy 812 ............ JA189

Doc. 80-4 PA Department of Corrections Policy 821 ............ JA225

Doc. 80-5 Declaration of Scott Woodring.............................. JA235

Doc. 80-6 Declaration of Dr. Arlene Seid .............................. JA242

Doc. 80-9 Grievance 562984 (regarding congregational prayer with visitors.............................................................................. JA248

Doc. 80-11 Grievance 564054 (regarding circumcision) ....... JA254

Doc. 80-12 PA Department of Corrections Policy 13.2.1 ...... JA264

Doc. 110 Plaintiff's Counter Statement of Material Facts Pursuant to Local Rule 56.1 (Jul. 21, 2022) ........................................................ JA272

Doc. 110-2 Declaration by Fernando Nuñez Jr. (Jul. 21, 2022) .....JA287

Doc. 111 Plaintiff Reply Brief to Defendants' Motion for Summary Judgment (Jul. 28, 2022) ................................................................. JA294

Query    Reports    Utilities    Help    Log Out

APPEAL,ARC,CLOSED,PROSE,PRSLC

# United States District Court
## Middle District of Pennsylvania (Scranton)
### CIVIL DOCKET FOR CASE #: 3:15-cv-01573-JPW-EW

Nunez et al v. Wolf et al                                     Date Filed: 08/12/2015
Assigned to: Honorable Jennifer P. Wilson                     Date Terminated: 09/30/2022
Referred to: Pro Se Law Clerk EW                              Jury Demand: Plaintiff
Case in other court: Third Circuit, 22-03076                  Nature of Suit: 550 Prisoner: Civil Rights
Cause: 42:1983 Prisoner Civil Rights                          Jurisdiction: Federal Question

**Plaintiff**

**Fernando Nunez**                       represented by    **Fernando Nunez**
*Jr.*                                                       FM8959
                                                           SCI-Mahanoy
                                                           SPECIAL MAIL - OPEN ONLY IN THE
                                                           PRESENCE OF THE INMATE
                                                           301 Grey Line Drive
                                                           Frackville, PA 17931
                                                           PRO SE

**Plaintiff**

**Jenny Nunez**                          represented by    **Jenny Nunez**
*TERMINATED: 10/16/2018*                                   4418 Hurley Street
                                                           Philadelphia, PA 19120
                                                           PRO SE

V.

**Defendant**

**Tom W Wolf**                           represented by    **Chase M. DeFelice**
*TERMINATED: 11/13/2020*                                   Office of General Counsel
                                                           PA Department of Corrections
                                                           1920 Tehnology Parkway
                                                           Mehanicsburg, PA 17050
                                                           717-728-7763
                                                           Email: chdefelice@pa.gov
                                                           *TERMINATED: 11/13/2020*
                                                           *ATTORNEY TO BE NOTICED*

                                                           **Debra S. Rand**
                                                           Chief Counsel's Office
                                                           Pennsylvania Department of Corrections,
                                                           1920 Technology Parkway
                                                           Mechanicsburg, PA 17050
                                                           717-728-7763
                                                           Email: drand@pa.gov

JA020

*TERMINATED: 11/13/2020*
*ATTORNEY TO BE NOTICED*

**Defendant**

**George Little**                    represented by  **Abby N Trovinger**
                                     PA Office of General Counsel - Dept. of
                                     Corrections
                                     1920 Technology Pkwy
                                     Mechanicsburg, PA 17050
                                     717-728-7763
                                     Email: atrovinger@pa.gov
                                     *ATTORNEY TO BE NOTICED*

                                     **Chase M. DeFelice**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

                                     **Debra S. Rand**
                                     (See above for address)
                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**James A. Eckard**                  represented by  **Debra S. Rand**
*Facility Manager*                                   (See above for address)
*TERMINATED: 04/09/2019*                             *TERMINATED: 04/09/2019*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Jane Doe**                         represented by  **Debra S. Rand**
*(C.O. A. Duvall)*                                   (See above for address)
*TERMINATED: 04/09/2019*                             *TERMINATED: 04/09/2019*
                                                     *ATTORNEY TO BE NOTICED*

**Defendant**

**Tabb Bickell**                     represented by  **Abby N Trovinger**
*Regional Secretary of DOC*                          (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Chase M. DeFelice**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Debra S. Rand**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/12/2015 | 1 | COMPLAINT against All Defendants, filed by Fernando Nunez, Jenny Nunez.(lh) (Entered: 08/13/2015) |
| 08/12/2015 | 2 | U.S. MARSHAL - 285, AO 398 and AO 399 Service Forms Completed by Plaintiff. (lh) (Entered: 08/13/2015) |

JA021

| | | |
|---|---|---|
| 08/13/2015 | | DOCKET ANNOTATION: Sent documents to Laura for proper forms (please note there are two plaintiffs). (lh) (Entered: 08/13/2015) |
| 08/13/2015 | 3 | STANDING PRACTICE ORDER sent to Fernando Nunez and Jenny Nunez. (lh) (Entered: 08/13/2015) |
| 08/14/2015 | 4 | MOTION (Application) for Leave to Proceed in forma pauperis by Fernando Nunez.(ao) (Entered: 08/14/2015) |
| 08/14/2015 | 5 | PRISONER AUTHORIZATION by Fernando Nunez allowing prison to submit copy of prisoner's trust fund account to the court, and approving the entire filing fee to be deducted from prisoner inmate account. (ao) (Entered: 08/14/2015) |
| 09/28/2015 | 6 | Letter dtd 9/23/15 from Fernando Nunez requesting ifp form for wife. (ao) (Entered: 09/28/2015) |
| 10/05/2015 | 7 | NOTICE of Voluntary Dismissal of Specified Claims filed by Fernando Nunez (ao) (Entered: 10/05/2015) |
| 10/13/2015 | 8 | NOTICE of Voluntary Dismissal of Specified Claims by Jenny Nunez (ao) (Entered: 10/13/2015) |
| 10/29/2015 | 9 | MOTION for Leave to Proceed in forma pauperis by Jenny Nunez.(lh) (Entered: 10/29/2015) |
| 09/29/2016 | 10 | NOTICE of Change of Address dtd 9/26/16 by Fernando Nunez to SCI-Albion. (ao) (Entered: 09/29/2016) |
| 06/02/2017 | 11 | MOTION to Appoint Counsel by Fernando Nunez. (Attachments: # 1 Proposed Order) (ao) (Entered: 06/02/2017) |
| 07/17/2017 | 12 | NOTICE of Change of Address dtd 7/12/17 by Fernando Nunez to SCI-Somerset. (ao) (Entered: 07/17/2017) |
| 07/09/2018 | 13 | MOTION to Compel an Order ruling on Pltf's IFP application by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 07/09/2018) |
| 07/09/2018 | 14 | MOTION to Order US Marshal to serve Defts' with Pltf's pro se complaint by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 07/09/2018) |
| 07/26/2018 | 15 | NOTICE of Voluntary Dismissal of Co-Plaintiff Jenny E. Nunez by Jenny Nunez (ga) (Entered: 07/26/2018) |
| 10/17/2018 | 16 | ORDER DIRECTING U.S. MARSHAL TO SERVE SUMMONS AND COMPLAINT. Pltf's 4 Motion for Leave to Proceed in forma pauperis is construed as a motion to proceed w/out full prepayment of fees and costs and GRANTED. The Motion 9 for Leave to Proceed filed by Jenny Nunez is DENIED as moot based on her notice of intention to withdraw from the action. The Motion 14 to Order Service by the US Marshal is DENIED as moot.Signed by Honorable A. Richard Caputo on 10/16/18. (ao) (Entered: 10/17/2018) |
| 10/17/2018 | 17 | ADMINISTRATIVE ORDER sent to Prison Superintendent/Warden (ao) (Entered: 10/17/2018) |
| 10/17/2018 | 18 | Summons Issued as to Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf and provided TO U.S. MARSHAL for service on Defendant(s)in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure. (NOTICE TO ATTORNEYS RECEIVING THE SUMMONS ELECTRONICALLY: You must print the summons and the attachment when you receive it in your e-mail and serve them with the complaint on all defendants in the manner prescribed by Rule 4 of the Federal Rules of |

JA022

| | | |
|---|---|---|
| | | Civil Procedure). (ao) (Additional attachment(s) added on 10/17/2018: # 1 USM 285) (ao). (Entered: 10/17/2018) |
| 10/18/2018 | 19 | MEMORANDUM (Order to follow as separate docket entry) re 11 MOTION to Appoint Counsel filed by Fernando Nunez. Signed by Honorable A. Richard Caputo on 10/18/18. (dw) (Entered: 10/18/2018) |
| 10/18/2018 | 20 | ORDER (memorandum filed previously as separate docket entry). Plaintiff's Motion to Appoint Counsel 11 is DENIED without prejudice.Signed by Honorable A. Richard Caputo on 10/18/18. (dw) (Entered: 10/18/2018) |
| 11/08/2018 | | Receipt of payment from FERNANDO NUNEZ in the amount of $3.17 for PLRA CIVIL FILING FEE. Transaction posted on 11/7/2018. Receipt number 333063013 processed by gangeli. (jjs, ) (Entered: 11/08/2018) |
| 11/08/2018 | | Receipt of payment from FERNANDO NUNEZ in the amount of $17.02 for PLRA CIVIL FILING FEE. Transaction posted on 11/7/2018. Receipt number 333063024 processed by gangeli. (jjs, ) (Entered: 11/08/2018) |
| 11/21/2018 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $20.00 for PLRA CIVIL FILING FEE. Transaction posted on 11/20/2018. Receipt number 333063196 processed by lhannick. (tp) (Entered: 11/21/2018) |
| 12/11/2018 | 21 | NOTICE of Appearance by Debra S. Rand on behalf of All Defendants (Rand, Debra) (Entered: 12/11/2018) |
| 12/11/2018 | 22 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf. (Attachments: # 1 Proposed Order) (Rand, Debra) (Entered: 12/11/2018) |
| 12/11/2018 | 23 | BRIEF IN SUPPORT re 22 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf. (Rand, Debra) (Entered: 12/11/2018) |
| 12/11/2018 | | Receipt of payment from fernanto nunez in the amount of $20.00 for PLRA CIVIL FILING FEE. Transaction posted on 12/10/2018. Receipt number 333063497 processed by gangeli. (jjs, ) (Entered: 12/11/2018) |
| 12/11/2018 | | Receipt of payment from fernando nunez in the amount of $2.74 for PLRA CIVIL FILING FEE. Transaction posted on 12/10/2018. Receipt number 333063498 processed by gangeli. (jjs, ) (Entered: 12/11/2018) |
| 12/17/2018 | 24 | SUMMONS Returned Executed. James A. Eckard served on 11/20/2018, answer due 12/11/2018. (ao) (Entered: 12/17/2018) |
| 12/17/2018 | 25 | SUMMONS Returned Executed. Jane Doe (C.O. Duvall) served on 11/20/2018, answer due 12/11/2018. (ao) (Entered: 12/17/2018) |
| 12/17/2018 | 26 | SUMMONS Returned Executed John E. Wetzel served on 11/30/2018, answer due 12/21/2018. (ao) (Entered: 12/17/2018) |
| 12/17/2018 | 27 | SUMMONS Returned Executed Tabb Bickell served on 11/30/2018, answer due 12/21/2018. (ao) (Entered: 12/17/2018) |
| 12/27/2018 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $20.00 for PLRA CIVIL FILING FEE. Transaction posted on 12/26/2018. Receipt number 333063672 processed by lhannick. (tp) (Entered: 12/27/2018) |
| 01/09/2019 | 28 | MOTION to Accept Amended 1 Complaint by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 01/09/2019) |

| 01/09/2019 | [29](#) | PROPOSED DOCUMENT re: AMENDED COMPLAINT (ao) (Entered: 01/09/2019) |
|---|---|---|
| 01/09/2019 | [30](#) | SUMMONS & Complaint Returned Executed as to Tom W Wolf served on 12/21/2018, answer due 1/11/2019. (ao) (Entered: 01/09/2019) |
| 01/11/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $2.88 for PLRA CIVIL FILING FEE. Transaction posted on 1/10/2019. Receipt number 333063896 processed by epetrosk. (jjs) (Entered: 01/11/2019) |
| 01/28/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $20.00 for PLRA CIVIL FILING FEE. Transaction posted on 1/25/2019. Receipt number 333064081 processed by gangeli. (jjs, ) (Entered: 01/28/2019) |
| 02/08/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $3.02 for PLRA CIVIL FILING FEE. Transaction posted on 2/7/2019. Receipt number 333064281 processed by epetrosk. (jjs, ) (Entered: 02/08/2019) |
| 02/11/2019 | [31](#) | MOTION to Dismiss Specified Defendants' by Fernando Nunez.(ao) (Entered: 02/11/2019) |
| 02/14/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $30.00 for PLRA CIVIL FILING FEE. Transaction posted on 2/13/2019. Receipt number 333064408 processed by lhannick. (jjs, ) (Entered: 02/14/2019) |
| 03/11/2019 | [32](#) | REQUEST dtd 3/6/19 for 3 Consent to Jurisdiction by a United States Magistrate Judge forms by Fernando Nunez. (ao) (Mailed requested forms to Pltf) (Entered: 03/11/2019) |
| 04/05/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $4.70 for PLRA CIVIL FILING FEE. Transaction posted on 4/4/2019. Receipt number 333065174 processed by epetrosk. (jjs) (Entered: 04/05/2019) |
| 04/09/2019 | [33](#) | ORDER - Mr. Nunez's motion to file an Amended Complaint (Doc. 28) is granted.The Clerk of Court will docket the proposed amended complaint (Doc. 29) as the Amended Complaint in this action. Mr. Nunez's motion to Dismiss Specified Defts (Doc. 31), is construed as a Notice of Voluntary Dismissal of Defts Duvall and Eckard and granted. Defts CO A Duvall and James A Eckard are dismissed from this action. Defts' motion to dismiss (Doc. 22) is dismissedwithout prejudice. Defts shall file a response to the Amended Complaint by 5/1/19.Signed by Honorable A. Richard Caputo on 4/9/19 (ao) (Entered: 04/09/2019) |
| 04/09/2019 | [34](#) | AMENDED COMPLAINT against Tabb Bickell, John E. Wetzel, Tom W Wolf, filed by Fernando Nunez.(ao) (Entered: 04/09/2019) |
| 04/16/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $0.34 for PLRA CIVIL FILING FEE. Transaction posted on 4/15/2019. Receipt number 333065382 processed by gangeli. (jjs, ) (Entered: 04/16/2019) |
| 04/30/2019 | [35](#) | MOTION to Dismiss *Amended Complaint* by Tabb Bickell, John E. Wetzel, Tom W Wolf. (Attachments: # [1](#) Proposed Order)(Rand, Debra) (Entered: 04/30/2019) |
| 05/02/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $20.00 for PLRA CIVIL FILING FEE. Transaction posted on 5/1/2019. Receipt number 333065571 processed by epetrosk. (jjs) (Entered: 05/02/2019) |
| 05/09/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $9.00 for PLRA CIVIL FILING FEE. Transaction posted on 5/8/2019. Receipt number 333065717 processed by aoswald. (tp) (Entered: 05/09/2019) |

| | | |
|---|---|---|
| 05/13/2019 | | DOCKET ANNOTATION: Document 36 deleted per the request of counsel. Document was a duplicate of Document 35. (aaa) (Entered: 05/13/2019) |
| 05/13/2019 | 36 | BRIEF IN SUPPORT re 35 MOTION to Dismiss *Amended Complaint* filed by Tabb Bickell, John E. Wetzel, Tom W Wolf.(Rand, Debra) (Entered: 05/13/2019) |
| 05/23/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $6.38 for PLRA CIVIL FILING FEE. Transaction posted on 5/22/2019. Receipt number 333065886 processed by aoswald. (jjs, ) (Entered: 05/23/2019) |
| 05/23/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $6.05 for PLRA CIVIL FILING FEE. Transaction posted on 5/22/2019. Receipt number 333065887 processed by aoswald. (jjs, ) (Entered: 05/23/2019) |
| 05/29/2019 | 37 | MOTION for Extension of Time to File Brief in Opposition to 35 MOTION to Dismiss *Amended Complaint* filed by Fernando Nunez.(ao) (Entered: 05/29/2019) |
| 05/29/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $8.74 for PLRA CIVIL FILING FEE. Transaction posted on 5/28/2019. Receipt number 333065926 processed by aoswald. (jjs, ) (Entered: 05/29/2019) |
| 05/31/2019 | 38 | NOTICE of Change of Address by Fernando Nunez to SCI Mahanoy. (ao) (Main Document 38 replaced on 5/31/2019) (ao). (Entered: 05/31/2019) |
| 06/10/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $10.87 for PLRA CIVIL FILING FEE. Transaction posted on 6/7/2019. Receipt number 333066118 processed by aoswald. (jjs, ) (Entered: 06/10/2019) |
| 06/19/2019 | 39 | ORDER granting 37 Motion for Extension of Time to File Response/Reply re 35 MOTION to Dismiss *Amended Complaint*. Brief in Opposition due by 7/8/2019.Signed by Honorable A. Richard Caputo on 6/18/19. (dw) (Entered: 06/19/2019) |
| 06/25/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $17.81 for PLRA CIVIL FILING FEE. Transaction posted on 6/24/2019. Receipt number 333066294 processed by aoswald. (jjs, ) (Entered: 06/25/2019) |
| 06/25/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $0.86 for PLRA CIVIL FILING FEE. Transaction posted on 6/24/2019. Receipt number 333066295 processed by aoswald. (jjs, ) (Entered: 06/25/2019) |
| 07/11/2019 | 40 | BRIEF IN OPPOSITION re 35 MOTION to Dismiss *Amended Complaint* filed by Fernando Nunez.(ao) (Entered: 07/11/2019) |
| 07/11/2019 | 41 | MOTION to Exceed Page Limitation by Fernando Nunez.(ao) (Entered: 07/11/2019) |
| 07/17/2019 | 42 | ORDER granting 41 Motion for Leave to File Excess Pages. The Court will accept Plaintiff's opposition brief as properly filed. Defendants may file a reply brief in support of their Motion to Dismiss the amended complaint on or before 8/8/19. No further briefs may be filed without leave of Court. Signed by Honorable A. Richard Caputo on 7/17/19. (dw) (Entered: 07/17/2019) |
| 08/06/2019 | | Receipt of payment from FERNANDO NUNEZ in the amount of $11.87 for PLRA CIVIL FILING FEE. Transaction posted on 8/5/2019. Receipt number 333066966 processed by gangeli. (jjs) (Entered: 08/06/2019) |
| 09/10/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $33.17 for PLRA CIVIL FILING FEE. Transaction posted on 9/6/2019. Receipt number 333067416 processed by gangeli. (jjs) (Entered: 09/10/2019) |

| | | |
|---|---|---|
| 10/07/2019 | | Receipt of payment from FERNANDO NUNEZ JR in the amount of $81.38 for PLRA CIVIL FILING FEE. Transaction posted on 10/4/2019. Receipt number 333067986 processed by aoswald. (jjs) (Entered: 10/07/2019) |
| 12/16/2019 | 43 | MOTION to Join Additional Defts and Claims 1 Complaint by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 12/16/2019) |
| 12/16/2019 | 44 | BRIEF IN SUPPORT re 43 MOTION to Join Additional Defts and Claims 1 Complaint filed by Fernando Nunez.(ao) (Entered: 12/16/2019) |
| 12/16/2019 | 45 | MOTION for leave to file Supplemental Complaint by Fernando Nunez.(ao) (Entered: 12/16/2019) |
| 12/16/2019 | 46 | BRIEF IN SUPPORT re 45 MOTION for leave to file Supplemental Complaint filed by Fernando Nunez.(ao) (Entered: 12/16/2019) |
| 12/16/2019 | 47 | PROPOSED DOCUMENT re: SUPPLEMENTAL COMPLAINT (ao) (Entered: 12/16/2019) |
| 12/16/2019 | 48 | EXHIBITS by Fernando Nunez. (ao) (Entered: 12/16/2019) |
| 12/20/2019 | 49 | First MOTION for Extension of Time to To Respond to Discovery by Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf. (Attachments: # 1 Proposed Order) (Rand, Debra) (Entered: 12/20/2019) |
| 12/23/2019 | 50 | ORDER granting Defts 49 Motion to Extend Time. Defts Bickell and Wetzel shall respond to Plaintiffs November 25, 2019-interrogatories by Tuesday, February 25, 2020.Signed by Honorable A. Richard Caputo on 12/23/19 (ao) (Entered: 12/23/2019) |
| 12/27/2019 | 51 | BRIEF IN OPPOSITION re 43 MOTION to Amend/Correct 1 Complaint filed by Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf.(Rand, Debra) (Entered: 12/27/2019) |
| 12/27/2019 | 52 | BRIEF IN OPPOSITION re 45 MOTION to Supplement filed by Tabb Bickell, Jane Doe, James A. Eckard, John E. Wetzel, Tom W Wolf.(Rand, Debra) (Entered: 12/27/2019) |
| 01/21/2020 | 53 | MOTION for Extension of Time to File Brief filed by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 01/21/2020) |
| 02/26/2020 | 54 | ORDER granting 53 Motion for Extension of Time to File Brief in Support re 45 MOTION to Supplement. Brief in Support due by 3/23/2020.Signed by Honorable A. Richard Caputo on 2/26/20. (dw) (Entered: 02/26/2020) |
| 03/20/2020 | 55 | REPLY BRIEF re 45 MOTION to Supplement Complaint filed by Fernando Nunez.(ao) (Entered: 03/20/2020) |
| 03/25/2020 | | VERBAL ORDER by Chief Judge Christopher C. Conner - Case Reassigned to Honorable Malachy E Mannion. (bg) (Entered: 03/25/2020) |
| 04/02/2020 | 56 | MOTION to Compel Discovery by Fernando Nunez.(ao) (Entered: 04/02/2020) |
| 04/06/2020 | 57 | BRIEF IN SUPPORT re 56 MOTION to Compel Discovery filed by Fernando Nunez. (ao) (Entered: 04/06/2020) |
| 04/17/2020 | 58 | NOTICE of Appearance by Chase M. DeFelice on behalf of Tabb Bickell, John E. Wetzel, Tom W Wolf. (DeFelice, Chase) (Entered: 04/17/2020) |
| 04/17/2020 | 59 | BRIEF IN OPPOSITION re 56 MOTION to Compel Discovery filed by Tabb Bickell, John E. Wetzel, Tom W Wolf.(DeFelice, Chase) (Entered: 04/17/2020) |

JA026

| 05/04/2020 | 60 | REPLY BRIEF re 56 MOTION to Compel Discovery filed by Fernando Nunez.(ao) (Entered: 05/04/2020) |
|---|---|---|
| 09/24/2020 | 61 | Letter dtd 9/21/20 from Fernando Nunez RE: Rulings on motions. (ao) (Entered: 09/24/2020) |
| 09/28/2020 | 62 | Letter dtd 9/21/20 from Fernando Nunez, Jr. RE: status of case. (ao) (Entered: 09/28/2020) |
| 11/13/2020 | 63 | MEMORANDUM (Order to follow as separate docket entry)Signed by Honorable Malachy E Mannion on 11/13/20. (ga) (Entered: 11/13/2020) |
| 11/13/2020 | 64 | ORDER (memorandum filed previously as separate docket entry). Motion to dismiss the Amended Complaint (Doc. 35) is Granted in part and Denied in part. Mr. Nunez's motion to join addional parties (Docs.3& 45) are DENIED. (See Order for complete details).Signed by Honorable Malachy E Mannion on 11/13/20. (ga) (Entered: 11/13/2020) |
| 11/24/2020 | 65 | NOTICE of Appearance by Abby N Trovinger on behalf of Tabb Bickell, John E. Wetzel (Trovinger, Abby) (Entered: 11/24/2020) |
| 12/03/2020 |  | VERBAL ORDER REASSIGNING CASE - Case reassigned to Honorable Jennifer P. Wilson for all further proceedings. Honorable Malachy E Mannion no longer assigned to case. (jw) (Entered: 12/03/2020) |
| 12/03/2020 | 66 | ANSWER to 34 Amended Complaint by Tabb Bickell, John E. Wetzel.(Trovinger, Abby) (Entered: 12/03/2020) |
| 12/07/2020 | 67 | MOTION for Reconsideration re 64 Order (memorandum filed previously as separate docket entry) by Fernando Nunez.(dw) (Entered: 12/07/2020) |
| 12/11/2020 | 68 | MEMORANDUM (Order to follow as separate docket entry) re 56 MOTION to Compel Discovery filed by Fernando Nunez. Signed by Honorable Jennifer P. Wilson on 12/11/2020. (ve) (Entered: 12/11/2020) |
| 12/11/2020 | 69 | ORDER (memorandum filed previously as separate docket entry) denying 56 MOTION to Compel Discovery filed by Fernando Nunez. Signed by Honorable Jennifer P. Wilson on 12/11/2020. (ve) (Entered: 12/11/2020) |
| 12/11/2020 | 70 | SCHEDULING ORDER - IT IS ORDERED THAT: 1. Fact discovery shall be completed by Friday, May 28, 2021. All requests for extensions of this deadline shall be made at least fourteen (14) days before the expiration of the discovery period. 2. Dispositive motions and supporting briefs shall be filed by Wednesday, June 30, 2021. Briefing on dispositive motions shall comply with PA M.D. Local Rules 7.4, 7.5, 7.6, 7.7, 7.8, and 56.1, except that briefs in support of any dispositive motions shall be filed by the above date. Signed by Honorable Jennifer P. Wilson on 12/11/2020. (ve) (Entered: 12/11/2020) |
| 12/14/2020 | 71 | BRIEF IN SUPPORT re 67 MOTION for Reconsideration re 64 Order (memorandum filed previously as separate docket entry), filed by Fernando Nunez.(ao) (Entered: 12/14/2020) |
| 05/17/2021 | 72 | MOTION to Compel Discovery by Fernando Nunez.(ao) (Entered: 05/17/2021) |
| 05/21/2021 | 73 | BRIEF IN SUPPORT re 72 MOTION to Compel Discovery filed by Fernando Nunez. (ao) (Entered: 05/21/2021) |
| 06/01/2021 | 74 | MOTION to determine the sufficiency of an answer or objection by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 06/01/2021) |

JA027

| 06/07/2021 | 75 | BRIEF IN SUPPORT re 74 MOTION to determine the sufficiency of an answer or objection filed by Fernando Nunez.(ao) (Entered: 06/07/2021) |
|---|---|---|
| 06/30/2021 | 76 | MOTION to Exceed Page Limitation by Tabb Bickell, John E. Wetzel. (Attachments: # 1 Proposed Order)(Trovinger, Abby) (Entered: 06/30/2021) |
| 06/30/2021 | 77 | MOTION for Summary Judgment by Tabb Bickell, John E. Wetzel. (Attachments: # 1 Proposed Order)(Trovinger, Abby) (Entered: 06/30/2021) |
| 06/30/2021 | 78 | BRIEF IN SUPPORT re 77 MOTION for Summary Judgment filed by Tabb Bickell, John E. Wetzel.(Trovinger, Abby) (Entered: 06/30/2021) |
| 06/30/2021 | 79 | STATEMENT OF FACTS re 77 MOTION for Summary Judgment filed by Tabb Bickell, John E. Wetzel.(Trovinger, Abby) (Entered: 06/30/2021) |
| 06/30/2021 | 80 | APPENDIX by Tabb Bickell, John E. Wetzel. to 77 MOTION for Summary Judgment . (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J, # 11 Exhibit(s) K, # 12 Exhibit(s) L, # 13 Exhibit(s) M, # 14 Exhibit(s) N, # 15 Exhibit(s) O, # 16 Exhibit(s) P)(Trovinger, Abby) (Entered: 06/30/2021) |
| 07/12/2021 | 81 | Second MOTION to Compel Discovery by Fernando Nunez. (Attachments: # 1 Proposed Order)(ao) (Entered: 07/12/2021) |
| 07/22/2021 | 82 | MOTION to Stay re 77 MOTION for Summary Judgment Proceedings by Fernando Nunez.(ao) (Entered: 07/22/2021) |
| 07/22/2021 | 83 | BRIEF IN SUPPORT re 81 MOTION to Compel Discovery filed by Fernando Nunez. (ao) (Entered: 07/22/2021) |
| 07/22/2021 | 84 | EXHIBITS by Fernando Nunez. (ao) (Entered: 07/22/2021) |
| 09/23/2021 | 85 | ORDER denying 67 Motion for Reconsideration. Signed by Honorable Jennifer P. Wilson on 9/23/2021 (ve) (Entered: 09/23/2021) |
| 09/23/2021 | 86 | ORDER - IT IS ORDERED THAT:1. Plaintiffs motion to compel, Doc. 72, is DISMISSED as moot.2. By October 25, 2021, Defendants shall file a response to Nunezs motion challenging the sufficiency of their discovery responses, Doc. 74, as well as his second motion to compel, Doc. 81.3. Defendants motion to exceed page limits, Doc. 76, is GRANTED nunc pro tunc.4. Nunezs motion to stay his obligation to respond to Defendants motion for summary judgement, Doc. 82, is GRANTED.5. The court will set a deadline by which Nunez shall file a properly supported response to Defendants motion for summary judgment following the courts disposition of his discovery motions. Signed by Honorable Jennifer P. Wilson on 9/23/2021 (ve) (Entered: 09/23/2021) |
| 10/22/2021 | | DOCKET ANNOTATION: Atty Trovinger has been notified to refile Reply Brief (Doc. 87) as Brief in Opposition. (ao) (Entered: 10/22/2021) |
| 10/22/2021 | 87 | BRIEF IN OPPOSITION re 81 MOTION to Compel Discovery, 74 MOTION to determine the sufficiency of an answer or objection filed by Tabb Bickell, John E. Wetzel. (Attachments: # 1 Exhibit(s) A)(Trovinger, Abby) Modified on 10/22/2021 (ao). (Entered: 10/22/2021) |
| 11/12/2021 | 88 | REPLY BRIEF re 81 MOTION to Compel Discovery filed by Fernando Nunez.(ao) (Entered: 11/12/2021) |
| 12/16/2021 | 89 | MOTION to Clarification, MOTION for Reconsideration re 85 Order on Motion for Reconsideration by Fernando Nunez.(ao) (Entered: 12/16/2021) |

JA028

| 01/04/2022 | 90 | BRIEF IN SUPPORT re 89 MOTION to Clarify MOTION for Reconsideration re 85 Order on Motion for Reconsideration filed by Fernando Nunez.(ao) (Entered: 01/04/2022) |
|---|---|---|
| 03/07/2022 | 91 | MEMORANDUM AND ORDER - IT IS ORDERED that the plaintiffs motion to compel, (Doc. 81 ), and a motion to determine sufficiency of responses to requests for admissions. (Doc. 74 ) are DENIED. Signed by Magistrate Judge Martin C. Carlson on March 7, 2022. (kjn) (Entered: 03/07/2022) |
| 03/14/2022 | 92 | ORDER - For the reasons previously stated by the district court, thissecond motion to reconsider (Doc. 89 ), is DENIED. Signed by Magistrate Judge Martin C. Carlson on March 14, 2022. (kjn) (Entered: 03/14/2022) |
| 03/15/2022 | 93 | ORDER - IT IS HEREBY ORDERED THAT the plaintiff shall file his brief in opposition to the defendants motion for summary judgment (Doc. 77 ), on or before April 14th, 2022. Signed by Magistrate Judge Martin C. Carlson on March 15, 2022. (kjn) (Entered: 03/15/2022) |
| 03/21/2022 | 94 | MOTION to Join Secretary George M. Little as a Deft by Fernando Nunez.(ao) (Entered: 03/21/2022) |
| 03/25/2022 | 95 | OBJECTIONS by Fernando Nunez to 91 Memorandum, Order. (ao) (Entered: 03/25/2022) |
| 04/01/2022 | 96 | OBJECTIONS by Jenny Nunez to Non-dispositive Order No. 92. (gs) (Additional attachment(s) added on 4/1/2022: # 1 Supplement) (gs). (Entered: 04/01/2022) |
| 04/04/2022 | 97 | OBJECTIONS by Fernando Nunez to 92 Order. (ao) (Entered: 04/04/2022) |
| 04/06/2022 | 98 | MOTION for Reconsideration re 93 Order, Set Motion and R&R Dealines/Hearings by Fernando Nunez. (Attachments: # 1 Proposed Order)(gs) (Entered: 04/06/2022) |
| 04/06/2022 | 99 | BRIEF IN SUPPORT re 98 MOTION for Reconsideration re 93 Order, Set Motion and R&R Dealines/Hearings filed by Fernando Nunez.(gs) (Entered: 04/06/2022) |
| 04/06/2022 | 100 | BRIEF IN SUPPORT re 94 MOTION Join Secretary George M. Little as a Deft filed by Fernando Nunez.(ao) (Entered: 04/06/2022) |
| 05/09/2022 | 101 | ORDER denying 98 MOTION for Reconsideration. IT IS HEREBY ORDERED THAT theplaintiff shall file his brief in opposition to the defendants motion for summary judgment (Doc. 77 ), on or before June 6, 2022. The defendants may then file a reply brief on or before June 20, 2022. Signed by Magistrate Judge Martin C. Carlson on May 9, 2022. (kjn) (Entered: 05/09/2022) |
| 05/13/2022 | 102 | ORDER granting 94 Motion to substitute the name of the current Secretary of the Department of Corrections. George Little will be substituted as the nominal defendant with respect to the plaintiffs prayers for prospective and injunctive relief. Signed by Magistrate Judge Martin C. Carlson on May 13, 2022. (kjn) (Entered: 05/13/2022) |
| 06/06/2022 | 103 | NOTICE of Change of Address by Fernando Nunez (pjr) (Entered: 06/06/2022) |
| 06/13/2022 | 104 | MOTION to Modify Scheduling Order to Permit Limiited Discovery by Fernando Nunez. (Attachments: # 1 Exhibit 1, # 2 Proposed Order)(pjr) (Entered: 06/13/2022) |
| 06/13/2022 | 105 | MOTION to file second Amend/Correct 1 Complaint by Fernando Nunez. (Attachments: # 1 Proposed Order, # 2 Proposed Amended Complaint); (3) Exh. 2 First Amended Complaint) (pjr). (Entered: 06/13/2022) |
| 06/13/2022 | 106 | BRIEF IN SUPPORT re 105 MOTION to Amend/Correct 1 Complaint filed by Fernando Nunez.(pjr) (Entered: 06/13/2022) |

JA029

| 06/15/2022 | [107](#) | BRIEF IN SUPPORT re [104](#) MOTION to Modify Scheduling Order to Permit Limiited Discovery filed by Fernando Nunez.(pjr) (Entered: 06/15/2022) |
| 06/27/2022 | [108](#) | ORDER - AND NOW, on this 27th day of June, 2022, IT IS ORDERED THAT:1. Plaintiffs motion for leave to file a second amended complaint, Doc. 105, is DENIED as MOOT.2. Plaintiffs motion to modify the scheduling order, Doc. 104, is DENIED.3. Plaintiff shall reply to Defendants motion for summary judgment, Doc. 77, on or before July 15, 2022. This deadline will not be extended further. If no response is filed by the deadline set forth in this order, the court will address Defendants motion as though Plaintiff has failed to respond. Signed by Honorable Jennifer P. Wilson on 6/27/2022 (ve) (Entered: 06/27/2022) |
| 07/21/2022 | [109](#) | MOTION to Exceed Page Limitation by Fernando Nunez. (Attachments: # [1](#) Proposed Order)(pjr) (Entered: 07/21/2022) |
| 07/21/2022 | [110](#) | Statement of Facts re [77](#) MOTION for Summary Judgment filed by Fernando Nunez. (Attachments: # [1](#) Appendix, # [2](#) Appendix, # [3](#) Appendix)(pjr) (Entered: 07/21/2022) |
| 07/28/2022 | [111](#) | BRIEF IN OPPOSITION re [77](#) MOTION for Summary Judgment filed by Fernando Nunez.(pjr) (Entered: 07/28/2022) |
| 08/08/2022 | [112](#) | ORDER granting [109](#) Motion for Leave to File Excess Pages. IT IS ORDERED THAT Plaintiffs brief in opposition, Doc. 111, is accepted as properly filed in its totality. Signed by Honorable Jennifer P. Wilson on 8/8/2022 (ve) (Entered: 08/08/2022) |
| 09/30/2022 | [113](#) | MEMORANDUM (Order to follow as separate docket entry) re [77](#) MOTION for Summary Judgment filed by George Little, Tabb Bickell. Signed by Honorable Jennifer P. Wilson on 9/30/2022. (ve) (Entered: 10/03/2022) |
| 09/30/2022 | [114](#) | ORDER (Memorandum filed previously as a separate entry) granting [77](#) Motion for Summary Judgment. Judgment is entered in favor of the Defendants and against Plaintiff. The clerk of the court is directed to CLOSE this case. Signed by Honorable Jennifer P. Wilson on 9/30/2022 (ve) (Entered: 10/03/2022) |
| 11/02/2022 | [115](#) | NOTICE OF APPEAL in PRISONER Case as to [114](#) Order on Motion for Summary Judgment, by Fernando Nunez. Filing Fee and Docket Fee NOT PAID. NO IFP WAS FILED. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (pjr) (Entered: 11/02/2022) |
| 11/25/2022 | [117](#) | REQUEST for Copy of Updated Docket Sheet by Fernando Nunez. (Copy of docket sheet sent on 11/25/22) (ga) (Entered: 11/25/2022) |
| 12/08/2022 | [118](#) | MOTION for Leave to Appeal in forma pauperis by Fernando Nunez. (Attachments: # [1](#) Proposed Order)(pjr) (Entered: 12/08/2022) |
| 12/08/2022 | [119](#) | **CERTIFIED** Prisoner Trust Fund Account Statement by Fernando Nunez. (pjr) (Entered: 12/08/2022) |
| 12/12/2022 | [120](#) | ORDER - IT IS ORDERED THAT Plaintiffs motion to proceed in forma pauperis on appeal, Doc. 118, and his certified prisoner trust fund account statement, Doc. 119, are hereby transferred to the Third Circuit Court of Appeals to be associated with Case No. 22-3076. Signed by Honorable Jennifer P. Wilson on 12/12/2022. (ve) (Entered: 12/12/2022) |
| 12/12/2022 | | Supplemental Record on Appeal transmitted to US Court of Appeals re [118](#) MOTION for Leave to Appeal in forma pauperis, [119](#) Prisoner Trust Fund Account Statement. Documents and Docket Sheet available through ECF. The Clerk's Office hereby certifies |

| | | |
|---|---|---|
| | | the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (ve) (Entered: 12/12/2022) |
| 12/15/2022 | 121 | ORDER of USCA as to 115 Notice of Appeal, filed by Fernando Nunez granting motion to proceed in forma pauperis and assessing payments of the filing fees to be pay to the District Court. (Caitlyn) (Entered: 12/15/2022) |
| 12/16/2022 | 122 | MOTION for Leave to Appeal in forma pauperis by Fernando Nunez.(ao) (Entered: 12/16/2022) |
| 12/16/2022 | 123 | AFFIDAVIT in Support re 122 MOTION for Leave to Appeal in forma pauperis filed by Fernando Nunez.(ao) (Entered: 12/16/2022) |
| 12/16/2022 | 124 | CERTIFIED Prisoner Trust Fund Account Statement for Fernando Nunez. (ao) (Entered: 12/16/2022) |
| 12/16/2022 | | Supplemental Record on Appeal transmitted to US Court of Appeals re 124 Prisoner Trust Fund Account Statement, 123 Affidavit in Support of Motion, 122 MOTION for Leave to Appeal in forma pauperis. Documents and Docket Sheet available through ECF. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (ao) (Entered: 12/16/2022) |
| 12/16/2022 | 125 | ORDER of USCA as to 115 Notice of Appeal, filed by Fernando Nunez The Clerk's Order entered December 15, 2022 is amended to correct the District Court in which payments of the filing fees are to be directed. (Caitlyn) (Entered: 12/16/2022) |
| 12/19/2022 | 126 | ORDER - IT IS ORDERED THAT Plaintiffs motions to proceed in forma pauperis on appeal, Docs. 118, 122, are DENIED as moot. Signed by Honorable Jennifer P. Wilson on 12/19/2022 (ve) (Entered: 12/19/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/27/2023 12:07:04 | | |
| **PACER Login:** | AaronKingrwb | **Client Code:** | 097791-90180-20185 |
| **Description:** | Docket Report | **Search Criteria:** | 3:15-cv-01573-JPW-EW |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

# FORM TO BE USED BY A PRISONER IN FILING A CIVIL RIGHTS COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(1)  FERNANDO NUNEZ, JR.  # FM 8959 :

**(Name of Plaintiff)        (Inmate Number)**
1100 Pike Street
Huntingdon, PA 16654

**(Address)**

(2)  Jenny Nunez          N/A :

**(Name of Plaintiff)        (Inmate Number)**
4418 Hurley Street
Philadelphia, PA 19120

**(Address)**

**(Each named party must be numbered,
and all names must be printed or typed)**

          **vs.**

(1)  TOM W. WOLF :

(2)  JOHN E. WETZEL :

(3)  JAMES A. ECKARD :

**(Names of Defendants)**

**(Each named party must be numbered,
and all names must be printed or typed)**

$15-1573$

**(Case Number)**

**CIVIL COMPLAINT**

(4) TABB BICKELL

(5) JANE DOE

**FILED
SCRANTON**

AUG 1 2 2015

PER _____
**DEPUTY CLERK**

TO BE FILED UNDER: __X__ 42 U.S.C. § 1983 - STATE OFFICIALS

_____ 28 U.S.C. § 1331 - FEDERAL OFFICIALS

## I.   PREVIOUS LAWSUITS

A.    If you have filed any other lawsuits in federal court while a prisoner, please list the caption and case number including year, as well as the name of the judicial officer to whom it was assigned:

Fernando Nunez, Jr. Vs. Joseph Glyman, et al. Civil Action No. 2:06-cv-01434. Judicial Officer Assigned Honorable R. Barclay Surrick.

Fernando Nunez, Jr. Vs. Wertz, et al. Civil Action No. 3:14-cv-00727. Judicial officer Assigned District Court Judge Caputo.

JA032

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

In order to proceed in federal court, you must fully exhaust any available administrative remedies as to each ground on which you request action.

A. Is there a prisoner grievance procedure available at your present institution? __x__ Yes _____ No

B. Have you fully exhausted your available administrative remedies regarding each of your present claims? __x__ Yes _____ No

C. If your answer to "B" is Yes:

    1. What steps did you take? _Filed a first step grievance, second step appeal to my facility Manager, and final step appeal to central office._

    2. What was the result? _They denied my grievance and appeals on the merits. Resting on Policies as justification to infringe on my civil rights._

D. If your answer to "B" is No, explain why not: _____ N/A _____

## III. DEFENDANTS

(1) Name of first defendant: _Tom W. Wolf_

    Employed as _Governor_ at _Pennsylvania_
    Mailing address: _255 Main Capitol Bldg, Harrisburg, PA 17120_

(2) Name of second defendant: _John E. Wetzel_
    Employed as _Secretary of the DOC_ at _The Department of Corrections in Pennsylvania_
    Mailing address: _1920 Technology Parkway, Mechanicsburg, PA 17050_

(3) Name of third defendant: _Tabb Bickell_
    Employed as _Regional Secretary of DOC_ at _The Department of Corrections in Pennsylvania_
    Mailing address: _1920 Technology Parkway, Mechanicsburg, PA 17050_
    (List any additional defendants, their employment, and addresses on extra sheets if necessary)

## IV. STATEMENT OF CLAIM

(State here as briefly as possible the facts of your case. Describe how each defendant is involved, including dates and places. Do not give any legal arguments or cite any cases or statutes. Attach no more than three extra sheets if necessary.)

1. This case presents the question of whether all of the above captioned defendants are justified in denying the Plaintiffs Mr & Mrs. Nunez, conjugal/family visits to consummate their marriage and engage in private intimate association with one another consistent with their Islamic beliefs and fundamental substantive equal protection rights. Collectively, the plaintiffs in this civil action avers each defendant, while acting under color of state law, in their individual or official capacity, are implementing and/or are enforcing procedures and policies of the Pennsylvania Department of Corrections in an arbitrary unconstitutional manner in such a way as to constitute an unjustified government

2

JA033

Continuation of Page 2.

(4) Name of fourth defendant: James A. Eckard
Employed as Facility Manager at the State Correctional Institution,(SCI), of Huntingdon
Mailing Address: 1100 Pike Street, Huntingdon, Pennsylvania 16654-1112

(5) Name of fifth defendant: Jane Doe, (C.O. A. Duvall)
Employed as a Correctional Officer at SCI-Huntingdon
1100 Pike Street, Huntingdon, Pennsylvania 16654-1112

JA034

intrusion, when applied and enforced against lawfully married couples.

2. Specifically, Defendant Wolf, has failed to intervene and has allowed Defendant Wetzel, to exercise his discretion to implement policies to govern all state institutions within the Department of Corrections, (DOC). Policies which are often left vague and left to the discretion of individual Facilty Managers to interpret by way of Facility Rules & Procedures. The plaintiffs in this civil action aver the DOC's policies DC-ADM 821 (Governing Inmate Marriages), DC-ADM 812 (Governing Inmate Visits) & DC-ADM 818 (Governing Inmate Telephone systems), places a substantial burden on Plaintiff Nunez RLUIPA rights and constitute an impermissible government intrusion on their marital private intimate association with one another in such a way as to result in a loss of consortium with one another. In violation of their fundemental rights.

3. To be clear, Plaintiffs are Muslims of the Islamic faith and were permitted to marry one another on August 13, 2013. However, as a direct & proximate result of policies DC-ADM 821 & DC-ADM 812, plaintiffs were not permitted to consummate their marriage by way of prayer and sexual intimacy in violation of their religious beliefs. What is more, when Plaintiff Mrs.Nunez, visits her lawful spouse, Plaintiff Mr.Nunez, they are not allowed to kiss, embrace, hold hands, congregate in prayer in private. Nor are they permitted to engage in sexual intercourse with another. In fact, DOC policy DC-ADM 812, prohibits excessive touching & Kissing beyond what is allowed when visitors arrive & depart. Thus, any intimate act between the plaintiffs are considered "Excessive" & grounds to terminate and suspend their visits. In addition, to landing Plaintiff in solitary confinement for a maximum period of (90) days. Thus, the

( Continued at part 2 of PAGE 3 )

V.  **RELIEF**

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

1. To Consummate my marriage with my lawful   spouse in a manner consistent with our Islamic beliefs.

Be intimate with my lawful spouse in private in a manner consistent with our Islamic beliefs. To Congregate in prayer with my lawful spouse in private in a manner consistent with our Islamic beliefs. To be allowed to virtually visit with my legal spouse through the use of tablets and/or T.V. screen.

To be allowed to talk to my legal spouse via wireless phone through the use of "Inspire Tablets".

2. Grant injunctive, declaratory, punitive, nominal, monetary and compensative relief for pain & suffering, with regard to all Federal Constitutional and/or statutory violations. In addition to all State related tort violations cognizable under common law.

Pay plaintiffs reimbursement for the cost of this Civil action along with attorney fees that may be associated with the cost of pursuing this civil rights action.

3. Appoint a "Class Action" attorney to pursue this Civil Rights Action on behalf of the plaintiffs and any other plaintiffs that may be grieved by the defendants "state wide" Department Policies at issue.

3

JA035

Continuation of Page 3

are compelled to alienate one another and practice "Celibacy" in violation of their Islamic beliefs & fundamental substantive rights. As a direct & proximate result, Plaintiffs are left to suffer from psychological injuries. Such as severe depression & anxiety because they are unable to consort with another consistent with their Islamic beliefs. Unable to forefill their marital duties to one another Plaintiffs are often left to contemplate divorce.

To be clear, outside of the visiting contex, Plaintiffs way of communicating with one another is severely curtailed. Defendants Wetzel, Bickell & Eckard have denied plaintiff Mr.Nunez, equal access to its virtual visitation program or transfer him to an institution were such a program is available. Said defendants know Plaintiff Mr.Nunez, expressed a religious need to participate in such a program and further knows to deny him equal access to its virtual visitation program violates his equal protection rights and undermines his right to private intimate association with his family. Thereby placing a substantial burden on his RLUIPA rights. All of which, in turn, unlawfully intrudes on Plaintiff Mrs.Nunez, right to intimate association with her husband. Amounting to loss of consortium. The same holds true, with regard to Plaintiff Mr.Nunez, use of his housing unit phone. Per DOC policy DC-ADM 818, and Huntingdon's institutional Rule & Procedures, Plaintiffs are allotted only (30) minutes to communicate with one another via telephone given the high demand for inmate use of housing unit phones. Plaintiffs contends that the limited use of the phone to communicate with one another violates their fundamental rights to intimate association with one another & places a substantial burden on Plaintiff Mr.Nunez religious beliefs. All the defendants know or reasonably should know that such rights are being violated & knows that such a violation could be remedied by allowing Plaintiff Mr. Nunez to purchase a global tel link "Inspire Tablet" which has wireless phone capabilities that permit him to use said tablet within the confine of his cell.

Part 2 of PAGE 3.

JA036

I declare under penalty of perjury that the foregoing is true and correct.

Signed this _____9th_____ day of _____August_____, 20 _15_.

_____
(Signature of Plaintiff)

Date: August 4, 2015

Jenny E. Núñez

4

JA037

Fernando Nunez
# FM 8959
1100 Pike Street
Huntingdon, PA 16654-1112

No Fee Enclosed

RECEIVED
SCRANTON

AUG 12 2015

PER _____ DEPUTY CLERK

Office of The
United States Di
Middle Distric
William J. Neale
235 North Was
P.O. Box
Scranton, PA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ, JR.,

    Plaintiff,

    v.

TOM W. WOLF, *et al.*,

    Defendants.

NO. 3:15-CV-1573

(JUDGE CAPUTO)

## ORDER

**NOW**, this ___16th___ day of October, 2018, **IT IS HEREBY ORDERED** that:

(1)   Plaintiff's Motion for Leave to Proceed *In Forma Pauperis* (Doc. 4) is construed as a motion to proceed without full prepayment of fees and costs, and is **GRANTED**.

(2)   The United States Marshal is directed to serve Plaintiff's Complaint (Doc. 1) on the named Defendants.

(3)   The Motion for Leave to Proceed *In Forma Pauperis* (Doc. 9) filed by Jenny Nunez is **DENIED as moot** based on her notice of intention to withdraw from the action.

(4)   The Motion to Order Service by the United States Marshal (Doc. 14) is **DENIED as moot**.

A. Richard Caputo
United States District Judge

JA039

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FERNANDO NUÑEZ JR., | : | CIVIL ACTION |
| Plaintiff | | No. 3:15-cv-01573 |
| | : | |
| Vs. | : | ( Honorable A. Richard Caputo ) |
| | : | |
| TOM W. WOLF, | : | |
| JOHN E. WETZEL, | : | FIRST AMENDED COMPLAINT |
| TABB BICKELL, et al., | | |
| Defendants. | : | |

RECEIVED
SCRANTON

APR 0 9 2018

PER _____ DEPUTY CLERK

AMENDED COMPLAINT

## I. Introduction

Fernando Nuñez Jr.,("Plaintiff"), pursues this civil action acting pro se pursuant to 42 U.S.C. §1983, seeking declarative and permanent injunctive relief asserting that several state wide policies and/or regulations of the Pennsylvania Department of Corrections ("Department") implemented and enforced by the named Defendants' in this action places a substantial burden on his religious practices and beliefs as a Muslim. In violation of the Religious Land Use Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §2000cc-1(a).

## II. Jurisdiction

1. This Court has original jurisdiction over this federal civil action pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue properly lies with this Court pursuant to 28 U.S.C. §1391 (b), because the events giving rise to these causes of actions occurred in Huntingdon County, Pennsylvania, which is located within this judicial district pursuant to 28 U.S.C. §118 (b).

1

JA040

## III. Parties

3. Plaintiff at all times relevant to this civil action was housed at the State Correctional Institutions at Huntingdon ("SCI Huntingdon") as a state prisoner within the Department, under identification number FM-8959.

4. Tom W. Wolf (hereinafter "Defendant Wolf") at all times relevant to this civil action was acting under color of state law as the Governor of Pennsylvania. He is being sued in his Official capacity for declaratory and permanent injunctive relief.

5. John E. Wetzel (hereinafter "Defendant Wetzel") at all times relevant to this civil action was acting under color of state law as the Secretary of the Department. He is being sued in his Official capacity for declaratory and permanent injunctive relief.

6. Tabb Bickell (hereinafter "Defendant Bickell") at all times relevant to this civil action was acting under color of state law as the Regional Secretary of the Department. He is being sued in his Official capacity for declaratory and permanent injunctive relief.

## IV. Factual Allegations Common To All Counts

7. Plaintiff is a devout Muslim and has endeavored to live by the principles of his faith since converting to Islam in 2003.

8. Plaintiff lawfully married, Jenny E. Nunez, on August 13, 2013, while incarcerated at SCI Rockview.

9. Notwithstanding Plaintiff's ability to lawfully marry his spouse, Department policies' DC-ADM 812 (Governing Inmate Visiting Priviliges), and DC-ADM 821 (Governing Inmate Marriages), prohibit him from consummating his marriage in a manner consistent with his religious beliefs and practices.

2

10. In order to consummate one's marriage as a Muslim, Plaintiff sincerely believes he must, inter alia : (1) lead a congregational prayer[1] with his spouse, and (2) only after their prayer, can he approach her intimately, in private, following their wedding ceremony.

11. Intimacy with one's spouse as defined and understood in Islam is broad. It covers **all** forms of intimacy. Such as: **light talk, love expressions, touching, caressing, kissing, fondling,** and **sexual intercourse.**

12. It is taught and understood in Islam that any form of intimacy between a husband and wife, are to take place privately, behind closed doors, away from small children and other adults.

13. Once married, it is the Sunnah[2] ("way") of Prophet Muhammad, to spend three consecutive nights with his spouse following one's wedding day.

14. When the allotted three days expire, it is the Sunnah ("way") of Prophet Muhammad, to spend atleast one night with his spouse after that - every three days. Longer days apart, however, is permitted only if both spouses understand that their time apart is temporary and not intentional, and they have exhausted all other approaches to be intimate with one another.

15. In Janaury of 2015, Plaintiff submitted three religious accommodation request ("RAR") forms in accordance with the Department's religious activities, DC-ADM 819, policy. Seeking : (1) **Conjugal Visits with his spouse** ; (2) **to offer Congregational Prayers in private** with his family during contact vists, and ; (3) to be ritually **circumcised.**

---

1. In Islam, a valid "congregational prayer" consists of two or more Muslims gathering to pray.

2. The Sunnah as defined and understood in the Islamic religion is: The legal way or ways, orders, acts of worship and statements of Prophet Muhammad, that have become models to be followed by the Muslims.

3

JA042

16. On April 16, 2015, Defendant Bickell denied all three RAR's simultaneously. A copy of that decision was forwarded to, inter alia, Defendant Wetzel.

17. On March 4, 2015, Plaintiff submitted a RAR to purchase an electric razor so that he can trim his mustache, arm pit and pubic hair, consistent with his religious beliefs and practice as a Muslim. Asserting that the standard razors sold on commissary irritates his skin. Causing painful razor bumps.

18. Sometime in the spring of 2015, Plaintiff submitted a RAR for virtual visits.

19. On June 8, 2015, both of Plaintiff's RAR's noted in ¶¶ 17-18, were denied by Defendant Bickell. A copy of that decision was forwarded to, inter alia, Defendant Wetzel.

20. On August 3, 2015, Plaintiff and his spouse forwarded their "Notice of Intent to File Civil Action" to Defendant Wolf. Urging him to intervene to stop Defendant Wetzel and his subordinates from implementing and enforcing arbitrary policies against lawfully married inmates because those policies violate, inter alia, Plaintiff's statutory rights under RLUIPA.

## V. Causes Of Actions

### C O U N T   1

### C O N J U G A L   V I S I T S -   R L U I P A

21. Plaintiff incorporates by reference herein ¶¶ 3-16, and ¶ 20, of this Amended Complaint in support of this cause of action.

22. Defendant Bickell gave a vague conclusory response when denying Plaintiff's RAR for conjugal visits with his spouse and, thus, failed to conduct an individualized assessment as to how Plaintiff's RAR would, in fact, jeopardize the security, health, and safety of the Department.

4

JA043

23. As the official policy maker, Defendant Wetzel, categorically prohibits conjugal visits for lawfully married inmates, as a matter of policy, ● in absence, of an individualized assessment of an inmate's religious beliefs and practices under RLUIPA.

24. The vague conclusory decision by Defendant Bickell to deny Plaintiff's RAR for conjugal visits was a categorical one because Department policies do not allow conjugal visits.

25. Defendants' Wetzel and Bickell's categorical prohibition on conjugal visits and their vague conclusory statements to deny conjugal vists rests on exaggerated concerns.

26. Defendants Wetzel and Bickell, did not explore or consider other alternative means that are least restrictive, before categorically prohibiting private conjugal visits between the Plaintiff and his lawful spouse.

27. In his grievance (#564319), Plaintiff urged the Defendants' Wetzel and Bickell, to consider how state prisons - in other jurisdictions like New York and Washington - balance Security, healthm and safety concerns in their family/conjugal visit programs, so as to encourage them to implement them in Pennsylvania state prisons. But they failed to do so.

28. When the Plaintiff and his spouse encouraged Defendant Wolf to intervene, and do the same, he too did nothing.

29. Defendants' Wetzel and Bickell, has not explained how Plaintiff poses a security risk specifically. As RLUIPA requires them to do.

30. To the extent the Departments' rests on the exaggerated concern of smuggling drugs and other contraband via visits, in support of their Security concerns, body scanners can be put in place, at a particular facility in which the designated conjugal visit can properly be held.

JA044

31. Plaintiff doesn't have a criminal record for domestic violence, and has <u>never</u> acted violently towards his spouse. Any security concerns in that regard, can be monitored by requiring all conjugal visits to held in a secured area on prison grounds. Like any other contact visit.

31. Defendant Wetzel, Bickell, and Wolf, can implement a "screening process" for conjugal visits, solely in regards to lawfully married inmates, as a security measure. Similar to California, New York, and Washington.

33. With regard to the Defendants' medical concerns (i.e, the spread of (communicable diseases) policies and procedures can be implemented as part of the family/conjugal visit program "screening process" <u>before</u> an inmate and spouse can be granted such a visit. Like states in New York and Washington, require.

34. Once an inmate and spouse undergoes a medical "screening process" those results can be considered as to whether ■■ a particular inmate or spouse should be granted a family/conjugal visit.

35. In any event, Plaintiff has no communicable disease to spread to inmates or staff. He's clean as a whistle.

36. Plaintiff request for weekend conjugal visits (Saturday and Sunday) twice a month is both reasonable and consistent with Plaintiff's religious beliefs and practices, and family/conjugal visit policies in New York and Washington.

37. Defendants Wetzel, Bickell, and Wolf's, current marriage and visiting policies or regulations, implemented and enforced state wide, places a substantial burden on Plaintiff's religious exercise and beliefs in such ways as to severally impair his ability to maintain an intimate, emotional, and spiritual bond with his wife in private.

6

JA045

38. Plaintiff sincerely believes sexual intimacy is necessary to consummate one's marriage in Islam because it is a means of fulfilling many goals not only lust.

39. The sincere intention of being intimate with one's spouse is a noble act of obedience to Allah which one acquires good deeds.

40. The intimate act itself protects oneself and one's spouse from falling into sin by directing their lust towards prohibited outlets such as **masturbation**, **homosexuality**, and **Zina** (i.e., **adultery** and **fornication**).

41. Plaintiff sincerely believes, once married in Islam, spouses have religious based rights upon one another ordained by Allah, that must be fulfilled in a serious and fair manner.

42. Fulfilling one's spousal rights in Islam is an indication of revering Allah and fearing his punishment. Neglecting those rights constitutes a clear act of disobedience that threatens the well-being of the sacred marital bond.

43. Plaintiff sincerely believes his spouse has a religious based right over him for, inter alia, **protection, safeguarding her secrets, kind treatment, entertaining her, fairness, company** and **intimacy.**

44. Protection as defined and understood in Islam is a **general** term that covers physical, emotional, and other forms of well-being. It is an obligation upon the Plaintiff to strive to protect his spouse in all those respects.

45. Plaintiff sincerely believes exposing his spouse's secrets is an indication of being a **dayyuth** Muslim (i.e. **a person who has no sense of protection or honor regarding his wife).** Especially, in matters of privacy that no person would normally know, except the husband. Such as physical or emotional anomalies, reaction to some intimate act and so on.

7

46. Kind treatment is not an optional favor from the Plaintiff. It is an obligation established through a divine command from Allah. Rendering kindness to his spouse is a sign of good nature and righteousness.

47. Entertaining his spouse, by being playful with her and doing lawful things with her that bring joy to her heart, is an obligation upon the Plaintiff.

48. Plaintiff has an obligation to treat his spouse and family with fairness and justice. A failure to do so is an indication of his failure in leading his family.

49. Plaintiff's spouse has a religious based right upon him for emotional and physical gratification. It is not permissible for him to neglect his spouse in such a way as to place her in a suspended state. Not enjoying any of his love and affection.

50. As a direct and proximate result of the Pennsylvania's Administrative Code and/or regulation, governing inmate visitation priviliges, Plaintiff is prohibited from having a private visit with his spouse because all contact visits are required to be under official supervision. See **37 Pa.Code §93.3 (h)(6)**.

51. Similarly, the Departments marriage and visiting policies prohibit private visits.

52. While in general population, Plaintiff's spouse travels a minimum of seven (7) hours just to visit the Plaintiff for a so called "contact" visit. That in reality is severely limited, and not the type of physical contact Plaintiff's religious beliefs permit.

53. Contact visits are conducted in open dormitory like atmosphere.

8

JA047

54. Its open dormitory visiting area is far from relaxed. Its often loud and over-crowded. Even oppressive.

55. Plaintiff and his spouse are forced to sit in close proximity to other inmates and their visitors.

56. Any light intimate talk between the Plaintiff and his spouse, can be heard by children and other adults because the Plaintiff and his spouse are prohibited from whispering in eachothers ear.

57. The only form of physical affection Plaintiff and his spouse are afforded is a brief kiss and embrace upon meeting and departing. In the presence of children and adults.

58. Plaintiff and his spouse cannot even show one another the smallest form of physical intimacy. Like holding hands because the Defendants' visiting policy prohibits such an intimate act under threat of terminating their visit and issuing Plaintiff a disciplinary misconduct.

59. Because the Plaintiff is prohibited from engaging in intimate acts with his spouse, in private, his spouse is left to feel unloved, alienated, and neglected.

60. At bottom, the Defendants' policies and administrative code regulations "as applied" to the Plaintiff, prohibits him and his lawful spouse from enjoying the full virtues of marriage. Placing a substantial burden on Plaintiff's religious beliefs and practice, because he cannot engage in acts of intimacy with his lawful spouse, in private, in a manner his religion obligates him too.

61. Plaintiff, in essence, is compelled to modify his religious beliefs by neglecting his religious duties and obligations in such a way as to sin and disobey Allah and Prophet Muhammad's Sunnah by engaging in act of "Celibacy".

9

62. Defendants' Wolf, Wetzel, and Bickell cannot justify categorically prohibiting family/conjugal visits to Plaintiff because they have not met their statutory burden under RLUIPA, demonstrating how he poses a risk to their institutions health, safety, and security.

63. As a direct and proximate result of the aforementioned administrative code regulations and Department polices, all of the named Defendants' have substantially burdened Plaintiff's religious beliefs and practices under RLUIPA when implementing and enforcing the foregoing, without exception. Although, knowing the challenged regulations and policies "as applied" violated RLUIPA.

### C O U N T   2

### CONGREGATIONAL PRAYERS – R L U I P A

64. Plaintiff incorporates by reference herein ¶¶ 7-10 and ¶¶ 15-16, of this amended complaint in support of this cause of action.

65. Plaintiff sincerely believes that congregating in prayer is obligatory upon all Muslim men and must be offered five times a day at specified times throughout the day.

66. It is a sin for the Plaintiff to forego the congregational prayer and that sin will condemn him to the hellfire.

67. Plaintiff's religious beliefs require him to pray in a manner consistent with the pillars of the prayer. Which are fourteen:

    (1) standing ; (2) the opening takbeer ; (3) recititing surah Al-Fatihah ; (4) bowing ; (5) rising from bowing ; (6) prostrating on all seven limbs ; (7) erecting oneself from it ; (8) sitting between the two prostrations ; (9) remaining tranquil (i.e, not rushing) during all of the pillars ; (10) maintaining the sequential order ; (11) the final tashahhud ; (12) sitting for it ; (13) sending salaat on the Prophet, and ; (14) the final two tasleems.

JA049

68. As the official policy maker of the Department Defendant Wetzel is directly involved in this action since he has implemented a state-wide policy that prohibits Plaintiff and his visitors from congregating in prayer during contact visits in a manner consistent with Plaintiff's religious beliefs.

69. Defendant Bickell is directly involved in this action because he denied Plaintiff's RAR solely on the basis of a **"safety concern"** claiming, allowing Plaintiff and his family to congregate in prayer would **"pose a major distraction to families of other inmates meeting their loved ones"**.

70. Defendant Bickell further asserted that **"the institution cannot provide every inmate with private visiting room for congregational prayers with family"** but he fails to assert a compelling governmental interest explaining why.

71. If lack of space is t he issue, Defendants' Wetzel and Bickell can allocate funds for that specific purpose. So as to construct and designate an area for prayer for all inmates and their vistors in a manner Plaintiff requests so that no ones religious beliefs would be substantially burdened.

72. Defendants' Wetzel and Bickell has not considered constructing a designated area for prayer in each facility visiting room to allow the Plaintiff and his visitors to congregate in prayer. Away from other inmates and their visitors, albeit, they have constructed or designated common play areas for children in every state facility throughout the Department to accommodate visiting children.

73. In his grievance (# 562984) Plaintiff proposed to congregate in prayer with his visitors in a secured area of the visiting room where non-contact or legal visits are held when those rooms are unoccupied and available as an easy available alternative.

11

JA050

74. An official visiting room ("OVR") or non-contact visiting room ("NCVR") can be designated as a prayer area in each state facility simply by removing the glass partition or desk and placing a video camera in the room to officially monitor the area.

75. Throughout the grievance appeal process administrative officials simply relied on policy when rejecting Plaintiff's suggested proposal because they felt it was "[n]ot feasible to provide other alternatives or to modify policy".

76. Because Defendants Wetzel and Bickell have continued to substantially burden Plaintiff's religious practice by denying his RAR without considering other available alternatives (as suggested by Plaintiff) they have violated RLUIPA.

77. Defendants' visiting and marriage policies, implemented and enforced state wide places a substantial burden on Plaintiff's religious beliefs and violates RLUIPA. Plaintiff is compelled to modify his religious practice by foregoing or delaying the congregational prayers with his visitors during its specified times. Interfering with his spiritual growth, marital duties, and relationship with his creator. Causing him to sin and condemn his soul to the hellfire.

## C O U N T   3

## E L E C T R I C   R A Z O R   -   R L U I P A

78. Plaintiff incorporates by reference herein ¶¶ 7, 17, and, 19, of this amended complaint in support of this cause of action.

79. Plaintiff sincerely believes trimming his mustache, arm pit and pubic hairs - every three days - is an ordained sunnah of his faith and is an act of beautification and cleanliness called "Fitra".

12

JA051

80. When Plaintiff submitted his RAR he cited the religious proofs in support of religious practice and asserted that the standard razor sold by the Department at commissary causes his genital area to break out in a skin rash and leaves him ingrown hairs that is both painful and sensitive to touch.

81. Plaintiff has been compelled to abandon a sacred religious practice (i.e, **fitra**), because the adverse side effects to using the standard razor sold by the Department causes him pain and distracts him from concentrating while in prayer.

82. As the official policy maker of the Department, Defendant Wetzel is directly involved in this action, since he implemented a state wide policy categorically prohibiting inmates from purchasing an electric razor for religious reasons; but permits the purchase of an electric razor by inmates who suffer from a medical condition. See Exhibit "1" ( **Access to Health Care Procedures Manual Policy, 13.2.1.,Section 10.E.1-8** ).

83. Defendant Bickell is directly involved in this action because he denied Plaintiff's RAR without citing a compelling governmental interest. He only asserted "**The least restrictive way for the inmate to shave private areas as he understands his faith to mandate, is to use a DOC - issued razor...[t]here is no safe accommodation that the Department can offer to meet the inmate's religious request**". See Exhibit "2" (RAR Denial For Electric Razor).

84. Defendant Bickell's asserted reasoning in ¶ 83, is unavailing because he has not asserted a compelling interest to deny Plaintiff's RAR and has not adequately explained the substantial underinclusiveness of its health care policy that permits inmates with medical conditions to purchase an electric razor but denies inmates that same privilige for religious reasons.

13

JA052

85. Because Defendants' Wetzel and Bickell cannot reconcile why the Department prohibits inmates from purchasing an electric razor for religious reasons, but they do permit inmates with a medical condition from ~~purchasing~~ one, they cannot reasonably claim there is no other alternative to accommodate Plaintiff's religious practice.

86. Plaintiff claims the DOC issued razor is the direct and proximate cause that compells him to forego a sacred religious practice of fitra. Yet and still the Defendants' have continued to substantially burden his religious exercise by adopting a "so what" approach in violation of RLUIPA.

87. Furthermore, the Defendants' fail to recognize that Plaintiff also seeks an electric razor to "trim" his mustache. Which he cannot do with the standard razor.

88. Defendants' Wetzel and Bickell cannot continue to enforce the foregoing policy in such a way as to categorically deny the purchase of an electric razor for inmates like Plaintiff who has a religious need for one. To do so places a substantial burden on Plaintiff's religious beliefs in violation of RLUIPA.

## C O U N T  4

### C I R C U M C I S I O N  -  R L U I P A

89. Plaintiff incorporates by reference herein ¶¶ 3, 5-7, and ¶¶ 15-16, of the amended complaint in support of this cause of action.

90. Plaintiff sincerely believes there are five mandatory characteristics of **fitrah** that all Muslims must practice: (1) **circumcision** ; (2) **shaving the pubic hair** ; (3) **trimming the mustache** ; (4) **clipping the nails**, and ; (5) **plucking the arm-pit hair**.

14

JA053

91. Plaintiff has learned and sincerely believes that anyone who converts to the religion of Islam is commanded to get circumcised as early as possible because it is one of the clear and apparent practices that distinguishes Muslims' from non-muslims.

92. Circumcision is a means of completing and perfecting the fitrah upon which Allah created all people. It is done by command from Allah and guidance from his messengers.

93. Circumcision, thus, establishes a way of conforming with Allah's legislations, even in the private genital area, which is the most personal part of a human's body. It shows submission to Allah's command and willingness to live by his laws apparently and secretly.

94. Plaintiff has learned and sincerly believes circumcision is an important hygienic method of maintaining the cleaniness of his genitals by eliminating an important hideout for filth and germs.

95. Plaintiff converted to Islam uncircumcised, and lives in constant fear that his prayers and other acts of worship will not be accepted because he has difficulty in removing urine from underneath his foreskin to his penis.

96. Circumcision is a minor surgery that removes the foreskin, resulting in complete exposure of the glans to one's penis. This surgery includes:

  a). Cutting around the frenar band and removing the foreskin ;
  b). Splitting the fremum and pushing it back until the crown of flesh is fully uncovered ;
  c). Drawing the blood out of the wound and surrounding areas, and ;
  d). Putting ointment, bandages, and gauze pads to help stop the bleeding and heal the would properly.

15

JA054

97. As the official policy maker of the Department, Defendant Wetzel is directly involved in this action since he implemented and enforces a state wide policy categorically prohibiting circumcision surgery for religious reasons.

98. Defendant Bickell is directly involved in this action because he denied Plaintiff RAR. Reasoning:

> [c]ircumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood - letting rituals for any religious rite pose ██████ ████ great medical and liability risks which the DOC is not willing to assume".

99. In his grievance (#564054) Plaintiff asserted his RAR for circumcision surgery, albeit, not medically necessary, was religiously based and necessary since he converted to the Islamic faith.

100. Simply because Defendants Wetzel and Bickell considers religious based circumcision surgery as "elective surgery" under Department policy, 13.2.1., is irrelevant and not dispositive to Plaintiff's RAR under RLUIPA.

101. To the extent Defendants Wetzel and Bickell believes it would be unreasonable to incur the costs of Plaintiff's circumcision surgery, that notion cannot be used to deny Plaintiff's RAR under RLUIPA. See 42 U.S.C. §2000cc-3(c).

102. Moreover, Defendants' Wetzel and Bickell, cannot deny Plaintiff's RAR on the assumption that the Department would have to incur the costs of surgery for "all inmates" because RLUIPA requires the Defendants' to conduct an more focused inquiry on Plaintiff's own RAR. Not other inmates.

16

JA055

103. Defendant Wetzel and Bickell's financial concerns are exaggerated and not factually based because they only assume they will incur an enormous financial expense if Plaintiff's RAR is granted, in absence of any fact based evidence in that regard.

104. Plaintiff has indicated throughout his grievance appeals that he will sign a valid "informed consent waiver" consistent with state law and assume any medical or liability risks that may or may not occur after his circumcision surgery. Thereby, alleviating the Department from any liability as a result of granting his RAR.

105. Defendant Wetzel's state wide policy cannot be continued to be enforced by Defendant Bickell or other subordinate Department employees to categorically deny Plaintiff a religious based surgery, because the foregoing policy places a substantial burden on Plaintiff's religious beliefs in violation of RLUIPA.

## IV. Prayer For Relief

106. Based on the foregoing, Plaintiff requests the following relief:

a). Grant a jury trial on all causes of actions so triable ;

b). A declaratory judgement that the Administrative Code regulation and Department policies at issue "as applied" to the Plaintiff when enforced by the Defendants' and their subordinates places a substantial burden on Plaintiff's religious beliefs in violation of RLUIPA ;

c). Grant a permanent injunction enjoining the Defendants, its employees and all persons acting in concert or participation with it, from enforcing the Administrative Code regulation and Department policies at issue, so as to not continue to substantially burden the Plaintiff's religious beliefs ;

d). Order the Defendants in this action to implement a family/conjugal visit program, and execute policies and practices which serve to accommodate Plaintiff's religious beliefs ;

e). Award Plaintiff attorney fees and costs pursuant to 42 U.S.C. §1988(b) ;

f). Award any other relief this Court deems just and fair.

JA056

Date: January 2, 2019

/s/ _Fernando Nunez_
Fernando Nunez Jr
I.D.# FM-8959
1600 Walters Mill Rd.
Somerset, PA 15510

18

JA057

EXHIBIT "1"

E. Procedures for Electric Razors

1. If an inmate requests an electric razor, the inmate must sign up for sick call. The *prescribing practitioner will* discuss the matter with the inmate and document the examination of the inmate on the DC-472 in the inmate's medical record.

2. After completing the examination regarding the electric razor, the *prescribing practitioner* will inform the CHCA of the inmate's request for the electric razor. The CHCA will forward the *prescribing practitioner's* documentation of the examination, as well as a rationale for the medical necessity for the use of an electric razor to the Chief of Clinical Services, BHCS at Central Office.

3. The Chief of Clinical Services, BHCS will review the request and approve or disapprove the request. The Chief of Clinical Services, BHCS will inform the CHCA of his/her decision. The CHCA will ensure that the *prescribing practitioner* is informed of the decision.

4. The *prescribing practitioner* who examined the inmate requesting the electric razor will ensure the following:

   a. that the inmate is informed of the decision regarding his/her request for the electric razor; and

   b. that the encounter with the inmate regarding the electric razor and the decision is recorded on the DC-472 in the inmate's medical record.

5. *The CHCA/designee will ensure that the Inmate Status automated application on DOCNet is updated as required.*

6. The vendor will be responsible for providing the electric razor to the inmate.

7. The Unit Manager will ensure that all three shifts of Corrections Officers working the block/housing unit are made aware and kept informed of any changes regarding the possession of electric razors or other special item(s) permitted to be retained by an inmate.

8. After receiving the electric razor, the inmate will ensure that his/her property inventory is updated accordingly. The Unit Manager will ensure that the razor is engraved with the inmate's full name and Department number.

F. Discontinuance or Change in Status Regarding Electric Razors

1. The Medical Department will review an order for the use of an electric razor quarterly. The *prescribing practitioner* will document the results of the review on the DC-472 in the inmate's medical record.

Issued: 9/26/2011
Effective: 10/1/2011

JA059

---

2. If the inmate's condition changes and the electric razor is no longer medically necessary, the *prescribing practitioner* will document the change on the DC-472 in the inmate's medical record *and notify the CHCA.*

3. *The CHCA/designee will ensure that the Inmate Status automated application on DOCNet I updated as required.*

4. The CHCA will inform the Unit Manager as to the change regarding the inmate's use of the electric razor.

G. Procedures for Pressure Relief Mattresses

1. *Pressure relief* mattresses will only be provided upon prescription by a physician for the following reasons:

   a. alleviation and/or prevention of pressure *ulcers* on inmate patients whose condition requires confinement to bed for prolonged periods of time;

   b. any other reason or circumstances as documented by a physician on the DC-472 in the inmate's medical record;

   c. *the CHCA/designee will ensure that the Inmate Status automated application on DOCNet is updated as required.*

2. The use of this equipment will be restricted solely to the infirmary inpatient care area or to a Long Term Medical Care Unit.

3. Because this item cannot be effectively disinfected, its use will be confined to a single patient and discarded when the patient no longer requires it, or if it becomes deteriorated and/or contaminated.

Issued: 9/26/2011
Effective: 10/1/2011

Case 3:15-cv-00967-S-BN Document 26 Filed Date Filed: 04/07/2006 23

EXHIBIT "2"



**pennsylvania**
DEPARTMENT OF CORRECTIONS

TO:      Tabb Bickell,
           Regional Deputy Secretary

FROM:   Shawn Kephart, Director

DATE:    June 8, 2015

RE:      Religious Accommodation Request Response
           <u>**Fernando Nunez Jr., FM-8959 – HUN**</u>

<u>**Religion**</u>
Muslim (MUS)

<u>**Accommodation Requested**</u>
For HUN to implement a "Virtual Visitation Program" or alternatively, to be transferred to DAL or MAH as they have such program and to be allowed to purchase an electric shaver to remove hair from armpit and pubic hair in a manner consistent with Islamic beliefs.

<u>**Recommendation**</u>
The requests for a virtual visitation program and to be moved to another institution are outside the purview of a request for a religious accommodation and thus are not addressed in this response. Inmate may ask institutional personnel to whom these requests can be made known. The least restrictive way for the inmate to shave private areas as he understands his faith to mandate, is to use a DOC-issued razor. If the inmate has a bona fide skin condition, verified by the medical department, that prevents him from using such a razor/trimmer, the request is referred to medical to see if there is a medical basis for him to use an electric razor in accordance with medical policy to trim his private areas. If there is not, then there is no safe accommodation that the Department can offer to meet the inmate's religious request.

<u>6 / 8</u> /2015                   ✓ Concur with recommendation
DATE         Reg. Deputy Secretary's Signature   ___Do not concur with
                                               recommendation

<u>6 / 12</u> /2015  Date BTS Staff informed institution of final decision.      DL
DATE                                                BTS Initials

<u>06 / 22</u> /2015  Date FCPD sent inmate copy of this memo.
DATE                                              FCPD Initials

cc:    Secretary John E. Wetzel           Rev. Ulrich Klemm, BTS
        Superintendent Eckard, HUN      Debra Rand, Legal Dept.
        Rev. Darrell Wireman, FCPD, HUN  Rel. Accommodation File
        Inmate

JA061  Rec'd 2-4-15

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the Plaintiff's "Amended Complaint" was filed and served via first-class mail, postage prepaid upon the following persons and address noted below:

Office of the Clerk
United States District Court
Middle District of Pennsylvania
235 North Washington Avenue
P.O. Box 1148
Scranton, PA 18501-1148

Debre Sue Rand, Esq.
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

January 2, 2019

/s/ *Fernando Nunez Jr.*
Fernando Nunez Jr.
# FM-8959
1600 Walters Mill Raod
Somerset, PA 15510

19

JA062

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,               :

    Plaintiff                :

                      :    **CIVIL ACTION NO. 3:15-1573**

  v.                           :

                      :    **(JUDGE MANNION)**

TOM W. WOLF*, et al.,*         :

    Defendants              :

### M E M O R A N D U M[1]

*Pro se* Plaintiff, Fernando Nunez, a state inmate, filed this civil rights complaint pursuant to 42 U.S.C. §1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§2000cc, *et. seq.* Presently before the Court is Defendants' motion to dismiss the amended complaint (ECF No. 35) and Plaintiff's motions to file a supplemental complaint (ECF Nos. 43 and 45). For the following reasons, the Court will grant in part, and deny in part, the Defendants' motion to dismiss the Amended Complaint. Mr. Nunez's motions to file a supplemental complaint will be denied without prejudice to him filing a separate action concerning his other alleged RLUIPA claims.

---

[1] This matter was recently reassigned to the undersigned following the passing of the Hon. A. Richard Caputo.

## I.    Allegations of the Amended Complaint

On August 9, 2015, Mr. Nunez filed his Complaint in this matter. (ECF No. 1.) Named as Defendants are Thomas Wolf, Governor of the Commonwealth of Pennsylvania, John Wetzel, Secretary of the Pennsylvania Department of Corrections (DOC), and Tabb Bickel, DOC Regional Deputy Secretary.[2] Mr. Nunez filed an Amended Complaint after Defendants sought to dismiss the original Complaint. (ECF No. 34.) The facts from Mr. Nunez's Amended Complaint, taken as true and viewed in the light most favorable to Plaintiff, are as follows:[3]

Mr. Nunez is a devout Muslim now, having converted to Islam in 2003. (*Id.* at ¶7.) In August 2013, while incarcerated, Mr. Nunez married. (*Id.* at ¶8.) In January 2015, Mr. Nunez submitted three Religious Accommodation Requests (RAR) seeking: (1) conjugal visits with his spouse; (2) the opportunity to engage in private congregational prayer with his visitors during contact visits; and (3) to be "ritually circumcised". (*Id.* at ¶15.) Defendant

---

[2] On April 9, 2019, Judge Caputo granted Mr. Nunez's motion to voluntarily dismiss Corrections Officer A. Duvall and Superintendent James Eckard. (ECF No. 33.)

[3] For the purpose of a motion to dismiss, the Court accepts factual allegations in the Complaint as true and draws all inferences in the light most favorable to the Plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

JA064

Bickell denied all three RAR's simultaneously in April 2015, Defendant Wetzel received a copy of the decisions. (*Id.* at ¶16.)

Following their wedding, the Sunnah indicates a Muslim couple spend three consecutive nights together. After their marriage, it is Sunnah for couples to spend at least one night together every three days unless both spouses understand "that their time apart is temporary and <u>not</u> intentional." (*Id.* at ¶14) (emphasis in the original). The Pennsylvania Department of Corrections (DOC) *Inmate Visiting Privileges Policy*, DC-ADM 812 and *Inmate Marriages Policy*, DC-ADM 821,[4] prohibit Mr. Nunez from physically consummating his marriage in accordance with his religious beliefs. (*Id.* at ¶9.) These policies, in combination with crowded and public visitation areas, also prohibit Mr. Nunez from demonstrating the appropriate level of private intimacy, physical or verbal, with his wife. DOC policy limits physical contact between visitors to a "brief kiss and embrace upon meeting and departing." (*Id.* at ¶¶50 - 57.) Defendant Bickell denied Mr. Nunez's request for "weekend conjugal visits (Saturday and Sunday) twice a month" citing the "categorical prohibition on conjugal visits" and security, facility, and health concerns, even though other states allow for such visits. (*Id.* at ¶¶24 – 25, 29 – 30, 33

---

[4] Available on line at https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx (last visited April 3, 2020.)

and 36.) Mr. Nunez "is [now] compelled to modify his religious beliefs by neglecting his religious duties and obligations in such a way as to sin and disobey Allah and [the] Prophet Muhammad's Sunnah by engaging in … 'Celibacy'." (*Id.* at ¶61.)

The DOC also has a "state-wide policy that prohibits Plaintiff and his visitors from congregating in prayer during contact visits in a manner consistent with [Mr. Nunez's] religious beliefs." (*Id.* at ¶68.) Defendant Bickell cites safety concerns when denying Mr. Nunez's request for visitor congregational prayer because it "would pose a major distraction to families of other inmates meeting their loved ones" and because "the institution cannot provide every inmate with private visiting rooms for congregational prayers with family." (*Id.* at ¶69 – 70.)

Mr. Nunez's remaining two claims involve Muslim religious grooming practices. There are five mandatory characteristics of "fitrah" that all Muslims "must" practice: (1) circumcision; (2) shaving of pubic hair; (3) trimming the mustache; (4) clipping the nails; and (5) the plucking of armpit hair. (*Id.* at ¶90.) Mr. Nunez converted to Islam while uncircumcised. (*Id.* at ¶ 95.) Circumcision is a minor surgery. (*Id.* at ¶96.) Defendant Bickell denied Mr. Nunez's request for circumcision stating that it is "an elective surgery and not medically necessary … it is unreasonable for the [DOC] to assume the costs

- 4 -

of elective surgery for all inmates, including medical expenses which it would incur if medical complications ensued". (*Id.* at ¶98.) Mr. Nunez argues his request for circumcision is religiously based, and not due to medical necessity. (*Id.* at ¶98.)

In March 2015, Mr. Nunez submitted a RAR requesting the use of an electric razor to perform religious grooming consistent with his religious beliefs because "the standard razors sol[d] [i]n commissary irritate his skin … [c]ausing painful razor bumps." (*Id.* at ¶17 and ¶80.) Defendant Bickell denied his request in June 2015. (*Id.* at 22.) Defendant Wetzel received a copy of the decision. (*Id.* at ¶19.) "[B]ecause of the adverse side effect to using the standard razor sold by the [DOC which] causes him pain and distracts him from concentrating while in prayer", Mr. Nunez has "abandon[ed] a sacred religious practice". (*Id.* at ¶81.) The DOC only allows inmates with a medical condition to purchase electric razors. (*Id.* at ¶82.)

On August 3, 2015, Mr. Nunez sent Governor Wolf a "Notice of Intent to File Civil Action" urging him to intervene in Defendant Wetzel and Defendant Bickell's actions which violate his constitutional rights and RLUIPA. (*Id.* at ¶20.) Defendant Wolf failed to intercede on Mr. Nunez behalf. (*Id.* at ¶28.) Mr. Nunez seeks declaratory and injunctive relief as well as attorney fees and costs.

## II. Motion to Dismiss Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). The statement required by Rule 8(a)(2) must give the defendant fair notice of the grounds for the claims. Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (*per curiam*). While detailed factual allegations are not required, conclusory statements that allege the complainant is entitled to relief are inadequate. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). Legal conclusions that provide the framework for a complaint must be supported by factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009).

When considering a Rule 12(b)(6) motion, a court is limited to determining if a plaintiff is entitled to offer evidence in support of his or her claims. *Semerenko v. Cendant Corp.,* 223 F.3d 165, 173 (3d Cir. 2000). A court does not consider whether a plaintiff will ultimately prevail. (*Id.*) In reviewing the sufficiency of a complaint, a court must take three steps: (1) identify the elements of the claim; (2) identify conclusions that are not entitled

JA068

to the assumption of truth; and (3) assume the veracity of the well-pleaded factual allegations and determine whether they plausibly give rise to an entitlement to relief. *Connelly v. Lane Constr. Corp.,* 809 F.3d 780, 787 (3d Cir. 2016) (citations omitted). If there are well-pleaded factual allegations, then a court must assume their truthfulness in deciding whether they raise an entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 - 56, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Dismissal is only appropriate when, accepting as true all the facts alleged in the complaint, Plaintiff has not plead enough factual allegations to provide a reasonable expectation that discovery will lead to evidence of each necessary element. *Trzaska v. L'Oreal USA, Inc.*, 865 F. 3d 155, 162 (3d Cir. 2017).

In deciding a Rule 12(b)(6) motion, a court considers the allegations in the complaint and exhibits attached to the complaint. *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010). In addition to the complaint and any exhibits attached, a court may examine "legal arguments presented in memorandums or briefs and arguments of counsel." *Pryor v. NCAA*, 288 F.3d 548, 560 (3d Cir. 2002) (quotation omitted). A court may also consider a "document integral or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997). A court, however, need not assume the plaintiff can prove facts that were not

- 7 -

alleged in the complaint. *City of Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1429 – 30). A plaintiff may not amend their Complaint by asserting new fact in an opposition brief. The Court does not consider facts when resolving a motion to dismiss. *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 181 (3d Cir. 1988) (citing *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1107 (7th Cir. 1984)) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

A complaint filed by a *pro se* plaintiff must be liberally construed and "held to less stringent standards than formal pleadings drafted by a lawyer." *Fantone v. Latini,* 780 F.3d 184, 193 (3d Cir. 2015) (quoting *Haines v. Kerner,* 404 U.S. 519, 520 – 21, 92 S.Ct. 594, 596, 596, 30 L.2d 652 (1972)); *see Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Nonetheless, the complaint still must contain allegations permitting the reasonable inference that the defendant is liable for the misconduct alleged. *Jackson v. Div. of Developmental Disabilities,* 394 F. App'x 950, 951 n. 3 (3d Cir. 2010) (nonprecedential) (quoted case omitted).

- 8 -

## III. Discussion

### A. Governor Wolf's Lack of Personal Involvement

Defendants seeks the dismissal of all claims against Governor Wolf in the alleged violations of Mr. Nunez's federal constitutional and statutory rights. (ECF No. 36 at 15.) A defendant in a civil rights action "cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey,* 481 F.3d 187, 210 (3d Cir. 2007). "[A] government official is liable only for his or her own conduct and accordingly must have had some sort of personal involvement in the alleged unconstitutional conduct." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 71 (3d Cir. 2011). A plaintiff may demonstrate the personal involvement of a supervisory defendant by alleging the supervisor "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violation." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.,* 372 F.3d 572, 586 (3d Cir. 2004). Claiming that a defendant learned of a constitutional violation after it occurred is insufficient to show that he or she personally directed that violation or had actual knowledge of it at the time it occurred. *Rode v. Dellarciprete*, 845 F.2d 1195, 1208 (3d Cir. 1988) (the after-the-fact submission of a grievance is "simply insufficient" to establish a

- 9 -

defendant's knowledge of an underlying constitutional violation at the time it occurred); *see Rosa-Diaz v. Dow,* 683 F. App'x 103, 107 (3d Cir. 2017) (supervisor's "after-the-fact participation in reviewing grievances or appeals, generally are an insufficient basis to establish" personal involvement). Alleging a mere hypothesis that an individual defendant had personal knowledge or involvement in depriving the plaintiff of his rights is insufficient to establish personal involvement. *Rode,* 845 F.2d 1208.

Mr. Nunez claims the RLUIPA violations occurred due to the inflexible enforcement of the DOC's policies issued by Secretary Wetzel and Defendant Bickell's denial of each of his RARs. Mr. Nunez does not allege Defendant Wolf formulated either of the DOC's policies in question or directed the actions taken by Defendants Bickell or Wetzel with respect to his RARs. Mr. Nunez's intent-to-sue letter faxed to Governor Wolf, is simply insufficient to allege Governor Wolf's personal involvement in the underlying claims. *Rode,* 845 F.2d at 1208 (transmission of grievance to state governor's office is insufficient to show governor's actual knowledge of alleged harm). Accordingly, the Court will grant Defendants' motion to dismiss with respect to Governor Wolf.

## B. Mr. Nunez's Official Capacity Claims Against Defendants

Mr. Nunez's claim for damages asserted under 42 U.S.C. §1983 may not proceed against the Defendants in their official capacities. Individual state employees sued in their official capacity are entitled to Eleventh Amendment immunity. *Jones v. Unknown D.O.C. Bus Driver & Transp. Crew,* 944 F.3d 478, 480 (3d Cir. 2019). Accordingly, Mr. Nunez's official capacity claims against Defendants will be dismissed.

Similarly, Mr. Nunez may not obtain monetary relief from Defendants under RLUIPA. RLUIPA does not create a private right of action for damages against prison officials in their individual capacities, *Sharp v. Johnson,* 669 F.3d 144, 153 (3d Cir. 2012), and claims for damages against them in their official capacities are barred by the sovereign immunity of the Commonwealth of Pennsylvania. *Sossamon v. Texas,* 563 U.S. 277, 293, 131 S.Ct. 1651, 1663, 179 L.Ed.2d 700 (2011). Thus, Mr. Nunez's RLUIPA claims, if successful, may yield only injunctive relief against the Defendants in their official capacities. *Banks v. Sec'y Pennsylvania Dep't of Corr.*, 601 F. App'x 101, 103 (3d Cir. 2015); *Small v. Wetzel*, 528 F. App'x 202, 208 (3d Cir. 2013); Sharp v. Johnson, 669 F.3d 144, 154 (3d Cir. 2012)("RLUIPA does not permit an action against defendants in their individual capacities; [t]hus, RLUIPA cannot impose direct liability on defendants.").

JA073

## C.    Mr. Nunez's RLUIPA Claims

RLUIPA "protects institutionalized persons who are unable to freely attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion". *Cutter v. Wilkinson*, 544 U.S. 709, 721, 125 S.Ct. 2113, 2122, 161 L.Ed.2d 1020 (2005). In relevant part, RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution … even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. §2000cc–1(a).

To establish a *prima facie* case under RLUIPA, an inmate must demonstrate (1) that he engaged in a religious exercise and (2) that the religious exercise was substantially burdened. If the plaintiff makes this *prima facie* showing the burden then shifts to the government "to show that the policy is in furtherance of a compelling governmental interest and is the least restrictive means of furthering this interest. *Washington v. Klem,* 497

- 12 -

F.3d 272, 283 (3d Cir. 2007) (citing 42 U.S.C. §2000cc-1(a)). Alternatively, if the inmate fails to present evidence to support a *prima facie* case, the government need not demonstrate "it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Holt v. Hobbs*, 574 U.S. 352, ____, 135 S.Ct. 853, 864, 190 L.Ed.2d 747 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728, 134 S.Ct. 2751, 280, 189 L.Ed.2d 675 (2014)). The application of the compelling interest standard is context-specific and deferential to the prison authorities' choices about how to run their institution. *Washington*, 497 F.3d at 283 (citing *Cutter*, 544 U.S. at 722 - 23, 125 S.Ct. at 2123).

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief 42 U.S.C. §2000cc–5(7)(A).

> For the purposes of RLUIPA, a "substantial burden" exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.

*Washington,* 497 F.3d at 280 (emphasis in original). A "substantial burden" includes a rule or regulation which compels the prisoner to engage in

"conduct that seriously violates [his] religious beliefs." *Holt,* 574 U.S. at ____, 135 S.Ct. at 862 (quoting *Hobby Lobby*, 573 U.S. at 720, 134 S.Ct. at 2775). "RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise ... not whether the RLUIPA claimant is able to engage in other forms of religious exercise." *Id.* at ____, 135 S.Ct. at 862.

Here, Mr. Nunez, a Muslim, alleges that the DOC is placing a substantial burden on his religious practices by denying him conjugal visits with his wife, group prayer with his visitors, an electric razor and circumcision surgery. He argues the DOC's denial of his requests, citing safety, security, and health concerns, are not justified as other state prisons (i.e. other than Pennsylvania) allow conjugal visits and that the DOC could adapt its contact visitation policy/space to allow group prayer with visitors. He points out that the DOC already provides allowance for inmates to obtain electric razors and circumcisions for medical, but not religious reasons. The Defendants argue that Mr. Nunez fails to state a RLUIPA claim based on any of the denied RARs. The Court disagrees, at this stage of the litigation, with Defendants on three of its four bases for dismissal of Mr. Nunez's RLUIPA claims.

Taking Mr. Nunez's allegations as true and liberally construing them in his favor, with respect to Mr. Nunez's conjugal visits, congregational worship

JA076

with visitors, and circumcision claims, he argues that he holds each of these acts as a sincere religious belief which is substantially burdened by the DOC's actions. As such, the Court will not dismiss these RLUIPA claims at this early stage of the proceedings. Whether Mr. Nunez will ultimately prevail on these claims, or whether Defendants will be able to rebut the factually asserted *prima facie* case, can only be determined by further development of a factual record. The court finds that discovery is required in this case before the court can determine if the Defendants are entitled to dismissal of plaintiff's stated RLUIPA claims and whether their denials of his three RORs substantially burden his religious exercise. *See* Abdul-Aziz v. Lanigan, 2020 WL 3287229, *11-13 (D. N.J. June 18, 2020) (district court considered plaintiff inmate's RLUIPA claims and RLUIPA's burden shifting framework after discovery upon the filing of a summary judgment motion by defendant prison officials) (citing, in part, Holt v. Hobbs, 574 U.S. 352, 135 S.Ct. 853 (2015) ("Holt made clear, RLUIPA's 'substantial burden' inquiry asks whether the government has substantially burdened religious exercise [ ], not whether the RLUIPA claimant is able to engage in other forms of religious exercise.")). *See also* Williams v. Annucci, 895 F.3d 180, 190 (2d Cir. 2018) (Court considered inmate's RLUIPA's claims after summary judgment motion filed and found that DOC failed to make the required showing with respect to its

- 15 -

evidence of a compelling interest and least restrictive particularized alternatives to adequately respond to the inmate's specific request for accommodations).

Therefore, the Court will deny Defendants' motion to dismiss as to Mr. Nunez's conjugal-visit claim, communal prayer during visitation claim, and circumcision claim at this time. After discovery, if appropriate, Defendants can file a motion for summary judgment regarding these RLUIPA claims.

The Defendants' motion to dismiss Mr. Nunez's RLUIPA claim based on the denial of an electric razor will be granted. Mr. Nunez's sincerely held religious beliefs require him to shave various portions of his body every three days. (ECF No. 34 at ¶ 79.) He does not contend the Defendants prohibit him from doing this. Rather, he states the standard razors sold in commissary cause "his genital area to break out in a skin rash and leaves him ingrown hairs that is both painful and sensitive to the touch." (*Id.* at ¶ 80.) He claims he must abandon his sacred religious practice of fitra because Defendant Bickell denied his RAR request for an electric razor. (*Id.* at ¶ 81 – 83.) He concedes that the Defendants permit inmates to purchase electric razors for medical, but not religious, reasons. (*Id.* at ¶ 82 and Exhs. 1 - 2.) Mr. Nunez's allegation fails to establish prima facie showing of a substantial burden upon his ability to practice his religion based on Defendants' denial

- 16 -

of an electric razor.[5] Accordingly, the Defendants' motion to dismiss as to this claim will be granted.

### D.    Requests to Supplement the Amended Complaint

Pursuant to Federal Rule of Civil Procedure 15(d), "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." A district court, at any stage of the case, has broad discretion to allow the filing of a supplemental pleading. *T Mobile Northeast LLC v. City of Wilmington, Del.*, 913 F.3d 311, 326 - 57 (3d Cir. 2019). Nevertheless, a court may deny a motion to supplement "in the absence of substantial or undue prejudice because of bad faith or dilatory motives, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed, or

---

[5] A plaintiff may not amend his complaint through his opposition brief, and new facts presented in an opposition brief may not be considered by the Court. *See Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."). Mr. Nunez did not assert an Eighth Amendment denial of medical care claim in his Amended Complaint. Accordingly, the Court will not consider Mr. Nunez's argument that he sought, and was denied, a medical exemption to obtain an electric razor.

futility of amendment." *Heyl & Patterson Int'l., Inc., v. F.D. Rich Housing of V.I., Inc.,* 663 F.2d 419, 415 (3d Cir. 1981).

Since the filing of his Amended Complaint and opposition to Defendants' motion to dismiss his Amended Complaint, Mr. Nunez filed a motion to add new RLUIPA claims and additional defendants to his present action (ECF Nos. 43 and 45). He filed a 38-page Supplemental Complaint in support of these motions. (ECF No. 47.) Mr. Nunez seeks to add eight new RLUIPA claims and join Eastern Regional Deputy Michael Wenerowicz and SCI-Mahanoy Superintendent Theresa Delbalso as defendants. (ECF No. 44.)

The eight proposed new claims challenge DOC policies that "categorically" ban: "(1) wireless phones; (2) hom[e] based virtual visits; (3) the purchase and possession of tweezers; (4) scented body oils; (5) private incoming mail; (6) in-cell privacy screens; (7) morning showers, and (8) requires inmates to strip naked, before and after, every contact visit – all of which Nunez asserts places a substantial burden on his religious practice and beliefs as a Muslim. Thus, violating RLUIPA." (*Id.* at 2.)

Mr. Nunez's grievance requesting an electronic tablet for the purpose of virtual visitation and phone capabilities was denied at final review on

January 8, 2016.[6] (ECF No. 47 at ¶26.) On July 17, 2019, Mr. Nunez's RAR challenging the DOC's new mail handling policies with respect to non-legal mail from his spouse was denied. (*Id.* at 51.) On August 4, 2019, Mr. Wenerowicz denied Mr. Nunez's request for a cell phone citing security reasons even though cell phones are allegedly sold in the Commissary at the Union County Jail in South Carolina. (*Id.* at ¶¶57 – 58.) Mr. Nunez's RAR requesting to take morning showers (a privilege reserved for the honor block), especially on Friday's before Jumu'ah, was denied on August 4, 2019. (*Id.* at 59 – 62.) On August 4, 2019, Mr. Wenerowicz denied Mr. Nunez's RAR request for tweezers for plucking armpit and pubic hair citing security reasons. (*Id.* at 63 – 64.) On September 16, 2019, Mr. Nunez's RAR request to purchase 1 oz. scented body oil for daily use was denied based on security concerns. (*Id.* at ¶¶65 – 66.) Again, citing security reasons, on November 9, 2019, Mr. Wenerowicz denied Mr. Nunez's RAR request seeking permission to use a privacy screen in his cell when using the bathroom. (*Id.* at ¶¶67 – 68.) A RAR requesting not to be strip searched

---

[6] A DOC virtual visitation program was institute in September 2018 at select facilities. (*Id.* at ¶27.) Thus, were the Court to allow Mr. Nunez to supplement his suit to include this claim, and only injunctive relief is available, his claim for relief would be moot. The fact that the visitor must physically travel to a designated terminal to access the DOC's virtual visitation program does not impact Mr. Nunez's RLUIPA rights.

before and after a contact visits, based on Mr. Nunez's objection to showing his "awrah or nakedness" to other males, was denied on September 4, 2019. (*Id.* at ¶¶211 – 219.)

Defendants oppose Plaintiff's motions noting that while supplemental pleadings are permitted pursuant to Fed. R. Civ. P. 15(d), Mr. Nunez cannot satisfy the requirements of Fed. R. Civ. P. 20 concerning the permissive joinder of defendants. If permitted to join the new claims and defendants, Mr. Nunez, aside from violating the "same transaction and occurrence or events" standard of Rule 20, he would be flouting the intent of the Prison Litigation Reform Act (PLRA).[7] (ECF Nos. 51 and 52.) Mr. Nunez argues the Defendants would not be prejudiced by the supplementation of his complaint as all claims share the same legal foundation, RLUIPA. (ECF No. 55.)

Two of the proposed claims transpired at SCI-Huntingdon[8] but involved Secretary Wetzel and DOC officials other than Defendant Bickell. The other

---

[7] The Prison Litigation Reform Act of 1995 (PLRA) changed the judicial treatment of civil rights actions filed by state and federal prisoners. One major change prompted by the PLRA was that prisoners must pay the full filing fee in non-habeas actions after the proper exhaustion of all available administrative remedies. *See* 28 U.S.C. §1915; *Ahmed v. Dragovich*, 297 F.3d 201, 209 (3d Cir. 2002) (administrative exhaustion of claims must be complete prior to filing of suit).

[8] *See* ECF No. 47 ¶ 22 (wireless phone and virtual visitation).

- 20 -

claims arose at least three years after the filing of his initial complaint in this matter at SCI-Mahanoy and do not personally involve Defendant Bickell.

The Court agrees with Defendants that Fed. R. Civ. P. 20 must also be considered in conjunction with Rule 15(d). While Mr. Nunez does not address the application of Rule 20 in his Reply, his draft supplemental complaint provides the Court with sufficient information to make a determination as to whether joinder of Superintendent DelBlaso and Regional Deputy Secretary Wenerowicz is appropriate under both Rule 20 and Rule 15.

Mr. Nunez cannot meet the demands of Fed. R. Civ. P. 20 when he seeks to include RLUIPA claims against Regional Deputy Secretary Wenerowicz and Superintendent Delbalso to his present action. Rule 20 of the Federal Rules of Civil Procedure governs the permissive joinder of parties in an action. Rule 20(a)(2) allows persons to "be joined in one action as defendants if: (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Joinder of claims, parties, and remedies is "strongly encouraged" when appropriate to further judicial economy and fairness. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16

- 21 -

L.Ed.2d 218 (1966); *Hagan v. Rogers*, 570 F.3d 146, 153 (3d Cir. 2009). However, the policy behind Rule 20 is not a license to join unrelated claims and defendants in a single lawsuit. *See Pruden v. SCI Camp Hill*, 252 F. App'x 436, 437 (3d Cir. 2007) (nonprecedential).

Here, Mr. Nunez has not resided at SCI-Huntingdon since September 26, 2016.[9] All but two of the proposed claims arose after his transfer from SCI-Huntingdon. Moreover, Defendant Bickell is not alleged to have any personal involvement in the denial of his request for wireless telephones and virtual visitation. Mr. Nunez fails to demonstrate any commonality among the Defendants and proposed defendants other than they, at one point or another, denied one of his RAR requests.[10] Simply joining any alleged RLUIPA violation that has occurred during the past five years of Mr. Nunez's incarceration that does not involve the same decision makers would be inappropriate. To do so under the guise of Fed. R. Civ. P. 15(d) would violate the precepts of Rule 20. To the extent Mr. Nunez argues that he will be "denied justice" (ECF No. 55 at 8) if he is unable to join his claims in a single

---

[9] *See* ECF No. 10, Notice of Change of Address ("I am no longer housed at SCI-Huntingdon".)

[10] Again, the exception to this statement pertains to the cell phone and virtual visit claims which Mr. Nunez claims he pursued through the DOC's grievance policy and not a RAR. (Doc. 47 at 25.)

action because claims 5 and 6 would be time barred, the Court does not find this argument persuasive.[11] Mr. Nunez states he exhausted each claim. If true, he elected to wait until December 2019 to file his motion to supplement his Amended Complaint. He had the opportunity to file an amended complaint in January 2019 and has not offered an adequate explanation for failing to include some, or all, of his proposed claims at that time. Upon his substantial compliance with the DOC's exhaustion process, he could have filed a civil rights action raising his exhausted RUILPA claim. Accordingly, his motions to join additional parties and RLUIPA claims will be denied.

An appropriate order shall issue.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Dated: November 13, 2020**
15-1773-01

---

[11] Mr. Nunez specifically refers to the denial of his RARs pertaining to the use of wireless telephones and home base virtual visitation. (*See* ECF No. 55 at 1.)

- 23 -

JA085

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FERNANDO NUNEZ, | : | |
|      **Plaintiff** | | |
| | : | **CIVIL ACTION NO. 3:15-1573** |
|   **v.** | | |
| | : | **(JUDGE MANNION)** |
| **TOM W. WOLF*, et al.,*** | | |
|     **Defendants** | : | |

## O R D E R

In accordance with the Memorandum issued this same day, it is

**ORDERED** that:

1. Defendants' motion to dismiss the amended complaint (ECF No. 35) is granted in part and denied in part.

2. All claims against Governor Wolf are dismissed pursuant to 28 U.S.C. §1915(e)(2)(B).

3. Defendants' motion to dismiss Mr. Nunez's RLUIPA claims concerning the denial of an electric razor is granted.

4. Defendants' motion to dismiss Mr. Nunez's RLUIPA claims concerning the denial of conjugal visitation, congregational prayer during contact visits, and religious circumcision surgery are denied at this time.

5. Mr. Nunez's motions to join additional parties and claims and supplemental complaint (ECF Nos. 43 and 45) are denied.

JA086

6. Defendants Wetzel and Bickell shall file an Answer to the remaining claims of the Amended Complaint within twenty-one (21) days of the date of this Order.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 13, 2020**
15-1573-01 ORDER

- 2 -

JA087

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FERNANDO NUNEZ, | : | |
| Plaintiff | | |
| | : | CIVIL ACTION NO. 3:15-1573 |
| v. | | |
| | : | (JUDGE JENNIFER P. WILSON) |
| TOM W. WOLF, *et al.*, | | |
| Defendants | : | |

**ANSWER TO PLAINTIFF'S AMENDED COMPLAINT**

Defendants Wetzel and Bickell, by and through undersigned counsel, hereby Answer Plaintiff's Amended Complaint as follows:

1. Admitted as to jurisdiction. Denied as to the remainder of the averment and strict proof thereof is demanded at trial.

2. Admitted as to venue. Denied as to the remainder of the averment and strict proof thereof is demanded at trial.

3. Admitted that Plaintiff was incarcerated at the Pennsylvania Department of Corrections ("Department") at the State Correctional Institute at Huntingdon ("SCI-Huntingdon") under the inmate number FM8959 at the time of the events pertaining to this matter. By way of further answer, Plaintiff is currently incarcerated at the State Correctional Institute at Mahanoy ("SCI-Mahanoy") under the inmate number FM8959.

1

4.      No response is required since Defendant Wolf is no longer involved in this litigation based on the Court's most recent ruling.  *See* Doc. 63 and 64.

5.      Admitted in part, denied in part.  Admitted that at the time of the remaining events in question, Defendant Wetzel was employed by the Department as the Secretary of Corrections.  Denied that Plaintiff is entitled to any injunctive relief in this case.

6.      Admitted in part, denied in part.  Admitted that at the time of the remaining events in question, Defendant Bickell was employed by the Department as a Regional Deputy Secretary.  Denied that Plaintiff is entitled to any injunctive relief in this case.

7.      Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

8.      Admitted.

9.      The Department's policies relevant to this case speak for themselves. To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said policies, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

JA089

10.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

11.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

12.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

13.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

14.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The

JA090

averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

15.    Admitted that Plaintiff submitted religious accommodation requests ("RAR") relating to the general topics contained in this averment.  By way of further answer, the RARs relevant to this case speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

16.    Admitted that the RARs relating to conjugal visits, circumcision, and prayer with family during in person visits were denied by response letter dated April 6, 2015.  Also admitted that the response letter was forwarded to Defendant Wetzel.  By way of further answer, the response letter relevant to this case speaks for itself.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

17.    No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling.  *See* Doc. 63 and 64.

JA091

18.     No response is required since Plaintiff's request to supplement his amended complaint wherein he alleged claims relating to virtual visits was denied in the Court's most recent ruling.  *See* Doc. 63 and 64.

19.     No response is required since the claims contained in averments 17 and 18 are not involved in this litigation based on the Court's most recent ruling.  *See* Doc. 63 and 64.

20.     No response is required as to Defendant Wolf because he is no longer involved in this litigation based on the Court's most recent ruling.  *See* Doc. 63 and 64.  The remainder of this averment is specifically denied and strict proof thereof is demanded at trial.

21.     This averment contains incorporation language so no response is required.

22.     Denied.   This averment is expressly denied and proof thereof is demanded at the time of trial.

23.     The Department's policies relevant to this case speak for themselves. To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said policies, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

JA092

24. This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required. To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

25. This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required. To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

26. This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required. To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

27. Plaintiff's grievance documents, if existing and relevant to this case, speak for themselves. To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied. If relevant, strict proof therefore is demanded at trial.

28. No response is required since Defendant Wolf is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

29. This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required. To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

6

30.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

31.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

32.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

33.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

34.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

35.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

JA094

36.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

37.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

38.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

39.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

40.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

JA095

41.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

42.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

43.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

44.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

45.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The

JA096

averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

46.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

47.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

48.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

49.    No response is required as to this averment because "Plaintiff's spouse" is not a party to this case.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

JA097

50.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

51.     The Department's policies speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said policies, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

52.     Denied.  After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

53.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

54.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

JA098

55.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

56.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

57.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

58.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  Further, the Department's policies speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said policies, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

59.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

60.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  Further, the Department's policies speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said policies, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

61.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

62.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

63.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

64.     This averment contains incorporation language so no response is required.

65.     Denied.  After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The

averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

66.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

67.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

68.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

69.     Admitted that the RAR relating to prayer with family during in person visits was denied by response letter dated April 6, 2015.  By way of further answer, the response letter relevant to this case speaks for itself.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

14

JA101

70.     Admitted that the RAR relating to prayer with family during in person visits was denied by response letter dated April 6, 2015.  By way of further answer, the response letter relevant to this case speaks for itself.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

71.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

72.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

73.     Plaintiff's grievance documents, if existing and relevant to this case, speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

JA102

74.    This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

75.    Plaintiff's grievance documents, if existing and relevant to this case, speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

76.    This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

77.    This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

78.    This averment contains incorporation language so no response is required.

79.    No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling.  *See* Doc. 63 and 64.

JA103

80.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

81.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

82.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

83.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

84.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

85.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

JA104

86.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

87.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

88.     No response is required since Plaintiff's claim relating to an electric razor is no longer involved in this litigation based on the Court's most recent ruling. *See* Doc. 63 and 64.

89.     This averment contains incorporation language so no response is required.

90.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

91.     Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

JA105

92.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

93.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

94.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

95.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

96.    Denied. After reasonable investigation, Defendants are without knowledge to form a belief as to the veracity or accuracy of the averment. The

JA106

averment is therefore expressly denied, and proof thereof is demanded at the time of trial.

97.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

98.     This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.  By way of further answer, the response letter relevant to this case speaks for itself.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

99.     Plaintiff's grievance documents, if existing and relevant to this case, speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

JA107

100.   This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

101.   This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

102.   This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

103.   This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

104.   Plaintiff's grievance documents, if existing and relevant to this case, speak for themselves.  To the extent that the allegations contained in the Amended Complaint are inconsistent with, differ from, or are contrary to said documentation, those allegations are specifically denied.  If relevant, strict proof therefore is demanded at trial.

105.   This averment contains conclusory statements of opinion and/or legal conclusions to which no response is required.  To the extent a response is required, this averment is expressly denied and proof thereof is demanded at trial.

106.   Denied.  Plaintiff is not entitled to any forms of relief as a result of this lawsuit.  Injunctive relief is not warranted, and money damages were denied by Court order.  *See* Doc. 63 and 64.

## **AFFIRMATIVE DEFENSES**

### FIRST AFFIRMATIVE DEFENSE

Defendants acted at all times within the scope of their authority and without any actual or imputed knowledge that their actions violated any of Plaintiff's constitutional rights and, therefore, are immune from suit.

### SECOND AFFIRMATIVE DEFENSE

Defendants at all times were acting in reliance upon valid federal and state laws and regulations.

### THIRD AFFIRMATIVE DEFENSE

Defendants assert each and every defense available to them under the existing Civil Rights Act.

JA109

FOURTH AFFIRMATIVE DEFENSE

Whatever injuries or damages were sustained by Plaintiff, as alleged, were caused in whole or in part or were contributed to by reasons of the negligent or intentional conduct of Plaintiff.

FIFTH AFFIRMATIVE DEFENSE

The acts or omissions of Defendants which were alleged to constitute negligent or more culpable conduct were not substantial causes or factors in the injuries sustained by Plaintiff.

SIXTH AFFIRMATIVE DEFENSE

Any and all damages or injuries sustained by Plaintiff resulted not from the conduct or acts of Defendants, but from the conduct or acts of Plaintiff or other persons.

SEVENTH AFFIRMATIVE DEFENSE

Whatever actions may have been taken by Defendants that caused loss to Plaintiff were justified.

EIGHTH AFFIRMATIVE DEFENSE

Defendants' conduct was neither negligent nor more culpable.

JA110

## NINTH AFFIRMATIVE DEFENSE

Defendants lack personal or direct involvement in any of the alleged violations of the Plaintiff's rights.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by sovereign immunity and are not waived by any of the exceptions thereto. 1 Pa.C.S. §2310; 42 Pa.C.S. §8522.

## ELEVENTH AFFIRMATIVE DEFENSE

To the extent that immunity has been waived with respect to any of Plaintiff's claims, Defendants assert all defenses to and limitations upon those claims which are or may hereafter be set forth at 42 Pa.C.S. §§8522 - 8528.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants are entitled to official immunity from Plaintiff's claims.

## THIRTEENTH AFFIRMATIVE DEFENSE

At all times relevant hereto, any actions or inactions of Defendants were done within the scope of their authority in good faith and without malice, and therefore, are entitled to qualified immunity.

JA111

## FOURTEENTH AFFIRMATIVE DEFENSE

Defendants are entitled to objective good faith immunity from Plaintiff's claims, and Defendants have not violated any rights and/or clearly established rights of Plaintiff.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiff consented to any actions or inactions committed by Defendants, and therefore, Plaintiff's claims are barred against Defendants.

## SIXTEENTH AFFIRMATIVE DEFENSE

Any actions or inactions committed by Defendants were done pursuant to duties required by statute, regulation or directive and therefore the Corrections Defendants are immune.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's operative complaint should be dismissed because he failed to exhaust available administrative remedies, as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e (a).

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's operative complaint should be dismissed because Defendants did not violate any of his religious rights under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, *et seq.*

JA112

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's operative complaint should be dismissed because Defendants did not violate any of his sincere religious beliefs under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc, *et seq.*

## TWENTIETH AFFIRMATIVE DEFENSE

Defendants asserts all limitations upon the Plaintiff's claims set forth in the Prison Litigation Reform Act, 42 U.S.C. § 1997e.

Respectfully submitted,

Office of General Counsel

By: /s/ Abby N. Trovinger
Abby N. Trovinger, Assistant Counsel
Attorney ID No. PA308329
Pa. Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
717.728.7763

Dated: December 3, 2020

JA113

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FERNANDO NUNEZ,          :
                                  :
               Plaintiff      :     No. 3:14-cv-00727
                                  :
              v.           :     (Judge Caputo)
                                  :
WERTZ, *et al.*,            :     Filed Via Electronic Case File
                                  :
             Defendants    :

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am providing a true and correct copy of the foregoing Answer for HAND-DELIVERY to the person below:

Fernando Nunez, FM8959
SCI-Mahanoy

By:    <u>/s/ Abby N. Trovinger</u>
           Abby N. Trovinger, Assistant Counsel
           Attorney ID No. PA308329
           Pa. Department of Corrections
           1920 Technology Parkway
           Mechanicsburg, PA 17050
           717.728.7763

Dated: December 3, 2020

JA114

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

No. 3:15-CV-1573

FERNANDO NUNEZ

Plaintiff,

V.

TOM W. WOLF, JOHN E. WETZEL

TABB BICKELL, REGIONAL SECRETARY

OF DOC,

Defendants

_____

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

GREGORY G. SCHWAB
General Counsel
Commonwealth of Pennsylvania

TIMOTHY HOLMES
Chief Counsel
Pennsylvania Department of Corrections

By:   ABBY N. TROVINGER
Assistant Counsel
Attorney I.D. No. 308329
Pennsylvania Dept. of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050
Dated: June 30, 2021      atrovinger@pa.gov

# TABLE OF CONTENTS

I.     STATEMENT OF THE CASE...………………………………………..1

II.    RELEVANT FACTUAL HISTORY ...........................................................2

II.    STANDARD OF REVIEW ...........................................................................3

III.   STATEMENT OF QUESTIONS PRESENTED ........................................5

IV.   ARGUMENTS ...............................................................................................5

    A.    Summary judgment should be granted in Defendants' favor as to Plaintiff's conjugal visits claim because his religion is not being substantially burdened, and the Department has several compelling government interests in denying Plaintiff a private visiting room for sexual contact with his spouse…………………………………………………………………..6

    B.    Summary judgment should be granted in Defendants' favor as to Plaintiff's congregational prayer claim because his religion is not being substantially burdened, the Department has several compelling government interests in preventing Plaintiff from having a private room with visitors, and a least restrictive alternative is available. ....................14

    C.    Summary judgment should be granted in Defendants' favor as to Plaintiff's circumcision claim because the Department has compelling government interests in declining inmate requests for elective surgeries…………………........................................................................18

V.    CONCLUSION...............................................................................................23

JA116

## TABLE OF CITATIONS

Other Authorities

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..................................................................................4
*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................4
*Clark v. Modern Grp. Ltd.*,
  9 F.3d 321 (3rd Cir. 1993) .......................................................................4
*Cowher v. Pike County Correctional Facility*,
  2019 WL 3302415 (USMD Pa. 2019)....................................................20
*Cutter v. Wilkinson*,
  544 U.S. 709 (2005)...............................................................................5, 6
*Fields v. Paramo*,
  2019 WL 4640502 (E.D. Ca. 2019)........................................................20
*Fuller v. Cate*,
  481 Fed. Appx. 413 (9th Cir. 2012)..........................................................9
*Gerber v. Hickman*,
  291 F.3d 617 [2002]................................................................................10
*Hernandez v. Coughlin*,
  18 F.3d 133(2nd Cir. 1994) ....................................................................10
*Imprisoned Citizens Union v. Shapp*,
  451 F. Supp. 893 (E.D.Pa. 1978) .............................................................7
*Lucas v. Tilton*,
  No. 1:08-cv-00515 AWI GSA, 2010 U.S. Dist. LEXIS 8347, 2010 WL 431737
  (E.D. Cal. Feb. 2, 2010).........................................................................10
*Marsh v. Granholm*,
  No. 2:05-cv-134, 2006 U.S. Dist. LEXIS 59203, 2006 WL 2439760 (W.D.
  Mich., Aug. 22, 2006).............................................................................10
*McCray v. Sullivan*,
  509 F.2d 1332 (5th Cir.1975) ...................................................................7
*Owens v. Kernan*,
  2016 WL 3361885 (USDC E.D. Cal. 2016)......................................9, 11
*Pouncil v. Tilton*,
  704 F.3d 568 (9th Cir. 2012) ....................................................................9
*Reynolds v. Wagner*,
  128 F.3d 166 (3rd Cir. 1997) ..................................................................19

*Robertson v. Kansas*,
  No. 07-3162-SAC, 2007 U.S. Dist. LEXIS 91266, 2007 WL 4322781 (D. Kan.
  Dec. 10, 2007)...................................................................................................10
*Shields v. Foston*,
  No. 2:11-cv-0015 JAM EFB, 2013 U.S. Dist. LEXIS 95776, 2013 WL 3456964
  (E. D. Cal., Jul. 9, 2013) ...............................................................................9, 11
*Thomas v. Corbett*,
  458 M.D. 2013 , pp.  (Pa. Cmwlth. 2013) ...................................................8
*Thomas v. Corbett*,
  90 A.3d 789 (Pa. Cmwlth. 2014) ..............................................................6, 7
*Turner v. Safley*,
  482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987) .......................................10
*Vega v. Lantz*,
  2009 WL 3157586 (D.C. Conn. 2009) ....................................................... 17, 20
*Vega v. Lantz*,
  2013 WL 6191855 (D.C. Conn. 2013) ............................................................20
*Washington v. Klem*,
  497 F.3d 272 (3rd Cir. 2007) .........................................................................6
*Winslow v. Prison Health Serv.*,
  406 F. App'x 671 (3rd Cir. 2011) ...................................................................19

## Statutes

42 U.S.C. § 2000cc–1(a)(1)–(2) ............................................................................5

9

Fed.R.Civ.P. 56(a)............................................................................................3
Rule 56(c)........................................................................................................4

## Regulations

37 Pa. Code 93.3(h)(6) ...................................................................................12

iv

## I.     Statement of the Case

Plaintiff, Fernando Nunez, is a Pennsylvania state inmate.  On April 9, 2019, Plaintiff filed the operative Amended Complaint ("AC") in this case.  (Doc. 34).  Remaining Defendants are Pennsylvania Department of Corrections ("Department") Secretary John Wetzel and then Department Regional Deputy Secretary Tabb Bickell.

In the AC, Plaintiff describes himself as a devout Muslim and claims that his religion rights are being violated under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in three ways.  First, he alleges that the Department' policy prohibiting conjugal visits violates his Islamic beliefs.  Specifically, he avers that he was permitted to marry in 2013, but was not permitted to consummate his marriage in accordance with his religious beliefs.  (Doc. 34 at ¶¶ 8-9).  He also seeks ongoing conjugal visits and other forms of intimacy as understood in Islamic practice to include "light talk, love expressions, touching, caressing, kissing and fondling." (Doc. 34 at ¶11).  Second, Plaintiff seeks to be able to engage in group prayer in the visiting room with his visitors.  (Doc. 34 at ¶ 68).  Third, he seeks a circumcision for religious reasons.  (Doc. 34 at ¶¶ 90-95).  It is not clear from the AC who would be responsible for payment of Plaintiff's circumcision.  (Doc. 34 at ¶¶ 90-106).

Plaintiff seeks injunctive relief in the form of "enjoining the Defendants… from enforcing  the Administrative Code regulation and Department policies at

issue, so as to not continue to substantially burden the Plaintiff's religious beliefs" and "Order the Defendants in his action to implement a family/conjugal visit program, and execute policies and practices which serve to accommodate Plaintiff's religious beliefs." (Doc. 34 at ¶ 106).

## II.   <u>Relevant Factual History</u>

Plaintiff is an individual incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon") during the events alleged in this lawsuit. (Doc. 34). He is by his own assertions a devout and practicing Muslim. His claims begin in January 2015 when he requested three religious accommodations while in state prison: 1) to engage in conjugal visits with his spouse, 2) to engage in congregate prayer in private with his family during contact visits, and 3) to be ritually circumcised. (App'x at A; Doc. 34 at ¶ 15). His request for conjugal visits was denied "due to safety, security and health concerns. (App'x at A). His request for congregational private prayer was denied because the request "would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. (App'x at A). Further, "The institution cannot provide every inmate with [a] private visiting room for congregational prayers with family members. (App'x at A). Plaintiff's request for circumcision was denied because "circumcision is an elective surgery and is not medically necessary", and also because of the costs involved for and after elective surgeries. (App'x at A).

Plaintiff filed grievance number 564319 relating to the conjugal visits issue, which was denied for the same reasons that the original accommodation was denied. It was noted that he is permitted to briefly embrace and kiss his spouse at the beginning and end of a visit. The denial was upheld on appeal at the first level, and again at the second level. (App'x at B).

Plaintiff filed grievance number 562984 relating to the private congregational prayer issue, and his grievance was denied because inmates share the visiting room and that space is not for the purpose of practicing religion. It was noted that he is permitted to quietly pray in a seated position with his guests. The denial was upheld on appeal at the first level, and again at the second level, based on the same rationale. (App'x at I).

Finally, Plaintiff filed grievance number 564054 relating to the circumcision issue; his grievance was denied because the Department does not permit elective surgeries. The denial was upheld on appeal at the first level, and again at the second level, based on the same rationale. (App'x at K).

## III.  <u>Standard of Review</u>

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person

3

could conclude that the position of the person with the burden of proof on the disputed issue is correct. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3rd Cir. 1993).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotations omitted). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id*.

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby, Inc.*, 477 U.S. at 250.

## IV.   Statement of Questions Presented[1]

A.   Should summary judgment should be granted in Defendants' favor as to Plaintiff's conjugal visits claim because his religion is not being substantially burdened, and the Department has several compelling government interests in denying Plaintiff a private visiting room for sexual contact with his spouse?

B.   Should summary judgment be granted in Defendants' favor as to Plaintiff's congregational prayer claim because his religion is not being substantially burdened, the Department has several compelling government interests in preventing Plaintiff from having a private room with visitors, and a least restrictive alternative is available?

C.   Should summary judgment be granted in Defendants' favor as to Plaintiff's circumcision claim because the Department has compelling government interests in declining inmate requests for elective surgeries?

## V.   Arguments

Section 3 of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") creates statutory protection for inmates in the exercise of their religion, providing, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability" unless the government establishes that the burden on religion furthers a "compelling governmental interest" through the "least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc–1(a)(1)–(2). "In *Cutter v. Wilkinson,* 544 U.S. 709 (2005), the United States Supreme Court, in addressing a facial First Amendment

---

[1] All suggested answers are in the affirmative.

Establishment Clause challenge to this provision of RLUIPA, observed that this provision was 'the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens.'" *Thomas v. Corbett*, 90 A.3d 789, 794 (Pa. Cmwlth. 2014) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005)). H

Under RLUIPA, a substantial burden exists where: "1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3rd Cir. 2007).

Health and safety matters are compelling governmental interests under RLUIPA. *Cutter*, 544 U.S. at 725.

In regard to the least restrictive means prong, and assuming that there is an alternative available, the government must show that it has considered and rejected those means. *Washington,* 497 F.3d at 284.

A.    Summary judgment should be granted in Defendants' favor as to Plaintiff's conjugal visits claim because his religion is not being substantially burdened, and the Department has several legitimate penological interests in denying Plaintiff a private visiting room for sexual contact with his spouse.

Plaintiff seeks to consummate his 2013 marriage and have ongoing conjugal visits with his wife in accordance with his Muslim beliefs. (Doc. 34 at ¶¶ 7-14). Specifically, Plaintiff seeks intimacy in the forms of "light talk, love expressions, touching, caressing, kissing, fondling, and sexual intercourse" to be conducted "privately, behind closed doors, away from small children and other adults." (Doc. 34 at ¶¶ 11-12). He requests that these visits take place twice a month on Saturday and Sunday. (Doc. 34 at ¶ 36).

In 2014, the issue of conjugal visits was raised before the Commonwealth Court of Pennsylvania in *Thomas v. Corbett*, 90 A.3d 789 (Pa. Cmwlth. 2014). There, the inmate made both First Amendment and RLUIPA arguments when the Department of Corrections denied his request for conjugal visits. *Id*. In relation to the constitutional claim, the Court stated: "Courts have held that a correctional authority's policy to deny conjugal visits does not deny an inmate any constitutional right." *Id*. at 794 (citing *McCray v. Sullivan,* 509 F.2d 1332, 1334 (5th Cir.1975), *cert. denied,* 423 U.S. 859 (1975); *Imprisoned Citizens Union v. Shapp,* 451 F. Supp. 893, 898–99 (E.D.Pa. 1978). On the RLUIPA claim, the Court declined to grant preliminary objections for lack of evidence. *Thomas,* 90 A.3d at 794-797. Subsequently, in 2019, the issues were decided via a Department motion for summary relief, wherein the Commonwealth Court accepted the Department's rejection of conjugal visits furthers a compelling state interest in ensuring the health

7

and safety of inmates and abating criminal activity." *Thomas v. Corbett*, 458 M.D. 2013 , pp. 3-7 (Pa. Cmwlth. 2013) (App'x at G). With respect to the lest restrictive alternatives analysis, the Court reasoned:

> Our inquiry, however, does not end here. DOC must also show that there are no genuine issues of material fact concerning its allegation that an outright ban on conjugal visits is the least restrictive means of furthering DOC's health and safety interest and its interest in abating criminal activity. Thomas argues that an outright ban is not the least restrictive means because the institution allegedly has movable homes on its property. On the other hand, DOC contends that the nature of conjugal visits requires a complete ban instead of a restriction because these visits require privacy, could spread communicable diseases, create an opportunity to bring in contraband, and may allow for the commission of crimes. Despite Thomas's contentions, we see no dispute concerning any material facts as to the least restrictive means prong. DOC has a clear responsibility to ensure the health and safety of inmates and to ensure that criminal activity is abated. DOC cannot abate crime and ensure the health and safety of inmates by permitting conjugal visits, even in a restricted manner. Any conceivable restriction, due to the inherently private nature of a conjugal visit, would still result in health and safety concerns. Accordingly, we will grant summary relief in DOC's favor with respect to the conjugal visit policy.

*Id*. at pp. 7-8. (App'x at G).

Though this Court is not bound by Commonwealth Court decisions, the exact same reasoning applies to this case for all the Department objectives reiterated above.

Further, case law in other areas of the country strongly supports the position that Plaintiff has no right to relief as a matter of law.  The federal district court in the Eastern District of California faced a  very similar case in which a California state inmate claimed that the prison policy prohibiting those convicted of life sentences from engaging in conjugal visits violated RLUIPA.  *Owens v. Kernan*, 2016 WL 3361885 (USDC E.D. Cal. 2016).  (App'x at H).  The district court dismissed the claim, citing several cases federal court cases as follows:

> This court previously considered and rejected an inmate's claim that the denial of conjugal visits violates RLUIPA, finding that the right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration and that although the right to marriage is constitutionally protected for inmates, the right to marital privacy and conjugal visits while incarcerated is not. *Shields v. Foston*, No. 2:11-cv-0015 JAM EFB, 2013 U.S. Dist. LEXIS 95776, 2013 WL 3456964 (E. D. Cal., Jul. 9, 2013). Another court in this district adopted that analysis, reasoning as follows:
>
>> Neither the U.S. Supreme Court nor the Ninth Circuit has yet addressed whether a sincerely held religious belief necessitating conjugal visits must be accommodated under RLUIPA. In *Shields v. Foston*, No. 2:11-cv-0015 JAM EFB, 2013 U.S. Dist. LEXIS 95776, 2013 WL 3456964 (E. D. Cal. Jul. 9, 2013), the court surveyed the district court decisions addressing the question. *See Pouncil v. Tilton*, 704 F.3d 568 (9th Cir. 2012)(addressing a statute of limitations issue but not the merits in a case challenging denial of conjugal visits under RLUIPA.) *Fuller v. Cate*, 481 Fed. Appx. 413 (9th Cir. 2012)(concluding that the attachments to plaintiff's complaint demonstrated that the prohibition on conjugal visits for LWOP inmates did not substantially burden plaintiff's right to enter into a valid Islamic marriage). The lower courts that have addressed the issue appear, thus far, to uniformly conclude that such beliefs must give way to the need for institutional security.

*Robertson v. Kansas*, No. 07-3162-SAC, 2007 U.S. Dist. LEXIS 91266, 2007 WL 4322781 (D. Kan. Dec. 10, 2007)(summarily denying Plaintiff's claim for conjugal visits under RLUIPA because such visits would burden prison officials and present security risks); *Marsh v. Granholm*, No. 2:05-cv-134, 2006 U.S. Dist. LEXIS 59203, 2006 WL 2439760 (W.D. Mich., Aug. 22, 2006)(granting summary judgment on plaintiff's RLUIPA claim because: (1) plaintiff, a murder convict, raised particular security concerns regarding his continued incarceration, (2) plaintiff's incarceration was at odds with his request to engage in private heterosexual procreation, and (3) the denial of conjugal visits was the least restrictive means of furthering the government's interest in institutional safety).

The *Foston* court notes that courts have consistently held that loss of sexual intimacy with a spouse is simply "part and parcel" of imprisonment. *Gerber v. Hickman*, 291 F.3d 617, 620-22 [2002]; *see also Turner v. Safley*, 482 U.S. 78, 97, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)("The right to marry, like many other rights, is subject to substantial restrictions as a result of incarceration."); *Hernandez v. Coughlin*, 18 F.3d 133, 137(2nd Cir. 1994)("[E]ven though the right to marriage is constitutionally protected for inmates, the right to marital privacy and conjugal visits while incarcerated is not."); *Lucas v. Tilton*, No. 1:08-cv-00515 AWI GSA, 2010 U.S. Dist. LEXIS 8347, 2010 WL 431737 (E.D. Cal. Feb. 2, 2010) (concluding that the balance of equities did not support plaintiff's request for a preliminary injunction allowing Plaintiff to have a conjugal visit with his wife "because the loss of intimate association is a well-known aspect of being imprisoned for conviction of a crime.").

> \*                \*                \*

That Plaintiff was denied a conjugal visit does not state a claim for relief under RLUIPA.

*Washington v. Cate*, No. 1:11-cv-00264 GSA PC, 2014 U.S. Dist. LEXIS 12402, at \*4-5 (E.D. Cal. Jan. 31, 2014). Like the plaintiff in *Washington* and *Shields v. Foston*, plaintiff's claim that he was denied

a conjugal visit because of his status as a life prisoner fails to state a claim for relief under RLUIPA.

*Owens*, 2016 WL 3361885 at 203.

Defendants argue that although Plaintiff cannot have sexual contact with his spouse, he is permitted to "share a brief kiss and embrace" when meeting and departing from a visit. (App'x at C; App'x at E). The Department also permits "a brief kiss" after marriage. (App'x at D; Appx' at E). Such contact fulfills several of Plaintiff's wishes regarding showing affection and love toward his spouse, and making her feel special and desired, as outlined in his AC. (Doc. 34, generally). Thus, he is not suffering a substantial burden by not being able to engage in sex acts with her.

However, assuming that a substantial burden exists for purposes of this analysis, the Department has several legitimate penological interests in preventing Plaintiff from doing so. First, the Department is responsible for the safety and security of all inmates, which includes preventing contraband from entering the prisons. Plaintiff has shown himself to pose a direct threat regarding introduction of contraband into the Department. Additionally, it would be very difficult to monitor whether any contraband was being passed between the parties during long kisses, long embraces, and/or sexual acts. (App'x at E).

Second, as a related issue, Plaintiff could not engage in sexual acts in the same visiting room where other visits are taking place. This means that he would need to

11

be afforded his own private room for the conjugal visit. If this Plaintiff is granted such an accommodation, certainly all inmates would expect the same, and the Department simply does not have the space to accommodate such requests. (App'x at E).

Third, the needs of other inmates are also a legitimate penological concern for the Department. Visiting room areas in the prison are a part of the planning process and are large in nature such that several visits can be going on at one time. Plaintiff could not engage in sexual acts in the same visiting room where other visits are taking place—he would need a private room for the visit. (App'x at E).

In Pennsylvania, all contact visits in a prison are to take place under official supervision. 37 Pa. Code 93.3(h)(6). This means that a corrections officer would need to either supervise or record (or both) the sexual acts of others, so the visit would no longer be private and the corrections officer would be subjected to a very precarious situation. Space and time for visitation at the Department is limited. At the State Correctional Institution at Huntingdon, where Plaintiff is located, the visiting hours are from 8:00am to 8:00pm, 7 days per week. No prison could accommodate a private room for all inmates requesting conjugal visits during visiting hours on any given day. (App'x at E).

From a different perspective, the Department is responsible for the health of inmates to the extent that can be controlled. Permitting inmates to have sexual

12

contact with visitors increases the likelihood that sexually transmittable infections (STIs) will be introduced into the prisons, which it and of itself leads to a host of other problems.  (App'x at F).

Particularly concerning STIs in an institutional setting include: Hepatitis, HIV, Syphilis, Herpes, Chlamydia and Gonorrhea.  STIs can often be difficult to detect by even the infected individual themselves.  Increased STI rates in the institutions will result in medical issues for inmates.  STIs can often be very contagious and some can last a lifetime.  STIs in particular can cause cancer, infertility, and even death.  Hepatitis B and Hepatitis C in particular can cause permanent liver damage.  If gone undetected, many can cause permanent damage and even death.  To complicate matters, STIs often are not detected unless an inmate self-discloses.   (App'x at F).

Increased STI rates in the institutions would be detrimental to the population and will result in high costs of medical treatment, if treatment is even an option.  There would be no way for the Department to ensure that safe sex was occurring during a conjugal visit in order to safeguard that STIs were not being passed from one participant to the other.  This in turn would result in more medical issues for inmates, and more costs for the Department in the treatment of those issues.  Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of

preventing STIs from entering and spreading around the prison population.  (App'x at F).

Finally, the Department would have no way of ensuring that the sexual encounters were consensual at any given moment, which could result in a crime being committed at the prison.  (App'x at F).  Merely because Plaintiff argues that he has a healthy relationship with his spouse does not make it so on a particular visit. Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing sexual assaults on government property.  (App'x at F).

As explained above, the RLUIPA analysis includes whether the Department has considered and rejected a least restrictive alternative, if one is available.  As the Commonwealth Court reasoned, there really is no least restrictive alternative to Plaintiff's request for conjugal visits.  The Department cannot safely provide that for all the reasons indicated above.

Defendants are entitled to summary judgment in relation to Plaintiff's RLUIPA claims regarding the denial of sexual contact visits with his spouse in a private room.

B.   Summary judgment should be granted in Defendants' favor as to Plaintiff's congregational prayer claim because his religion is not being substantially burdened, the Department has several compelling government interests in preventing Plaintiff from having a private room with visitors, and a least restrictive alternative is available.

Plaintiff seeks to engage in congregational prayer with visitors in a private visiting room. (Doc. 34 at ¶¶ 65-66). The prayer would include several prostrations and recitations throughout. (Doc. 34 at ¶ 67). When he sought to engage in those acts via a religious accommodation request and then a grievance, Plaintiff's request for congregational prayer in a private room was denied, but he was informed that he would be permitted to engage in a quiet, seated prayer with his visitors in order to balance his needs with those of other inmates and visitors using the same designated visiting room. (App'x at A; App'x at I).

Plaintiff does not allege that he cannot pray, nor is he averring that he cannot pray with visitors. What he is saying is that he cannot do it in the exact way he wishes, but rather, he needs a private room with an area for group prostration. This simply is not required by RLUIPA. Plaintiff's ability to practice his religion is not substantially burdened by the inability to have a private room for congregational prayer. He can still pray as he wishes in the privacy of his cell, or with visitors quietly in seated positions in the designated visiting area.

Even assuming *arguendo* that he suffers a substantial burden by the restrictions currently in place, the Department has several legitimate penological interests in not permitting congregational prayer sessions between inmates and visitors. For the reasons already mentioned above in relation to Plaintiff's first request, he poses a specific security concern when it comes to contraband being

15

brought into the prison. Additionally, it would be very difficult for security personnel to observe whether contraband is being passed from one person to another if they are in a private room, prostrating themselves, and able to conceal items much easier than in a seated position next to one another in the already-designated visiting room. (App'x at E).

The needs of other inmates are also a legitimate penological concern for the Department. Visiting room areas in the prison are a part of the planning process and are large in nature such that several visits can be going on at one time. If Plaintiff engages in his congregate prayer in the way he wishes, no one else can reasonably meet at the same time given the noise and distraction. That takes away visiting time from other inmates, and converts a currently neutral meeting space into one being used for religious purposes. (App'x at E). Then, of course, the Department has a new problem relating to one religion being given preference over another, receiving more prayer time than another, etc.

Scarcity of resources is a concern as well—if Plaintiff were to be given a private room to engage in visits and group prayers, other inmates would surely expect the same treatment and the Department would be obliged to provide such an accommodation for every inmate seeking group prayer with visitors. All of these requests would, of necessity, for be for the same basic time frame when visiting hours are permitted at SCI-Huntingdon from 8:00am to 8:00pm each day. This

16

would result in the need to supply a virtually limitless number of rooms at or near the same time, and to staff each one with security personnel. (App'x at E). If other inmates were not granted such an opportunity but Plaintiff was, feelings of resentment could manifest into assaults very quickly in the prison setting. (App'x at E).

In addition, inmates would likely demand/expect related accoutrements, *i.e.*, prayer rugs, crosses, kneeling benches, ceremonial pipes, prayer books, meditation pillows, etc. Such an approach is simply unworkable, and under RLUIPA need not be accommodated due to the compelling governmental interest of prison security and scarcity of resources. (App'x at E).

Importantly, The Department considered, and Plaintiff was ultimately afforded, a least restrictive alternative with which to engage in prayer with his visitors. (App'x at A; App'x at I). He is permitted to pray with them sitting down quietly in the visiting rooms. In the prison context, this is an adequate alternative.

Undersigned counsel believes that this is an issue of first impression for this Court, as well as across the country. However, the US District Court of Connecticut reviewed a case where an inmate requested congregate prayer with other Muslim inmates five times per day pursuant to RLUIPA. *Vega v. Lantz*, 2009 WL 3157586 (D.C. Conn. 2009) (App'x at J). In that case, the state prison had a regulation that permitted its inmates to engage in one congregate prayer per week. *Id*. at 2. In

17

support of its denial, the prison argued compelling government interests of "prison security and order". *Id*. at 10. The Court agreed with the prison, holding:

> [T]he regulation is in furtherance of compelling government interests of prison security and order and is the least restrictive means of furthering that compelling government interest. The defendants permit the plaintiff to pray in his cell, and their policy provides that weekly congregate prayer be held for each religion. RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security concerns that the defendants identify. The defendants' motion for summary judgment is granted as to this RLUIPA claim."

*Id*. at 10.

Defendants here have the same concerns, and then some, given Plaintiff's request to engage in congregate prayer with visitors. Similarly, Plaintiff is permitted to pray in his cell in furtherance of the practice of his religion. (App'x at A). As already mentioned, he is also permitted to pray quietly with visitors in the visiting room.

Judgment should be granted in favor of Defendants on the RLUIPA claim relating to private congregational prayer with visitors.

C.     Summary judgment should be granted in Defendants' favor as to Plaintiff's circumcision claim because the Department has compelling government interests in declining inmate requests for elective surgeries.

Plaintiff indicates that his religion requires that converts to Islam must get ritually circumcised. (Doc. 34 at ¶¶ 90-97). Plaintiff acknowledges that the circumcision surgery is not medically necessary, and his request for the surgery on

religious grounds was denied.  (See App'x at I; Doc. 34 at ¶¶ 90-97).  Though it is unclear from Plaintiff's accommodation request who he wants to pay for the cost of a circumcision surgery, it is clear from the Amended Complaint that he expects the Department to pay for the procedure.  (Doc. 34 at ¶¶ 101-103).

In the denial letter, the Department indicated, "It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery."  (App'x at A).  The Department also cited to Policy 13.2.1 as indicative that the Department does not pay for cosmetic surgeries.  (App'x at A; App'x at K).

"Prisoners do not have a constitutional right to limitless medical care, free of the cost constraints under which law-abiding citizens receive treatment." *Winslow v. Prison Health Serv.*, 406 F. App'x 671, 674 (3rd Cir. 2011) (citing *Reynolds v. Wagner,* 128 F.3d 166, 175 (3rd Cir. 1997) and holding that the 8th Amendment was not violated by prison declining to pay for hernia that did not medically require surgery).  (App'x at J).

In a recent case before this district court in 2019, *Cowher v. Pike County Correctional Facility*, a federal inmate argued that the DOC Defendants were deliberately indifferent to his medical needs when they denied his request for back or hip surgery because it was not medically necessary bur rather elective in nature.

*Cowher v. Pike County Correctional Facility*, 2019 WL 3302415 (USMD Pa. 2019) (unreported) (App'x at K). The Court held that since the medical professionals provided care and indicated that the procedure was not necessary, it was not cruel and unusual to decline the inmate's request for surgery. *Id*. at 13-15.

No Court has held that a request for cosmetic surgery sought for religious reasons under RLUIPA must be provided. There are legitimate penological reasons for this. As explained in by the United States District Court of Connecticut in *Vega v. Lantz*, where an inmate sought a circumcision for religious reasons:

> The DOC's preclusion of elective surgeries for prisoners is reasonably related to legitimate penological interests. Elective surgery could alter a prisoner's identifying characteristics. It would be eminently unreasonable to allocate taxpayer money to elective surgeries for prisoners, and permitting prisoners with means to purchase elective surgery would sow discord by emphasizing wealth disparities. Finally, remaining uncircumcised does not prevent plaintiff from taking advantage of other available means of religious exercise such as prayer and study.

*Vega v. Lantz*, 2013 WL 6191855 (D.C. Conn. 2013) (App'x at L). Based on this reasoning, the *Vega* Court concluded that corrections officials had met the burden to show a compelling governmental interest to deny religious circumcisions. The United States District Court of the Eastern District of California has held the same. *Fields v. Paramo*, 2019 WL 4640502 (E.D. Ca. 2019) (applying the *Turner* analysis and finding in the prison's favor on all four prongs). (App'x at M).

Defendants concede here that the denial of Plaintiff's request to be circumcised with government funds places a substantial burden on his religious exercise. However, prison resources do not allow for inmates to be afforded with government funds to pay for cosmetic surgeries.

The Department provides medically necessary care to all inmates pursuant to DOC Policy 13.2.1, Section 1(A). (App'x at F; App'x at L). Pennsylvania State Correctional Institutions are not currently equipped to conduct medically-necessary surgeries, so all surgeries occur off site. When an inmate has to be transported to an outside medical facility for a medical procedure, he must be accompanied by at least two or more security staff, depending on the inmate Custody Level. The Department pays for the cost of medically-necessary surgeries. The Department provides some medical care to inmates on a case-by-case basis pursuant to Policy 13.2.1, Section 1(B). There are some medical services that the Department does not provide pursuant to Policy 13.2.1, Section 1(C). Department policy 13.2.1, Section 1(C)(1) indicates: "Medical services not provided by the Department include, but are not limited to…cosmetic surgery or services." (App'x at F; App'x at L).

Circumcision is considered a cosmetic surgery, sometimes referred to as elective surgery. Circumcision surgery is often done to increase sexual gratification. (App'x at F).

21

Traditional circumcision surgery generally costs approximately $3,500.00. (App'x at F).

Plaintiff indicates that he wants to be ritually circumcised in order to keep his genital area clean for religious purposes. Proper hygiene techniques will allow for clean genital areas without the need to be circumcised. Availability of resources in the community for cosmetic surgery is stretched very thin at the present time because of the COVID pandemic. If Plaintiff were able to get the procedure done, he would then come back into the prison with the potential for further complications, which the Department would have to pay for. Risks of complications include: bleeding, infection, and wound dehiscence (opening up of the wound after surgery is finished), Glans hyperesthesia, skin bridges and meatal stenosis. (App'x at F).

Denying Plaintiff's request for ritual circumcision serves the legitimate penological interest of conserving government resources, including the cost of surgery, hospital services, security transportation staff to and from the hospital, and the cost of any potential post-surgery complications. (App'x at F).

Plaintiff argues that the cosmetic/elective aspect of the surgery is inapposite to whether it is required on religious grounds. But the two are necessarily intertwined based on Plaintiff's expectation that the government will fund the cost of his desired cosmetic procedure.

22

JA140

# CONCLUSION

Based on the foregoing reasoning, this Court should grant the Motion for Summary Judgment in favor of Defendants.

<div style="margin-left:40%">

Respectfully submitted,

By:  /s/ Abby N. Trovinger
*Abby N. Trovinger, Assistant Counsel*
Attorney I.D. No. PA308329
PA Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA  17050

</div>

Dated:  June 30, 2021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,           :
      Plaintiff

                                :    CIVIL ACTION NO. 3:15-1573

          v.

                                :    (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
      Defendants          :

## CERTIFICATE OF SERVICE

I hereby certify that I am providing a true and correct copy of the foregoing Brief in Support of Motion for Summary Judgment for HAND-DELIVERY to the person below:

Fernando Nunez, FM8959
SCI-Mahanoy

By:   /s/ Abby N. Trovinger
        Abby N. Trovinger, Assistant Counsel
        Attorney ID No. PA308329
        Pa. Department of Corrections
        1920 Technology Parkway
        Mechanicsburg, PA 17050
        717.728.7763

Dated: June 30, 2021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,                       :
     Plaintiff

                           :    CIVIL ACTION NO. 3:15-1573

        v.

                           :    (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
     Defendants                       :

## DEFENDANTS' STATEMENT OF MATERIAL FACTS
## PURSUANT TO LOCAL RULE 56

Defendants, by and through Counsel, hereby file this Statement of Material Facts pursuant to Local Rule 56.1 of the United States District Court for the Middle District of Pennsylvania, and hereby set forth the following statement of material facts to which they contend that there are no genuine issues to be tried:

1.     Plaintiff, Fernando Nunez, is a Pennsylvania state inmate who was incarcerated at the State Correctional Institution at Huntingdon ("SCI-Huntingdon") during the events alleged in this lawsuit.  (Doc. 34).

2.     On April 9, 2019, Plaintiff filed the operative Amended Complaint ("AC") in this case.  (Doc. 34).

3.     Remaining Defendants are Pennsylvania Department of Corrections ("Department") Secretary John Wetzel and then Department Regional Deputy Secretary Tabb Bickell.  (Doc. 34).

JA143

4. Plaintiff describes himself as a devout Muslim and claims that his religion rights are being violated under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in three ways. (D0c. 34, generally).

5. First, he alleges that the Department' policy prohibiting conjugal visits violates his Islamic beliefs. Specifically, he avers that he was permitted to marry in 2013, but was not permitted to consummate his marriage in accordance with his religious beliefs. (Doc. 34 at ¶¶ 8-9).

6. Plaintiff seeks ongoing conjugal visits and other forms of intimacy as understood in Islamic practice to include "light talk, love expressions, touching, caressing, kissing and fondling." (Doc. 34 at ¶11).

7. Second, Plaintiff seeks to be able to engage in group prayer in the visiting room with his visitors. (Doc. 34 at ¶ 68).

8. Third, he seeks a circumcision for religious reasons. (Doc. 34 at ¶¶ 90-95). It is not clear from the AC who would be responsible for payment of Plaintiff's circumcision. (Doc. 34 at ¶¶ 90-106).

9. Plaintiff seeks injunctive relief in the form of "enjoining the Defendants… from enforcing the Administrative Code regulation and Department policies at issue, so as to not continue to substantially burden the Plaintiff's religious beliefs" and "Order the Defendants in his action to implement a

2

JA144

family/conjugal visit program, and execute policies and practices which serve to accommodate Plaintiff's religious beliefs." (Doc. 34 at ¶ 106).

10.    In January 2015, Plaintiff requested three religious accommodations while in state prison: 1) to engage in conjugal visits with his spouse, 2) to engage in congregate prayer in private with his family during contact visits, and 3) to be ritually circumcised. (App'x at A; Doc. 34 at ¶ 15).

11.    Plaintiff's request for conjugal visits was denied "due to safety, security and health concerns. (App'x at A).

12.    His request for congregational private prayer was denied because the request "would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. Further, "The institution cannot provide every inmate with [a] private visiting room for congregational prayers with family members. (App'x at A).

13.    Plaintiff's request for circumcision was denied because "circumcision is an elective surgery and is not medically necessary", and also because of the costs involved for and after elective surgeries. The Department also cited to Policy 13.2.1 as indicative that the Department does not pay for cosmetic surgeries. (App'x at A; App'x at K).

14.    Plaintiff filed grievance number 564319 relating to the conjugal visits issue, which was denied for the same reasons that the original accommodation was

denied. It was noted that he is permitted to briefly embrace and kiss his spouse at the beginning and end of a visit. The denial was upheld on appeal at the first level, and again at the second level. (App'x at B).

15. Plaintiff filed grievance number 562984 relating to the private congregational prayer issue, and his grievance was denied because inmates share the visiting room and that space is not for the purpose of practicing religion. It was noted that he is permitted to quietly pray in a seated position with his guests. The denial was upheld on appeal at the first level, and again at the second level, based on the same rationale. (App'x at I).

16. Finally, Plaintiff filed grievance number 564054 relating to the circumcision issue; his grievance was denied because the Department does not permit elective surgeries. The denial was upheld on appeal at the first level, and again at the second level, based on the same rationale. (App'x at K).

17. Although Plaintiff cannot have sexual contact with his spouse, he is permitted to "share a brief kiss and embrace" when meeting and departing from a visit. (App'x at C; App'x at E).

18. The Department also permits "a brief kiss" after marriage. (App'x at D; App'x at E).

19.    The Department is responsible for the safety and security of all inmates, which includes preventing contraband from entering the prisons.  (App'x at E).

20.    Plaintiff has shown himself to pose a direct threat regarding introduction of contraband into the Department. (App'x at E).

21.    It would be very difficult to monitor whether any contraband was being passed between the parties during long kisses, long embraces, and/or sexual acts.  (App'x at E).

22.    Plaintiff could not engage in sexual acts in the same visiting room where other visits are taking place.  This means that he would need to be afforded his own private room for the conjugal visit.  (App'x at E).

23.    If this Plaintiff is granted such an accommodation, certainly all inmates would expect the same, and the Department simply does not have the space to accommodate such requests.  (App'x at E).

24.    The needs of other inmates are also a legitimate penological concern for the Department.  (App'x at E).

25.    Visiting room areas in the prison are a part of the planning process and are large in nature such that several visits can be going on at one time.  (App'x at E).

26.     Plaintiff could not engage in sexual acts in the same visiting room where other visits are taking place—he would need a private room for the visit. (App'x at E).

27.     In Pennsylvania, all contact visits in a prison are to take place under official supervision.  37 Pa. Code 93.3(h)(6).  This means that a corrections officer would need to either supervise or record (or both) the sexual acts of others, so the visit would no longer be private and the corrections officer would be subjected to a very precarious situation.  (App'x at E).

28.     Space and time for visitation at the Department is limited.  At the State Correctional Institution at Huntingdon, where Plaintiff is located, the visiting hours are from 8:00am to 8:00pm, 7 days per week.  (App'x at E).

29.     No prison could accommodate a private room for all inmates requesting conjugal visits during visiting hours on any given day.  (App'x at E).

30.     The Department is responsible for the health of inmates to the extent that can be controlled.  Permitting inmates to have sexual contact with visitors increases the likelihood that sexually transmittable infections (STIs) will be introduced into the prisons, which it and of itself leads to a host of other problems. (App'x at F).

31.     Particularly concerning STIs in an institutional setting include: Hepatitis, HIV, Syphilis, Herpes, Chlamydia and Gonorrhea.  (App'x at F).

6

32.    STIs can often be difficult to detect by even the infected individual themselves.  (App'x at F).

33.    Increased STI rates in the institutions will result in medical issues for inmates.  (App'x at F).

34.    STIs can often be very contagious and some can last a lifetime.  STIs in particular can cause cancer, infertility, and even death.  (App'x at F).

35.    Hepatitis B and Hepatitis C in particular can cause permanent liver damage.  (App'x at F).

36.    If gone undetected, many can cause permanent damage and even death.  To complicate matters, STIs often are not detected unless an inmate self-discloses.   (App'x at F).

37.    Increased STI rates in the institutions would be detrimental to the population and will result in high costs of medical treatment, if treatment is even an option.  (App'x at F).

38.    There would be no way for the Department to ensure that safe sex was occurring during a conjugal visit in order to safeguard that STIs were not being passed from one participant to the other.  This in turn would result in more medical issues for inmates, and more costs for the Department in the treatment of those issues.  (App'x at F).

39.     Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing STIs from entering and spreading around the prison population.   (App'x at F).

40.     The Department would have no way of ensuring that the sexual encounters were consensual at any given moment, which could result in a crime being committed at the prison.   Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing sexual assaults on government property.  (App'x at F).

41.     The Department has several legitimate penological interests in not permitting congregational prayer sessions between inmates and visitors.  (App'x at E).

42.     Plaintiff poses a specific security concern when it comes to contraband being brought into the prison. (App'x at E).

43.     Additionally, it would be very difficult for security personnel to observe whether contraband is being passed from one person to another if they are in a private room, prostrating themselves, and able to conceal items much easier than in a seated position next to one another in the already-designated visiting room.  (App'x at E).

44.     The needs of other inmates are also a legitimate penological concern for the Department.  (App'x at E).

8

45.     Visiting room areas in the prison are a part of the planning process and are large in nature such that several visits can be going on at one time.  If Plaintiff engages in his congregate prayer in the way he wishes, no one else can reasonably meet at the same time given the noise and distraction.  That takes away visiting time from other inmates, and converts a currently neutral meeting space into one being used for religious purposes.  (App'x at E).

46.     Scarcity of resources is a concern as well—if Plaintiff were to be given a private room to engage in visits and group prayers, other inmates would surely expect the same treatment and the Department would be obliged to provide such an accommodation for every inmate seeking group prayer with visitors. (App'x at E).

47.     All of these requests would, of necessity, for be for the same basic time frame when visiting hours are permitted at SCI-Huntingdon from 8:00am to 8:00pm each day.  (App'x at E).

48.     This would result in the need to supply a virtually limitless number of rooms at or near the same time, and to staff each one with security personnel. (App'x at E).

49.     If other inmates were not granted such an opportunity but Plaintiff was, feelings of resentment could manifest into assaults very quickly in the prison setting.  (App'x at E).

9

JA151

50.    Inmates would likely demand/expect related accoutrements, *i.e.*, prayer rugs, crosses, kneeling benches, ceremonial pipes, prayer books, meditation pillows, etc. (App'x at E).

51.    The Department has compelling governmental interests of prison security and scarcity of resources to decline congregational prayer in the visiting room or a private room.  (App'x at E).

52.    The Department provides medically necessary care to all inmates pursuant to  DOC Policy 13.2.1, Section 1(A).  (App'x at F; App'x at L).

53.    Pennsylvania State Correctional Institutions are not currently equipped to conduct medically-necessary surgeries, so all surgeries occur off site. (App'x at F).

54.    When an inmate has to be transported to an outside medical facility for a medical procedure, he must be accompanied by at least two or more security staff, depending on the inmate Custody Level.   (App'x at F).

55.    The Department provides medically necessary care to all inmates pursuant to  DOC Policy 13.2.1, Section 1(A).  (App'x at F; App'x at L).

56.    The Department pays for the cost of medically-necessary surgeries. (App'x at F; App'x at L).

57.    The Department provides some medical care to inmates on a case-by-case basis pursuant to Policy 13.2.1, Section 1(B).  (App'x at F; App'x at L).

58.    There are some medical services that the Department does not provide pursuant to Policy 13.2.1, Section 1(C).  Department policy 13.2.1, Section 1(C)(1) indicates: "Medical services not provided by the Department include, but are not limited to…cosmetic surgery or services." (App'x at F; App'x at L).

59.    Circumcision is considered a cosmetic surgery, sometimes referred to as elective surgery.   Circumcision surgery is often done to increase sexual gratification.  (App'x at F).

60.    Traditional circumcision surgery generally costs approximately $3,500.00.  (App'x at F).

61.    Plaintiff indicates that he wants to be ritually circumcised in order to keep his genital area clean for religious purposes.  (Doc. 34).

62.    Proper hygiene techniques will allow for clean genital areas without the need to be circumcised.  (App'x at F).

63.    Availability of resources in the community for cosmetic surgery is stretched very thin at the present time because of the COVID pandemic.  (App'x at F).

64.    If Plaintiff were able to get the procedure done, he would then come back into the prison with the potential for further complications, which the Department would have to pay for.  (App'x at F).

65. Risks of complications include: bleeding, infection, and wound dehiscence (opening up of the wound after surgery is finished), Glans hyperesthesia, skin bridges and meatal stenosis. (App'x at F).

66. Denying Plaintiff's request for ritual circumcision serves the legitimate penological interest of conserving government resources, including the cost of surgery, hospital services, security transportation staff to and from the hospital, and the cost of any potential post-surgery complications. (App'x at F).

Respectfully submitted,

Office of General Counsel

By:   /s/ Abby N. Trovinger
        Abby N. Trovinger, Assistant Counsel
        Attorney I.D. No. PA308329
        Pennsylvania Department of Corrections
        Office of Chief Counsel
        1920 Technology Parkway
        Mechanicsburg, PA 17050
Dated: June 30, 2021    atrovinger@pa.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,                    :
     Plaintiff

                          :    CIVIL ACTION NO. 3:15-1573

     v.

                          :    (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
     Defendants                  :

## CERTIFICATE OF SERVICE

I hereby certify that I am providing a true and correct copy of the foregoing Statement of Material Facts for HAND-DELIVERY to the person below:

Fernando Nunez, FM8959
SCI-Mahanoy

By:   /s/ Abby N. Trovinger
        Abby N. Trovinger, Assistant Counsel
        Attorney ID No. PA308329
        Pa. Department of Corrections
        1920 Technology Parkway
        Mechanicsburg, PA 17050
        717.728.7763

Dated: June 30, 2021

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FERNANDO NUNEZ,<br>Plaintiff | : | |
| | : | CIVIL ACTION NO. 3:15-1573 |
| v. | : | (JUDGE JENNIFER P. WILSON) |
| TOM W. WOLF, *et al.*,<br>Defendants | : | |

## APPENDIX TO DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

A.  Religious Accommodation Request Documents

B.  Grievance 564319 (regarding conjugal visits)

C.  Department Policy 812

D.  Department Policy 821

E.  Declaration of Scott Woodring

F.  Declaration of Dr. Arlene Seid

G.  *Thomas v. Corbett*, 458 M.D. 2013 (Pa. Cmwlth. 2013)

H.  *Owens v. Kernan*, 2016 WL 3361885 (USDC E.D. Cal. 2016)

I.  Grievance 562984 (regarding congregational prayer with visitors)

J.  *Vega v. Lantz*, 2009 WL 3157586 (D.C. Conn. 2009)

K.  Grievance 564054 (regarding circumcision)

L.  Department Policy 13.2.1

M.  *Winslow v. Prison Health Serv.*, 406 F. App'x 671, 674 (3rd Cir. 2011)

JA156

N.     *Cowher v. Pike County Correctional Facility*, 2019 WL 3302415

(M.D. Pa. 2019)

O.     *Vega v. Lantz*, 2013 WL 6191855 (D.C. Conn. 2013)

P.     *Fields v. Paramo*, 2019 WL 4640502 (E.D. Ca. 2019)

Respectfully submitted,

By:     /s/ Abby N. Trovinger
Abby N. Trovinger, Assistant Counsel
Attorney I.D. No. PA308329
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA  17050

Dated:  June 30, 2021

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

FERNANDO NUNEZ,                    :
     Plaintiff

                           :   CIVIL ACTION NO. 3:15-1573

       v.

                           :   (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
     Defendants            :

## <u>CERTIFICATE OF SERVICE</u>

    I hereby certify that I am providing a true and correct copy of the foregoing Appendix for HAND-DELIVERY to the person below:

<div align="center">

Fernando Nunez, FM8959
SCI-Mahanoy

</div>

               By:   <u>/s/ Abby N. Trovinger</u>
                     Abby N. Trovinger, Assistant Counsel
                     Attorney ID No. PA308329
                     Pa. Department of Corrections
                     1920 Technology Parkway
                     Mechanicsburg, PA 17050
                     717.728.7763

Dated: June 30, 2021



## pennsylvania
DEPARTMENT OF CORRECTIONS

TO: Tabb Bickell, Deputy Secretary
Central Region

FROM: Shawn Kephart, Director

DATE: April 6, 2015

RE: Religious Accommodation Request Response
**Fernando Nunez Jr. – HUN**

**Religion**
Muslim (MUS)

**Accommodation Requested**
a) To be able to shower with privacy screens/curtains.

b) Conjugal visit with spouse.

c) Circumcision.

d) To be allowed to prayer with family members during visit.

**Recommendation**
a) The physical plant of some facilities do not include individual showers, which is the case at this facility. However, the request to be able to shower in privacy can easily be accomplished by the inmate wearing his boxers or placing a towel around his private areas while showering or

b) Conjugal visit with spouse is denied due to safety, security and health concerns.

c) The request by this inmate to be ritually circumcised while confined in the PA DOC is DENIED as circumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. While incarcerated, the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice.

d) The request to prayer with family members during visit is denied. Performing religious practices in the Visiting Room, requiring participants to lie prostrate on the ground, would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. The inmate may pray quietly make supplication with his family members during their visit. The institution cannot provide every inmate with private visiting room for congregational prayers with family members. The inmate and his family members are free to pray by themselves both before their visit has commenced and after their visit has concluded.

___4_ / _7__ /2015          ___Concur with recommendation
DATE              Reg. Deputy Secretary's Signature   ___Do not concur with
                                                          recommendation

___4_ / _18_ /2015   Date BTS Staff informed institution of final decision.        ___DL____
DATE                                                                               BTS Initials

_____ / _____ /2015   Date FCPD sent inmate copy of this memo.                     _____
DATE                                                                               FCPD Initials


cc:   Secretary John E. Wetzel                    Rev. Ulrich Klemm, BTS
      Superintendent Eckard, HUN                  Debra Rand, Legal Dept.
      Rev. Darrell Wireman, FCPD, HUN             Rel. Accommodation File
      Inmate

# RELIGIOUS ACCOMMODATION EVALUATION FORM - Non-Grooming

| LAST Name: NUNEZ | FIRST Name: FERNANDO | DOC #: FM8959 |
|---|---|---|

Facility: HUNT    Religion on Accom. Request Form: AL-ISLAM

Date: 02/19/20 15    Religion on DOCNet: ISLAM

What accommodation(s) is the inmate requesting for religious reasons? (check all that apply)

☐ Kosher Diet   ☐ No Animal Products Diet   ☐ Other Diet   ☐ Holy Day Accommodation
☐ Separate Group Meeting   ☐ Religious Article   ☒ Other Accommodation

**For Religious Diet Requests Only:** Is the inmate currently on a therapeutic diet? ☐ Yes ☐ No
If yes, according to Medical, could the religious diet, if approved, interfere with any health condition, allergy or regimen of medicine the inmate receives? ☐ Yes ☐ No

☐ Inmate given a copy of the resource, **Religious Diets in the Department (4-I).**

**FCPD SUMMARY** of interview with inmate and rationale for approving/denying request. Attach additional sheets as necessary. CONJUGAL VISITS WITH SPOUSE. CURRENTLY PROHIBITED W/I THE DOC.

| | Recommend APPROVAL | | Recommend DISAPPROVAL | | State reasons IF disagreeing with FCPD recommendation |
|---|---|---|---|---|---|
| | Initials | Date | Initials | Date | |
| FCPD | | | Q.V. | 02/19/15 | |
| CCPM | | | NH | 2/19/15 | |
| FSM Food/diet requests only | | | | | |
| Major | | | GW | 3-2-15 | |
| DSCS | | | R.M | 2/19/15 | |
| DSFM | | | JTO | 2/25/15 | |

Facility Manger:  ☐ APPROVE Recommendation    ☒ DISAPPROVE Recommendation

Comments:

FM Signature _____    DATE 3 / 5 /20 15

FM: Return completed Evaluation Form to FCPD for copying and sending to BTS.

*DC-ADM 819, Religious Activities Procedures Manual*
*Section 4 – Religious Accommodations*
Issued: 1/24/2013
Effective: 2/1/2013

RECEIVED
MAR 13 2015
*Attachment 4-H*
Bureau of Treatment Services
Department of Co...
JA161

# RELIGIOUS ACCOMMODATION REQUEST FORM - Non-Grooming

Each inmate seeking a religious accommodation – other than for an exemption to the Department's Grooming Policy - must submit a **Religious Accommodation Request Form – Non-Grooming** in order for the request to be considered. Requests on behalf of a group of inmates are not accepted. Identical requests may be grouped by the FCPD who may prepare one response. For an exemption to the Department's Grooming Policy, ask your FCPD for a **Grooming Exemption Request Form (4-A)**.

| LAST Name: NUÑEZ | FIRST Name: FERNANDO | DOC #: FM 8959 | SCI: Huntingdon |
|---|---|---|---|
| Name of Religion: Al-Islam | Housing Unit: B.A. 3064 | DC inmate? (circle) (Yes) No | AC inmate? (circle) Yes (No) |

Which accommodation are you seeking for religious reasons? (check all that apply)

☐Kosher Diet ☐No Animal Products Diet ☐Other Diet ☐Holy Day Accommodation
☐Separate Group Meeting ☐Religious Article ☑Other Accommodation

A. Summarize the accommodation you are requesting. To have Conjugal visits with my Spouse, in private, so that I can engage in acts of intimacy. Such as, embracing, kissing & sexual intercourse. For I have never "consummated my marriage" with my Spouse, after our marriage ceremony. In A manner consistent with my Islamic beliefs because D.O.C. Policy 821 & 812, Prohibits me from doing so.

For **Religious Diet** Requests Only: Are you currently on a therapeutic diet? ☐Yes ☐No
If yes, what is your therapeutic diet: _____
If your religious diet request is approved, could receiving the religious diet interfere with any health condition, allergy or regimen of medicine that you receive? ☐Yes ☐No Explain.

C. Explain the key teachings and practices of your faith. Attach additional sheets as necessary. In Islam, one believes that Allah is the one who ordained marriage. He prohibits anything that conflicts with marriage or undermines its values. That is to say Allah & his messenger has unequivocally stated that having intercourse with one's spouse, is an act of obedience to Allah & the Sunnah of his messenger. See Surah's Ar-Rūm 30:21; Al-Baqarah 2:187. Particularly since both Spouses have A right upon eachother for protection, Preserving eachother's chastity and intimacy. See; Attached documents A) Etiquettes of Intimacy and b) Consummating The Marriage

D. Describe how you practice your faith in prison. Attach additional sheets as necessary. I practice Islam in accordance with the Qur'an And Sunnah of the Messenger in a manner that was taught to & understood by the richeous predecessors

D. List any book references or sources which support the religious reason supporting your accommodation. 1) The Quest For Love & Mercy (Regulations For Marriage In Islam) Book 1. 2). Closer Than A Garment (Marital Intimacy According To The Pure Sunnah) Book 2. and 3). The Fragile Vessel (Rights And Obligations between The Spouses In Islam), a series Book by: Muhammad Mustafa al-Jibaly

| Inmate Signature: Fernando Nuñez | 1 / 5 / 20 15 Date request prepared by inmate |
|---|---|
| FCPD Signature: | 01 / 06 / 20 15 Date request rec'd by FCPD |

**DC-ADM 819, Religious Activities Procedures Manual**
*Section 4 – Religious Accommodations*
Issued: 1/24/2013
Effective: 2/1/2013

*Attachment 4-G*
JA162

## CHAPTER 7

## CONSUMMATING THE MARRIAGE

### Advising the Married Couple

Prior to leaving the newlywed couple to themselves on their wedding night, it is important to give them advice regarding the Islāmic guidelines for marital intimacy, rights and obligations between the spouses, and other issues of importance for them. Most of this necessary information is included in this book and its two sequels. [1]

### Kindness to the Bride

The husband should be extremely kind to his bride on their first night together, especially if she is a virgin. He should understand that this night marks the beginning of a totally new life for her. This may make her nervous and slow in cooperating with him. So, he should not brutally force himself on to her. If she does not appear to be fully ready on the first night, he should work on easing her emotions while waiting for the ultimate union between them one or more days later — as might be necessary.

Allāh's Messenger (ﷺ) was very kind and gentle with 'Ā'ishah (ﷺ) on their first night with him. He gave her some milk to drink, allowed her young girlfriends to remain with her for a while, and talked to them jokingly — so as to make her feel at ease.

Asmā' Bint Yazīd Bin as-Sakan [2] reported that she adorned 'Ā'ishah (ﷺ) for the Prophet (ﷺ) and then invited him in. He came and sat next to her. He was given a large cup of milk. He drank some of it and then gave it to 'Ā'ishah (ﷺ) who shyly lowered her head.

---

[1] See "Closer Than a Garment" and "The Fragile Vessels" by the Author.
[2] She was Mu'th Bin Jabal's cousin: one of the *Anṣār* women who gave her covenant to the Prophet (ﷺ) during Bay'at ur-Riḍwān.

133

The following is a summary of acts of intimacy that are recommended between the two spouses. The evidence for this is found in this or other chapters of this book or, in some cases, in the other two parts of this series [3]:

1.  The two spouses go into a private room and close the curtains and doors to make sure that no one, not even a small child, will be able to watch them. Covering the *'awrah* in front of other than one's spouse is an important obligation.

2.  The two spouses adorn and beautify themselves for each other. Each of them wears clothes, jewelry, and perfumes that pleases the other partner. They brush their teeth and make sure that no ugly smells come out of their mouth or body. They avoid clothes or makeup that are prohibited in Islām or that are known to be specific for the disbelievers or the decadent. Ibn 'Abbās (ﷺ) said:

    "I like to beautify myself for my wife as much as I like her to beautify herself for me." [1]

3.  The two spouses indulge in various acts of foreplay that may include light talk and love expressions, touching, caressing, kissing, and so on. The husband should not rush into intercourse until he feels that his wife is ready for it. He should be especially kind and gentle with her on the first few nights of their marriage.

    Ibn Qudāmah (ﷺ) said:

    "It is recommended for the man to caress and fondle his wife prior to intercourse in order to arouse her so that she would get as much pleasure from intercourse as he does ... And if he climaxes before her, it would be disliked for him to pull out until she climaxes ... because that would otherwise cause her harm and prevent her from fulfilling her desire." [2]

    Oral sex should be avoided — except in a very limited scope. The same is true about most so-called "fetishes. These issues will be discussed later in this book.

4.  The two spouses may undress completely and freely look at each others' private parts. *Hadiths* preventing this are unauthentic, and we will see later that 'Ā'ishah (ﷺ) and the Prophet (ﷺ) bathed together, with each of them looking at his mate. However, it is recommended to hide their intimacy and nakedness under a shared cover for protection from anyone (such as a child) who might unexpectedly come within close range of them.

5.  The two spouses mention Allāh's name and the supplication that was cited earlier in this chapter. It is important for them to bring to mind the important goals of their intimacy and the reward that they expect for it from Allāh (ﷺ). They should also remember Satan's plotting and that he will whisper to them and attempt to

---

[1] Recorded by Ibn Jarīr aṭ-Ṭabarī in his commentary on the *āyah* 2:228.
[2] *Al-Mughnī* 8:136.

THE WOMAN'S RIGHTS IN ISLĀM

The woman's rights are ordained by Allāh, and no one may violate them for any reason. Al-Miqdām (؈) reported that Allāh's Messenger (؈) said:

«إن الله تعالى يوصيكم بالنساء خيراً، فإنهنّ أمهاتُكم وبناتُكم وخالاتُكم. إن الرجلَ من أهل الكتاب يُزوّج المرأةَ وما تعلق يداها الخيطَ، فما يرغبُ واحدٌ منهما عن صاحبه.»

‹Indeed, Allāh (؈) commands you to be good to the women; indeed, they are your mothers, daughters, and (maternal) aunts. Indeed, a man from the People of the Book would be married to a woman who can hardly know how to pull a string (from ignorance), and yet, neither of them would want to depart from his companion.›[1]

The woman's lesser physical strength is not, by any means, a justification for the man to overstep her rights. Abū Hurayrah (؈) reported that Allāh's Messenger (؈) said:

«إني أُحرّجُ عليكم حقَّ الضعيفين: اليتيم والمرأة.»

‹I strongly admonish you in regard to the right of the two weak ones: the orphan and the woman.›[2]

THE WIFE'S RIGHTS IN ISLĀM

The wife's rights on her husband are clearly ordained and strongly established in Islām. Allāh's Messenger (؈) gave the following

---

[1] Recorded by aṭ-Ṭabarānī in al-Kabīr. Initially verified to be weak by al-Albānī. But he subsequently considered it ḥasan, as is noted by Zuhayr ash-Shāwīsh in Ḍaʿīf ul-Jāmiʿ no. 1763.

[2] Recorded by Aḥmad, Ibn Mājah, and others. Verified to be ḥasan by al-Albānī (aṣ-Ṣaḥīḥah no. 1015 & Ṣaḥīḥ ul-Jāmiʿ no. 2447).

THE HUSBAND SHOULD FULFILL HIS WIFE'S DESIRE

The husband is also required to help his wife fulfill her desire and maintain her chastity. ʿAbdullāh Bin ʿAmr Bin al-ʿAṣ (؈) reported that Allāh's Messenger (؈) said to him:

«يا عبدَ الله! ألم أُخبَر أنك تَصومُ النهارَ وتقومُ الليلَ؟ فلا تَفعَل، فإنّكَ إذا فعلتَ ذلك هُجِمَتْ عينُكَ، ونَفِهتْ نفسُكَ، فصُمْ وأفطِرْ، وقُمْ ونَمْ، فإن لِجَسَدِكَ عَليكَ حقاً، وإن لِعينَيكَ عليكَ حقاً، وإن لِزوجِكَ عليكَ حقاً. وإن بحسبِك أن تصومَ من كل شهرٍ ثلاثةَ أيام، فإن لك بكل حَسَنةٍ عَشرَ أمثالِها، فإن ذلك صيامُ الدهرِ كلِّه.»

‹O ʿAbdullāh: Haven't I been informed that you fast the days and stand the nights (in prayer)? Do not do that, because if you did, your eye will become tired, and your body will become sick. So, fast (on some days) and break your fast (on others); and get up (for the night prayer) and sleep; for, indeed, your body has a right upon you, your eyes have a right upon you, and your wife has a right upon you. Indeed, it would suffice you to fast three days from each month, because you get for each good deed ten times its worth; thus, this would count as fasting the whole time.›

instruction to a number of his companions, including 'Uthmān Bin Maẓ'ūn [1] and 'Abdullāh Bin 'Amr [2] (ﷺ):

«إن لزوجك عليك حقاً.»

‹Your wife has a right upon you.› [3]

'Amr Bin al-Aḥwaṣ (ﷺ) reported [4] that Allāh's Messenger (ﷺ) said:

«ألا إن لكم على نسائكم حقاً، ولنسائكم عليكم حقاً.»

‹Lo! you have rights on your women, and your women have rights on you.› [5]

Fulfilling the wife's rights is an indication of *taqwā*: revering Allāh and fearing His punishment. It is a trust between the man and his Lord (ﷺ), and He will question him about that trust. Jābir (ﷺ) reported that Allāh's Messenger (ﷺ) said:

«اتقوا الله في النساء، فإنكم أخذتموهن بأمانة الله، واستحللتم فروجهن بكلمة الله، ولهن عليكم رزقهن وكسوتهن بالمعروف.»

‹Have *taqwā* of Allāh in regard to your women. Indeed, you took them (in marriage) through a trust with Allāh, and had access to their private parts by Allāh's word (permission). They have a right on you — that you provide them with food and clothing in a fitting manner.› [6]

---

1   Recorded by Aḥmad and Abū Dāwūd. Verified to be authentic by al-Albānī (*Irwā' ul-Ghalīl* no. 2015).
2   The full *ḥadīth* is cited later in this chapter.
3   Recorded by al-Bukhārī, Muslim, and others.
4   The full *ḥadīth* is cited p. 3.
5   Recorded by at-Tirmidhī, an-Nasā'ī, and Ibn Mājah. Verified to be *ḥasan* by al-Albānī (*Ṣaḥīḥ ul-Jāmi'* no. 7880 & *Irwā' ul-Ghalīl* no. 2030).
6   Recorded by Muslim and Abū Dāwūd as part of Jābir's long *ḥadīth* describing the Prophet's (ﷺ) *Ḥajj*.

The woman has rights and obligations. Her rights must be fulfilled in a serious and fair manner. This is an important requirement in Islām; neglecting it constitutes a clear act of disobedience and threatens the well-being of the family and the Muslim society.

With this introduction, we go on to discuss some of the rights that are specifically related to the women in Islām.

## Protection

### AN IMPORTANT OBLIGATION UPON THE HUSBAND

Security and safety are most important for a human being. One needs to feel reasonably secure in order to function normally and perform one's regular tasks.

The wife is usually the weaker of the two spouses, and looks to her husband for protection. Thus, one of the husband's most important obligations is providing protection for his wife. This is part of his responsibility as leader of the family:

«الرِّجَالُ قَوَّامُونَ عَلَى النِّسَاءِ بِمَا فَضَّلَ اللَّهُ بَعْضَهُمْ عَلَى بَعْضٍ وَبِمَا أَنفَقُوا مِنْ أَمْوَالِهِمْ» النساء ٣٤

«Men are in charge of women by (right of) what (qualities) Allāh has given one over the other and what they spend (in support) from their wealth.» [1]

This *āyah* shows that Allāh gave leadership (or *qawāmah*) to the man because of certain qualities that would normally enable him to conduct such a responsibility. A most important quality of a leader is his ability to protect his followers and provide for them an atmosphere of security and harmony.

Protection is a general term that covers physical, emotional, and other forms of well-being. The husband must strive to protect his wife in all of those respects. Some details in this regard will be discussed

---

1   *An-Nisā'* 4:34.

JA165

### DENIAL OF INTIMATE PLEASURE IS A MAJOR SIN

Since it is a major obligation upon the wife to fulfill her husband's desire, refusing to do so is a major sin that deserves the angels' curse and Allāh's wrath. Abū Hurayrah (﷌) reported that the Prophet (ﷺ) said:

«إذا دعا الرجل امرأته إلى فراشه، فأبَتْ (فلم تأته)، فبات غضبان عليها، لعنتها الملائكة حتى تصبح (أو يرضى عنها).»

‹If a man invites his wife to bed and she refuses to come and he sleeps while angry, the angels curse her till the morning.› [1]

In another report, Abū Hurayrah (﷌) said that the Prophet (ﷺ) said:

«إذا باتت المرأة هاجرةً فراش زوجها لعَنَتها الملائكة حتى تصبح.»

‹When a woman deserts her husband's bed at night, the angels curse her until the morning.› [2]

And Abū Hurayrah (﷌) reported that the Prophet (ﷺ) said:

«والذي نفسي بيده، ما من رجل يدعو امرأته إلى فراشِه، فتأبى عليه، إلا كان الذي في السماء ساخطاً عليها حتى يرضى عنها.»

‹By the One in whose hand is my soul, never would a man invite his wife to his bed and she refuses but that the One who is above the heavens would be angry with her until he (her husband) forgives her.› [3]

---

1   Recorded by al-Bukhārī, Muslim, and others.
2   Recorded by al-Bukhārī, Muslim, and others.
3   Recorded by Muslim.

in the subsequent sections.

### GHAYRAH

As a demonstration of a man's love toward his wife, he should have *ghayrah* for her. *Ghayrah* is the great concern about her well-being, and the zeal to protect her from anything that may harm her person, such as an evil touch, word, or look.

But *ghayrah* should not reach the point of distrusting and suspecting her without reason, nor should it be for the purpose of finding possible mistakes. Jābir Bin ʿAtīk (﷌) reported that Allāh's Messenger (ﷺ) said:

«إن من الغَيْرة ما يحب الله، ومنها ما يبغض اللهُ. فأما الغيرة التي يحب اللهُ، فالغيرةُ في ريبة. وأما التي يُبغِضُ اللهُ، فالغيرة في غير ريبة.»

‹Indeed, there is a form of *ghayrah* that Allāh loves, and a form that Allāh hates. *Ghayrah* that Allāh loves is that which is based on (valid) suspicion. And *ghayrah* that Allāh hates is that which is without (valid) suspicion.› [1]

A person without *ghayrah* is called *dayyūth*. A *dayyūth* is a person who has no sense of protection or honor regarding his wife. As we discussed in the second book of this series [2], a *dayyūth* will not enter *Jannah*.

---

1   Recorded by Aḥmad, Abū Dāwūd, and others. Verified to be *ḥasan* by al-Albānī (*Irwāʾ ul-Ghalīl* no. 1999).
2   See "Closer than a Garment" by the author.

# Religious Accommodation Request Interview
## SCI-Huntingdon, Rev. D. Wireman, FCPD

_NUNEZ_, _FERNANDO_     _FM 8959_     _BA 3064_
Inmate's Name                  Number         Block

_MR. MORNINGSTAR_     _WIREMAN_     _02/19/15_
Counselor's Name           Interviewer          Date

1. What religious accommodation are you requesting? _Conjugal visit_

2. Did you have an accommodation before you came to Huntingdon?
_No_

If yes, what institution?
If yes, what chaplain?
If yes, do you have a copy of that exemption now?

3. What is your religion? _ISLAM_

4. When and how did you become a follower of this religion?
_2001_

5. How long have you been attending that religious service here?
_SINCE NOV. 2014_

6. Tell me some of the fundamental beliefs and teachings of your faith.
_FIVE PILLARS_
_- SHAHADAH - SAWM_
_- SALAT_
_- ZAKAT - HAJJ_

7. Tell me some of the religious duties or obligations of this faith.
_SALAT, FASTING, ETC._

8. Tell me about any holy days or rituals that followers of this faith are expected to observe.
_RAMADAN FAST, FEAST_

JA167

# RELIGIOUS ACCOMMODATION EVALUATION FORM - Non-Grooming

| LAST Name: NUNEZ | FIRST Name: FERNANDO | DOC #: FM8959 |
|---|---|---|
| Facility: HUNT | Religion on Accom. Request Form: AL-ISLAM | |
| Date: 02/19/20 15 | Religion on DOCNet: ISLAM | |

What accommodation(s) is the inmate requesting for religious reasons? (check all that apply)

☐ Kosher Diet ☐ No Animal Products Diet ☐ Other Diet ☐ Holy Day Accommodation
☐ Separate Group Meeting ☐ Religious Article ☒ Other Accommodation

**For Religious Diet Requests Only:** Is the inmate currently on a therapeutic diet? ☐ Yes ☐ No
If yes, according to Medical, could the religious diet, if approved, interfere with any health condition, allergy or regimen of medicine the inmate receives? ☐ Yes ☐ No

☐ Inmate given a copy of the resource, **Religious Diets in the Department (4-I).**

**FCPD SUMMARY** of interview with inmate and rationale for approving/denying request. Attach additional sheets as necessary. PRIVACY SHOWERS.

| | Recommend APPROVAL | | Recommend DISAPPROVAL | | State reasons IF disagreeing with FCPD recommendation |
|---|---|---|---|---|---|
| | Initials | Date | Initials | Date | |
| **FCPD** | | | GW | 02/19/15 | |
| **CCPM** | | | NH | 2/19/15 | |
| **FSM** Food/diet requests only | | | | | |
| **Major** | | | SW | 3-2-15 | |
| **DSCS** | | | RM | 2/19/15 | |
| **DSFM** | | | APD | 3/05/15 | |

**Facility Manger:** ☐ APPROVE Recommendation ☒ DISAPPROVE Recommendation

Comments:

FM Signature _[signature]_ DATE 3 / 5 /2015

FM: Return completed Evaluation Form to FCPD for copying and sending to BTS.

RECEIVED
MAR 13 2015

*DC-ADM 819, Religious Activities Procedures Manual*
*Section 4 – Religious Accommodations*
Issued: 1/24/2013
Effective: 2/1/2013

Bureau of Treatment Services
Department of... *Attachment 4-H*

JA168

# RELIGIOUS ACCOMMODATION REQUEST FORM - Non-Grooming

Each inmate seeking a religious accommodation – other than for an exemption to the Department's Grooming Policy - must submit a **Religious Accommodation Request Form – Non-Grooming** in order for the request to be considered. Requests on behalf of a group of inmates are not accepted. Identical requests may be grouped by the FCPD who may prepare one response. For an exemption to the Department's Grooming Policy, ask your FCPD for a **Grooming Exemption Request Form (4-A)**.

| LAST Name: Nuñez | FIRST Name: Fernando | DOC #: FM-8959 | SCI: Huntingdon |
|---|---|---|---|
| Name of Religion: Al-Islam | Housing Unit: B.A. 3064 | DC inmate? (circle) Yes (No) AC inmate? (circle) Yes (No) | |

Which accommodation are you seeking for religious reasons? (check all that apply)

☐ Kosher Diet  ☐ No Animal Products Diet  ☐ Other Diet  ☐ Holy Day Accommodation
☐ Separate Group Meeting  ☐ Religious Article  ☑ Other Accommodation

A. Summarize the accommodation you are requesting. To Shower in a shower stall with privacy screens/curtains. So that I am not forced to leave my Awrah uncovered or stare at other mens Awrah.

For **Religious Diet** Requests Only: Are you currently on a therapeutic diet? ☐ Yes ☐ No
If yes, what is your therapeutic diet: _____
If your religious diet request is approved, could receiving the religious diet interfere with any health condition, allergy or regimen of medicine that you receive? ☐ Yes ☐ No  Explain.

C. Explain the key teachings and practices of your faith. Attach additional sheets as necessary.
In Islam, it is prohibited to bath naked or in front of people, because my Awrah is left uncovered. Further, while showering, I am grieved by taking showers with groups of men who's Awrah is exposed.

D. Describe how you practice your faith in prison. Attach additional sheets as necessary.
I practice my religion in accordance with the Quran & Sunnah. I am upon the methodology of the richeous predecessors of prophet Muhammad, (saw).

D. List any book references or sources which support the religious reason supporting your accommodation. See Attach document on bathing naked.

| Inmate Signature: Fernando Nunez | 1 / 6 / 20 15 Date request prepared by inmate |
|---|---|
| FCPD Signature: | 01 / 08 / 20 15 Date request rec'd by FCPD |

**DC-ADM 819, Religious Activities Procedures Manual**
**Section 4 – Religious Accommodations**
Issued: 1/24/2013
Effective: 2/1/2013

*Attachment 4-G*

JA169

Ruling on being naked when taking a bath

Can a person take bath without any clothes on his body?

Praise be to Allaah.

Yes, it is permissible for a person to take a bath naked, because this was reported from the Prophet (peace and blessings of Allaah be upon him) as was reported by Maymoonah (may Allaah be pleased with her(, w ho said that she and the Prophet (peace and blessings of Allaah be upon him) took a bath together, washing from a large bowl in which there were traces of dough. And it was reported in several places as narrated by al-Bukhaari and Muslim, and he bathed with 'Aa'ishah (may Allaah be pleased with her).

There is no saheeh hadeeth from the Prophet (peace and blessings of Allaah be upon him) to indicate that it is obligatory to cover oneself when bathing. It was reported that some of the Salaf used to cover themselves, but this is not obligatory according to Islam. It is sufficient to be far from where people can see you.

Some scholars use as evidence the hadeeth in al-Saheehayn which speaks of Moosa (peace be upon him) bathing naked (al-Bukhaari, 274; Muslim, 339). Al-Nawawi entitled the chapter in Saheeh Muslim in which this hadeeth occurs "the permissiblity of bathing naked when one is alone."

It was also reported that Ayyoob (peace be upon him) bathed naked. (Saheeh al-Bukhaari, 275).

Imaam al-Nawawi said:

We have already seen in the previous chapter that it is permissible to uncover the 'awrah when necessary, when one is alone, such as when taking a bath, urinating, engaging in intimate relations with one's wife, and so on. In all of these cases it is permissible to uncover one's 'awrah when one is alone, but in front of other people it is forbidden to uncover the 'awrah in all cases.

The scholars said:

Covering oneself with a wrapper or something similar when taking a bath alone is preferable than uncovering oneself. Uncovering oneself is permissible for the period of time that is essential to take a bath, etc., but uncovering oneself for longer than that is haraam according to the most correct opinion, and Allaah knows best.

JA170

**Religious Accommodation Request Interview**                    Page 2

9. Do you attend worship opportunities here? If not, why not?

*Yes.*

10. Do you participate in religious study opportunities here?

*Yes.*

11. Tell me about any initiative you have taken to interact with a faith group leader (chaplain, spiritual advisor, etc.) while you have been incarcerated.

*Participation of activities, Jumah etc.*

12. Tell me about what religious books and religious items you possess.

*Qur'an, Three Fundamental Principle The book of End day*

13. Is there anything else you want me to know in regard to your request for this religious accommodation?

*Shower, = See accomodation*

14. What is the character (attitudes and behavior) of a man who is sincerely practicing your faith?

*Shamefuess, Honesty*

# RELIGIOUS ACCOMMODATION EVALUATION FORM - Non-Grooming

| LAST Name: NUNEZ | FIRST Name: FERNANDO | DOC #: FM 8959 |
|---|---|---|

| Facility: HUNT | Religion on Accom. Request Form: AL - ISLAM |
|---|---|

| Date: 02/19 /20 15 | Religion on DOCNet: ISLAM |
|---|---|

**What accommodation(s) is the inmate requesting for religious reasons?** (check all that apply)

☐ Kosher Diet  ☐ No Animal Products Diet  ☐ Other Diet  ☐ Holy Day Accommodation

☐ Separate Group Meeting  ☐ Religious Article  ☑ Other Accommodation

**For Religious Diet Requests Only:** Is the inmate currently on a therapeutic diet? ☐ Yes ☐ No

If yes, according to Medical, could the religious diet, if approved, interfere with any health condition, allergy or regimen of medicine the inmate receives? ☐ Yes ☐ No

☐ Inmate given a copy of the resource, **Religious Diets in the Department (4-I).**

**FCPD SUMMARY** of interview with inmate and rationale for approving/denying request. Attach additional sheets as necessary. CIRCUMCISION . DISAPPROVED BASED UPON DOC POLICY, SEE ATTACHED

| | Recommend APPROVAL | | Recommend DISAPPROVAL | | State reasons IF disagreeing with FCPD recommendation |
|---|---|---|---|---|---|
| | Initials | Date | Initials | Date | |
| **FCPD** | | | Cen. | 02/19/15 | |
| **CCPM** | | | MH | 2/19/15 | |
| **FSM** Food/diet requests only | | | | | |
| **Major** | | | SW | 3-2-15 | |
| **DSCS** | | | R.Mc | 2/19/15 | |
| **DSFM** | | | JYO | 2/25/15 | |

**Facility Manger:** ☐ APPROVE Recommendation  ☑ DISAPPROVE Recommendation

Comments:

FM Signature _J. Curran_  DATE 3 / 5 /2015

FM: Return completed Evaluation Form to FCPD for copying and sending to BTS.

*DC-ADM 819, Religious Activities Procedures Manual*
*Section 4 – Religious Accommodations*
Issued: 1/24/2013
Effective: 2/1/2013

*Attachment 4-H*

RECEIVED

MAR 2 4 2015

Bureau of Treatment Services
Department of Corrections

JA172

# GROOMING EXEMPTION REQUEST FORM

An inmate seeking an exemption to the Department's Grooming Policy for **religious reasons** must submit a **Grooming Exemption Request Form** to his/her FCPD.

| LAST Name: Nuñez | FIRST Name: Fernando | | DOC #: FM 8959 |
|---|---|---|---|
| Facility: Huntingdon | Name of Religion: | Al Islam | |
| Date: 1 / 5 / 20 15 | Housing Unit: B.A. 3064 | | DC inmate? (circle) Yes (No) AC inmate? (circle) Yes (No) |

Mark the **Grooming Exemption** you are seeking below: (check all that apply)

☐ HAIR-Length  ☐ BEARD-Length  ☐ Sidelocks/Sidecurls  ☑ Other _Circumcision_

A. Describe the religious reasons why you are requesting an exemption to the Department's Grooming Policy. Attach additional sheets as necessary. Allah commanded the prophet Muhammad to follow the pure creed of Ibrahim, and circumcision is part of it. An uncircumcised person is liable to impurity and uncleanliness because of the remains of urine underneath his foreskin. This could nullify his prayer and other acts of worship. Moreover, because I was not raised a muslim, growing up, I was never circumcised. In Islam, when one converts to the religion, he MUST get circumcised. It is a Quality of Fitrah & there are Five.: Circumcision, shaving the pubic hair, trimming the mustache, clipping the nails, & plucking the armpit hair.

B. OTHER THAN teachings of your faith on hair/beard-length, list key beliefs and practices of your faith tradition. Attach additional sheets as necessary. The Five pillars of Islam 1) The Shahadah, 2) Hajj (Pilgrimage); 3) Fast during Ramadan; 4) pay the Zakat (charity) and 5) Pray all Five Prayers daily.

C. Describe how you practice your faith in prison. Attach additional sheets as necessary. I practice Islam in accordance with the Qur'an and Sunnah of the Messenger in a manner that was taught to & understood by the richeous predecessors.

D. List any book references or sources which support the religious reason you state for needing an exemption to the Department's Grooming Policy. The Qur'an An-Nahl 16:123. Attached herewith I have Appended Relevant information extracted from Book 4 — called, "Our Precious Sprouts" (Islamic Regulations For Newborns) by: Muhammad Mustafa al-Jibaly

| Inmate Signature: Fernando Nuñez | 1 5 20 15 | Date request prepared by inmate |
|---|---|---|
| FCPD Signature: | 01 06 20 15 | Date FCPD rec'd and noted PENDING APPROVAL in UMS |

**DC-ADM 819, Religious Activities Procedures Manual**
**Section 4 – Religious Accommodations**
Issued: 1/24/2013
Effective: 2/1/2013

*Attachment 4-A*

JA173

# RELIGIOUS ACCOMMODATION <u>EVALUATION</u> FORM - Non-Grooming

| LAST Name: NUNEZ | FIRST Name: FERNANDO | DOC #: FM8959 |
|---|---|---|

| Facility: HUNT | Religion on Accom. Request Form: AL - ISLAM |
|---|---|

| Date: 02/19 /20 15 | Religion on DOCNet: ISLAM |
|---|---|

**What accommodation(s) is the inmate requesting for religious reasons? (check all that apply)**

☐ Kosher Diet ☐ No Animal Products Diet ☐ Other Diet ☐ Holy Day Accommodation ☐ Separate Group Meeting ☐ Religious Article ☒ Other Accommodation

**For Religious Diet Requests Only:** Is the inmate currently on a therapeutic diet? ☐ Yes ☐ No
If yes, according to Medical, could the religious diet, if approved, interfere with any health condition, allergy or regimen of medicine the inmate receives? ☐ Yes ☐ No

☐ Inmate given a copy of the resource, **Religious Diets in the Department (4-I).**

**FCPD SUMMARY** of interview with inmate and rationale for approving/denying request. Attach additional sheets as necessary. PRAYER WITH SPOUSE, CHILDREN, FAMILY, FRIENDS, ETC. IN A SMALL ROOM DURING CONTACT VISITS. NOT FEASIBLE STRUCTURALLY. PRACTICAL CONCERNS: WHAT IF A NUMBER OF COUPLES WANTED TO PRAY AT SAME TIME (VISIT) - SPACE? ISSUE.

| | Recommend APPROVAL | | Recommend DISAPPROVAL | | State reasons IF disagreeing with FCPD recommendation |
|---|---|---|---|---|---|
| | Initials | Date | Initials | Date | |
| FCPD | | | 12m. | 02/19/15 | |
| CCPM | | | MH | 2/19/15 | |
| FSM Food/diet requests only | | | | | |
| Major | | | SW | 22 | |
| DSCS | | | R.M | 2/19/15 | |
| DSFM | | | JPO | 3/25/15 | |

| Facility Manger: ☐ APPROVE Recommendation ☒ DISAPPROVE Recommendation |
|---|

Comments:

FM Signature _[signature]_ DATE 3 / 5 /20 15

FM: Return completed Evaluation Form to FCPD for copying and sending to BTS.

RECEIVED

MAR 13 2015

*Attachment 4-H*
Bureau of Treatment Services
Department of Corrections

JA174

# RELIGIOUS ACCOMMODATION REQUEST FORM - Non-Grooming

Each inmate seeking a religious accommodation – other than for an exemption to the Department's Grooming Policy - must submit a **Religious Accommodation Request Form – Non-Grooming** in order for the request to be considered. Requests on behalf of a group of inmates are not accepted. Identical requests may be grouped by the FCPD who may prepare one response. For an exemption to the Department's Grooming Policy, ask your FCPD for a **Grooming Exemption Request Form (4-A).**

| LAST Name: Nuñez | FIRST Name: Fernando | DOC #: FM 8959 | SCI: Huntingdon |
|---|---|---|---|

| Name of Religion: Al Islam | Housing Unit: B.A.3064 | DC inmate? (circle) Yes (No) <br> AC inmate? (circle) Yes (No) |
|---|---|---|

**Which accommodation are you seeking for religious reasons?** (check all that apply)

☐ Kosher Diet ☐ No Animal Products Diet ☐ Other Diet ☐ Holy Day Accommodation
☐ Separate Group Meeting ☐ Religious Article ☑ Other Accommodation

A. Summarize the accommodation you are requesting. To engage in congregation prayers with my spouse, children, family, friends, etc., in a small room, during the times I receive a contact visit, such as the legal visiting room areas, or any other unoccupied room, away from other inmate visitors, in a manner consistent with Islamic teachings, (i.e., how Muslims pray). It is a deviation from Islamic practice to pray while sitting, for reasons that I am not sick/ill, nor considered to be a traveler who is on a journey, during the times I am mandated to pray, when I get a contact visit.

<u>For **Religious Diet** Requests Only:</u> Are you currently on a therapeutic diet? ☐ Yes ☐ No
If yes, what is your therapeutic diet: _____
If your religious diet request is approved, could receiving the religious diet interfere with any health condition, allergy or regimen of medicine that you receive? ☐ Yes ☐ No Explain.

C. Explain the key teachings and practices of your faith. Attach additional sheets as necessary.
The Five Pillars In Islam: (1) The Shahada, (2) To pray the five daily prayers, (3) To fast on Ramadan, (4) To give charity (Zakat), and (5) To make pilgrimage (Hajj) to Mekkah.

D. Describe how you practice your faith in prison. Attach additional sheets as necessary.
I practice my Religion (Islam) in accordance with The Qur'an and Sunnah & Methodology of the richeous predecessors (Salifi Salah)

D. List any book references or sources which support the religious reason supporting your accommodation. See Attached Proofs that provides a source that supports my request.

Page 2 & 3

| Inmate Signature: *Fernando Nuñez* | / 25 /20 15 <br> Date request prepared by inmate |
|---|---|
| FCPD Signature: *signature* | 01 /27 /20 15 <br> Date request rec'd by FCPD |

*DC-ADM 819, Religious Activities Procedures Manual*
**Section 4 – Religious Accommodations**
Issued: 1/24/2013
Effective: 2/1/2013

*Attachment 4-G*

JA175

. At SCI Huntingdon, staff working the visiting room forbits, Muslims, such as myself, to offer Islamic obligatory congregational prayers, "standing", with my visitors during my contact visits. Relying on Doc Policy DC-ADM 812 and Local visiting room procedures. Superintendant Eckard, has held the same. Cited below are Proofs and Evidences in Islam that substantiates my religious Accommodation.

1. In the Book, "Fatawa Arkan-ul-Islam Islamic Verdicts on the Pillars of Islam, Vol. Pages 525-528, by the Honorable Shaikh Muhammad bin Salih Al-'Uthaimeen", Muslims are informed that it is an obligation upon the Islamic Community to congregate in prayer, because the Muslim community is one community and the unity will not be achieved without them gathering to perform their acts of worship and the greatest of acts of worship, the best of them and the most confirmed of them is prayer.

2. In the Book, "A Summary of Islamic Jurisprudence, Vol. 1., page 195, By Dr. Salih Al-Fawzan", I am informed that," the least number that should be present in order to perform A valid congregational prayer is two persons. That is two persons are the least number that can form A congregation. Abu Musa, narrated as A marfu (traceable) hadith that the Prophet (P.B.U.H) said:

< "The Congregation Prayer is to be performed by two persons or what is more than that number." >

Related by Ibn Majah (972) [1/517].

In addition, there is A hadith stating that the prophet (PBUH) said:
< "Who can do an act of charity to this Man (by performing prayer with him to let him get the reward for congregational prayer)? A man stood and performed the prayer with him. Thereupon, the Prophet (PBUH) said," That is A congregation". >
Related by Ahmad (11394) [3/57], Abu Dawud (574) [1/274] and At-Tirmidhi (220) [1/427].

3. The Commentary of Imam An-Nawawi, states," Offering Salah in congregation is anywhere, i.e., At home, in business premises, at an open place, in the desert etc. See," Riyad Us-Saliheen, Vol. 2. page 845.

4. Among the virtues of the Congregational Prayer is that it teaches the ignorant, multiplies the reward and motivates toward doing righteous deeds. This happens when A muslim person sees other Muslims practicing good deeds and as A result, he or she follow them. This came in the Hadith related by Al-Bukhari (782) [2/783] in which the prophet said:

< "The Prayer in congregation is twenty times Superior to the Prayer Performed By A Person Alone." >

By, Fernando Nunez
Fernando Nunez
SCI - Huntingdon

Date : 1-25-15

2

5. As for the Islamic Ruling on the one who does not observe the congregational Prayer, Ibn Abbas said, "He will be in Hellfire". See, "A Summary of Islamic Jurisprudence, Vol. 1, at page 192," by Dr. Salih Al-Fawzan.

6. Scholars In Islam have all agreed that," the congregational prayer is obligatory upon Men whether one is in residence or on A journey and whether in A State of Safety or fear, as an individual duty. See, Al-Buckhari (636)[1/153] and Muslim (1358) [2/100]. Further proof is provided in the Book of Allah. Where Allah says:

   < "And when you [i.e, The commander of an army] are among them and lead them in prayer, let a group of them Stand in prayer.." [Qur'an An-Nisa: 102]

7. In Islam, Muslims are obligated to pray in A manner consistent with the - Pillars of the Prayer — which are Fourteen. See, "An Explanation of the conditions, pillars and Requirements of Prayer," at Page 82, by Mujaddid bin Abdul-Wahhaab.

8. Accordingly, the First Pillar, ("Standing") is mandatory, if he is able to do so. Whoever prays sitting while having the ability to stand, his prayer is invalid. The Proof for this is the hadith of Imran bin Hasan, who reported that Allah's Messenger (PBUH) said:

   < "Pray Standing, but if you cannot, then Pray sitting. And if you cannot, then pray lying on your side". >. See, Al-Bukhaaree (1117).

   An additional Proof for standing in Prayer is Recorded in the Book of Allah. Where Allah says:

   < "Maintain with care the obligatory prayers and in particular the middle [i.e, Asr] Prayer and Stand before Allah, devoutly obedient." > [Qur'an Al-Baqarah: 228]

9. For SCI-Huntingdon to rely on Doc policy and its institutional Local Visiting Rules procedures to deny me and or compel me to forego Islamic obligatory congregational prayers with my visitors during contact visits, undermines my religious beliefs and is in direct contradiction to Islam and its teachings because I am compelled to deviate from my religion and not congregate in prayer or pray in the manner Islam commands, during my contact visits. The Prophet (PBUH) said:

   < "The hand of Allah is with the Muslim Community, so whoever deviates from it deviates to Hellfire". >

   Related by Ahmad (7144)[2/229] and Abu dawud (603)[1/286].

By. Feirnardo Nunez
Fernardo Alvarez
SCI-Huntingdon

Date: 1-25-15

2

# Religious Accommodation Request Interview
## SCI-Huntingdon, Rev. D. Wireman, FCPD

NUNEZ  FERNANDO          EM8959          BA-3064
Inmate's Name                        Number                    Block

MR, MORNINGSTAR        WIREMAN          02/19/15
Counselor's Name                    Interviewer                  Date

1. What religious accommodation are you requesting? Prayer with wife, children, family, friends in visiting room — within a private room

2. Did you have an accommodation before you came to Huntingdon?
No

If yes, what institution?
If yes, what chaplain?
If yes, do you have a copy of that exemption now?

3. What is your religion? Islam

4. When and how did you become a follower of this religion?
2001

5. How long have you been attending that religious service here?
SINCE NOV, 2014

6. Tell me some of the fundamental beliefs and teachings of your faith.
FIVE PILLARS

7. Tell me some of the religious duties or obligations of this faith.
SALAT, FASTING, ETC.

8. Tell me about any holy days or rituals that followers of this faith are expected to observe.
RAMADAN FAST, FEAST

JA178

**Wireman, Darrell**

| | |
|---|---|
| **From:** | Erdogan, Bilgin |
| **Sent:** | Wednesday, February 11, 2015 3:08 PM |
| **To:** | Wireman, Darrell |
| **Subject:** | about circumcision request |

Here is the information

REQUEST: To be ritually circumcised.
RESPONSE: The request by this inmate to be ritually circumcised while confined in the PA DOC is denied at this time. Blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. As ritual circumcision is not deemed a medical necessity, this ritual is denied. While incarcerated the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the ~~rabbi~~ Imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice

Fatih Akdemir I Assistant Religion, Volunteer, and Recreational Services Program Administrator
Department of Corrections I Bureau of Treatment Services
1920 Technology Parkway I Mechanicsburg PA 17050-8507
Phone: 717.728.0396 I Fax: 717.728.0308
fakdemir@pa.gov

1

JA179

الشارب، وتقليم الأظافر، ونتف الإبط. »

‹There are five qualities of *fiṭrah*: circumcision, shaving the pubic hair, trimming the mustache, clipping the nails, and plucking the armpit hair.› [1]

Commenting on this *ḥadīth*, Abū Bakr Bin al-ʿArabī (رحمه الله) said:

"I view that all five qualities mentioned in this *ḥadīth* are mandatory, because anyone who neglects them would not appear like a human being — much less a Muslim." [2]

In another narration, the Prophet (ﷺ) named ten or eleven qualities of *fiṭrah*. ʿĀʾishah (رضي الله عنها) reported that Allāh's Messenger (ﷺ) said:

«عشر من الفطرة: قص الشارب، وإعفاء اللحية، والسِّواك، والمضمضة واستنشاق الماء، وقص الأظافر وغسل البراجم، ونتف الإبط، وحلق العانة، وانتقاص الماء، والاختتان. »

‹There are ten qualities of *fiṭrah*: trimming the mustache, sparing the beard, *siwāk* (brushing the teeth), inhaling water (to clean the nose) and rinsing the mouth, clipping the nails, washing the finger knuckles, plucking the armpit hair, shaving the pubic hair, washing the private parts with water, and circumcision.› [3]

---

1 Recorded by al-Bukhārī, Muslim, and others.
2 Reported by Ibn Ḥajar in *Fatḥ ul-Bārī* 10:417.
3 A combined report recorded by Muslim, Abū Dāwūd, Aḥmad, Ibn Abī Shaybah, and others (*Ṣaḥīḥ ul-Jāmiʿ* no. 2222). A similar *ḥadīth* is recorded by Aḥmad, Ibn Mājah, and Abū Dāwūd from ʿAmmār (رضي الله عنه), and is verified to be *ḥasan* by al-Albānī (*Ṣaḥīḥ ul-Jāmiʿ* no. 5906).

---

### A PROPHETIC COMMAND

Allāh's Messenger (ﷺ) commanded a new Muslim to get circumcised.

Kulayb al-Juhanī (رضي الله عنه) reported that he came to the Prophet (ﷺ) and told him that he had embraced Islām. The Prophet (ﷺ) then commanded him:

«ألق عنك شعر الكفر وأختتن. »

‹Shave off the hair of *kufr*, and get circumcised.› [1]

### A PRACTICE OF THE FATHER OF PROPHETS

We have seen earlier that circumcision was first performed by Ibrāhīm (عليه السلام) in fulfillment of a command by Allāh (سبحانه وتعالى).

Similar to the earlier narration, Abū Hurayrah (رضي الله عنه) reported that Allāh's Messenger (ﷺ) said:

«اختتن إبراهيمُ وهو ابنُ ثمانينَ سنةً بالقَدُّوم. »

‹Ibrāhīm (عليه السلام) was circumcised with an axe when he was eighty years old.› [2]

Al-Marwazī reported that Imām Aḥmad (رحمه الله) was asked about this and he explained:

"He (Ibrāhīm) used the (sharp) edge of the axe." [3]

### A PRACTICE OF THE ṢAḤĀBAH

Circumcision was practiced by the ṣaḥābah — even though they often delayed it until the child was older. Ibn ʿAbbās (رضي الله عنهما) was asked, "How old were you when Allāh's Messenger (ﷺ) passed away?" He replied:

---

1 Recorded by Abū Dāwūd and Aḥmad. Verified to be *ḥasan* by al-Albānī (*Ṣaḥīḥ ul-Jāmiʿ* no. 1251 and *Irwāʾ ul-Ghalīl* no. 79).
2 Recorded by al-Bukhārī, Muslim, and others.
3 *Tuḥfat ul-Mawdūd* p. 95.

JA180

commands and ordains it. Circumcision must then be obligatory to make it possible for the person performing it to cut the foreskin.

7. An uncircumcised person is liable to impurity and uncleanliness because of the remains of urine underneath his foreskin. This could nullify his prayer and other acts of worship.

### OUR CONCLUSION

We saw in the earlier texts that Ibrāhīm (☙) started the *sunnah* of circumcision, that the Prophet (☙) commanded a new Muslim to get circumcised, and that circumcision has been a consistent practice of Muslims from the time of the *ṣaḥābah*.

Based on this, in addition to Ibn ul-Qayyim's above reasoning, we accept the position that circumcision is obligatory. Al-Albānī (☙) said:

> "As for the ruling of circumcision, the correct opinion according to us is that it is obligatory. This is the opinion of the majority of *'ulamā'*, such as Mālik, Ash-Shāfi'ī, and Aḥmad. Ibn ul-Qayyim took this position as well and presented fifteen different reasons to support it. Even though those reasons cannot individually prove this position, there is no doubt that they can collectively do so." [1]

---

1    *Tamām ul-Minnah* p. 69.

JA181

# Religious Accommodation Request Interview
## SCI-Huntingdon, Rev. D. Wireman, FCPD

NUNEZ FERNANDO                    FM8959        BA 3064
Inmate's Name                          Number              Block

MR. MORNINGSTAR        WIREMAN              02/19/15
Counselor's Name              Interviewer                    Date

1. What religious accommodation are you requesting?  Circumsation

2. Did you have an accommodation before you came to Huntingdon?
         NO

   If yes, what institution?
   If yes, what chaplain?
   If yes, do you have a copy of that exemption now?

3. What is your religion?  ISLAM

4. When and how did you become a follower of this religion?
   2001

5. How long have you been attending that religious service here?
   SINCE NOV. 2014

6. Tell me some of the fundamental beliefs and teachings of your faith.
   FIVE PILLARS

7. Tell me some of the religious duties or obligations of this faith.
   SALAT, FASTING, ETC.

8. Tell me about any holy days or rituals that followers of this faith are expected to observe.
   RAMADAN FAST, FEAST

JA182

2015

# Final Appeal Decision
## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of your appeal to the Secretary's Office of Inmate Grievances and Appeals for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to the Facility Manager, the Facility Manager's response, the issues you raised to final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Special Investigations and Intelligence, etc) may have been solicited in making a determination in response to your issue as well.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| SCI Filed at: | Huntingdon | Current SCI: | Huntingdon |
| Grievance #: | 564319 | | |

| Decision: | ☒ Uphold Response (UR) ☐ Uphold Inmate (UI) ☐ Uphold in part/Deny in part |
|---|---|

*It is the decision of the Secretary's Office of Inmate Grievances and Appeals to uphold the initial response, uphold the inmate, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | *Frivolous* |
|---|---|

You state in your grievance that your request to have conjugal visits was denied. You believe this is a violation of your Amendment Rights. An investigation was conducted regarding your allegations. The record reflects that your request was reviewed and denied by Central Office. Conjugal visits are not permitted due to safety, security and health concerns. You have failed to provide any evidence to substantiate your claims. Therefore, your requested relief is denied.

| Signature: | Dorina Varner *(signature)* |
|---|---|
| Title: | Chief Grievance Officer |
| Date: | 6/29/15 |

DLV

cc: DC-15/Superintendent Eckard
Grievance Office


Case 1:21-cv-00573 Document 26 Page 8 of 68 Filed 04/14/2023 of 6

Security of appeal
Inmate Grievances
JUN 11 2015

Hun

| INMATE NUMBER | NAME | FACILITY | DATE | GRIEVANCE# |
|---|---|---|---|---|
| FM 8959 | FERNANDO NUNEZ | HUNTINGDON | JUNE 4, 2015 | 564319 |

I received my appeal from the Superintendent on ___6-4-15___ and have the following appeal issues.

**Refer to DC-ADM 804, Grievance Appeal Procedures, for complete instructions.
Appeals must relate to the issue presented in the initial grievance and 1st level appeal.**

**Please provide a BRIEF (no longer than two pages) appeal statement.**

The subject matter grieved ( i.e. denial for conjugal visits), was denied on 5-5-15 by the G.O. upon adopting Mr.Bickell's reasoning denying my religious accommodation request on 4-6-15, and reliance on DOC policies DC-ADM 812 and DC-ADM 821 prohibiting my request. When submitting my appeal thereto to my Facility Manager, he upheld the G.O's response essentially adopting his reasoning. For the reasons that follow I argue, the G.O. and my facility manager's reliance on the aforementioned policies to deny grievance was in error. Because my religious accommodation sought to be exempt from DOC policies for religious reasons and my grievance challenged those very policies because they pose a substantial burden on my islamic beliefs. It is further argued that the reasons stated by, Mr.Bickell, was to vague for the G.O. & my facility manager to have adopted it as their own. Particulary, since my factual and legal arguments stated in my initial grievance & grievance appeal to my facility manager rebuts the reasoning adopted. Accordingly, I rely on & incorporate my contentions stated therein in full for purposes of this appeal. Arguing further that neither prison official has explained why they cannot implement a conjugal visit policy, as other states have. Notwithstanding their proffered concerns. Its failure to do so is telling evidencing that their concerns are exaggerated. Accordingly, I ask that my grievance & request for relief in all respects be sustained.

INMATE SIGNATURE: _Fernando Nunez_

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 – Appeals*
Issued: 12/1/2010
Effective: 12/8/2010

*Attachment 2-E*

JA184

## Facility Manager's Appeal Response
### SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy," the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me, and any other documents submitted.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| Facility: | HUN | Unit Location: | BA-Unit |
| Grievance #: | 564319 | | |

| Decision: | ☒ Uphold Response (UR) | ☐ Uphold in part/Deny in part |
|---|---|---|
| | ☐ Uphold Inmate (UI) | ☐ Dismiss/Dismiss Untimely |

*It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or uphold in part/deny in part. This response will include a brief rationale summarizing the conclusion and any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | | | | | *Frivolous* |
|---|---|---|---|---|---|

In reviewing your grievance and appeal, I note that your concern with receiving conjugal visits was appropriately addressed by Mr. Houser. In your appeal, you state you have proven the denial of your religious accommodation is an exaggerated concern. You have also provided documents citing policy from other states. As Mr. Houser explains in his response to your initial grievance, the DOC has no policy which permits conjugal visits; therefore, your religious accommodation request was denied. SCI-Huntingdon will continue to follow the direction of the Religious Accommodation Committee and the DOC.

In closing, I can only reiterate that I uphold the response provided by the grievance officer. Your grievance is found to be without merit.

| Signature: | J. A. Eckard | |
|---|---|---|
| Title: | Facility Manager | |
| Date: | 6-4-15 | |

cc:  DC-15
     File

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 - Appeals*                                          *Attachment 2-B*
Issued:    12/1/2010
Effective: 12/8/2010

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE:
FROM: (INMATE NAME & NUMBER) | | SIGNATURE OF INMATE:
WORK ASSIGNMENT: | HOUSING ASSIGNMENT:

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator _____ Date _____

WHITE Facility Grievance Coordinator Copy   CANARY File Copy   PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

Attachment 1-A

---

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE:
FROM: (INMATE NAME & NUMBER) | | SIGNATURE OF INMATE:
WORK ASSIGNMENT: | HOUSING ASSIGNMENT:

INSTRUCTIONS:
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

See attached 1 of 2

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator _____ Date _____

WHITE Facility Grievance Coordinator Copy   CANARY File Copy   PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

Attachment 1-A

---

INITIAL REVIEW RESPONSE
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

Inmate Name: Fernando Nunez | Inmate Number: FM-8959
Facility: SCI Huntingdon | Unit Location: BA-3064
Grievance #: 564319 | Grievance Date: 05/05/2015
Publication (if applicable):

Decision: ☐ Uphold Inmate   ☒ Grievance Denied

It is the decision of the grievance officer to uphold or deny the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance, and relief sought.

Response: ☐ Frivolous

Inmate Nunez files a grievance in response to his religious accommodation request for conjugal visits being denied. He believes this violates his 8th & 14th Amendment Rights, as well as his religious beliefs. He supports his request by evidence of other States having policies which permit conjugal visits & believes there are no safety, security & health risks which would prohibit this approval. He seeks relief in the form of $100,000 for emotional distress and the development of a policy which would permit conjugal visits. Upon review I've found the following:

As inmate Nunez mentioned in his grievance neither DC-ADM 812 Visiting or DC-ADM 821 Marriage policies permit conjugal visits. However, the marriage policy permits a "brief kiss" following the ceremony and the visiting policy permits a "brief kiss & embrace" when meeting & departing from a visit. Currently there are no polices or procedures in the PA Department of Corrections which would permit conjugal visits & therefore I find his religious accommodation request to be properly denied.

Upon brief research I've found only 6 States allow such visits & have specific criteria for approval. Therefore I find the PA Department of Corrections to be with the vast majority of States which do not permit conjugal visits.

Grievance & Relief Denied.

Signature: Morris L. Houser
Title: CCPM
Date: 05/05/2015

c:   Superintendent
     DC-15
     File

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 - Grievances & Initial Review*
Issued: 12/1/2010
Effective: 12/8/2010

Attachment 1-D

---

Inmate Name: Fernando Nunez        Inmate #: FM 8959
Facility: SCI Huntingdon           Unit Location: BA-3064
Grievance #: 564319                Grievance Date: 5-5-15
Subject: Facility Manager Grievance Appeal   Filed Date: 5-18-15

Discussion:

I appeal the 5-6-15, initial review response, issued by Grievance Officer,("G.O."), Morris L. Houser, denying my grievance for "Conjugal Visits" with my spouse. The G.O. acknowledges that my grieved contentions implicates Federal & State violations that substantially burdens my religious beliefs under RLUIPA. He further acknowledges my request for relief. Notwithstanding, he upholds the denial adopted by the regional secretary, albeit, failing to offer an "explained reason" that furthers a compelling government interest. In light of that fact I argue the following:

ARGUMENT:

Much like the named prison officials grieved, the G.O. fails to explain how accommodating me with my request implicates, safety, security & health concerns. Proving that the denial of my religious accommodation is an exaggerated concern. One in which I effectively rebutted. Citing "other state" policies, showing that the institutions in other states do in fact deal with the concerns in which the DOC has raised. Yet is still they do offer conjugal visits. The G.O. acknowledges this fact. But cites DC-ADM 812 & DC-ADM 821, policies that prohibits conjugal visits. Which is why I requested A religious accommodation in the first place & requested the DOC to implement A policy for that reason. For the G.O. to indicate that the above cited policies do permit a small form of "intimacy",(i.e. A brief kiss & embrace), it is my contention that such an "open display of intimacy" places A substantial burden on my Islamic beliefs, I believe such an act must be done in private, away from paying eyes. What is more, to witness "other inmates" engage in such acts stirs my desires to be sexually intimate with my wife. All of which the DOC prohibits. Causing me not only to sin, but to place my wife in an uncomfortable atmosphere. If I am not able to consummate my marriage or be intimate with her she has voiced her intent to divorce me as A result because she is strong by practicing celibacy. I ask that my grievance be upheld & the requested relief be upheld.

Page 2 of 2

By: Fernando Nunez

JA186

OFFICIAL COMPILATION OF CODES, RULES AND REGULATIONS OF THE STATE OF NEW YORK

TITLE 7. DEPARTMENT OF CORRECTIONAL SERVICES

CHAPTER IV. VISITATION

PART 220. FAMILY REUNION PROGRAM

*Text is current through January 17, 2013*

**Section 220.1 Description.** The Family Reunion Program is designed to provide selected inmates and their families the opportunity to meet for an extended period of time in privacy. The goal of the program is to preserve, enhance and strengthen family ties that have been disrupted as a result of incarceration.

**Section 220.2 Inmate eligibility.** Any inmate has the right to apply for participation in the family reunion program (FRP), if his/her facility of residence offers the program. Eligibility is to be determined during processing, not prior thereto. (a) *Preconditions.* An inmate must meet the following preconditions to be eligible to participate in the FRP; (1) Time. The inmate has been in the department's custody, in other than initial reception, for at least 6 months, and has been at the time of application a resident of a facility that offers the FRP for at least 30 days. (2) Adjustment. The inmate has exhibited a pattern of good institutional adjustment, and has not had any recent major disciplinary problems, any chronic disciplinary problems or severe disciplinary problems. Satisfactory behavior must be maintained throughout the duration of the application processing and the visit. (i) Major disciplinary problem. Any Tier II or III disciplinary proceedings in the eight weeks prior to the application resulting in confinement to cell, room or dorm continuously on certain days or during certain hours, for longer than 14 days, or, any loss of good time. Satisfactory behavior must be maintained throughout the duration of application processing and the visit. Reapplication can be made eight weeks from the confinement release date, or date of misbehavior report if loss of good time is the only sanction imposed. (ii) Chronic disciplinary problem. Three or more Tier II or III disciplinary proceedings in the last four months resulting in the imposition of any keeplock time, any loss of privileges, or any loss of good time. (iii) Severe disciplinary problem. A conviction or disciplinary finding for any of the following will result in a one year ban from the FRP beginning after any disciplinary confinement is over. Substance abuse disciplinary situations will require the completion of the ASAT program or equivalent before reapplication. A Tier II or III disciplinary report which includes: (a) A conviction for a federal or state crime while incarcerated; (b) a penal law offense; (c) voting; (d) escape; and/or (e) use or possession of drugs or alcohol during the FRP. (iv) Family facility service coordinators, superintendents, and the division of ministerial, family and volunteer services will exercise discretion in determining whether or not an inmate with disciplinary problems may participate in FRP. (2) Program participation. The inmate applicant must have participated in or pursued required programs as identified on his or her program/earned eligibility plan. Program/earned eligibility plan refusals, negative removals or regressions make an applicant ineligible until that need is addressed. Formal therapeutic programs sanctioned by the department, such as the Alcohol and Substance Abuse Treatment Program (ASAT) or other

approved department treatment program (including CASAT, DWI, the Stay n' Out Program at Arthurkill and Bayview and other specialized substance abuse programs approved by the department) for substance abuse and the Aggression Replacement Training Program (ART) for aggression/violence, are the standards that must be met. Inmates who have actively pursued their plan yet who have not completed programs and satisfied their needs will be evaluated according to their entire record. Active participation or actual completion, however, may be required to satisfy this precondition. (b) *Disqualifying conditions.* An inmate is not eligible to participate in FRP if: (1) the inmate is eligible for the temporary release program (unless the inmate's application for temporary release has been denied); (2) the inmate has a higher security designation than permitted at the program site; (3) the inmate is assigned to a special housing unit for disciplinary reasons or is in administrative segregation or in a mental health unit with concurrent SHU time (BHU, RMHU or IICP). (4) an inmate participant found in violation of FRP regulations/standards is ineligible to participate for 6 months from the date of the disciplinary hearing finding. A new application must be reviewed and approved by central office prior to the inmate's future program participation. (c) *Special review/inmate.* (1) A special review will be conducted which will include consideration of the specifics of the crime, the age of the inmate at the time of the offense, progress in programs, custodial adjustment, victim impact and the entire case record. A special review to determine eligibility will be conducted if an inmate: (i) has been designated a central monitoring case; (ii) has any outstanding warrants, show cause order (e.g., Bureau of Immigration & Customs Enforcement); (iii) has been convicted of heinous or unusual crimes or if it appears that the inmate is a sex offender; (iv) is a returned parole violator; (v) is in protective custody; (vi) is in a mental health unit; (a) review must include consideration of evaluation by psychiatric staff; (vii) is diagnosed as having a communicable disease; (viii) has been convicted of a violent crime against an elderly person or a child; (ix) has been convicted of escape or attempted escape; or (x) has a history of domestic violence. (2) Such a review shall be conducted only for an inmate who has been otherwise approved in accordance with the process set forth in section 220.4 of this Part. (3) Facility health services staff will notify the facility family services coordinator of any inmate approved for FRP who is diagnosed as having a communicable disease which may pose a health risk to a visitor. A FRP visit will not be denied solely on the basis of the HIV status of an inmate/applicant.

**Section 220.3 Family participation.** Any inmate has the right to apply for participation in the family reunion program (FRP), if his/her facility of residence offers the program. Eligibility is to be determined during processing, not prior thereto. (a) *Preconditions.* An inmate must meet the following preconditions to be eligible to participate in the FRP; (1) Time. The inmate has been in the department's custody, in other than initial reception, for at least 6 months, and has been at the time of application a resident of a facility that offers the FRP for at least 30 days. (2) Adjustment. The inmate has exhibited a pattern of good institutional adjustment, and has not had any recent major disciplinary problems, any chronic disciplinary problems or severe disciplinary problems. Satisfactory behavior must be maintained throughout the duration of the application processing and the visit. (i) Major disciplinary problem. Any Tier II or III disciplinary proceedings in the eight weeks prior to the application resulting in confinement to cell, room or dorm continuously on certain days or during certain hours, for longer than 14 days, or, any loss of good time. Satisfactory behavior must be maintained throughout the duration of application processing and the visit. Reapplication can be made eight weeks from the confinement release date, or date of

misbehavior report if loss of good time is the only sanction imposed. (ii) Chronic disciplinary problem. Three or more Tier II or III disciplinary proceedings in the last four months resulting in the imposition of any keeplock time, any loss of privileges, or any loss of good time. (iii) Severe disciplinary problem. A conviction or disciplinary finding for any of the following will result in a one year ban from the FRP beginning after any disciplinary confinement is over. Substance abuse disciplinary situations will require the completion of the ASAT program or equivalent before reapplication. A Tier II or III disciplinary report which includes: (a) A conviction for a federal or state crime while incarcerated; (b) a penal law offense; (c) rioting; (d) escape; and/or; (e) use or possession of drugs or alcohol during the FRP. (iv) Facility family service coordinators, superintendents, and the division of ministerial, family and volunteer services will exercise discretion in determining whether or not an inmate with disciplinary problems may participate in FRP. (2) Program participation. The inmate applicant must have participated in or pursued required programs as identified on his or her program/earned eligibility plan. Program/earned eligibility plan refusals, negative removals or regressions make an applicant ineligible until that need is addressed. Formal therapeutic programs sanctioned by the department, such as the Alcohol and Substance Abuse Treatment Program (ASAT) or other approved department treatment program (including CASAT, DWI, the Stay n' Out Program at Arthurkill and Bayview and other specialized substance abuse programs approved by the department) for substance abuse and the Aggression Replacement Training Program (ART) for aggression/violence, are the standards that must be met. Inmates who have actively pursued their plan yet who have not completed programs and satisfied their needs will be evaluated according to their entire record. Active participation or actual completion, however, may be required to satisfy this precondition. (b) *Disqualifying conditions.* An inmate is not eligible to participate in FRP if: (1) the inmate is eligible for the temporary release program (unless the inmate's application for temporary release has been denied); (2) the inmate has a higher security designation than permitted at the program site; (3) the inmate is assigned to a special housing unit for disciplinary reasons or is in administrative segregation or in a mental health unit with concurrent SHU time (BHU, RMHU or IICP). (4) an inmate participant found in violation of FRP regulations/standards is ineligible to participate for 6 months from the date of the disciplinary hearing finding. A new application must be reviewed and approved by central office prior to the inmate's future program participation. (c) *Special review/inmate.* (1) A special review will be conducted which will include consideration of the specifics of the crime, the age of the inmate at the time of the offense, progress in programs, custodial adjustment, victim impact and the entire case record. A special review to determine eligibility will be conducted if an inmate: (i) has been designated a central monitoring case; (ii) has any outstanding warrants, show cause order (e.g., Bureau of Immigration & Customs Enforcement); (iii) has been convicted of heinous or unusual crimes or if it appears that the inmate is a sex offender; (iv) is a returned parole violator; (v) is in protective custody; (vi) is in a mental health unit such as Merle Cooper, APPU, or ICP, or assigned to a mental health unit; (a) review must include consideration of evaluation by psychiatric staff; (vii) is diagnosed as having a communicable disease; (viii) has been convicted of a violent crime against an elderly person or a child; (ix) has been convicted of escape or attempted escape; or (x) has a history of domestic violence. (2) Such a review shall be conducted only for an inmate who has been otherwise approved in accordance with the process set forth in section 220.4 of this Part. (3) Facility health services staff will notify the facility family services coordinator of any inmate approved for FRP who is diagnosed as having a communicable disease which may pose a health risk to a visitor. A FRP visit will not be denied solely on the basis of the HIV status of an inmate/applicant.

**Section 220.4 Application processing (full cycle).** The following full-cycle procedures are to be used in processing applications of inmates who have not successfully participated in the program, and prior participants who have been transferred, received a disapproval recommendation at the facility level, or who wish to add new family participants who are over age 12. (a) *Facility family services coordinator.* (1) Receives application from inmate. (2) Obtains authorization for the release of confidential HIV-related information from every applicant who is applying for a FRP visit with his/her spouse. This authorization must be completed only once for a particular spouse: (i) reads and/or explains the above authorization to the applicant if the applicant cannot read or understand it, or has questions concerning the authorization; (ii) explains that this authorization in no way implies that the applicant is HIV positive or has AIDS; (iii) files the authorization in the inmate's FRP folder. (3) Logs receipt of application. (4) Prepares acknowledgment of application and forwards it to inmate. (5) Forwards application to inmate's correction counselor. (b) *Correction counselor.* (1) Checks to make sure inmate has been at facility for the required period of time. (2) Checks temporary release eligibility. (3) Reviews inmate's institutional program participation and adjustment. (4) Verifies that all requested visitors are on inmate's approved visiting list. (Only individuals listed on a specific application for a specific visit will be allowed. Each must be processed for a specific visit and each visit must be accompanied by an application.) (5) Recommends approval or disapproval, including reason(s) therefore. (6) Returns application to facility family services coordinator, who forwards it to the deputy superintendent for security. (c) Deputy superintendent for security or his designee (not below the rank of captain). (1) Checks inmate's security file for major, chronic, or severe disciplinary problems. (2) Checks for outstanding warrants; indicates whether inmate is an escape risk. (3) Recommends approval or disapproval, including reason(s) therefore. (4) Forwards application to facility family services coordinator. (d) *Facility family services coordinator.* (1) Reviews inmate's guidance unit records. (2) Reviews family data from probation report and checks for psychiatric evaluation. (3) Attaches pertinent supplemental data for superintendent's evaluation and review. (4) Recommends approval or disapproval, including reason(s) for recommendation. (5) Forwards application to superintendent. (e) *Facility superintendent (or designee).* (1) Reviews application in its entirety. (2) Recommends approval or disapproval; if application is disapproved, the reason(s) must be stated. (3) Returns application to facility family services coordinator, who forwards it to central office. (f) *Deputy commissioner for program services (or designee).* (1) Reviews application and facility recommendations. (2) Makes final determination; if application is disapproved must set forth the reason(s) therefore. (3) Returns the application to the facility family services coordinator. (g) *Family services coordinator.* Upon approval of the deputy commissioner for program services (or designee) or the superintendent, transmits the names of approved applicants to the facility health services unit. Approved spousal visit applicants shall be clearly highlighted. For initial spousal visits, the authorization for the release of confidential HIV-related information shall be provided to the health services unit. A copy of the authorization shall be retained on file by the family services coordinator. (h) *Facility health services unit.* Upon receiving the name of a spousal visit applicant, verifies the existence of the signed authorization for the release of confidential HIV-related information and reviews the inmate's medical record; and (1) if an inmate is HIV positive or known to have HIV disease, the medical


## pennsylvania
DEPARTMENT OF CORRECTIONS

TO: Tabb Bickell, Deputy Secretary
Central Region

FROM: Shawn Kephart, Director

DATE: April 6, 2015

RE: Religious Accommodation Request Response
Fernando Nunez Jr. – HUN

## Religion
Muslim (MUS)

## Accommodation Requested
a) To be able to shower with privacy screens/curtains.

b) Conjugal visit with spouse.

c) Circumcision.

d) To be allowed to prayer with family members during visit.

## Recommendation
a) The physical plant of some facilities do not include individual showers, which is the case at this facility. However, the request to be able to shower in privacy can easily be accomplished by the inmate wearing his boxers or placing a towel around his private areas while showering.

b) Conjugal visit with spouse is denied due to safety, security and health concerns.

c) The request by this inmate to be ritually circumcised while confined in the PA DOC is DENIED as circumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. While incarcerated, the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice.

d) The request to prayer with family members during visit is denied. Performing religious practices in the Visiting Room, requiring participants to lie prostrate on the ground, would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. The inmate may pray quietly make supplication with his family members during their visit. The institution cannot provide every inmate with private visiting room for congregational prayers with family members. The inmate and his family members are free to pray by themselves both before their visit has commenced and after their visit has concluded.

JA188 Rec'd 4-17-15



| | POLICY STATEMENT<br>Commonwealth of Pennsylvania • Department of Corrections |
|---|---|

| Policy Subject:<br><br>**Inmate Visiting Privileges** | | Policy Number:<br><br>**DC-ADM 812** |
|---|---|---|
| Date of Issue:<br><br>**September 1, 2009** | Authority:<br><br>**Signature on File**<br>**Jeffrey A. Beard, Ph.D.** | Effective Date:<br><br>**September 10, 2009** |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections.

## III. POLICY

It is the policy of the Department to set forth standardized rules and procedures governing inmate visiting privileges to facilitate a fair and consistent implementation of this policy.

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

JA189

**V.    SUSPENSION DURING AN EMERGENCY**

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

**VI.    RIGHTS UNDER THIS POLICY**

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

**VII.    RELEASE OF INFORMATION AND DISSEMINATION OF POLICY**

**A.  Release of Information**

1.  Policy

This policy document is public information and may be released upon request.

2.  Confidential Procedures (if applicable)

Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

**B.  Distribution of Policy**

1.  General Distribution

The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis.  Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2.  Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

## VIII.  SUPERSEDED POLICY AND CROSS REFERENCE

### A.  Superseded Policy

1.  Department Policy

    DC-ADM 812, Inmate Visiting Privileges, Issued January 5, 2007, by Secretary Jeffrey A. Beard, Ph.D.

2.  Facility Policy and Procedures

    This document supersedes all facility policy and procedures on this subject.

### B.  Cross Reference(s)

1.  Administrative Manuals

    a.  DC-ADM 801, Inmate Discipline;

    b.  DC-ADM 802, Administrative Custody Procedures;

    c.  DC-ADM 819, Religious Activities;

    d.  6.3.1, Facility Security;

    e.  6.3.12, Drug Interdiction;

    f.   6.5.1, Administration of Security Level 5 Housing Units; and

    g.  6.5.8, Capital Case Administration

2.  ACA Standards

    a.  Administration of Correctional Agencies: 2-CO-5D-01

    b.  Adult Correctional Institutions: 4-4274, 4-4275, 4-4285, 4-4445, 4-4498, 4-4499, 4-4499-1, 4-4500, 4-4501, 4-4503

    c.  Adult Community Residential Services: 4-ACRS-2A-02, 4-ACRS-5A-17, 4-ACRS-5A-18

    d.  Correctional Training Academies: None

JA191



**PROCEDURES MANUAL**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | Policy Number: |
| --- | --- |
| **Inmate Visiting Privileges** | **DC-ADM 812** |

| Date of Issue: | Authority: | Effective Date: |
| --- | --- | --- |
| **September 1, 2009** | **Signature on File** **Jeffrey A. Beard, Ph.D.** | **September 10, 2009** |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

JA192

*DC-ADM 812, Inmate Visiting Privileges Procedures Manual*
*Table of Contents*

## Section 1 – General Procedures

A. Setting for Visits ................................................................................. 1-1
B. Rules ..................................................................................................... 1-1
C. Visitor Identification & Registration.................................................... 1-3
D. Inmate – Visitor Physical Contact....................................................... 1-3
E. Approved Visitors List ......................................................................... 1-4
F. Visitor Quality Assurance Program ..................................................... 1-4
G. Administrative/Disciplinary Custody Status Inmates ........................ 1-5
H. Capital Case Inmates .......................................................................... 1-5
I.   Inmates in Outside Hospitals ............................................................ 1-5
J. Special Programs ................................................................................. 1-6
K. Virtual Visitation................................................................................. 1-6
L. Transportation..................................................................................... 1-7
M. Prohibited Visitors.............................................................................. 1-7
N. Suspension, Termination, or Restriction of Visiting Privileges ......... 1-8


DC-313, Visitor Inquiry..............................................................Attachment 1-A
DC-131A, Special Visitor Inquiry...............................................Attachment 1-B
DC-315, List of Acceptable Forms of Identification ..................Attachment 1-C
DC-311A, Approved Visitors Form.............................................Attachment 1-D
DC-312A, Supplementary Approved Visitors Form....................Attachment 1-E
Visitor Quality Assurance Program Memo ................................Attachment 1-F
Visitor Quality Assurance Program Survey Form.......................Attachment 1-G
Virtual Visiting Program Facilities ............................................Attachment 1-H
Program Guidelines................................................................... Attachment 1-I
Program Acknowledgement Form ............................. Attachment 1-I, Appendix 1
Family Virtual Visitation Program ............................. Attachment 1-I, Appendix 2
Family Virtual Visitation Centers ............................. Attachment 1-I, Appendix 3
Visitor Family Virtual Visitation Program Acknowledgement............ Attachment 1-I, Appendix 4
Family Virtual Visitation Program Visitor Sign-In Log....................... Attachment 1-I, Appendix 5
Visitor Evaluation of Family Virtual Visitation ......................... Attachment 1-I, Appendix 6
Inmate Evaluation of Family Virtual Visitation ........................ Attachment 1-I, Appendix 7
Youth Evaluation of Family Virtual Visitation ......................... Attachment 1-I, Appendix 8
SCI-Staff Evaluation of Family Virtual Visitation .................... Attachment 1-I, Appendix 9
Prison Society Monitor Record of Family Virtual Visitation ............. Attachment 1-I, Appendix 10
Families Outside Monitor Record of Family Virtual Visitation ......... Attachment 1-I, Appendix 11

## Section 2 – Special Inquiries and Visits

A. Special Inquiries.................................................................................. 2-1
B. Special Visits ....................................................................................... 2-2

## Section 3 – Security

A. General Security Procedures ............................................................... 3-1
B. Searches ............................................................................................... 3-1
C. Face Veils or Obstructive Clothing ..................................................... 3-5

JA193

**DC-ADM 812, Inmate Visiting Privileges Procedures Manual**
**Table of Contents**

D. Animals on Department Property ............................................................. 3-5

## Section 4 – Community Corrections Centers (CCCs)

A. General Procedures .............................................................................. 4-1
B. Visiting Restriction/Termination ............................................................. 4-1
C. Official Visitors and Special Visits ......................................................... 4-2

## Section 5 – Private Viewings & Deathbed Visits

A. General Procedures .............................................................................. 5-1
B. Costs ..................................................................................................... 5-3

Private Viewing – Deathbed Visit Worksheet ...................................... Attachment 5-A

## Section 1 – General Procedures

### A. Setting for Visits

1. An inmate in general population will be permitted contact visits in a relaxed setting, under supervision of the assigned Correctional Officer(s).[1]

2. An appropriate outdoor area furnished with tables may also be provided.

3. The inmate and visitor(s) may eat and drink items sold within the visiting room or outdoor visiting area.

4. If space permits, a children's play area will be provided with toys and books.

### B. Rules[2]

1. An inmate in general population will be permitted to have visits in accordance with the visiting hours established by the facility, but no less frequently than once per week. Visiting will be permitted every day of the year unless suspended by the Facility Manager.

2. Only attorneys and religious advisors will be permitted to visit during the first 10 days following commitment to a Diagnostic Classification Center.

3. Visits shall be no less than one hour in duration and shall occur during regularly scheduled visiting hours. Longer periods may be allowed depending upon the inmate's custody level and available space.[3]

4. The number of visitors any inmate may have at any one time may be limited depending upon available space. Each facility will designate the maximum number of visitors permitted per inmate, per visit and the maximum capacity of people, inmates, and visitors, permitted in the visiting areas. In the event that visiting areas are at full capacity, and more visits are to be conducted, visits will be terminated on a "first in/first out" basis provided the minimum visiting time of one hour has elapsed.[4]

5. All minor children must be accompanied by a parent/legal guardian, county children/youth services agency staff, or an adult approved by the parent/legal guardian to accompany the child. The parent/legal guardian shall indicate, on the **DC-313, Visitor Inquiry (Attachment 1-A)** or the **DC-313A, Special Visitor Inquiry (Attachment 1-B)**, his/her approval for the minor to visit and the name of an adult who may accompany the child on the visit.

---

[1] 4-4156, 4-4499-1
[2] 4-4499
[3] 4-4501
[4] 4-4498

Issued: 5/21/2014
Effective: 6/18/2014

JA195

6. Visiting more than one inmate is not permitted without a valid reason and must be approved by the Facility Manager.

7. Unless the Facility Manager/designee grants special permission, no person may be on more than one inmate's visiting list at any one facility except in cases where the person is part of the immediate family of more than one inmate. A visitor may be granted visiting privileges at more than one facility.

8. Any visitor's privileges may be limited, suspended, or restricted (such as non-contact visits only or a restriction on visiting at more than one facility) if information becomes available suggesting that allowing the individual to visit poses a threat to the safety and security of any Department facility.

9. Every inmate having visits is required to wear underwear and a Department supplied jumpsuit and shoes. Any inmate reporting to the visiting changing area who is not wearing underwear will be denied having that visit (undershorts for males, undershorts and bra for females).

10. Visitors are expected to dress appropriately and avoid clothing styles that are revealing or provocative. The standard language and posting for the visiting rooms will be, "See-through garments and garments that expose private parts of the body will not be permitted. Swimming suits, clothing that is too short, and clothing that exposes the midriff are prohibited. Clothing that references obscene language, drugs, sex or violence is also prohibited. Failure to comply with these guidelines may result in the visitor not being permitted to visit." ***A listing of clothing items that are not permitted to be worn when visiting a Department facility can be accessed on the Department's public website under "Inmate and Visiting Information>Inmate Visiting Rules>Dress Code – What not to Wear."***

11. Visitors are not permitted to leave money for the inmate they are visiting. Funds will only be accepted via the mail, in the form of a money order or a certified check, and/or by electronic transfer. The Department's public website, www.cor.state.pa.us, contains instructions for making an electronic transfer of funds into an inmate's account (click on "Inmate Accounts").

12. Visitors are not permitted to take coats, jackets, or other outer garments (excluding suit coats, sports jackets/blazers and/or cardigan type sweaters) used for protection from the elements, to the seating area of the visiting room or outdoor visiting area. All such garments must be secured in a locker in the facility lobby area, or placed on a coat rack in the visiting room, whichever procedure is provided at the facility.[5]

13. Each facility shall make available to visitors, upon request, an informational pamphlet that contains the facility visiting rules and procedures.

---

[5] 4-4156

Issued: 5/21/2014
Effective: 6/18/2014

JA196

Case 1:22-cv-01673-DLB Document 126 Page 30-81 Date Filed 06/08/21 04/17/2023 36

## C. Visitor Identification & Registration

1. Proper identification is required for all visitors.[6] Proper forms of identification, and the number required, are contained in the **DC-315, List of Acceptable Forms of Identification (Attachment 1-C)**.

2. A visitor who cannot produce acceptable identification will not be permitted to visit unless approved by the Facility Manager/designee. A visitor who falsifies identifying information will be suspended/barred from the facility for a period of time determined by the Facility Manager.

3. All visitors are required to register in and out of the facility using the **DC-325, Register of Institutional Visitors Form**.[7]

4. During the initial visit by a child, the Visiting Processing Officer is to determine if the child is five years of age or less and add that determination to the visitor tracking system. During the initial and any subsequent visits by the child, the Visiting Processing Officer shall notify the Visiting Room Officer of those visits in which the inmate may hold his/her child as noted in **Subsection D.3. below**. The adult accompanying the child is to be notified of the determination and of the subsequent restrictions.

## D. Inmate – Visitor Physical Contact

1. The inmate and visitor(s) may share a brief kiss and embrace only when meeting and departing.

2. If at any time during the visit the Visiting Room Officer has concerns regarding the appropriateness of the inmate's or visitor's behavior, the Visiting Room Officer will direct the inmate and the visitor to separate.

3. The inmate may only hold small children five years of age or less on his/her lap. The Visiting Room Officer will closely monitor situations when an inmate is holding such children or the child is sitting on an inmate's lap and the amount of time the child is being held. If the Visiting Room Officer has any concern regarding the size/age of a child, the amount of time the inmate has held the child, the amount of time the child has been sitting on the inmate's lap, or the manner in which the child is held or handled, the Visiting Room Officer will direct the inmate to remove the child from his/her lap.

4. An inmate who violates the visiting room rules as they pertain to the holding of small children or inappropriate physical contact with any visitor jeopardize both his/her own visitation privileges as well as those of the visitor. Any serious or repeated violations of these rules may result in a misconduct and/or prohibition of contact visits. If contact visits

---

[6] 4-4499
[7] 4-4503, 1-ABC-5D-15

1-3

are prohibited, the Facility Manager will make such a decision based upon the information concerning the incident and the prohibition will be for all visits and for a specific period. If a minor child is involved, a permanent prohibition for contact visits with all minor children will be imposed. Reinstatement of contact visits with minor children, in violation of this section, requires the written approval of the Secretary/designee.

5. An inmate who has a prohibition on contact visits with minor children at one facility will not be permitted contact visits with minor children at any other facility.

## E. Approved Visitors List

1. A list of approved visitors shall be established during the initial classification period and recorded on the **DC-311A, Approved Visitors Form (Attachment 1-D)**.[8]  The authorized visitors list may contain up to 40 names.

2. Each facility shall establish procedures for approving the names of all persons with whom the inmate wishes to visit before he/she is placed on the authorized list. This includes the names of all minor children. Any individual meeting the criteria listed in **Subsection M.1. below** will not be approved for visiting without approval of the Facility Manager.

3. Changes or additions to the approved list may be made in accordance with established procedures using a **DC-312A, Supplementary Approved Visitors Form (Attachment 1-E)** at the times specified by the facility.

4. Each inmate must supply all the information required by the **DC-311A** and the **DC-312A** forms for a visitor to be approved. This information includes the visitor's name, date of birth, relation, and address. If any of this information is not provided, the visitor will not be approved.

5. All staff must maintain the confidentiality of an inmate's visiting list. Staff shall not disseminate any information to outside visitors regarding the content of an inmate's visiting list. Any person making inquiries as to the content of an inmate's visitors list should be directed to write to that inmate for information. This restriction does not apply to the courts or law enforcement agencies.

6. The name of a visitor may be removed upon authorization of the Facility Manager.

## F. Visitor Quality Assurance Program

1. The **Visitor Quality Assurance Program Memo (Attachment 1-F)** and the **Visitor Quality Assurance Program Survey Form (Attachment 1-G)** shall be made available to every visitor at the facility. A visitor who is willing to give his/her views regarding visiting services shall be permitted to take the **Visitor Quality Assurance Program Memo** and the **Visitor Quality Assurance Program Survey Form** into the main visiting

---

[8] 4-4285

Issued: 5/21/2014
Effective: 6/18/2014

room for review and completion. Upon completion, the **Visitor Quality Assurance Program Survey Form** shall be deposited in the drop box provided.

2. The Corrections Superintendent's Assistant (CSA) shall collect the **Visitor Quality Assurance Program Survey Forms** weekly, and where required, prepare a written response to the visitor regarding his/her concerns. Information gathered shall be periodically reviewed to determine whether the high quality of service required is being provided on a consistent basis. Reports on data received shall be prepared and submitted to the Facility Manager/designee and appropriate Department Heads.

## G. Administrative/Disciplinary Custody Status Inmates

An inmate in Administrative/Disciplinary Custody shall be governed by Department policy **DC-ADM 801**, and **6.5.1, "Administration of Security Level 5 Housing Units."** A restricted housing unit inmate will be restricted to weekday visits (excluding holidays) only. An inmate in a Special Management or a *Secure Residential Treatment Unit (SRTU)* shall be governed by the program phases.

## H. Capital Case Inmates

Prior to the Governor's warrant being issued, only non-contact visits are permitted and the length and frequency of visits will be in accordance with Department policy **DC-ADM 802**. After the Governor's warrant has been issued, all non-contact visits are restricted by law to the inmate's attorney, religious advisor, and members of the immediate family, unless otherwise directed by court order and in accordance with Department policy **6.5.8, "Capital Case Administration."**

## I. Inmates in Outside Hospitals

1. Visiting privileges for an inmate who is in an outside hospital as an inpatient will only be permitted as approved by the Facility Manager or in cases of serious illness or injury that may be life threatening.

2. Visiting for an inmate who is in an outside hospital as an inpatient will be restricted to immediate family members who have been previously approved and placed on the inmate's authorized visiting list or for immediate family members who are not on the list but that have traveled a considerable distance.

3. The Officer assigned to the hospital shall notify the facility of the names and relationship of each visitor and the starting and ending time of any visit.

4. Visitors will be limited to two family members in the room at any one time unless the hospital requires a lower number.

Issued: 5/21/2014
Effective: 6/18/2014

JA199

5. Outer clothing garments, purses, hand bags, brief cases, food items, gifts, etc. are prohibited from being taken into the inmate's room. The visitors may not leave any items (e.g., food, money) for the inmate.

6. The inmate's restraints are to be checked by the Officer on duty, before and after any visit.

7. In accordance with **DC-ADM 819, "Religious Activities"**, the FCPD/designee may visit an inmate hospitalized as an inpatient in outside hospitals.

## J. Special Programs

An inmate participating in a special program such as the Motivational Boot Camp and Forestry Camp shall be afforded visiting privileges consistent with the established goals of the program. Each Program Administrator shall develop appropriate procedures for visiting at these locations.

## K. Virtual Visitation

1. Virtual Visitation shall be available at the facilities listed in the **Virtual Visiting Program Facilities (Attachment 1-H)** and limited to persons living in the Philadelphia and Pittsburgh areas.

2. The Virtual Visitation Program uses video conferencing technology as a means to:

   a. enhance the parenting skills program;

   b. allow an inmate to visit with immediate family members, caregivers of the inmate's children, and other individuals on the inmate's approved visiting list approved by the Facility Manager/designee with whom he/she would otherwise not be able to visit;

   c. increase the frequency of visits for an inmate with the individuals listed on the inmate's approved visiting list; and

   d. permit the scheduling of visits at times that are best for the individuals listed on the inmate's approved visiting list.

3. The cost to the inmate or his/her family participating in this program shall be determined by the Department.

4. Inmate participation in the Virtual Visitation Program is voluntary and every inmate in general population status, regardless of his/her custody level, is eligible. An inmate housed in Administrative and Disciplinary Custody is not permitted to participate in the Virtual Visitation Program.

5. Each inmate selected for participation in this program shall be issued a copy of the **Program Guidelines (Attachment 1-I)** and is required to sign a **Program**

1-6

JA200

**Acknowledgement Form (Attachment 1-I, Appendix 1)** accepting the guidelines established by the Department.

6. The Department shall attempt to reserve at least 10 percent of the Virtual Visitation Program visiting slots per month for long-term offender inmates. A long-term offender inmate is defined as having a minimum sentence of 10 or more years and an inmate serving a life sentence.

7. Up to five persons will be permitted to visit if space permits.

8. If the scheduled visit does not take place at the fault of the visitor and/or the scheduled inmate, a "missed visit" fee will be paid by the person who scheduled the visit and must be paid at or before the nest scheduled visit. Persons who fail to pay the fee will not be permitted to participate in the program until the fee is paid.

**L. Transportation**

A visitor in need of transportation to a state correctional facility may contact the Pennsylvania Prison Society (PPS) for a bus schedule from Philadelphia to various state correctional facilities. Visit the PPS web site at www.prisonsociety.org or phone (215) 564-4775 for bus schedule and pricing information. Information on transportation may also be found in the **Handbook for the Friends and Families of PA DOC Inmates** through the Bureau of Treatment Services (BTS). Additional information, as it becomes available, shall be posted to the bulletin boards throughout the facility.

**M. Prohibited Visitors**

1. The following categories of individuals will generally be prohibited from visiting an inmate:

   a. a former inmate of any correctional system;

   b. any person who is currently under parole or probation supervision;

   c. any current inmate in pre-release status;

   d. any Department employee;

   e. any former Department employee;

   f. any currently active Volunteer for the Department;

   g. any current or former contract employee; and/or

   h. any victim of the inmate (without prior approval).

Issued: 5/21/2014
Effective: 6/18/2014

JA201

2. The Department recognizes that legitimate reasons may exist for an inmate to receive visits from those categories of persons listed above. These persons may visit only with the permission of the Facility Manager as set forth below.

3. The following procedures shall be followed for requesting approval for a prohibited individual to visit.

   a. The inmate requesting such a visit must submit a request slip to his/her counselor identifying the visitor by name, relationship, and status (current inmate, former inmate, parolee, employee, etc).

   b. The counselor shall ensure that a Unit Team recommendation is provided to the Facility Manager regarding the advisability of this visit.

   c. In the case of a pre-release inmate or current employee, the Facility Manager of the requesting facility shall contact any other Facility Manager involved for his/her approval. The Facility Manager of the facility where the visit is to take place shall make the final decision regarding this visitation request.

   d. Any ex-offender currently on probation or parole must be pre-approved. An ex-offender currently on probation or parole will not be considered for visiting unless he/she had completed at least one year of successful parole or probation supervision and has prior written permission from his/her Parole or Probation Officer. The Facility Manager/designee may make an exception to the one year rule.

   e. An ex-offender whose parole or probation has expired must have proof of the expiration of his/her parole or probation.

4. If visiting privileges have been approved for a Prohibited Visitor at a facility, and the inmate is transferred to a new facility, the approval shall follow. If the Facility manager at the receiving facility determines that a review is necessary, those visiting privileges will remain active while under review. Should information be found that would warrant these privileges be denied/suspended, the visitor and the inmate shall be informed in writing of this decision.

## N. Suspension, Termination, or Restriction of Visiting Privileges

1. Visits may be suspended, terminated, or restricted, to maintain the security or orderly running of the visiting room and/or the facility or as made necessary by the behavior of the inmate or visitor(s). Suspension or termination of a visit may be ordered by a Commissioned Officer. All suspensions and terminations of visits shall be reported, in writing to the respective Shift Commander and the Facility Manager.

2. The Hearing Examiner may impose a disciplinary sanction suspending or restricting an inmate's visiting privileges for a violation of the visiting room rules and regulation. All imposed sanctions shall be in accordance with Department policy **DC-ADM 801**.

JA202

Case 5:22-cv-01673-JLS Document 26 Page 187 File 04/17/23 Page 8 of 36

3. Visitation may be restricted or suspended, special security precautions imposed for violation of visiting rules, or as warranted by the behavior of the inmate and/or visitor(s) involved. Any inmate who is found guilty of a misconduct for dealing, using (including by urinalysis or refusal to submit to urinalysis) or possessing illegal or non-prescribed drugs and/or drug paraphernalia, will be prohibited from having contact visits for the period specified below. This period and the special security precaution will commence on the date of the misconduct hearing, upon a finding of guilt.

   1st offense-180 days

   2nd offense-360 days

   3rd offense – indefinitely

4. After three years of an inmate's contact visiting privileges being suspended indefinitely, and provided that the inmate has successfully participated in Alcohol and Other Drugs Treatment, the inmate may request reinstatement of his/her visiting privileges by submitting a written request to the Facility Manager. Upon receipt of such a request the Facility Manager shall review the request, make a recommendation of approval/disapproval, and forward it to the Regional Deputy Secretary. Upon receipt of the request and the Facility Manager's recommendation, the Regional Deputy Secretary shall determine whether the inmate's visiting privileges are to be reinstated and inform the Facility Manager of the determination. The Facility Manager shall be responsible for informing the inmate, in writing, of the decision regarding the request.

5. Any visitor, including immediate family members of the inmate, who attempt to bring or who brings drugs upon the grounds of any Department facility will be permanently banned from visiting at all Department facilities and the matter shall be referred to the Pennsylvania State Police for prosecution.

6. If the Facility Manager suspends a visitor's visiting privileges, that Facility Manager shall notify the visitor of the reasons for the suspension.

7. Restriction of visiting privileges will not be used as a disciplinary measure for unrelated facility rule infraction. However, visiting privileges may be restricted as a result of changes in housing or custody level made as a result of an unrelated infractions. An inmate who violates any of the visiting room rules jeopardizes both his/her own visitation privileges as well as those of the outside visitor.

8. A visitor who is suspended or barred at one facility shall not be permitted to visit at any other facility. The Bureau of Information Technology (BIT) is responsible for ensuring that a comprehensive suspended/barred visitor's list is made available at each facility.

Issued: 5/21/2014
Effective: 6/18/2014

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
SCI-_____

_____

**Attention: Counselor** _____

Requesting Inmate Name/Number: _____ Housing Unit: _____
(**Minor should be listed on current visiting list**)

Minor's Name: _____ Date of Birth: _____ Gender: M ☐ F ☐

*Relationship:* ☐ *Son* ☐ *Daughter* ☐ *Grandson* ☐ *Granddaugher* ☐ *Niece* ☐ *Nephew* ☐ *Other* _____

Minor's Parent/Guardian: _____

_____
Address:     Street                                City            State           Zip

The inmate named above has requested that (Minor's Name) _____
Be approved as an authorized visitor and be permitted to visit him/her at the above facility.

Department of Corrections policy requires that the parent or legal guardian of a minor child (including a child of the inmate) submitted for Visiting List approval, be notified of such a request. The parent or legal guardian must indicate in writing that he/she approves of or objects to the minor visiting the inmate. The parent or legal guardian may also approve an adult to accompany the minor on such a visit(s).

Please indicate your decision by checking the appropriate box or boxes below:

☐     I **object** to having the above named minor on the inmate's Visiting List.

☐     I **approve** of having the above named minor on the inmate's Visiting List.

☐     I **approve** the adult listed below to accompany the minor on visit(s).

| **Name of Parent, Legal Guardian, or other Adult** | **Relationship to the Above-Named Minor** |
|---|---|
| _____ | _____ |
| _____ | _____ |

_____
Signature of Parent or Legal Guardian                            Date

**Please return this inquiry to the above address. If your reply is not received within two weeks, the inmate's request will be disapproved. The institution must receive this form no later than:** _____

_____
Unit Manager or Counselor's Signature and Date form returned.

*DC-ADM 812, Inmate Visiting Privileges Procedures Manual*
*Section 1 – General Procedures*

*Attachment 1-A*

Issued: 3/31/2014
Effective: 5/1/2014

JA204

(DC-313A – Special Visitor Inquiry)      **COMMONWEALTH OF PENNSYLVANIA**
                                        **Department of Corrections**

**(One Minor per form)**          SCI--_____

_____

_____

Attention: Counselor _____

Requesting Inmate Name/Number: _____ Housing Unit: _____

**(Minor should be listed on current visiting list)**

Minor's Name: _____ Date of Birth: _____ Gender: □ M □ F

***Relationship:*** □ ***Son*** □ ***Daughter*** □ ***Grandson*** □ ***Granddaugher*** □ ***Niece*** □ ***Nephew*** □ ***Other*** _____

Minor's Parent/Guardian: _____

_____

Address:      Street                                    City          State          Zip

The above referenced inmate has requested that (Minor's Name) _____
be approved as an authorized visitor and be permitted to visit him/her at the above facility.

Department of Corrections policy requires that the parent or legal guardian of a minor child (including a child of the inmate) submitted for Visiting List approval, be notified of all charges that the inmate is, or was previously incarcerated for when those charges resulted from any physical or sexual abuse of a minor. The parent or legal guardian must indicate in writing that he/she is aware of the charges against the inmate and that he/she approves of or objects to the minor having a non-contact visit with the inmate, and indicate whether the minor was or was not a victim of the inmate. The parent or legal guardian may also approve an adult to accompany the minor on a visit(s).

The charges against the inmate are: _____
_____
_____
_____

Please indicate your decision by checking the appropriate boxes below:

□      I, being made aware of the charges against this inmate, **object** to having the above named minor on the inmate's Visiting List.

□      I, being made aware of the charges against this inmate, **approve** of having the above named minor on the inmate's Visiting List.

□      I **approve** of having the minor's adult family member(s) (listed below) accompany the minor on visit(s).

| **Name of Parent, Legal Guardian, or other Adult** | **Relationship to the Above-Named Minor** |
|---|---|
| | |
| | |

□ The Minor **was** a victim of the inmate.      □The Minor **was not** a victim of the inmate.

_____
Signature of Parent or Legal Guardian          Date

**Please return this inquiry to the above address. If reply is not received within two weeks, the inmate's request will be disapproved. The institution must receive this form no later than:** _____

_____
Unit Manager or Counselor's Signature and Date form returned.

***DC-ADM 812, Inmate Visiting Privileges Procedures Manual***
***Section 1 – General Procedures***                       ***Attachment 1-B***
Issued: 3/31/2014
Effective: 5/1/2014

# DC-315     List of Acceptable Forms of Visitor Identification

**One (1) form of identification from "category A" or two (2) forms of identification from "category B" *one of which must contain a physical description of the person* are required.**

## Category A

1. Driver's license or ID card issued by a state or outlying possession of the United States provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address.

2. ID card issued by a federal, state, or local government agencies or entities provided it contains a photograph or information such as name, date of birth, sex, height, eye color, and address.

3. School ID, with photograph.

4. U.S. Passport

5. Certificate of U.S. Citizenship (INS Form N-560 or N-561)

6. Certificate of Naturalization (INS Form N-550 or N-570)

7. Alien Registration Receipt Card with photograph (INS Form I-151 or I-551)

8. Temporary Resident Card (INS Form I-688)

9. Any other form of identification that contains a photograph.

## Category B

1. Voter's registration card.

2. U.S. Military card or draft record.

3. Vehicle Registration

4. U.S. social security card issued by the Social Security Administration.

5. Certification of Birth Abroad issued by the Department of State (Form FS-545 or Form DS-1350)

6. Original or certified copy of a birth certificate issued by a state, county, municipal authority, or outlying possession of the United State bearing an official seal.

7. U.S. Citizen ID Card (INS Form I-197)

8. ID Card for use of Resident Citizen in the United States (INS Form I-179)

9. School record or report card.

10. Clinic, doctor, immunization, or hospital record.

11. Day-care or nursery school report.

12. Learner's Permit or Temporary Driver's License

13. Native American Tribal document

14. Any other document that contains information such as name, date of birth, sex, height, eye color, and address.

**Note: Any forms of identification presented after the expiration date indicated on the document will not be accepted.**

***DC-ADM 812, Inmate Visiting Privileges Procedures Manual***
***Section 01 – General Procedures***
Issued: 3/31/2014
Effective: 5/1/2014

*Attachment 1-C*
JA206

| DC-311A (revised 9/2011) | Commonwealth of Pennsylvania |
| --- | --- |
| | **Department of Corrections** |

| **FACILITY:** | **AUTHORIZED VISITORS LIST** |
| --- | --- |

Complete Section 1 and submit all copies of the form. After Section 2 has been completed, the copies will be separated and distributed. List the names and ages of the persons you wish to have on your visiting list. Additionally, you will need to indicate if any of the persons listed are: **(1) Present or former inmate (County/State/Federal), (2) Currently or previously on probation or parole, (3) Involved in your current or past offense(s), (4) Department of Corrections employee, (5) Former Department of Corrections Employee, or (6) Volunteer of Contract Employee for the Department of Corrections**. Place the number (1), (2), (3), (4), (5), or (6), if applicable, in the column on the far right after each visitor's name to indicate these relationships. Members of a family living at the same address may be counted as one name. Your spiritual advisor and attorney may be listed in the space provided. You may make changes to this list at any time using form DC-312A, Supplementary Authorized Visitors. All requests are subject to the approval of the facility, and any existing regulations of the Department of Corrections.

### 1. INMATE'S REQUEST

| Name | Date of Birth | Gender M/F | Relation | Address | Number of Category (1 through 6 listed above), if applicable |
| --- | --- | --- | --- | --- | --- |
| 1. | | | | | |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| 11. | | | | | |
| 12. | | | | | |
| 13. | | | | | |
| 14. | | | | | |
| 15. | | | | | |
| 16. | | | | | |
| 17. | | | | | |
| 18. | | | | | |
| 19. | | | | | |
| 20. | | | | | |
| Spiritual Advisor | | | | | |
| Attorney | | | | | |
| Reporter/Media | | | | | |

| Inmate Number: | Inmate's Signature: | | Date: | Location: |
| --- | --- | --- | --- | --- |

### 2. APPROVAL

| **Remarks:** | ☐ **All Approved:** | ☐ **Approved Except Line(s):** |
| --- | --- | --- |

| **Approving Signature:** | **Title:** | **Date:** |
| --- | --- | --- |

WHITE – RECORDS OFFICE (DC-15)          CANARY – VISITING ROOM          PINK - INMATE

*DC-ADM 812, Inmate Visiting Privileges Procedures Manual*
*Section 01 – General Procedures*          *Attachment 1-D*
Issued: 9/12/2011
Effective: 9/16/2011

JA207

| DC-312A (Revised 9/2011) | SUPPLEMENTARY AUTHORIZED VISITORS | Commonwealth of Pennsylvania Department of Corrections |
|---|---|---|

**FACILITY:**

| Number: | Name: | Housing Unit: | Date: | Counselor: |
|---|---|---|---|---|

Complete Section 1 and submit all copies of the form. After Section 2 has been completed, the copies will be separated and distributed. List the names and ages of the persons you wish to have on your visiting list. Additionally, you will need to indicate if any of the persons listed are: **(1) Present or former inmate (County/State/Federal), (2) Currently or previously on probation or parole, (3) Involved in your current or past offense(s), (4) Department of Corrections employee, (5) Former Department of Corrections Employee, or (6) Volunteer or Contract Employee for the Department of Corrections.** Place the number (1), (2), (3), (4), (5), or (6), if applicable, in the column on the far right after each visitor's name to indicate these relationships. Members of a family living at the same address may be counted as one name. Your spiritual advisor and attorney may be listed in the space provided. You may make changes to this list at any time. All requests are subject to the approval of the facility, and any existing regulations of the Department of Corrections.

### 1. REMOVAL FROM THE LIST OF AUTHORIZED VISITORS

| Name | Date of Birth | Gender M/F | Relation | Address |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### 2. ADDITIONS TO THE LIST OF AUTHORIZED VISITORS

| Name | Date of Birth | Gender M/F | Relation | Address | No. of Category (1 through 6 listed above), if applicable |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(  ) Name Change Only                    (  ) Address Change Only

_____
Inmate Signature

_____          _____
Counselor's Review                                   Approving Signature

WHITE – RECORDS OFFICE (DC-15)          CANARY – VISITING ROOM          PINK - INMATE

*DC-ADM 812, Inmate Visiting Privileges Procedures Manual*
*Section 01 – General Procedures*          *Attachment 1-E*
Issued: 9/12/2011
Effective: 9/16/2011

JA208

# VISITOR QUALITY ASSURANCE
# PROGRAM SURVEY

Please rate the following:

| Reception Lobby Area | Excellent | Good | Fair | Poor |
|---|---|---|---|---|
| 1. Visitor Registration Process | _____ | _____ | ____ | ____ |
| 2. Staff Courtesy & Efficiency | _____ | _____ | ____ | ____ |
| 3. Timely Processing | _____ | _____ | ____ | ____ |
| 4. Storage of Personal Effects | _____ | _____ | ____ | ____ |
| 5. Lobby Cleanliness | _____ | _____ | ____ | ____ |
| 6. Restroom Cleanliness | _____ | _____ | ____ | ____ |

| Inmate Visiting Room | | | | |
|---|---|---|---|---|
| 1. Area Neat, Clean, and Orderly | _____ | _____ | ____ | ____ |
| 2. Visiting Room Officer Helpful and Courteous | _____ | _____ | ____ | ____ |
| 3. Visiting Time Sufficient | _____ | _____ | ____ | ____ |
| 4. Restroom Cleanliness | _____ | _____ | ____ | ____ |
| 5. Children's Play Area | _____ | _____ | ____ | ____ |
| 6. Outdoor Visiting Area | _____ | _____ | ____ | ____ |

Time arrived: _____

Time started visit: _____   Signature: _____

Time visit completed: _____

If any members of our staff were especially courteous or responsive to your needs, please let us know so that we might recognize them and express your appreciation.

Name: _____    Name: _____

Position: _____    Position: _____

Personal Comments or Concerns: _____
_____
_____
_____
_____ Date: _____

For a written response please print your name and address:
_____

**Please leave in the Box provided at the main entrance.**

*DC-ADM 812, Inmate Visiting Privileges Procedures Manual*
*Section 1 – General Procedures*                           *Attachment 1-G*

JA209

Case 5:22-cv-30753-JDW  Document 26   Page 194   Filed 04/17/2023   Page of 36

## Section 2 – Special Inquiries and Visits

### A. Special Inquiries

1. The parent or legal guardian of a minor child, including a child of the inmate, submitted for Visiting List approval, shall be notified of such a request and that the parent or legal guardian shall indicate in writing that he/she approves of or objects to the minor visiting the inmate. If no response is received, the request for approval of the minor as a visitor shall be denied.

2. A minor may only visit when accompanied by a parent/legal guardian, County children/youth services agency staff, or an adult(s) approved by the parent/legal guardian to accompany the child.

3. In cases where the inmate is, or was previously convicted or adjudicated for an offense resulting from any physical or sexual abuse of a minor, the parent or legal guardian of a minor child, including a child of the inmate, shall be notified of all convictions, adjudications, or charges as set forth below. This notification is also required for cases in which the initial charge(s) were reduced to a lesser charge if a review of the facts of the crime indicates that the offense did involve any physical or sexual abuse of a minor. The parent or legal guardian must indicate in writing that he/she is aware of the charges against the inmate, that he/she approves of or objects to the minor visiting the inmate, and whether the minor was or was not a victim of the inmate. If no response is received, the request for approval of the minor as a visitor will be denied.

4. Any inmate who, as an adult or as a young adult offender, was ever convicted or adjudicated for a physical or sexual offense against a minor is prohibited from having a contact visit with any minor child. The Facility Manager may grant contact visits for such an inmate under special circumstances.[1]

5. In cases where there is insufficient information relative to the minor child or where any other concerns exist, the Facility Manager may remove, disapprove, or place restrictions (such as non contact visits only) on visits with the minor child.

6. In cases where a young adult offender committed a sexual offense, and the case was ordered sealed by the court, no notifications shall be made. In these cases the Facility Manager may, based upon this information or other concerns, remove, disapprove, or place other restrictions (such as non-contact visits only) on visits with any or all minor children.

7. As part of the inmate's annual review, the inmate's counselor will review the inmate's case history and ensure that all required visitor inquiries have been made.

8. If any staff member becomes aware of new or additional information pertaining to a sexual offense committed by an inmate, the staff member is to bring the information to

---

[1] 4-449-1

Issued: 3/31/2014
Effective: 5/1/2014

JA210

the attention of the Shift Commander and the inmate's Unit Manager as soon as possible via a **DC-121 Part 3, Employee Report of Incident**, in accordance with Department policy **6.3.1, "Facility Security."**

9. ***If visiting privileges have been approved for a Prohibited Visitor at a facility, and the inmate is transferred to a new facility, the approval shall follow. If the Facility manager at the receiving facility determines that a review is necessary, those visiting privileges will remain active while under review. Should information be found that would warrant these privileges be denied/suspended, the visitor and the inmate shall be informed in writing of this decision.***

## B. Special Visits

1. General

   Provisions shall be made for approval of special visits in cases of exceptional or extraordinary need. Special visits may include visits from a person who has come a long distance, visits to a hospitalized inmate, visits to an inmate in disciplinary status, and visits between an inmate and his/her attorney, clergy, social service agency representative, etc. and are not counted against the number of authorized regular visits. Only the Facility Manager/designee may approve special visits. Absent this approval, only a person on the inmate's approved list may visit.[2]

2. Religious Advisor

   Designation by an inmate of a Religious Advisor, as defined in Department policy **DC-ADM 819, "Religious Activities,"** may be made at any time. Such designation shall be in addition to the names on the approved list and will not be counted against the total of 40 and visits of this type will not be counted against the number of authorized regular visits. A Religious Advisor must be approved by the Facility Chaplaincy Program Director who will verify that the Religious Advisor is endorsed by the faith group authority. Volunteers, relatives, and family members will not be approved to be a Religious Advisor. An approved individual may be an advisor for more than one inmate, however, that individual may only visit one inmate at a time. There may be no group religious meetings in the visiting room unless the Facility Manager grants special permission. The length and number of visits for Religious Advisors may be limited depending upon available space.

3. Attorneys[3]

   An inmate may designate attorneys, with whom he/she desires visiting privileges, at any time.[4] Such designation shall be in addition to the names on the approved list and will not be counted against the total of 40 and visits of this type will not be counted against the number of authorized regular visits.

---

[2] 4-4500, 1-ABC-5D-14
[3] 4-4274
[4] 4-4275

Issued: 3/31/2014
Effective: 5/1/2014

JA211

a. The confidentiality of the attorney/client relationship will be honored. Personnel will not be stationed in such a manner as to be able to overhear normal conversation.[5]

b. An attorney who has been designated by an inmate as his/her legal advisor may permit persons, such as a law student, paralegal, or investigator to visit the inmate to act as the attorney's agent. Each person shall present to the facility at the time of the visit, a written statement signed by the attorney on the letterhead of his/her firm identifying each person as the attorney's agent and attesting that the visit is for the purpose of a legal consultation.

c. Each attorney and his/her agents are subject to the same rules and regulations as other visitors.

d. An inmate is prohibited from taking any legal materials into or from the visiting room without prior approval by the Facility Manager/designee.

4. Official Visitor

a. Any official visitor may enter and visit any State Correctional facility on any day, including Sunday, between the hours of 9:00 a.m. and 5:00 p.m. but shall not be authorized to enter and visit at any other time except with special permission of the official in charge of the facility. Official visitors shall have the right to interview privately, any inmate in the cell or room where he/she is confined. However, if the official in charge of the facility deems such cell entry is dangerous to the safety of the visitor, the inmate may be taken to another room where the interview will still be conducted privately. Employees of an official visitor may accompany and be present during an interview conducted by an official visitor except the number of such employees may be limited based on space and security needs of the facility.

b. An official visitor shall be permitted to use the attorney visiting rooms upon request (if available) for a private meeting with the general population inmate(s) that he/she wishes to visit. He/she can meet with one inmate at a time in a private meeting; he/she can meet with multiple inmates consecutively; or he/she can meet with a small group of inmates, as requested (unless there are legitimate security reasons why group meetings should be prohibited). A request to visit an L5 inmate will be accommodated in the L5 non-contact visiting booths. He/she can only meet with one L5 inmate at a time; however, he/she can meet consecutively with multiple L5 inmates on the same day, if requested. While he/she is not required to pre-schedule these visits, he/she is encouraged to do so (when possible), in order to facilitate the process.

c. An official visitor who is on an individual inmate's visiting list is not permitted access to any other area of the facility except the visiting room.

---

[5] 4-4275

Issued: 3/31/2014
Effective: 5/1/2014

JA212

## Section 3 – Security

### A. General Security Procedures

1.  If it is determined that a visit is or could be threat to the security and orderly running of the facility, the visit may be terminated or denied.

2.  Separate areas will be provided at all facilities whereby an inmate appearing for a visit will be searched and his/her state issued clothing and footwear exchanged for visiting room clothing and footwear. The reverse procedure will be followed upon completion of the visit.[1] The facility shall ensure that all visiting room clothing is laundered before reissue and that either all footwear is laundered or an appropriate disinfectant spray used before reissue.

3.  All inmate visits will be recorded in the inmate visitors computerized tracking system.

4.  The inmate must be present in the visiting search area before the inmate's visitors are permitted to enter/depart the visiting room.

### B. Searches

1.  General

    a.  Every visitor and inmate is subject to search before, during, and after visiting. Any visitor or inmate refusing to comply with facility search procedures will not be permitted any further visits unless authorization is received from the Facility Manager.[2]

    b.  With the exception of **Subsection B.1.b.(4) below**, each visitor is required to successfully pass a metal detection process prior to a contact visit. The process to be used is as follows:

        (1)  Each visitor must walk through a "walk through" metal detector. If the metal detector does not sound an alarm indicating the presence of a metallic object, a contact visit will be permitted, provided there are no other reasons to restrict the visit to non-contact or to deny the visit. If the metal detector sounds an alarm indicating the presence of a metallic object, the visitor will be scanned with a "hand held" metal detector in an effort to determine the source of the alarm. If the source of the alarm is determined to be a non-contraband item (e.g., coins, jewelry, metal zipper/buttons/snaps, etc.), a contact visit will be conducted provided there are no other reasons to restrict the visit to non-contact or to deny the visit. The Shift Commander is responsible for making the determination if a contact or non-contact visit is to be conducted or the visit denied. If the source of the alarm is contraband the visit will be denied.

---

[1] 4-4156
[2] 4,4156,4-4503

JA213

(2)   If the source of the alarm is believed to be an article of outer clothing such as a coat, sweater, or shoes, the visitor may remove the item. The removed item is to be searched and the procedures outlined in **Subsection B.1.b.(1) above** repeated. If the item is contraband-free and the visitor successfully passes the second scanning, a contact visit *may* be conducted, provided there are no other reasons to restrict the visit to non-contact or to deny the visit. If the item contains contraband the visit will be denied. If the visitor fails to successfully pass the second scanning, a non-contact visit will be permitted *based upon the availability and the location of the non-contact visiting area and determination of the Shift Commander*.[3] The visitor shall be notified that the wearing of that item for a future visit will result in his/her visit being denied. The Shift Commander is responsible for making the determination if a non-contact visit is to be conducted or the visit denied.

(3)   If the source of the alarm is believed to be an article of underclothing, the visitor will not be permitted to remove the item. The visitor *may* be offered a non-contact visit *based upon the availability and the location of the non-contact visiting area and determination of the Shift Commander*, provided there are no other reasons to deny the visit, and shall be notified that the wearing of that item of clothing for a future visit may result in his/her visit being denied. The Shift Commander is responsible for making the determination if a non-contact visit is to be conducted or the visit denied.

(4)   For a visitor with a metal implant, or who is medically required to wear an item constructed with metallic items (e.g., back brace, knee support, etc.), or who is medically required to use an ambulatory assistance device (e.g., wheel chair, walker, cane, crutches, etc.) to have contact visits he/she must provide a doctor's certificate verifying the medical requirement. If a claim of such a medical requirement is made during the initial visit and no doctor's certificate is available at that time, a non-contact visit *may* be permitted. A doctor's certificate is required at the subsequent visits for contact visits to be conducted. A visitor with such requirements will be scanned with a "hand held" metal detector for detection of metallic objects other than those medically required. The Shift Commander is responsible for making the determination if a non-contact visit is to be conducted *based upon the availability and location of the non-contact visiting area,* or the visit denied.

(5)   A visitor will be allowed to take medically required ambulatory assistance devices (e.g., wheel chair, walkers, canes, crutches, etc.), into the visiting area. An inmate in the visiting area is prohibited from handling any of these articles.

(6)   Pat searches and/or strip searches of a visitor are strictly prohibited.

(7)   The Facility Manager will be notified in writing of all contraband finds, all approved non-contact visits, and all denied visits.

---

[3] 4-4156

JA214

c.  A visitor will be permitted to bring baby food in the original unopened jars into the visiting room. Officers will open all vacuum-sealed containers to ensure the jars have not previously been opened. Facilities may develop local procedure to address the amount of baby food that may be taken into the visiting room. A visitor may take up to three bottles into the visiting area. The bottles must be of clear plastic and contain pre-mixed formula or white milk.

d.  A visitor may take up to three diapers into the visiting area. The diapers must be loose, not boxed. Staff should continue to carefully inspect diapers for contraband.

e.  The facility may make determinations about whether other items such as baby cream or wipes will be allowed into the visiting room.

f.  A visitor may use only a clear plastic bag to carry the above items into the visitors' area. The visitor must carry all items in at the beginning of the visit. No visitor shall be permitted to leave during a visit for more items and return to the visiting room. If the visitor opts to the leave the visiting room, the visit will be considered concluded.

g.  No purses, bag, diaper bags, etc. will be permitted into the facility. A visitor may take cash money in small denominations and coins into the visiting room for the purpose of using the vending machines. These monies may be carried in a small "see through" change purse type container. An inmate in the visiting room is prohibited from handling any forms of currency. At facilities using token operated vending machines, no cash money is allowed in the visiting room.

h.  A visitor is allowed to take medically prescribed medications that may be needed for a medical emergency (e.g., nitroglycerin, asthma inhaler, etc.). All over-the-counter medications are prohibited from being taken into the visiting room.

i.  A visitor will be allowed to take medically required ambulatory assistance devices, (e.g., wheel chair, walkers, canes, crutches, etc.) into the visiting area. An inmate in the visiting area is prohibited from handling any of these articles.

j.  All tobacco products are prohibited in visiting areas.

k.  Cell phones, pagers, Personal Digital Assistants (PDAs), video/audio recording devices, and photography equipment are prohibited in visiting areas.

2.  Vehicles

    A visitor is subject to searches of vehicles parked on facility grounds in accordance with Department policy **6.3.12, "Drug Interdiction."**

3.  Electronic Drug Detection Devices

    Every visitor is subject to being scanned by an Electronic Drug Detection Device. If the presence of contraband is detected, the following procedures shall be followed:

JA215

a.  The visitor will be given the option of removing an article(s) of outer clothing believed to be contaminated and washing his/her hands. A second test will then be performed. It is the policy of the Department not to conduct strip searches on visitors. If the second test is positive, the visitor may request a non-contact visit.[4] If a visitor believes that legitimate circumstances exist that may result in a positive scan reading, the visitor MUST provide the processing officer with written documentation of the circumstances BEFORE taking the test.

b.  A visitor may test positive on two visits and still be afforded the opportunity to request a non-contact visit. On each of these occasions, the Shift Commander, upon his/her review, may approve a non-contact visit. If a non-contact visit is not approved, the Facility Manager shall review the circumstances of the disapproval and, based upon the review, may impose a suspension of visiting privileges for up to 90 days for the visitor. On the third occasion of a positive reading, the following visiting privileges suspensions shall be imposed:

  (1)  third occasion, visiting privileges will be suspended for 180 days;

  (2)  fourth occasion, (if within one year of the privileges being reinstated for the third occasion), visiting privileges will be suspended for one year; and

  (3)  fifth occasion, (if within one year of the privileges being reinstated for the fourth occasion), privileges will be suspended indefinitely.

c.  After two years of the visitor's privileges being suspended indefinitely, the visitor may request reinstatement of his/her visiting privileges by submitting a written request to the Facility Manager. Upon receipt of such a request, the Facility Manager shall review the request, make a recommendation of approval/disapproval, and forward it to the Regional Deputy Secretary. Upon receipt of the request and the Facility Manager's recommendation, the Regional Deputy Secretary shall determine whether the visitor's visiting privileges are to be reinstated and inform the Facility Manager of the determination. The Facility Manager shall be responsible for informing the visitor, in writing, of the decision regarding the request.

d.  Any visitor who has a positive reading will be provided with a printout of the test results if he/she requests a copy. Additionally, all positive scan results will be retained for a period of 12 months. If no second positive reading occurs for the visitor during the 12 month period, upon request of the visitor, the record of the test will be expunged. However, if a second positive result occurs during the 12 month period, the records will be retained. All requests to expunge the record will be honored unless specific security concerns exist. Any denial of such a request requires the approval of the respective Regional Deputy Secretary or Secretary.

e.  Any deviation from the procedures listed in **Subsection B.3.b. above** that increases or decreases the period of suspension requires the approval of the respective Regional Deputy Secretary or Secretary.

---

[4] 4-4499-1

JA216

4. K-9 Air Scans

   Every visitor is subject to an air scan by a K-9 team to detect the presence of drugs. A positive K-9 alert will be handled in the same manner as a positive scan by an Electronic Drug Detection Device. The positive alert will be included as an "occasion" for determining suspension of visiting privileges, in accordance with **Subsection B.3.b. above**.

## C. Face Veils or Obstructive Clothing

Face veils or other articles of clothing that obstruct the view of an individual's face required by a female visitor's religious beliefs are permitted to be worn inside the facility. To ensure for positive identification of the visitor, the following procedures will be followed for processing a visitor wearing a face veil or other article of clothing that obstructs the view of an individual's face when entering/exiting a facility:

1. In all instances a female staff member will be used to identify the visitor. When possible, a female Corrections Officer will be used. When a female Corrections Officer is not available, female staff from other departments (e.g., Medical, Business Office, Records, Food Services, etc.) will be used to process a female visitor and confirm his/her identity when leaving.

2. The removing or removal of the face veil or other article of clothing will be done in a location that affords the visitor privacy as to not be seen by male individuals.

3. All face veils or other articles of clothing that obstruct the view of an individual's face must be moved or removed to allow the staff member an unobstructed view of the visitor's face. After the staff member has viewed the visitor's face the visitor will be instructed to place the face veil or other article of clothing back to its original position.

4. Before leaving the facility, the face veil must again be opened to confirm the identity of the visitor.

## D. Animals on Department Property

1. Any visitor who brings an animal(s) onto Department property shall be responsible to remove and restrain the animal(s) to allow a Department K-9 team to search the vehicle. If the visitor refuses to cooperate, the visit will be denied.

2. If any animal(s) are found to be left unattended in a visitor's vehicle under harsh conditions (i.e., too hot, too cold, etc.), the visitor shall be identified and the visit terminated. The visitor will be advised to vacate the property. If he/she refuses to cooperate, Department staff shall contact the appropriate authorities to report the situation.

JA217

## Section 4 – Community Corrections Centers (CCCs)

### A. General Procedures

1. Each Center Director shall identify a visiting area within the center.

2. Every visitor and resident is subject to search before, during, and after visiting. Any visiting refusing to comply with center search procedures will not be permitted any further visits until authorization is received from the Center Director.

3. Any person entering a CCC shall immediately inform staff of his/her presence. The visitor shall state the nature of his/her visit, including the name(s) of the resident(s) he/she is visiting.

4. Every visitor is required to enter his/her name and resident to be visited in the visitor's log. Proper identification shall be verified by the Community Corrections Center Monitor on duty.

5. Each visitor is to proceed directly to the Visiting Area and is not allowed in other areas of the Center without approval by the Community Corrections Center Monitor on duty.[1]

6. Center staff shall contact the resident and inform him/her that he/she has a visitor(s).

7. A former Community Corrections Center resident is prohibited from visiting a current resident without special permission form the Community Corrections Center Director.

8. A Community Corrections Center resident wishing to visit an inmate in a State Correctional Facility must receive prior written approval from the following individuals:

   a. Facility Manager of the State Correctional Facility; and

   b. the Regional Director of the CCC.

9. A visitor is prohibited from leaving any item with the inmate without approval of the Community Corrections Center Monitor on duty.

### B. Visiting Restriction/Termination

1. A resident's visiting privileges may be restricted if Center staff deems that the resident is failing to accomplish established goals or when the resident or a visitor violates the Center's rules and regulations.

2. The Center Director may terminate a visit or suspend/bar an individual from visiting if it is determined that visiting is or would present a threat to the security and orderly running of

---

[1] 4-ACRS-2A-02

JA218

the center. Each individual who is suspended/barred shall be notified, in writing by the Center Director.[2]

## C. Official Visitors and Special Visits

1. Visits by an official visitor shall be in accordance with **Section 2, Subsection B.4**.

2. When necessary special visits can be authorized by the Community Corrections Center Director.[3]

---

[2] 4-ACRS-5A-17
[3] 4-ACRS-5A-18

Case 5:22-cv-30573-JPW Document 126 Page 30204 Filed 04/04/21 Page 1 of 36

## Section 5 – Private Viewing & Deathbed Visits

### A. General Procedures

1. If approved by the Facility Manager, every inmate, except a Custody Level 5 inmate and an inmate serving a life sentence, may be permitted to make a private viewing or deathbed visit of an immediate family member.[1] The visit must occur in a hospital or hospice facility. A visit to a private home is not permitted. No inmate is entitled to or otherwise has a right to such a visit. Public safety shall be the overriding concern in all cases.

2. Except as provided in **Subsection A.1. above**, each inmate may attend either a private viewing or a deathbed visit. Attendance at both is prohibited. A Private viewing or deathbed visit is not permitted outside of the Commonwealth of Pennsylvania.

3. An inmate having pre-release status shall be processed in accordance with **DC- ADM 805, "Pre-Release, Outside Work and Housing Assignments, Community Works Programs, Escorted Leave, Armed Mounted Work Detail, Forestry Unit Programs and Temporary Hold-In Orders."**

4. A request for a private viewing or deathbed visit shall be submitted to the Facility Manager. The Facility Manager/designee shall ensure for the timely notification of the inmate and verification of the information received. Verification of the information may be accomplished by:

   a. contacting the funeral home, hospital, hospice, or nursing home; and

   b. reviewing the inmate's **DC-15** and **DC-14** files regarding the relationship of the deceased or infirmed individual.

5. The Facility Manager/designee shall complete a **Private Viewing – Deathbed Visit Worksheet (Attachment 5-A)** and consider the following factors in determining whether to grant a private viewing or  deathbed visit:

   a. the offense for which the inmate was convicted and the inmate's criminal history;

   b. the inmate's minimum and maximum sentence dates;

   c. the inmate's detainer status;

   d. the inmate's misconduct history over the past year; and

   e. any information available that would indicate that the inmate is an escape risk.

---

[1] 4-4455

Issued: 1/25/2011
Effective: 1/28/2011

JA220

6. The Facility Manager/designee may contact a Community Corrections Center (CCC), Community Contract Facility (CCF), Pennsylvania State Police (PSP), local law enforcement agency, or any other entity near the location of the private viewing or a deathbed visit to gather information regarding potential risks that may be associated with transporting the inmate to the private viewing or a deathbed visit location.

7. The Facility Manager shall approve or deny the private viewing or deathbed visit.[2] The Facility Manager/designee shall notify the inmate of approval or denial of the private viewing or a deathbed visit and advise the inmate that he/she must make a choice between a private viewing or deathbed visit, if applicable. If approved, the Facility Manager/designee shall be responsible of notifying the Office of the Victim Advocate (OVA), via telephone, of the approval.

8. The Facility Manager/designee shall make security and other arrangements with the funeral home, hospice, hospital, or nursing home for the viewing or visit. In the case of a private viewing, the maximum time an inmate is allowed at the private viewing is one-hour. This time must be prearranged with the funeral home director and it must be at a time when access by the general public is restricted. In the case of a deathbed visit, the visit must be conducted in accordance with the visiting hours and regulations of the hospice, hospital, or nursing home. If the length of visits is not defined by the hospice, hospital, or nursing home, the inmate will be permitted a maximum of one hour in which to visit.

9. In the event that the location of the private viewing or deathbed visit is closer to a facility other than the one in which the inmate is housed, and time permitting, a temporary transfer of the inmate to the closer facility may be considered. If such a transfer is considered, both Facility Managers (sending/receiving facility) must approve the inmate's attendance at the private viewing or deathbed visit.

10. Staff escorting the inmate shall be attired in accordance with Department policy **6.2.4, "Uniform Regulations."** The inmate will be transported in state issued cocoa brown clothing and the transport will be conducted in accordance with Department policy **6.3.1, "Facility Security."** A determination shall be made prior to the transport if the inmate will miss a scheduled meal. In the event a scheduled meal would be missed, arrangements are to be made to provide the inmate with a bagged meal and a beverage for consumption during the transport.

11. A court order is not necessary for an inmate to attend a private viewing or deathbed visit. Any orders directing that an inmate be permitted to attend a private viewing or deathbed visit should be referred to the Office of Chief Counsel.

12. The Facility Manager shall ensure that the OVA is notified of the approval of each private viewing or deathbed visit in accordance with Department policy **1.2.1, "Victim Services."**

---

[2] 4-4445

Issued: 1/25/2011
Effective: 1/28/2011

JA221

13. The Facility Manager may contact the Regional Deputy Secretary concerning any operational issues posed by a particular private viewing or deathbed visit.

14. The transporting officers are authorized to terminate the transport at any time if he/she determines that his/her security or safety, or that of the public or the inmate cannot be maintained. In such cases, each officer must complete a **DC-121 Part 3, Employee Report of Incident**, in accordance with Department policy **6.3.1** upon return to the facility.

15. Three family members or other visitors may be present at the private viewing or deathbed visit. The inmate and visitor(s) may share a brief kiss and embrace only when meeting and departing, in accordance with **Section 1** of this procedures manual.

## B. Costs

All costs associated with an inmate attending a private viewing or deathbed visit shall be borne by the inmate or his/her family.

1. The Facility Manager/designee shall inform the inmate or the inmate's family of the cost of the visit and make appropriate arrangements for payment of costs prior to transport.

2. Cash and personal checks cannot be accepted.

3. The inmate's family may pay the cost via money order, cashier's check, or certified check. These instruments are to be made payable to the "Commonwealth of Pennsylvania."

4. The inmate's family may present the money order, cashier's check, or certified check at the facility closest to his/her home. The funds will be credited to the inmate's account by the Business Office at that facility.

5. The family also has the option to transfer funds electronically into the inmate's account via *J-Pay*. The inmate or the family must notify the facility that the funds are to be used for this purpose since the wire transfer does not state the purpose. The Facility Manager/designee shall notify the facility Business Office that the family has chosen this option for payment of the cost of the visit.

6. Funds deposited to the inmate's account by his/her family for a private viewing or deathbed visit are not considered income or gifts and are not subject to Act 84 or Crime Victim Fund deductions.

7. The inmate may sign a cash slip for the expense of the trip if he/she has the funds available in his/her account.

Issued: 1/25/2011
Effective: 1/28/2011

JA222

**Attorney** – Any person licensed to practice in any State or Federal court.

**Common Law Spouse** – A person who the inmate has designated as a common law spouse in his/her inmate record.

**Contact Visits** – Visits in a setting in which the inmate and visitor are permitted limited physical contact and are not separated by security barriers or control systems.

**DC-311A – Approved Visitors** – A Department form used by an inmate to list the names of all persons he/she wishes to designate as facility visitors.

**DC-312A – Supplementary Approved Visitors**  - A Department form used by an inmate to make additions or deletions to his/her approved visitors list.

**DC-313 - Visitor Inquiry** - A Department form used to notify the parent or legal guardian of a minor that an inmate, who has not been convicted of a physical or sexual offense involving a minor, has requested the minor be approved for visits. This form is also used by the parent or legal guardian to respond approving of, or objecting to, the minor visiting the inmate.

**DC-313A - Special Visitor Inquiry** - A Department of Corrections form used to notify the parent or legal guardian of a minor that an inmate, who has been convicted of a physical or sexual offense involving a minor, has requested the minor be approved for visits; to make the parent or legal guardian aware of all physical or sexual abuse offenses of the inmate that involved a minor; for the parent or legal guardian to respond approving of, or objecting to, the minor visiting the inmate; and to inform the facility if the minor was or was not a victim of the inmate.

**DC-315 - List of Acceptable Forms of Visitor Identification** - A list of documents accepted at Department facilities to establish the identity of inmate visitors.

**Deathbed Visit** - Supervised visit by an inmate with an immediate family member who is not expected to live due to terminal illness or injury and for whom death appears imminent, as determined by the attending physician and who is in a controlled environment such as a hospice, nursing home, or hospital.

**Department** - The Pennsylvania Department of Corrections.

**Electronic Drug Detection Device** - An electronic device that detects the presence of drug traces on persons, property, and clothing.

**Ex-Offender** - Any person released from criminal justice custody including any person currently on or off parole or probation or under any type of criminal justice supervision.

**Facility Manager** - The Superintendent of a State Correctional Facility, State Regional Correctional Facility, Commander of a Motivational Boot Camp, Director of a Community Corrections Center, or Director of the Training Academy.

JA223

**Immediate Family Member** - Immediate family members are defined as spouse (legal or valid common law), children, parents, grandparents, brothers, sisters, aunts, unless, or step-relative with whom the inmate has made his/her home. Such relationships must be verifiable in the inmate's record.

**Imminent Danger of Death** - A medical condition with a prognosis indicating reasonably low probability of survival for more than six months, as determined by the treating physician.

**Inmate Visitor's Computerized Tracking System** - A computerized system used at Department facilities to maintain inmate visitor's information for use in the Department.

**Minor** - Any person under 18 years of age.

**Official Visitor** - As defined by statute, the Governor, Lieutenant Governor, members of the Senate and House of Representatives, justices, and judges of the courts of record, the General Counsel, the Attorney General and Deputies, and authorized members of the Pennsylvania Prison Society who have been designated as official visitors, whose names shall be given to the correctional official in charge of the appropriate facility in writing, together with the terms of their appointment under its corporate seal.

**Private Viewing** - Supervised visit by an inmate to attend a private viewing designated for family members only of an immediate family member. (See Section IV.M.)

**Private Viewing or Deathbed Visit Expenses** - The costs incurred by an inmate or his/her family to cover the expenses of the Department in providing Corrections Officer escort for the inmate. These cost include, but may not be limited to: staff escort overtime salary and benefits, transportation, meals, and lodging.

**Public Visitor** - Any individual who officially engages in an approved inmate visit using the facility visiting room.

**Religious Advisor** - An individual, selected by an inmate, from the outside community who has received endorsement from a faith group to provide individual religious counseling.

**Special Visit** - A visit by an Official Visitor, the inmate's Religious Advisor, or attorney. A special visit is a visit in addition to the regular weekly visit, or an approved visitor who is not on an inmate's visiting list.

**Transport Officers** - Corrections officers assigned to transport an inmate to a deathbed or private viewing.

**Young Adult Offender** - An offender between the ages of 15 and 18 who has been adjudicated as an adult.

JA224



| | |
|---|---|
| **POLICY STATEMENT**<br>Commonwealth of Pennsylvania • Department of Corrections | |

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Marriages** | **DC-ADM 821** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **August 10, 2011** | **Signature on File**<br>**John E. Wetzel** | **August 17, 2011** |

## I. AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, 71 P.S. §§61, 66, 186, and 310-1, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. APPLICABILITY

This policy is applicable to all facilities operated under the jurisdiction of, or conducting business with the Department of Corrections.

## III. POLICY

It is the policy of the Department to permit inmates to marry while incarcerated in accordance with the procedures set forth in the accompanying procedures manual.

## IV. PROCEDURES

All applicable procedures are contained in the procedures manual that accompanies this policy document.

JA225

## V.   SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary/designee may suspend any provision or section of this policy for a specific period.

## VI.   RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual.  This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## VII.   RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A.   Release of Information

1.   Policy

This policy document is public information and may be released upon request.

2.   Confidential Procedures (if applicable)

Confidential procedures for this document, if any, are <u>not public information</u> and may not be released in its entirety or in part, without the approval of the Secretary of Corrections/designee. Confidential procedures may be released to any Department of Corrections employee on an as needed basis.

### B.   Distribution of Policy

1.   General Distribution

The Department of Corrections' policy and procedures shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis.  Distribution of confidential procedures to other individuals and/or agencies is subject to the approval of the Secretary of Corrections/designee.

2.   Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures either in hard copy or via email, whichever is most appropriate.

**VIII. SUPERSEDED POLICY AND CROSS REFERENCE**

    **A. Superseded Policy**

       1.  Department Policy

          DC-ADM 821, Inmate Marriages, issued July 27, 2010, by former Secretary Jeffrey A. Beard, Ph.D.

       2.  Facility Policy and Procedures

          This document supersedes all facility policy and procedures on this subject.

    **B. Cross Reference(s)**

       1.  Administrative Manuals

          a.  DC-ADM 812, Inmate Visiting Privileges; and

          b.  1.1.10, Videoconferences.

       2.  ACA Standards

          a.  Administration of Correctional Agencies: None

          b.  Adult Correctional Institutions: None

          c.  Adult Community Residential Services: None

          d.  Correctional Training Academies: None



| | | |
|---|---|---|
| | PROCEDURES MANUAL | |
| | Commonwealth of Pennsylvania • Department of Corrections | |

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Inmate Marriages** | | **DC-ADM 821** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **August 10, 2011** | **Signature on File** | **August 17, 2011** |
| | **John E. Wetzel** | |

Release of Information:

**Policy Document:** This policy document is public information and may be released upon request.

**Procedures Manual:** The procedures manual for this policy may be released in its entirety or in part, with the prior approval of the Secretary/designee. Unless prior approval of the Secretary/designee has been obtained, this manual or parts thereof may be released to any Department employee on an as needed basis only.

JA228

**DC-ADM 821, Inmate Marriages Procedures Manual**
*Table of Contents*

## Section 1 – Marriage Requests & Obtainment of License

A. General Marriage Principles ............................................................. 1-1
B. Marriage Requests ......................................................................... 1-1
C. Obtainment of License ................................................................... 1-2

## Section 2 – Performance of Ceremonies

A. Ceremony Officiate ........................................................................ 2-1
B. Conduction of Ceremony ............................................................... 2-1

## Section 1 – Marriage Requests & Obtainment of License

### A. General Marriage Principles

1. *The Department will approve requests by inmates to wed while incarcerated provided:*

   a. *the inmate is able to be interviewed in person or by video by a representative from a local county office responsible for issuing marriage licenses (Marriage License Bureau, Orphans Court Clerk, Prothonotary or Register of Wills);*

   b. *the inmate and/or his/her fiancé/fiancée will pay all costs associated with security, the marriage license, and arranging for someone to officiate the wedding;*

   c. *there are no legitimate peneological interests that would be adversely affected if an inmate and his/her fiancé/fiancée were to be married;*

   d. *the Facility Manager will deny a marriage if:*

      (1) *the process to obtain a marriage license requires transporting an inmate out of the facility, thus creating a risk of escape;*

      (2) *the inmate has not completed any mandatory sexual treatment program (as applicable);*

      (3) *it is determined, through information provided by the Office of the Victim Advocate (OVA) and other sources, that the inmate's fiancé/fiancée was the victim of the inmate's crime and the nature of the crime raises sufficient doubt as to the true motives of the inmate;*

      (4) *the fiancé/fiancée is expected to testify for/against the inmate;*

      (5) *there are other significant situations, similar to those listed above, which would warrant the denial of a marriage for a period of time.*

2. *Inmates placed on the Restricted Release List (RRL) are not eligible to be married until they have been removed from the RRL for a minimum of 60 days.*

### B. Marriage Requests

1. The inmate will submit an initial request for marriage in writing to his/her counselor.

2. The counselor will interview and counsel the inmate and his/her fiancé/fiancée so that both parties fully understand the inmate's present custody status and the anticipated date of eligibility for pre-release, parole, or other release status. If pre-release or parole status

appears likely **within the next 12 months**, the inmate will be counseled as to the advisability of deferring the marriage until such status is obtained.

3. Final plans will be developed by the inmate's counselor and submitted to the Facility Manager/designee for approval of the date, time, and place of the ceremony.

4. The inmate is responsible for the cost of the marriage license.

5. An inmate in a Community Corrections Center (CCC) is responsible for all arrangements in **Subsection A.4. above and B.1. below**.

6. A marriage request by a Capital Case inmate will be referred to the Facility Manager/designee and Regional Deputy Secretary for review.

## C. Obtainment of License

Some courts may require a personal appearance by the inmate to apply for a marriage license. The inmate is responsible for notifying the court that the Department will not provide transportation to obtain the marriage license for security reasons, but alternatives are available as follows:

1. videoconferencing may be considered, providing the facility and the court has the technology, and the use of a videoconference is approved by the court. Applications for marriage using a videoconference will be in accordance with Department policy **1.1.10, "Videoconferencing;"** and

2. a request that the court permit someone from the Prothonotary's office to conduct the interview at the facility.

Issued: 1/20/2012
Effective: 1/27/2012

JA231

Case 1:22-cv-01673-DLF-RMC Document 26 Page 246 Date Filed 04/17/2023 10

## Section 2 – Performance of Ceremonies

### A. Ceremony Officiate

1. ***Facility and contract chaplains are under no obligation to officiate inmate marriages.*** A facility chaplain may perform the ceremony at no charge to the inmate. If the facility chaplain will not perform the marriage ceremony, the inmate shall incur the cost of ***an individual authorized*** to solemnize marriage ***in the Commonwealth of Pennsylvania as outlined in the PA State Code 23 Pa.C.S.A. sec. 1503. Individuals authorized to solemnize marriage in the Commonwealth of Pennsylvania are limited to:***

   a. ***Pennsylvania court justices, judges or magisterial district justices (or retired justices/judges serving in those capacities);***

   b. ***U.S. judges and magistrates (senior judges and bankruptcy judges included) as well as the 3rd Circuit Court of Appeals Judges (active or retired), provided they are residents of the Commonwealth;***

   c. ***a mayor of any city or borough of the Commonwealth; and***

   d. ***a minister, priest or rabbi or any regularly established church or congregation. Additionally, religious organizations (religious society, religious institutions included) in the Commonwealth may join persons together in marriage when at least one of the persons is a member of the organization (society or institution), according to the rules and customs of the organization (society or institution).***

2. ***An individual authorized to solemnize marriage in the Commonwealth of Pennsylvania*** may perform the ceremony within the facility's visiting room when regular visiting hours are not scheduled and in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

3. ***A religious marriage (i.e., a marriage ceremony conducted apart from an inmate first obtaining a marriage license) that has no legal significant is <u>prohibited</u> from being conducted by facility and contract chaplains.***

### B. Conduction of Ceremony

1. The Facility Manager/designee will ensure that an appropriate level of security personnel and equipment is present during the wedding ceremony.

2. The inmate and his/her prospective spouse will be permitted to have two visitors each present at the ceremony. The ***visitors*** must be selected from the inmate's approved visiting list.

Issued: 8/10/2011
Effective: 8/17/2011

JA232

3. The wedding band(s) must be present for inspection and approval upon arrival at the facility. The band(s) will consist of a simple metal band without a stone of any kind. *Inmates are permitted to have a wedding band sent into a facility, provided the wedding band is sent directly from a jeweler.*

4. The bride will be permitted to carry a simple two flower array during the ceremony.

5. Upon completion of the marriage ceremony, the couple shall be allowed a brief kiss. A visit shall be permitted in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

6. Only inmate photographers assigned to the Visiting Room may take a photograph, in accordance with facility procedure regarding inmate photographs. The cost for the photograph will be borne by the inmate/spouse.

Issued: 8/10/2011
Effective: 8/17/2011

JA233

**Department** – The Pennsylvania Department of Corrections.

**Facility Manager** – The Superintendent of a State Correctional Facility, Commander of a Motivational Boot Camp, Director of a Community Corrections Center, or Director of the Training Academy.

**Faith Group Representative/Leader** – An individual from the outside religious community, approved by the Facility Manager/designee, who ***is approved and/or authorized to*** conduct religious activities ***and sacraments***.

**Magistrate** – For the purposes of this policy, the magistrate is the local district justice who has the authority to perform a civil marriage ceremony that is legally binding.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,                          :
     Plaintiff

                                  :   CIVIL ACTION NO. 3:15-1573

         v.

                                  :   (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
     Defendants                 :

## <u>DECLARATION BY SCOTT WOODRING</u>

    I, Scott Woodring, hereby declare under penalty of perjury in accordance with 28 U.S.C. §1746 that the following statements are true and correct based upon my personal knowledge, work experiences, and records within my control at the Pennsylvania Department of Corrections ("Department" or "DOC"):

    1.    I have worked in the field of corrections for over 25 years, serving in all different capacities, including: a housing unit officer and sergeant, Critical Incident Manager, Shift Commander, Inspection Captain, and staff assistant to executive level leadership.

    2.    I currently serve as the Chief of Security, with rank of Major, for the Department. I have served in this position since 2018.

    3.    As the Chief of Security, I oversee the security aspects of the Department including the supervision of facility security practices and procedures and reviewing all policies and procedures as they relate to security.

JA235

4.    Plaintiff submitted a religious accommodation request in January 2015 to engage in conjugal visits with his spouse.

5.    Upon the request of counsel for Defendants in the above captioned matter, I considered Plaintiff's request to engage in conjugal visits with his spouse from a Department security perspective.

6.    Department policy 812 permits an inmate and his visitor to "share a brief kiss and embrace" when meeting and departing from a visit.

7.    With regard to the issue of spousal contact, Department policy 812 also permits "a brief kiss" after marriage.

8.    Several legitimate penological reasons exist for the Department to prohibit contact visits of a sexual nature.

9.    First, the Department is responsible for the safety and security of all inmates, which includes preventing contraband from entering the prisons.

10.    Visiting room areas are a main avenue of the introduction of contraband into Pennsylvania state prisons.

11.    Additionally, Plaintiff has shown himself to pose a direct threat regarding introduction of contraband into the Department.

12.    It would also be very difficult to monitor whether any contraband was being passed between the parties.

13. The needs of other inmates are also a legitimate penological concern for the Department.

14. Visiting room areas in the prison are a part of the planning process and are large in nature such that several visits can be going on at one time.

15. Plaintiff could not engage in sexual acts in the same visiting room where other visits are taking place—he would need a private room for the visit.

16. In Pennsylvania, all contact visits in a prison are to take place under official supervision. 37 Pa. Code 93.3(h)(6).

17. This means that a corrections officer would need to either supervise or record (or both) the sexual acts of others, so the visit would no longer be private and the corrections officer would be subjected to a very precarious situation.

18. Space and time for visitation at the Department is limited.

19. At the State Correctional Institution at Huntingdon, where Plaintiff is located, the visiting hours are from 8:00am to 8:00pm, 7 days per week.

20. No prison could accommodate a private room for all inmates requesting conjugal visits during visiting hours on any given day.

21. Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing contraband from entering the prisons via private contact visits.

22.     Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of utilizing resources of staffing, space, and time to best serve all inmates and not just this Plaintiff.

23.     Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing staff from being in the position of supervising a sexual encounter between Plaintiff and his wife.

24.     Plaintiff submitted a religious accommodation request in January 2015 to engage in during congregate prayer in private with his family contact visits.

25.     According to Plaintiff, the prayer would include several prostrations and recitations throughout.

26.     Plaintiff was informed through the religious accommodation process, as well as the grievance process, that he could sit next to his visitor and pray quietly so as not to interrupt other inmates during their visits in the same area.

27.     Plaintiff acknowledges that the prayer would be disruptive to other visitors using the visiting room at the same time, and suggests that he should receive a private room to conduct his visits.

28.     Upon the request of counsel for Defendants in the above captioned matter, I considered Plaintiff's request to engage in congregate prayer in private with his family during contact visits from a Department security perspective.

29. No religious group is currently permitted to pray communally with family visitors in any demonstrative way in the visiting room.

30. For the reasons already mentioned above in relation to Plaintiff's request for conjugal visits, he poses a specific security concern when it comes to contraband being brought into the prison.

31. Additionally, it would be very difficult for security personnel to observe whether contraband is being passed from one person to another if they are in a private room, prostrating themselves, and able to conceal items much easier than in a seated position next to one another in the already-designated visiting room.

32. Just as with the request for conjugal visits, Plaintiff's actions will affect other inmates in a negative way.

33. If Plaintiff engages in his congregate prayer in the way he wishes, no one else can reasonably meet at the same time given the noise and distraction. That takes away visiting time from other inmates, and converts a currently neutral meeting space into one being used for religious purposes.

34. Plaintiff's request for congregate prayer in the visiting room would also serve to convert a neutral meeting space into one being used for religious purposes.

35. Inmates would each want time to prayer within their own religious groups, and when one is granted something that the others are not, resentment and hatred fester.

36.     These feelings manifest into assaults very quickly in the prison setting.

37.     As with conjugal visits, scarcity of resources is a concern here as well—if Plaintiff were to be given a private room to engage in visits and group prayers, other inmates would surely expect the same treatment.

38.     All of these requests would, of necessity, be for the same basic time frame when visiting hours are permitted at SCI-Huntingdon.

39.     This would result in the need to supply a virtually limitless number of rooms at or near the same time, and to staff each one with security personnel.

40.     In addition, inmates would likely demand prayer-related items be such as pipes, books, rugs, etc. be brought into the visiting room.

41.     Such an approach is simply unworkable due to the compelling governmental interests of prison safety and security, as well as scarcity of resources.

42.     Denying Plaintiff's request for congregate prayer in private with his family during visits serves the legitimate penological interest of preventing contraband from entering the prisons via private contact visits.

43.     Denying Plaintiff's request for congregate prayer in private with his family during visits serves the legitimate penological interest of utilizing resources of staffing, space, and time to best serve all inmates and not just this Plaintiff.

44.     Denying Plaintiff's request for congregate prayer in private with his family during visits serves the legitimate penological interest of preventing the

visiting room from being converted from a neutral meeting space into one being used for religious purposes.

Respectfully Submitted,

Scott Woodring, Chief of Security
Bureau of Facility & Special Operations
Pennsylvania Department of Corrections

Date: June 30, 2021

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ,  :
    Plaintiff

                         :    CIVIL ACTION NO. 3:15-1573

    v.

                         :    (JUDGE JENNIFER P. WILSON)

TOM W. WOLF, *et al.*,
    Defendants          :

## DECLARATION OF ARLENE SEID, M.D.

1.    I am presently employed by the Pennsylvania Department of Corrections ("DOC") as the Chief of Clinical Services for the Bureau of Health Care Services ("BHCS"). I have held that position since May 4, 2020.

2.    Prior to that, I held the position of Medical Director, Quality Assurance at the Pennsylvania Department of Health ("DOH").

3.    I have been a licensed Physician since 2002. My specialty is Preventive Medicine and a Fellow of American College of Preventive Medicine. My medical license is currently in good standing.

4.    In my capacity as Chief of Clinical Services for BHCS, I oversee DOC's Medical department's, all medical contracts and other health treatment services, as well as provide clinical consultation to the DOC.

5.    Plaintiff submitted a religious accommodation request in January 2015 to engage in conjugal visits with his spouse.

JA242

6.    Upon the request of counsel for Defendants in the above captioned matter, I considered Plaintiff's request to engage in conjugal visits with his spouse from an inmate health and medical perspective.

7.    Department policy DC-ADM 812 permits an inmate and his/her visitor to "share a brief kiss and embrace" when meeting and departing from a visit.

8.    With regard to the issue of spousal contact, Department policy DC-ADM 821 permits "a brief kiss" after marriage.

9.    Several legitimate medical reasons exist for the Department to prohibit contact visits of a sexual nature.

10.    First, the Department is responsible for the health and safety of all inmates, which includes preventing the introduction of sexually-transmitted infections (STIs) into any institution.

11.    Particularly concerning STIs in an institutional setting include: Hepatitis, HIV, Syphilis, Herpes, Chlamydia and Gonorrhea.

12.    STIs can often be difficult to detect by even the infected individual themselves.

13.    Increased STI rates in the institutions will result in medical issues for inmates.

14.    STIs can often be very contagious and some can last a lifetime.

15.    STIs in particular can cause cancer, infertility, and even death.

2

JA243

16.     Hepatitis B and Hepatitis C in particular can cause permanent liver damage.

17.     STIs often are not detected unless an inmate self-discloses; and if gone undetected, many can cause permanent damage and even death.

18.     Increased STI rates in the institutions would be detrimental to the population and will result in high costs of medical treatment, if treatment is even an option.

19.     There would be no way for the Department to ensure that safe sex was occurring during a conjugal visit in order to safeguard that STIs were not being passed from one participant to the other.

20.     Further, there would be no way for the Department to guarantee that the sexual contact taking place during the conjugal visit was consensual.

21.     Permitting conjugal visits has a probability of leading to sexual assaults on prison property.

22.     Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing STIs from entering and spreading around the prison population.

23.     Denying Plaintiff's request for conjugal visits serves the legitimate penological interest of preventing sexual assaults on government property.

3

24.     Plaintiff submitted a religious accommodation request in January 2015 to be ritually circumcised.

25.     Upon the request of counsel for Defendants in the above captioned matter, I considered Plaintiff's request to be ritually circumcised from an inmate health and medical perspective.

26.     The Department provides medically necessary care to all inmates pursuant to  DOC Policy 13.2.1, Section 1(A).

27.     Pennsylvania State Correctional Institutions are not currently equipped to conduct medically-necessary surgeries, so all surgeries occur off site.

28.     When an inmate has to be transported to an outside medical facility for a medical procedure, he must be accompanied by at least two or more security staff, depending on the inmate Custody Level.

29.     The Department pays for the cost of medically-necessary surgeries.

30.     The Department provides some medical care to inmates on a case-by-case basis pursuant to Policy 13.2.1, Section 1(B).

31.     There are some medical services that the Department does not provide pursuant to Policy 13.2.1, Section 1(C).

32.     Department policy 13.2.1, Section 1(C)(1) indicates: "Medical services not provided by the Department include, but are not limited to…cosmetic surgery or services."

4

33.   Circumcision is considered a cosmetic surgery, sometimes referred to as elective surgery.

34.   Circumcision surgery is often done to increase sexual gratification.

35.   Traditional circumcision surgery generally costs approximately $3,500.00.

36.   Plaintiff indicates that he wants to be ritually circumcised in order to keep his genital area clean for religious purposes.

37.   Proper hygiene techniques will allow for clean genital areas without the need to be circumcised.

38.   Availability of resources in the community for cosmetic surgery is stretched very thin at the present time because of the COVID pandemic.

39.   If Plaintiff were able to get the procedure done, he would then come back into the prison with the potential for further complications, which the Department would then have to pay for.

40.   Risks of complication include: bleeding, infection and wound dehiscence (opening up of the wound after surgery is finished), Glans hyperesthesia, skin bridges and meatal stenosis.

41.   Denying Plaintiff's request for ritual circumcision serves the legitimate penological interest of conserving government resources, including the cost of

JA246

surgery, hospital services, security transportation staff to and from the hospital, and the cost of any potential post-surgery complications.

I hereby verify, under the penalty of perjury, in accordance with 28 U.S.C § 1746, that I have reviewed the foregoing Declaration, and it is true to the best of my knowledge, information and belief.

Respectfully submitted,

Arlene Seid, M.D., MPH
Chief of Clinical Services
Bureau of Health Care Services

Date: June 30, 2021

6

JA247

2015

# Final Appeal Decision
## Secretary's Office of Inmate Grievances & Appeals
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of your appeal to the Secretary's Office of Inmate Grievances and Appeals for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to the Facility Manager, the Facility Manager's response, the issues you raised to final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Special Investigations and Intelligence, etc) may have been solicited in making a determination in response to your issue as well.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| SCI Filed at: | Huntingdon | Current SCI: | Huntingdon |
| Grievance #: | 562984 | | |

| Decision: | ☒ Uphold Response (UR) |
|---|---|
| | ☐ Uphold Inmate (UI) |
| | ☐ Uphold in part/Deny in part |

*It is the decision of the Secretary's Office of Inmate Grievances and Appeals to uphold the initial response, uphold the inmate, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | *Frivolous* |
|---|---|

You state in your grievance that your religious accommodation to have group prayer in the visiting room was denied. You state that you believe that you are discriminated against because non-Muslim inmates are permitted to hold hands and pray with their visitors. As stated in the response the visiting room is not for the purpose of practicing religion. However, a seated, quiet prayer would be permitted as long as it didn't distract other visitors. It is not feasible to provide other alternatives or to modify policy. You have failed to provide any evidence that you are being discriminated against.

| Signature: | Dorina Varner *[signature]* |
|---|---|
| Title: | Chief Grievance Officer |
| Date: | 6/29/15 |

DLV

cc:     DC-15/Superintendent Eckard
         Grievance Office

***DC-ADM 804, Inmate Grievance System Procedures Manual***
***Section 2 – Appeals***                                    ***Attachment 2-F***

*AWh*

Inmate Name: Fernando Nunez

Facility: SCI Huntingdon

Grievance #: 562984

Subject: Final Grievance Appeal to SOIGA

Inmate #: FM 8959

Unit Location: B.A.#3064

Date: 6-4-15

## DISCUSSION:

Attached herewith is the denial of my religious accommodation request, the G.Os initial review response, my initial grievance, my grievance appeal to my Facility Manager, James A. Eckard, and Mr.Eckard's facility manager appeal response.

Instantly, Nunez filed a grievance challenging, Mr.Bickell's decision to deny my religious accommodation request,( i.e. to congregate in prayer with my friends and family during contact visits ), Mr.Eckards, informal denial to congregate in prayer with my family and friends "standing" in a secured room away from other visitors, and Secretary Wetzel's failure to implement a policy to permit my religious request.

Within his grievance, Nunez, asserted that Mr.Bickell, failed to claim a compelling government interest when denying hiis religious request in violation of , inter alia, RLUIPA. He further claimed that both Bickell & Eckard's proposed alternative,( i.e., to be allowed to pray siliently while sitting ), was unacceptable to him because to pray in such a manner is inconsistent with the Islamic faith. Thereby, causing a substantial burden on him. Further asserting that SCI Huntingdon has implemented an in-house practice of permitting non-muslims to congregate in prayer outloud, holding hands with their visitors, but are denying muslim inmates such as himself to congregate in prayer with his visitors in a secluded area of the visiting room.

The G.O. assigned to hear Nunez grievance, simply adopted Mr.Bickell's rational in absense of any discussion addressing the substantial merits contained therein. Nor did he offer any discussion justifying why policy cannot be modified to accommodate my religious request or why my suggested alternatives stated within my initial grievance cannot be honored. Nunez appealed and his facily manager upheld the G.Os response, albeit, acknowledging his concerns. He now challenges thEiR decisions, adopting and incorporating by reference his initial grievance and facility manager appeal in support of this appeal. Arguing further that it was error for Mr.Eckard to not have required the G.O. to address concerns stressed in his initial grievance. What is more, Mr.Eckard should have addressed those concerns sue sponte. For the reasons stated, his grievance must be sustained and relief granted.

BY, *Fernando Nunez*

Fernando Nunez.

cc: FILE

**Facility Manager's Appeal Response**

## SCI-Huntingdon
### 1100 Pike St.
### Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy," the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me, and any other documents submitted.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| Facility: | HUN | Unit Location: | BA-Unit |
| Grievance #: | 562984 | | |

| Decision: | ☒ Uphold Response (UR) | ☐ Uphold in part/Deny in part |
|---|---|---|
| | ☐ Uphold Inmate (UI) | ☐ Dismiss/Dismiss Untimely |

*It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or uphold in part/deny in part. This response will include a brief rationale summarizing the conclusion and any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | *Frivolous* |
|---|---|

In reviewing your grievance and appeal, I note that your concern with the denial of your request for group prayer in the visiting room was appropriately addressed by Mr. Houser. In your appeal, you argue Mr. Houser failed to address the "substantial merits" in your grievance. You feel he should explain why policy cannot be modified to accommodate your request and why your suggested alternatives are not feasible. In his response to your religious accommodation request, Director Kephart makes a reasonable suggestion that you may pray quietly with your family members during visits. It is not feasible to provide other alternatives or to modify policy. Staff at SCI-Huntingdon will follow policy and the recommendations of the Religious Accommodation Review Committee.

In closing, I can only reiterate that I uphold the response provided by the grievance officer. Your grievance is found to be without merit.

| Signature: | J. A. Eckard |
|---|---|
| Title: | Facility Manager |
| Date: | 5-28-15 |

cc: DC-15
   File

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 2 - Appeals*
Issued: 12/1/2010
Effective: 12/8/2010

*Attachment 2-B*

JA250

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator          Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

---

DC-ADM 804, Inmate Grievance System Procedures Manual
Section 1 – Grievances & Initial Review
Issued: 3/31/2014
Effective: 5/1/2014                    Attachment 1-A

---

**INITIAL REVIEW RESPONSE**
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows:

| Inmate Name: | Fernando Nunez | Inmate Number: | FM-8959 |
|---|---|---|---|
| Facility: | SCI Huntingdon | Unit Location: | BA-3064 |
| Grievance #: | 562984 | Grievance Date: | 05/05/2015 |
| Publication (if applicable): | | | |

| Decision: | ☐ Uphold Inmate    ☒ Grievance Denied |
|---|---|

It is the decision of the grievance officer to uphold or deny the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance, and relief sought.

Response: ☐ Frivolous ☒

Inmate Nunez files a grievance in response to the denial of his religious accommodation request to congregate in prayer in the visiting room during contact visits. He claims discrimination because he believes non-Muslim inmates are permitted to hold hands & pray with their visitors. He believes his denied request for accommodation violates his 8th & 14th Amendments & has caused psychological harm, and emotional distress. He seeks relief in the form of $100,000, a policy change to permit his request & if necessary the building of additional space to accommodate his request. Upon review I find the following:

In general the visiting room is not intended for the purpose of practicing religion. However, as noted on the DC-135A response from Superintendent Eckard, & in the response from BTS Director Kephart, a seated, quiet prayer, which was not distractive to other visitors would be permitted.

In view of the responses from Superintendent Eckard, BTS Director Kephart & review of the DC-ADM 812 Visiting Privileges & DC-ADM 819 Religious Activities, I find the denial of his religious accommodation request to be appropriate.

Grievance & Relief Denied.

| Signature: | Morris L. Houser |
|---|---|
| Title: | CCPM |
| Date: | 05/05/2015 |

cc: Superintendent
    DC-15
    File

DC-ADM 804, Inmate Grievance System Procedures Manual
Section 1 – Grievances & Initial Review
Issued: 12/1/2010
Effective: 12/8/2010                    Attachment 1-D

---

DC-ADM 804, Inmate Grievance System Procedures Manual
Section 1 – Grievances & Initial Review
Issued: 3/31/2014
Effective: 5/1/2014                    Attachment 1-A

| Inmate #: | FM-8959 |
|---|---|
| Facility: | Huntingdon | Unit Location: | BA-3064 |
| Grievance #: | 562984 | Grievance Date: | 5-5-15 |
| Subject: | Facility Manager Grievance Appeal | Filed Date: | 5-14-15 |

**Discussion:**

I appeal the 5-6-15, initial review response, issued by Grievance Officer, ("G.O") Morris L. Houser, denying my grievance to, "Congregate in prayer with my visitors during contact visits in a manner consistent with my Islamic beliefs". The G.O. acknowledges that my grievance raises Federal & State tort violations that substantially burdens my religious beliefs under RLUIPA & further acknowledges my request for monetary compensation & request for a policy change to accommodate my religious request. Yet, cites DOC policy, (i.e. DC-ADM 812 & DC-ADM 819), and the disposition rendered by prison officials named in my initial grievance to deny my grievance. For the reasons that follow, I challenge his findings & conclusions below.

**Argument:**

From the outset, although the G.O. adopts the disposition rendered by the prison officials named in my grievance, he fails to address the substantial merits in my grievance challenging their disposition. What is more, he ignores that I am challenging and/or seeking an exemption from the very same policies in which he cites to deny my grievance, because those policies places A substantial burden on my Islamic beliefs. In short, he does not explain why those policies cannot be modified to accommodate my religious request. Nor, does he explain why the easily available alternative in which I proposed within my grievance,("to utilize the non-contact visiting room when they are not in use and/or avialable to congregate with my visitors), cannot be accommodated. Or, why A building to do so cannot be constructed. This omitted failure failure is troubling to say the least, given the fact that I proposed such an alternative as A least restrictive means to accommodate my religious request. Yet, DOC offitials are not willing to take it. Thereby, compelling me & my visitors to modify our religious beliefs in such a manner as to substantially burden our Islamic beliefs. Causing us to sin. I ask that my grievance & requested relief in all respects be upheld & by the G.O. decision be vacated.

By: _Fernando Nunez_
    Fernando Nunez

**Left Form:**

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Superintendent 3064

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)
Mr. Eckard

2. Date:
12-28-14

3. By: (Print Inmate Name and Number)
Fernando Nunez # FM8959
Fernando Nunez (Inmate Signature)

4. Counselor's Name
Morningstar

5. Unit Manager's Name
Cook

6. Work Assignment
GLP

7. Housing Assignment
B.A. 364

8. Subject: State your request completely but briefly. Give details.

Mr. Eckard,

Currently an issue of importance needs to be clarified regarding restrictions and/or limits placed upon inmates (myself) and visitors (my family), regarding praying in the visiting room. Though staff in the visiting has indicated to me that policy is silent on the issue, they are under the impression that praying in the visiting room can not be accommodated, due to lack of space, & possible offense other visitors may take by my religious practice.

Specifically, I am Muslim, who's religion is Islam. As you are aware, Muslims pray in a certain manner & at specific times. As of December 2014, two prayers are mandated by my religion "Dhuhr at Approx 12:00 in the afternoon" & Asr at Approx 2:30 P.M" - Such times during my visit.

In Summation, I ask whether it is permissible for me & my family to pray in the visiting room - during my visit? Your clarity on this question would be of great assistance.

9. Response: (This Section for Staff Response Only)

The visiting room is intended for visiting to having religious ceremonies. However if you stay in your seats and pray silent. I do not think anyone will have an issue with it. The bottom line you must respect others who are in the visiting room -for it's intended purpose

To DC-14 CAR only ☐     To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ Print _____ Sign Eckard Date 12/3/14

Revised July 2000

---

**Right Form:**

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

3064

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer)
Mr. Eckard
Superintendent

2. Date:
1-6-15

3. By: (Print Inmate Name and Number)
Fernando Nunez # FM8959
Fernando Nunez (Inmate Signature)

4. Counselor's Name
Morningstar

5. Unit Manager's Name
Cook

6. Work Assignment
GLP

7. Housing Assignment
B.A. 3064

8. Subject: State your request completely but briefly. Give details.

In response to my request dated 12-31-14 you stated that although the visiting room is not intended for religious ceremonies, (for me to offer islamic prayer with my spouse, family etc.) you do not have an issue with us praying during our visits - so long as we remain in our seats & pray silently. Respectfully, as Muslims, our Islamic Faith, requires us to pray a certain way. We are required to stand, facing a particular direction & voice our prayers out loud. To pray in the manner that you indicated, is not permissible, In Islam. Thus, I request that we be allowed to pray at our scheduled times, in a secured area of the visiting room, such as the small room where non-contact or legal visits are held, should the room be available.

Sir, this request is reasonable & would not offend other visitors or my religious practice. Should you find my proposed request unacceptable, then I humbly request that you direct visiting room staff to allow me & my family to offer our islamic prayers in a manner consistent with our Islamic faith during our contact visits.

9. Response: (This Section for Staff Response Only)

Nunez,

I can not accommodate your request.

To DC-14 CAR only ☐     To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ Print _____ Sign Eckard Date 1/8/15

Revised July 2000



**pennsylvania**
DEPARTMENT OF CORRECTIONS

TO:      Tabb Bickell, Deputy Secretary
Central Region

FROM:      Shawn Kephart, Director

DATE:      April 6, 2015

RE:      Religious Accommodation Request Response
<u>Fernando Nunez Jr. – HUN</u>

<u>Religion</u>
Muslim (MUS)

<u>Accommodation Requested</u>
     a)   To be able to shower with privacy screens/curtains.

     b)   Conjugal visit with spouse.

     c)   Circumcision.

     d)   To be allowed to prayer with family members during visit.

<u>Recommendation</u>
     a)   The physical plant of some facilities do not include individual showers, which is the case at this facility. However, the request to be able to shower in privacy can easily be accomplished by the inmate wearing his boxers or placing a towel around his private areas while showering.

     b)   Conjugal visit with spouse is denied due to safety, security and health concerns.

     c)   The request by this inmate to be ritually circumcised while confined in the PA DOC is DENIED as circumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. While incarcerated, the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice.

     d)   The request to prayer with family members during visit is denied. Performing religious practices in the Visiting Room, requiring participants to lie prostrate on the ground, would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. The inmate may pray quietly make supplication with his family members during their visit. The institution cannot provide every inmate with private visiting room for congregational prayers with family members. The inmate and his family members are free to pray by themselves both before their visit has commenced and after their visit has concluded.

---

JA253 

2015

**Final Appeal Decision**
**Secretary's Office of Inmate Grievances & Appeals**
Pennsylvania Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

This serves to acknowledge receipt of your appeal to the Secretary's Office of Inmate Grievances and Appeals for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy", the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to the Facility Manager, the Facility Manager's response, the issues you raised to final review, and (when applicable) any revised institutional responses required as a result of a subsequent remand action by this office. As necessary, input from appropriate Central Office Bureaus (e.g., Health Care Services, Chief Counsel, Office of Special Investigations and Intelligence, etc) may have been solicited in making a determination in response to your issue as well.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| SCI Filed at: | Huntingdon | Current SCI: | Huntingdon |
| Grievance #: | 564054 | | |

| Decision: | ☒ Uphold Response (UR) |
|---|---|
| | ☐ Uphold Inmate (UI) |
| | ☐ Uphold in part/Deny in part |

*It is the decision of the Secretary's Office of Inmate Grievances and Appeals to uphold the initial response, uphold the inmate, or Uphold in part/Deny in part. This response will include a brief rationale, summarizing the conclusion, any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | | Frivolous |
|---|---|---|

These two grievances were combined; however, after further review it was discovered that they were two separate issues. Your issues were addressed under one number but in Part 1 and Part 2.

You state in your appeal that the open-dorm shower room offends your Islamic beliefs in that you are compelled to expose your awrah to other men while showering, you are forced to witness other men expose their awrah while showering in close proximity of other nude men. You state that you suffer from psychological harm for these reasons. You also state that there is no need to delay your incentive based transfer. An investigation was conducted regarding your allegations. The record reflects that you did receive the denial notice from Deputy Secretary Bickell with an explanation of that denial. As stated, you are on the list for an incentive based transfer and will be transferred in accordance with policy. You have failed to provide any evidence to substantiate your claims.

Also, in your grievance you request circumcision surgery due to your religious beliefs. An investigation was conducted by Mr. Houser. The record reflects that accordance with DC ADM 819 and policy 13.2.1 this procedure is an elective surgery and not permitted. Therefore, your requested relief is denied.

| Signature: | Dorina Varner | *Dorina Varner* |
|---|---|---|
| Title: | Chief Grievance Officer | |
| Date: | 6/25/15 | |

DLV

cc:     DC-15/Superintendent Eckard
          Grievance Office

Inmate Name: Fernando Nunez

Facility: SCI Huntingdon

Grievance #: 564054 Part 1

Subject: Final Grievance Appeal to SOIGA

Inmate #: FM_8959

Unit Location: B.A.#3064

Date: 5-29-15    Secretary's Office
Inmate Grievances & Appeals

JUN 03 2015

Discussion:

Attached herewith is the denial of my religious accommodation request, the G.O.'s initial review response, my initial grievance, and grievance appeal to my Facility Manager. Instantly, Nunez filed a grievance challenging, inter alia, Mr.Bickell's, decision denying his religious accommodation request. In his initial grievance, Nunez argued that SCI Huntingdon's open-dorm shower room offends his Islamic beliefs in the following manner: 1) He is compelled to expose his awrah to other men while showering and; 2) He is forced to witness other men expose their awrah while showering in close proximity to men showering nude.

He claims that showering under those circumstances places a substantial burden on his RLUIPA rights and causes him to suffer psychological harm for the reasons stressed throughout his grievance and grievance appeals. Arguing further, he asserts an equal protection violation grounded on the fact that DOC officials has implemented a discriminatory practice by requiring him to shower in an open dorm room setting at Huntingdon, knowing that similarly situated inmates in other state institutions have privacy shower stalls. For the reasons stated, he has requested, inter alia, that his incentive base transfer be processed without unecessary delay as a least restrictive means to relieve him of the substantial burden created by Huntingdon's showering practice.

A R G U M E N T :

The G.O. assigned to hear Nunez's grievance adopted the reasoning proffered by Mr.Bickell, to deny his grievance; in absence of any discussion refuting those contentions argued within Nunez initial grievance. What is more, the G.O. denied Nunez requested relief,( i.e. to be transfered), asserting that he does not qualify for an incentive base transfer. On appeal, the Facility manager at Huntingdon, upheld the G.O.'s disposition, but modified it in some respect with regard to my eligibility for an incentive base transfer. Stating,"There are no plans to transfer you based on your request for a religious accommodation; however, I did verify with your unit team that you are on the list for an incentive base transfer". Given, this disposition there is no legitimate reason to delay my incentive base transfer, irrespective of prison officials perspective view of my religious request for one. This is especially true since I am arguing that the proposed alternative in which prison officials are suggesting is unacceptable to me because it essentially requires me to modify my religious beliefs in a manner argued throughout my religious accommodation request,grievance and grievance appeals. Subsequently, I ask that my grievance be sustained and my incentive base transfer be processed 'without unnecessary delay'.

BY, *Fernando Nunez*
                Fernando Nunez

JA255



## pennsylvania
### DEPARTMENT OF CORRECTIONS

TO:      Tabb Bickell, Deputy Secretary
           Central Region

FROM:    Shawn Kephart, Director

DATE:     April 6, 2015

RE:        Religious Accommodation Request Response
           <u>Fernando Nunez Jr. – HUN</u>

<u>Religion</u>
Muslim (MUS)

<u>Accommodation Requested</u>
    a)   To be able to shower with privacy screens/curtains.

    b)   Conjugal visit with spouse.

    c)   Circumcision.

    d)   To be allowed to prayer with family members during visit.

<u>Recommendation</u>
    a)   The physical plant of some facilities do not include individual showers, which is the case at this facility. However, the request to be able to shower in privacy can easily be accomplished by the inmate wearing his boxers or placing a towel around his private areas while showering.

    b)   Conjugal visit with spouse is denied due to safety, security and health concerns.

    c)   The request by this inmate to be ritually circumcised while confined in the PA DOC is DENIED as circumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. While incarcerated, the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice.

    d)   The request to prayer with family members during visit is denied. Performing religious practices in the Visiting Room, requiring participants to lie prostrate on the ground, would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. The inmate may pray quietly make supplication with his family members during their visit. The institution cannot provide every inmate with private visiting room for congregational prayers with family members. The inmate and his family members are free to pray by themselves both before their visit has commenced and after their visit has concluded.

---

Bureau of Treatment Services | 1920 Technology Parkway | Mechanicsburg PA 17050 | 717.728-2000 www.cor.state.pa.us

JA256   Rec'd 4-17-15

_4 / 7 /2015_     ___ Concur with recommendation
DATE     Reg. Deputy Secretary's Signature ___ Do not concur with
                                              recommendation

_4 / 10 /2015_  Date BTS Staff informed institution of final decision.     _D L_
DATE                                                                   BTS Initials

_04 / 16 /2015_  Date FCPD sent inmate copy of this memo.     _UW_
DATE                                                       FCPD Initials

cc:   Secretary John E. Wetzel                    Rev. Ulrich Klemm, BTS
      Superintendent Eckard, HUN                  Debra Rand, Legal Dept.
      Rev. Darrell Wireman, FCPD, HUN             Rel. Accommodation File
      Inmate

JA257

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE

GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½ x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator                    Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

Attachment 1-A

---

**INITIAL REVIEW RESPONSE**
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM-8959 |
|---|---|---|---|
| Facility: | SCI Huntingdon | Unit Location: | BA-3064 |
| Grievance #: | 564054 Part 1 | Grievance Date: | 05/05/2015 |
| Publication (if applicable): | | | |

Decision: ☐ Uphold Inmate   ☑ Grievance Denied

*This is the decision of the grievance officer to uphold or deny the inmate's initial grievance. This response will include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance and, relief sought.*

Response:

Inmate Nunez files a grievance in response to the denial of his religious accommodation request for the showers being installed to permit private privacy. He believes to privately shower violates his religious rights & the 8th & 14th Amendments. He finds the alternatives of showering in his boxers or wearing a towel to be unacceptable alternatives. He seeks relief in the form of $100,000 for psychological harm and a transfer to either SCI-Graterford or SCI-Phoenix because he meets the criteria for an incentive Based Transfer. Upon review of find the following:

Inmate Nunez was transferred to SCI-Huntingdon on 10/18/14 & subsequently entered general population on 11/05/14. He was assigned to BA-housing unit where he continues to be assigned. The showers on this unit have been the same open style shower room design since his adjustment to BA-unit. Therefore I've found Inmate Nunez resided under these conditions for 106-days without issue until filing for religious accommodation (private showers) on 02/19/15. Additionally, the entire facility, excluding the RHU/DTU, is designed with open style shower rooms & therefore there's an inability to provide private showers to the general population. I find the suggestions made by BTS Director Kephart to be appropriate & more easily SCI-Huntingdon inmates have accepted these suggestions & shower in their boxers or towels. Lastly, because SCI-Huntingdon has an inability to provide private showers to general population, & in view of inmate Nunez request for transfer, its possible inmate Nunez is using the shower issue as a point to facilitate his transfer.

Inmate Nunez believes he is eligible for an Incentive Based Transfer & upon review PRC finds he does not meet the criteria for this transfer. Specifically, the criteria requires an overall positive adjustment for the past 7 years. I've found inmate Nunez has incurred misconducts within this time period for Assault, Sexual Harassment & 5 other Class 1 misconducts. Additionally, he has been processed for an Admin/Sep. transfer from SCI-Rockview for suspected negative behavior.

Grievance & Relief Denied.

| Signature: | Morris L. Houser | |
|---|---|---|
| Title: | CCPM | |
| Date: | 05/05/2015 | |

---

Inmate Name: Fernando Nunez                    Inmate #: FM 8959
Facility: SCI Huntingdon                    Unit Location: BA-3064
Grievance #: 564054 Part 1                    Grievance Date: 5-5-15
Subject: Facility Manager Grievance Appeal

Discussion:

I appeal the 5-6-15, initial review response, issued by Grievance officer, ("G.O."), Morris L. Houser, denying my grievance to have the DOC install privacy shower stalls at SCI-Huntingdon and/or transfer me to an institution, within my home region, (i.e. Graterford or Phoenix), that has privacy shower stalls. The G.O. acknowledges my contentions that the open-dorm shower rooms at Huntingdon, violates my religious beliefs under RLUIPA & my federal constitutional rights under the 8th & 14th Amendments. Yet, the G.O. continues to adopt the rationale stated by prison officials. For the reasons stated below, I rebut the G.O.'s findings & conclusions.

Arguments:

The G.O. finds it relevant that I've been housed on B.A. were the unit has open-style shower rooms, since 11-05-14. Implying, that it was no issue for me anytime before submitting my grievance. That is absurd. I've attempted to address the issue with my unit team, chaplain & Imam. All to no avail. Prompting me to submit a religious accommodation request, per per policy. Thus, explaining the 106 days delay in which he mentions. What is more, my unit team led me to believe that I was put on the incentive base transfer "waiting list". The fact that the G.O. now disagrees with my unit team, is telling.

In anyevent, I requested A transfer as A "least restrictive means" to accommodate my religious request, because I find it highly unlikely that The DOC will convert their open shower rooms, voluntarily, like SCI Rockview. In short, I merely requested A transfer to save the DOC the legal expense of civil litigation. A form of relief that the DOC will have to honor if the Federal Court, grants me an injunction. A legal conclusion that the court will likely find, given the fact that if the proposed "alternative" stated by prison officials named in my initial grievance, is unacceptable to me & my religious beliefs for the reasons stated in my grievance. I should not be compelled to witness "other me" shower naked or expose their figure in any manner shape or form. That practice not only violates my religious beliefs but promotes sexual harassment & homosexuality. I ask that my grievance be upheld & the G.O's response be reversed & vacated.

By: [signature] Fernando Nunez

JA258    5-11-15

---

DC-804
Part 1

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE

GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-804 form and one one-sided 8½ x 11" page). State all relief that you are seeking.

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator                    Date

WHITE Facility Grievance Coordinator Copy    CANARY File Copy    PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

Attachment 1-A

# Facility Manager's Appeal Response
## SCI-Huntingdon
1100 Pike St.
Huntingdon, PA  16654-1112



This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy," the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me, and any other documents submitted.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| Facility: | HUN | Unit Location: | BA-Unit |
| Grievance #: | 564054, Part 1 | | |

| Decision: | ☒ Uphold Response (UR) | ☐ Uphold in part/Deny in part |
|---|---|---|
| | ☐ Uphold Inmate (UI) | ☐ Dismiss/Dismiss Untimely |

*It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or uphold in part/deny in part. This response will include a brief rationale summarizing the conclusion and any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

**Response:** *Frivolous*

In reviewing your grievance and appeal, I note that your concerns with private showers were appropriately addressed by Mr. Houser.  In your appeal, you argue Mr. Houser acknowledged SCI-Huntingdon's open showers violate your religious beliefs.  You point out you have attempted to address this issue numerous times, finally resulting in your request for a religious accommodation.  I find the Bureau of Treatment Services has made reasonable suggestions to accommodate your request for private showers.  SCI-Huntingdon does not have individual showers; however, it is suggested you wear boxers or place a towel around your private areas while showering.  You also argue you should not have to look at other inmates who are naked while showering.  I can only suggest you make every effort not to look at other inmates while they are showering.  There are no plans to transfer you based on your request for a religious accommodation; however, I did verify with your unit team that you are on the list for an incentive based transfer.

In closing, I can only reiterate that I uphold the response provided by the grievance officer.  Your grievance is found to be without merit.

| Signature: | J. A. Eckard |
|---|---|
| Title: | Facility Manager |
| Date: | 5-22-15 |

cc:   DC-15
      File

**DC-ADM 804, Inmate Grievance System Procedures Manual**
**Section 2 - Appeals**
Issued:   12/1/2010
Effective: 12/8/2010

*Attachment 2-B*

JA259

Inmate Name: Fernando Nunez
Facility: Huntingdon
Grievance #: 564054, Part 2
Subject: Final Grievance Appeal to SOIGA

JUN 03 2015

Inmate #: FM 8959
Unit location: B.A.# 3064
Date: 5-29-15

Discussion:

Attached herewith is my Religious Accommodation Request,("RAR"), my initial grievance, the G.O.'s initial review response, my facility manager appeal and my facility manager's grievance appeal response. Instantly, the subject matter grieved stems from Nunez RAR for "circumcision". Mr.Bickell, the G.O. assigned and Huntingdon's facility manager all collectively denied Nunez request and subsequent grievance, relying on Policy. For the reasons stated below I challenge those dispositions collectively.

ARGUMENT:

From the outset, I argue that it was error for prison officials named in my initial grievance, the G.O. and my facility manager to rely on DOC policy to deny my religious accommodation request and grievance because my religious request seeks an exception to policy and/or to have policy modified to honor my religious request and RLUIPA rights. What is more, prison officials fail to provide a compelling reason to deny my request. Proffering nothing more than false concerns in which I refuted at great length in my initial grievance which i rely on and incorporate in full here on this appeal. I ask that my grievance be sustained along with my requested relief.

BY, *[signature]*

JA260

**Facility Manager's Appeal Response**

**SCI-Huntingdon**

1100 Pike St.

Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance appeal to the Facility Manager for the grievance noted below. In accordance with the provisions of DC-ADM 804, "Inmate Grievance System Policy," the following response is being provided based on a review of the entire record of this grievance. The review included your initial grievance, the Grievance Officer's response, your appeal to me, and any other documents submitted.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM8959 |
|---|---|---|---|
| Facility: | HUN | Unit Location: | BA-Unit |
| Grievance #: | 564054, Part 2 | | |

| Decision: | ☒ Uphold Response (UR) | ☐ Uphold in part/Deny in part |
|---|---|---|
| | ☐ Uphold Inmate (UI) | ☐ Dismiss/Dismiss Untimely |

*It is the decision of this Facility Manager to uphold the initial response, uphold the inmate, dismiss, or uphold in part/deny in part. This response will include a brief rationale summarizing the conclusion and any action taken to resolve the issue(s) raised in the grievance and your appeal and relief sought.*

| Response: | *Frivolous* |
|---|---|

In reviewing your grievance and appeal, I note that your concern with your request for circumcision was appropriately addressed by Mr. Houser. In your appeal, you argue Mr. Houser does not acknowledge your grievance is predicated on a policy that prohibits the surgery which you are requesting. As noted by Mr. Houser in his response to your initial grievance, you have been incarcerated over 11 years claiming the Islamic faith; however, this appears to be the first time you have requested circumcision. Neither DC ADM 819 nor the 13.2.1 permits elective surgery. Circumcision is considered elective surgery and it is not medically necessary. Mr. Kephart's memo has provided a thorough explanation of the denial of your request for elective surgery, and SCI-Huntingdon will continue to follow policy.

In closing, I can only reiterate that I uphold the response provided by the grievance officer. Your grievance is found to be without merit.

| Signature: | J. A. Eckard |
|---|---|
| Title: | Facility Manager |
| Date: | 5-22-15 |

cc: DC-15
     File

**DC-ADM 804, Inmate Grievance System Procedures Manual**

**Section 2 - Appeals**                                         *Attachment 2-B*

Issued: 12/1/2010

Effective: 12/8/2010

JA261

DC-804
Part 1
Rev 9/2010

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA 17001-0598

FOR OFFICIAL USE
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures in the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-604 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

*(body text illegible/faded)*

PAGE 1 of 4

B. List actions taken and staff you have contacted, before submitting this grievance.

*(body text illegible/faded)*

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____  _____
Signature of Facility Grievance Coordinator    Date

WHITE Facility Grievance Coordinator Copy   CANARY File Copy   PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 12/1/2010
Effective: 12/8/2010

*Attachment 1-A*

---

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
1920 TECHNOLOGY PARKWAY
MECHANICSBURG, PA 17050

FOR OFFICIAL USE
GRIEVANCE NUMBER

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE OF INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures in the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. List in Block B any action you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages (one DC-604 form and one one-sided 8½" x 11" page). State all relief that you are seeking.

*(body text illegible/faded)*

B. List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____  _____
Signature of Facility Grievance Coordinator    Date

WHITE Facility Grievance Coordinator Copy   CANARY File Copy   PINK Action Return Copy
GOLDEN ROD Inmate Copy

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 3/31/2014
Effective: 5/1/2014

*Attachment 1-A*

---

**INITIAL REVIEW RESPONSE**
SCI-Huntingdon
1100 Pike St.
Huntingdon, PA 16654-1112

This serves to acknowledge receipt of your grievance to the assigned Grievance Officer. The response is as follows.

| Inmate Name: | Fernando Nunez | Inmate Number: | FM-8959 |
|---|---|---|---|
| Facility: | SCI Huntingdon | Unit Location: | BA-3064 |
| Grievance #: | 564054 Part 2 | Grievance Date: | 05/05/2015 |
| Publication (if applicable): | | | |

| Decision: | ☐ Uphold Inmate ☒ Grievance Denied |
|---|---|
| It is the decision of the grievance officer to uphold or deny the inmate's initial grievance. This response should include a brief rationale, summarize the conclusion, any action taken to resolve the issue(s) raised in the grievance and, relief sought. | ☐ Frivolous |
| Response: | |

Inmate Nunez files a grievance in response to the denial of his religious accommodation request for circumcision surgery. He believes the denial is placing a substantial burden on his religious beliefs & violates his religious rights & 8th Amendment. He seeks monetary compensation relief in the form of $100,000 per party & a change in policy which would permit such a request. Upon review I find the following:

Inmate Nunez was received into the PA Department of Corrections on 09/23/03 & was subsequently transferred to SCI-Huntingdon on 10/16/14. This appears to be his first request for this surgery despite being incarcerated for the past 11+years, all while being of the Islam religious faith. I note that neither DC-ADM 819 Religious Activities nor DOC Policy 13.2.1 Access to Health Care permit this procedure as elective surgery. In view of department polices, & the response from BTS Director Kephart, I find the denial of this surgery appropriate.

Grievance & Relief Denied.

| Signature: | Morris L. Houser |
|---|---|
| Title: | CCPM |
| Date: | 05/05/2015 |

cc: Superintendent
DC-15
File

*DC-ADM 804, Inmate Grievance System Procedures Manual*
*Section 1 – Grievances & Initial Review*
Issued: 12/1/2010
Effective: 12/8/2010

*Attachment 1-D*

---

| Inmate Name: Fernando Nunez | Inmate #: FM-8959 |
|---|---|
| Facility: SCI Huntingdon | Unit Location: BA-3064 |
| Grievance #: 564054 Part 2 | Grievance Date: 5-5-15 |
| Subject: Facility Manager Grievance Appeal | Filed Date: 5-13-15 |

Discussion:

I appeal the 5-6-15, initial review response issued by Grievance Officer,("G.O."), Morris L. Houser, denying my grievance for "Circumcision Surgery". The G.O. acknowledges my grievance raises Federal & State tort violations that substantially burdens my religious beliefs under RLUIPA & further acknowledges my request for relief. Yet, it upholds the denial issued by the regional secretary, citing DOC Policies DC-ADM 819 & 13.2.1. For the reasons that follow, I challenge his findings & conclusions below.

ARGUMENT:

Instantly, the G.O. does not refute my grieved contentions countering Mr.Bickell's disposition. Nor does the recognize that my grievance was predicated on the very fact that the DOC has in place A policy that prohibits the type of surgery in which I am requesting. Which is exactly why I submitted A religious accommodation seeking an exemption from policy, for religious reasons. The G.O. ignores this. He continues to cite policy to deny my grievance, albeit, my grievance alleges that the policies in which the G.O. cites places A substantial burden on my religious beliefs. For the reasons stated, supra, the G.O.'s response must be vacated & my grievance must be sustained.

By: _____
Fernando Nunez



**pennsylvania**
DEPARTMENT OF CORRECTIONS

TO:       Tabb Bickell, Deputy Secretary
             Central Region

FROM:      Shawn Kephart, Director

DATE:       April 6, 2015

RE:         Religious Accommodation Request Response
             <u>Fernando Nunez Jr. – HUN</u>

<u>Religion</u>
Muslim (MUS)

<u>Accommodation Requested</u>
    a)   To be able to shower with privacy screens/curtains.

    b)   Conjugal visit with spouse.

    c)   Circumcision.

    d)   To be allowed to prayer with family members during visit.

<u>Recommendation</u>
    a)   The physical plant of some facilities do not include individual showers, which is the case at this facility. However, the request to be able to shower in privacy can easily be accomplished by the inmate wearing his boxers or placing a towel around his private areas while showering ( (

    b)   Conjugal visit with spouse is denied due to safety, security and health concerns.

    c)   The request by this inmate to be ritually circumcised while confined in the PA DOC is DENIED as circumcision is elective surgery and is not medically necessary. It is unreasonable for the Department to assume the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery. Additionally, blood-letting rituals for any religious rite pose great medical and liability risks which the DOC is not willing to assume. While incarcerated, the inmate is encouraged to avail himself of the opportunities to practice his faith, through dialogue with the imam, attendance at faith-sponsored activities and holy day observances and through regular devotional practice.

    d)   The request to prayer with family members during visit is denied. Performing religious practices in the Visiting Room, requiring participants to lie prostrate on the ground, would not only create a safety concern, but would also pose a major distraction to families of other inmates meeting their loved ones. The inmate may pray quietly make supplication with his family members during their visit. The institution cannot provide every inmate with private visiting room for congregational prayers with family members. The inmate and his family members are free to pray by themselves both before their visit has commenced and after their visit has concluded.

---

JA263 Rec'd 4-17-15



**BULLETIN**
**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | | |
|---|---|---|
| **Access to Health Care Procedures Manual**<br>**Section 1 – Inmate Health Care Plan** | | |

| Policy Number: | | |
|---|---|---|
| **13.2.1, Section 01-1** | | |

| Original Issue Date: | | |
|---|---|---|
| **October 9, 2012** | | |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| **June 29, 2015** | **Signature on File**<br><br>**John E. Wetzel** | **July 9, 2015** |

The purpose of this bulletin is to update **Subsection C. Non-Provided Medical Services** of Department policy **13.2.1, "Access to Health Care."** The below listed language in red has been **DELETED**:

**Subsection C.3.**

3. sexual reassignment surgery and related treatment. If an inmate has commenced a course of treatment for reassignment prior to incarceration, a contracted Health Care Provider will evaluate him/her and limited medically necessary treatment may be administered to prevent complications associated with reassignment. This limited treatment will not include surgery;

**Subsection C.11.**

11. mammoplasties performed for augmentation or prosthetic implants;

**Subsection C.17.**

17. bone growth stimulator, unless for long bones;

**Subsection C. Non-Provided Medical Services** shall now read:

Medical services not provided by the Department include, but are not limited to, the following:

1. cosmetic surgery or services;

2. extraordinary medical expenses for infants beyond routine newborn care – refer to **Section 13** of this procedures manual;

3. sterilization (including castration);

4. investigation of or treatment for infertility, reversal of sterilization, artificial insemination or in-vitro fertilization;

JA264

(3) an inmate in the RHU/SMU/MHU/SSNU is to sign up for sick call in the manner described in **Subsection A.8. above**. The health care provider may determine that any request to be seen at the time of rounding (inmate did not sign up for sick call) is urgent and needs immediate attention or can advise the inmate to follow usual sick call procedures. In the event that urgent medical attention is needed, the Corrections Officer will notify the medical department.[18]

10. Discharge Planning Services (referrals for medical/psychiatric follow-up for an inmate who are being released from prison and/or being discharged to a Community Corrections Center [CCC])[19] in accordance with **Section 7, Inpatient Unit Medical Procedures** of this procedures manual.

11. Pharmacy Services

   a. pharmaceuticals will be prescribed for Food and Drug Administration (FDA) approved clinical indication;[20]

   b. pharmaceuticals used for non-FDA approved conditions may be used under the following circumstances:

   (1) the drug is generally accepted as a treatment for a non-FDA approved condition;

   (2) is consistent with community standards for medical care; and/or

   (3) the final decision to use the drug is made by the treating physician.

   c. refer to **Section 12, Pharmacy Guidelines** and **Section 15, Direct Observation Therapy** of this procedures manual.

## B. Medical Services Provided on a Case-By-Case Basis

1. Organ Transplant

   The Department will provide an organ transplant when medically necessary to sustain life and health on a case-by-case basis.

   a. The facility CHCA will notify the Clinical Coordinator, BHCS when the facility medical director identifies an inmate as a candidate for an organ transplant.

   b. Diagnostic work-up for organ transplantation will be approved by the Chief of Clinical Services/designee and the Contracted Health Care Provider.

---

[18] 4-4346
[19] 4-4347
[20] 4-4378

1-10

c.  The Deputy Secretary for Administration will be notified of final approval for an inmate organ transplant.

    (1)  The Chief of Clinical Services/designee, BHCS will form a transplant review committee comprised of the Corporate Medical Director/designee for the Contract Health Care Provider, and the Assistant Medical Director, BHCS to review the clinical findings of the facility Medical Director and the transplant center.

    (2)  The transplant will be approved if the transplant review committee deems the inmate recipient a suitable candidate and if the transplant is medically necessary to sustain life and health.

    (3)  The Chief of Clinical Services will notify the facility CHCA of the approval and the inmate will be permanently transferred to a facility within one hour of the transplant center, if possible.

    (4)  The Contracted Health Care Provider will be responsible for all costs related to the diagnostic work-up, assessment, treatment, surgical intervention and/or medical complications associated with an autologous/recipient transplant.

    (5)  The Transplant Committee's recommendation will be final.

2.  Inmate Organ Transplant Donation

a.  When an inmate wishes to donate an organ for transplantation, the CHCA will be the primary contact for the inmate, family, transplant center, facility and Department entities. The CHCA will coordinate all inquiries and transplant activities until completion of the approved course of action.

b.  The Chief of Clinical Services/designee may authorize a donor/recipient transplant for an inmate to donate an organ only to the following family members:

    (1)  full blood sibling – both birth parents in common (25% chance of a full HLA match. 50% chance of a half-match);

    (2)  blood half-sibling – one birth parent in common (50% chance of a half-match);

    (3)  birth parent – (50% chance of a half-match); or

    (4)  birth child – (50% chance of a half-match).

c.  Upon notification by an inmate, family member, transplant center, nurse, and vendor staff, the CHCA will:

    (1)  review and initiate the **DC-594, Transplant Organ Donation Checklist (Attachment 1-H)**;

JA266

(2)  obtain a **DC-108, Authorization for Release of Information Form** in accordance with Department policy **DC-ADM 003, "Release of Information"** from the inmate for all applicable parties, including vendor staff;

(3)  identify involved family contacts and transplant center coordinator (names, addresses and phone numbers in accordance with the **DC-594**);

(4)  mail the **DC-595, Pennsylvania Department of Corrections – Initial Organ Donation Costs Letter to Inmate Relative(s) and Transplant Center (Attachment 1-I)**, to family contacts and the transplant center coordinator;

(5)  provide the **DC-596, Pennsylvania Department of Corrections – Inmate Organ Donor Agreement Letter (Attachment 1-J)** to the inmate;

(6)  upon notification by family contacts and/or the transplant center coordinator that they wish to proceed, the CHCA will send them a **DC-597, Pennsylvania Department of Corrections – Specific Organ Donation Costs Letter to Inmate Relative(s) and Transplant Center (Attachment 1-K)** outlining specific cost estimates and further details of the transplant procedure. The **DC-597** will include the initial payment required, if any for histocompatibility testing. The instruction will specify that all monies must be sent to the CHCA. The **DC-597** will be signed by the Facility Manager. The **DC-597** will include a signature line for the recipient and a copy to be returned acknowledging the responsibility to pay all costs of organ donation;

(7)  upon receipt of the signed **DC-597** and funds to cover the cost of histocompatibility testing, the CHCA will arrange with the medical contract or the transplant center coordinator for the histocompatibility testing;

(8)  upon notification by the transplant center coordinator that the inmate is selected as a donor, the CHCA will send a **DC-598, Pennsylvania Department of Corrections – Final Estimated Organ Donation Costs Letter to Inmate Relative(s) and Transplant Center (Attachment 1-L)** signed by the Facility Manager to the appropriate family contact or transplant center coordinator providing estimated Department costs for the particular organ harvesting procedure. The **DC-598** will stipulate that estimated costs must be paid in advance and will provide instructions for payment;

(9)  when payment is received, the CHCA will coordinate with the transplant center coordinator and security staff to schedule the organ harvesting procedure;

(10)  following completion of all testing and harvesting procedures and resolution of all medical complications, the CHCA will reconcile all charges and payments. If appropriate, excess payments will be refunded to payers;

JA267

(11) all transplant forms and copied letters including the **DC-594**, **DC-595**, **DC-596**, **DC-597**, and **DC-598** will be filed under the **DC-539, Consent Divider**, located under the Legal/Correspondence Tab, in the medical record; and

(12) all **DC-108** forms shall be filed under the **DC-532, Release of Information Divider**, located under the Legal/Correspondence Tab, in the medical record.

## C. Non-Provided Medical Services[21]

Medical services not provided by the Department include, but are not limited to, the following:

1. cosmetic surgery or services;

2. extraordinary medical expenses for infants beyond routine newborn care – refer to **Section 13** of this procedures manual;

3. sexual reassignment surgery and related treatment. If an inmate has commenced a course of treatment for reassignment prior to incarceration, a contracted Health Care Provider will evaluate him/her and limited medically necessary treatment may be administered to prevent complications associated with reassignment. This limited treatment will not include surgery;

4. sterilization (including castration);

5. investigation of or treatment for infertility, reversal of sterilization, artificial insemination or invitro fertilization;

6. refractive eye surgery;

7. penile prosthesis;

8. pharmaceuticals used for non-FDA approved conditions unless the guidelines in **Subsection A.6.u. above** are met;

9. biofeedback and acupuncture;

10. weight reduction programs, unless medically necessary;

11. mammoplasties performed for augmentation or prosthetic implants;

12. surgical or dental procedures to correct congenital or developmental malformations, unless medically/psychiatrically necessary;

13. chiropractic or naturopathic services;

---

[21] 4-4398

JA268

14. treatment of impotence;

15. dental cosmetic procedures;

16. gold dental restorations;

17. bone growth stimulator, unless for long bones;

18. special footwear that is not medically necessary;

19. sperm/egg donation; and

20. other fertility tests/treatment.

## D. Notification of Next of Kin[22]

1. In the event an inmate is seriously injured, the CHCA/designee will notify the Shift Commander or Duty Officer in order to report the incident in accordance with Department policy **6.3.1, Section 17, Reporting of Extraordinary Occurrences**. The required **DC-121, Report of Extraordinary Occurrence**, will serve as official notice of the incident. The Shift Commander/Duty Officer will notify the inmate's next of kin.

2. In the event an inmate becomes seriously/critically ill or injured or an inmate dies during normal business hours, the Facility Manager will designate the CHCA or the facility's Public Information Officer (PIO) as the staff member responsible for notifying the inmate's next of kin. If the incident occurs after normal business hours, the facility's Duty Officer/designee will notify the inmate's next of kin.

3. The CHCA, PIO, or Duty Officer will attempt to contact the inmate's next of kin via telephone. When telephone contact is made with the next of kin, the staff member will provide all the information possible in accordance with Department policy **DC-ADM 003**, regarding the release of confidential personal information, as well as confidential medical information. This information will include, but not be limited to:

   a. the inmate's name;

   b. the circumstances surrounding the incident (illness or injury);

   c. the name and location of the treatment center, if the inmate is no longer in the facility;

   d. the telephone number of the treatment center;

   e. the name of the physician treatment the inmate, if available; and

---

[22] 4-ACRS-4C-21, 1-CTA-3F-04

JA269

4. The parenting staff/designee shall inform the inmate that it is her responsibility to arrange for her child's care. Emphasis shall be placed on using the spouse, the baby's father, parents, grandparents, brothers, sisters, close friends, foster care, or adoption.

5. It is the hospital social worker's responsibility to notify the caregiver of the birth. Arrangements for telephone calls from the hospital must be made with the parenting staff/designee in advance. If the inmate wants a family visit on the day that the baby is discharged, arrangements shall be made with the parenting staff/designee in advance. The inmate is to instruct visitors to bring ID in accordance with Department policy **DC-ADM 812, "Inmate Visiting Privileges."**

6. The inmate is responsible to arrange for caregivers to bring a car seat and necessary clothing to the hospital for the baby (undershirt, sleeper, sweater, and blanket). The hospital social worker calls the caregiver when the baby is to be discharged.

## D. Postpartum Education and Counseling Programs

Postpartum education classes and counseling programs shall be provided to the inmate as outlined in the **Pregnancy Plan of Action (Attachment 13-C)** or on an as needed basis. Separation issues and postpartum expectations and abnormalities shall be the focal points of this programming.[6]

## E. Visitation

1. An inmate visitor(s) is allowed to be in the birthing room while the birth is taking place if he/she is on the inmate's approved visitors list and are following hospital policy and procedures. Facilities shall encourage bonding between the inmate mother and her newborn child while at the clinic/hospital. An inmate visitor(s) shall follow the hospital visiting hours and be admitted to the inmate's hospital room provided he/she is listed on the facility's approved visitors list for that inmate.

2. Visitation shall be encouraged between the inmate, the caregiver, and her newborn child after discharge from the hospital.

## F. Elective Termination of Pregnancy

Elective termination of pregnancy procedures will be provided at the inmate's request.[7]

1. The inmate and her family shall be responsible for all costs related to the diagnostic work-up, assessment, treatment, surgical intervention, medical complications, security officer and transportation costs associated with the elective termination of pregnancy procedures.

---

[6] 4-4353
[7] 4-4398

JA270

2. The Chief of Clinical Services shall be consulted prior to elective termination of pregnancy procedures being instituted.

*3.* A physician, in compliance with all applicable laws, including the Abortion Control Act, 18 Pa. C.S.A. §§ 3201-3220, Chapter 2, shall perform elective termination of pregnancy procedures.

4. Elective termination of pregnancy procedures shall be performed by a physician, in conformance with the requirements regarding minors, as referenced in the **Abortion Control Act, 18 Pa. C.S.A. §§ 3201-3220, Chapter 2, Page 10, Subsection II.E.3**.

*5.* These procedures shall not be performed in Department facilities. They shall be performed off-site in hospitals or OB/GYN physician offices.

JA271

FILED
HARRISBURG, PA

JUL 2 1 2022

PER____IBR_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FERNANDO NUNEZ JR.                :      CIVIL ACTION
            Plaintiff,                   NO. 3:15-cv-01573

      v.                          :      ( Judge Jennifer P. Wilson )
                                  :
TOM W. WOLF, et al.,              :
            Defendants.           :

PLAINTIFF'S COUNTER STATEMENT OF MATERIAL FACTS PURSUANT TO
LOCAL RULE 56.1

Plaintiff, Fernando Nunez Jr. ("Nunez"), proceeding pro se, hereby submits his counter statement of material facts under Local Rule 56.1, of the United States District Court for the Middle District of Pennsylvania, in reply to the defendants' statement of facts (Doc 79) and in support of his brief opposing defendants motion for summary judgment (Doc 77).

1. ADMITTED.

2. ADMITTED.

3. ADMITTED in part, and DENIED, in part. It is ADMITTED that defendant Tabb Bickell remains a defendant in this action, however, John Wetzel, is not and therefore DISPUTED/DENIED. By order dated May 13, 2022 this Court substituted the name of the current Secretary of the Department, George Little, for the former Secretary of the Department, John Wetzel. (Doc 102).

4. ADMITTED.

5. ADMITTED.

6. ADMITTED.

7. ADMITTED.

1

JA272

8. It is ADMITTED that Nunez seeks circumcision for religious reasons, (Doc 34 at ¶ 99), however, it is DENIED/DISPUTED that Nunez's amended complaint ("AC") did not make clear who would be responsible for incuring the expense for his circumcision surgery. Nunez AC cited the relevant statutory text under RLUIPA, 42 U.S.C. §2000cc-3(c), to make clear the defendants would be responsible for incuring the expense for his circumcision surgery. (Doc 34 at ¶ 101).

9. ADMITTED.

10. ADMITTED.

11. ADMITTED. (Plt's App'x at 29).

12. ADMITTED. (Plt's App'x 29).

13. ADMITTED.

14. ADMITTED.

15. ADMITTED.

16. ADMITTED.

17. ADMITTED.

18. ADMITTED.

19. ADMITTED.

20. OBJECTION/DISPUTED. Defendants reference a seven (7) page declaration by Scott Woodring, as a whole, which is conclusory. Violating Fed.R.Civ.P.56(c)(1)(A). The declaration itself does not cite or reference any admissible evidence or information in their filings to substantiate this disputed assertion. Violating Fed.R.Civ.P. 56(c)(2) and (c)(4). This conclusory assertion cannot be used to establish a compelling governmental interest. Washington v. Klem, 497 F.3d 272, 283 (3d Cir.2007)(the mere assertion of security or health reasons is not, by itself, enough for the government to satisfy the compelling governmental interest requirement. A conclusory statement is also not enough). Smith v. Ozmint, 578 F.3d 246, 252 (4th Cir.2009)(noting conclusory assertions in prison officials affidavit are insufficient to satisfy strict scrutiny).Furthermore defendant Bickell has admitted that he denied Nunez's RAR for conjugal visits based on DOC policy alone. (Plt's App'x at 14, ¶ 14). He further asserted that allowing Nunez to have conjugal visits - in private - would raise a "general" security

2

JA273

concern because "[S]uch visits require complete privacy. Any time an inmate is out of view of staff there is the chance for violence, property destruction, or the passing of contraband." Id at ¶ 13. Nunez, in contrast, has alleged in his AC that he has no criminal record for domestic violence and has never acted violently towards his spouse. (Doc 34 at ¶ 31). And further asserted in his declaration that he has NEVER been issued a prison misconduct for smuggling contraband into prison. (Plt's App'x at 1, ¶ 25).

21. DISPUTED. During the discovery stage, Nunez proposed that allowing his spouse to pass through a metal detector and body scanner - before every conjugal visit with Nunez - would satisfy the Department's security concerns regarding the introduction of contraband into its prisons. And yet Defendant Bickell and former Secretary John Wetzel denied that it would. (Plt's App'x at 14 ¶ 20. And App'x at 15, ¶ 3). But then announced to the public that full body-scanners would be placed in every State Correctional Institution ("SCI") to stop the flow of contraband from entering into its SCI's. (Plt's App'x at 21, pages 2/11, 4/11 & 5/11. And App'x at 22, pages 8/11 - 9/11; And Plt's App'x 30). A full body scanner has been installed at SCI Mahanoy in 2019 and every inmate must pass through it before and after every contact visit. (Plt's App'x at 1, ¶ 10).

Per Department policy, ALL inmates are also required to be stripped searched before and after every contact visit. (Plt's App'x at 6, DC-ADM 203 Section 2.B.1.a.). Such scanning and strip searches, whether done individually or in combination with eachother has satisfied similar security concerns across the nation to stop the flow of contraband from entering prisons. (Plt's App'x at 18, pages 42-44). Nunez, therefore disputes the defendants' security concern in this regard.

3

22. ADMITTED.

23. DISPUTED/OBJECTION. Nunez objects to defendants' contention that "all inmates" would request private conjugal visits. Defendants offer no direct evidence from any inmate requesting such visits. Nor have they introduced admissible evidence of any department official, having personal knowledge of processing such requests. Its failure in that regard amounts to nothing more than speculation and conjecture of what a hypothetical inmate - in general - might request in some future case. It is inadmissible evidence under Fed.R.E. 602 and 701, and insufficient to satisfy the defendants' burden under RLUIPA.

Nunez further disputes the defendants' bold assertion that they do not have the space to accommodate his request for conjugal visits with his lawful spouse. During discovery, defendant Bickell and Wetzel, rejected Nunez's proposal to reconfigure its non-contact visiting room booths within any SCI in which he is housed and designate those private rooms for conjugal visits. (Plt's App'x at 14, ¶ 25 ; and App'x at 15, ¶ 13). Nor did they consider purchasing module/mobile homes to place them on prison grounds to create a secure space, under official supervision, to accommodate Nunez's request for conjugal visits. Similar to other state prisons like Washington (Plt's App'x at 41, Page 2 of 18), California (Plt's App'x at 43, page 3), and New York (Plt's App'x 42, page 19 ¶ M). The fact that other state prisons has done so, suggest that a least restrictive means is available, but the defendants refused to even consider it. RLUIPA mandates that the government has the burden to prove that the challenged policy at issue is the least restrictive means. 42 U.S.C. §2000cc-1(a). A genuine issue of material fact is therefore in dispute as to whether the department can create a space - on prison grounds - for private conjugal visits with Nunez and his spouse.

24. ADMITTED.

25. ADMITTED.

26. ADMITTED.

27. It is ADMITTED that all contact visits in a prison are to take place under official supervision per 37 Pa.Code 93.3(h)(6), however, Nunez DISPUTES the declaration of Scott Woodring, (Doc 80 at App'x E), which the defendants rely upon to interpret the relevant phrase "official supervision" to mean that prison officers would need to either supervise or record Nunez's intimate acts with his spouse.

4

because Woodring, is not qualified to interpret legal phrases of the relevant administrative code at issue. Furthermore, the administrative code at issue, does not define the term "official supervision" in the manner suggested by Woodring. To interpret the relevant administrative code in such a way as suggested by Woodring and the defendants' would violate state law, 18 Pa.C.S. §5703, and not reasonable because the same administrative law permits inmates and their attorney to have contact visits that are "confidential" and prohibits officers' from being stationed in a manner as to be able to overhear normal conversation. See 37 Pa.Code 93.3(c)(1). Additionally, there are no cameras, or officers inside a non-contact visiting room both with inmate's or their visitors during their non-contact visit. (Plt's App'x at 1, ¶ 20).Also an "Official Visitor" may privately visit an inmate in his cell. (Doc 80 at App'x C, DC-ADM 812 Section 2.B.4.a-b).

28. ADMITTED, in part, and DISPUTED, in part. It is ADMITTED that space and time for visitation at the Department is limited. It is DISPUTED that Nunez is located at SCI Huntingdon. Nunez is currently housed at SCI Mahanoy and has not been housed in SCI Huntingdon since September 12, 2016. (Plt's App'x at 33).

29. DISPUTED. Other state prisons like: New York, California, and Washington, accommodates legally married inmates to have private conjugal visits with their spouses. (Plt's App'x at 41, page 2 of 18; App'x at 42, page 1 of 19; and App'x at 43, page 3). Given the practices and policies permitting conjugal visits in other state prisons like New York, California, and Washington, strongly suggest the Department could satisfy its concerns through a means less restrictive than denying Nunez the exemption he seeks.

30. ADMITTED, in part, and DISPUTED, in part. It is ADMITTED that the Department is responsible for the health of inmates to the extent that can be controlled. But it is DISPUTED that permitting inmates - in general - to have sexual contact with their visitors increases the likelihood that STI's will be introduced into the prisons. That is because Nunez is not seeking to have sexual contact with just any visitor. He only seeks to engage in intimate acts with his legal spouse in private. Neither of whom have STI's. (Plt's App'x at 1, ¶ 27 and App'x at 11). At any rate, the defendants can implement policies requiring an inmate and his spouse to undergo a medical screening test for STI's as a pre-condition before being approved for such a visit. Similar to the policies in place in Washington (Plt's App'x at 41, page 10 of 18) and New York (Plt's App'x at 42, pages 5-6).

31. ADMITTED.

32. DISPUTED. STI's can be detected by medical testing. Nunez and his spouse can undergo a medical screening test for STI's prior to being approved for a conjugal visit as noted, supra, in paragraph 30.

33. ADMITTED.

34. ADMITTED.

35. ADMITTED.

36. ADMITTED.

37. ADMITTED.

38. DISPUTED. The defendants' can implement policies and procedures requiring Nunez and his spouse to undergo seperate medical screening tests for STI's, prior to being approved for a conjugal visit. Once their tests proves negative, they can have a conjugal visit. As noted, supra, in paragraph 30, that is the practice and policy in place in other state prisons like: New York, Washington, and California.

39. DISPUTED. Denying Nunez request for conjugal visits places a substantial burden on his sincere religious practices and beliefs as noted in his declaration. (Plt's App'x at 1, ¶ 5, ¶ 26).

Defendants failed to explain why other state prisons in California, New York, and Washington, with the same compelling interests are able to implement programs for private conjugal visits but the Department of Pennsylvania can't. When responding to Nunez's interrogatory requests defendant Bickell and former Secretary John Wetzel, each stated that they did not consider the family/conjugal visit policies in California, New York, or Washington, as a least restrictive means, before placing a categorical ban on conjugal visits with one's legal spouse. (Plt's App'x at 14, ¶¶ 11-12, ¶ 17-18, ¶ 21-24; and App'x at 15, ¶ 12, ¶ 15, and ¶ 25). The defendants did not consider the policies of other states as a least restrictive means to protect its interest in health, safety, and security. Violating RLUIPA.

JA277

40. OBJECTION/DISPUTED. Defendants' reliance on Dr.Arlene Seid declaration, is not based on any fact based admissible evidence, information, or personal knowledge and is conclusory at best. Violating Fed.R.Civ.P. 56(c)(2) and (c)(4). Indeed, her declaration is merely based on knowledge, information and belief. (Doc 80, App'x at F page 6). She did not set out any facts that be admissible in evidence, or explained how she is competent to testify on such a matter. Nor has she explained how her job title would qualify her to know about such a disputed fact under Fed.R.E. 602. Her declaration should be stricken in that respect. Richardson v. Oldham, 12 F.3d 1373, 1378-79 (5th Cir.1994)(finding no abuse of discretion in district court striking portions of affidavit that were based on information and belief because they were "not based on personal knowledge and failed the requirements of Fed.R.Civ.P. 56(e)"). Furthermore, the defendants' reliance on Dr. Arlene Seid's declaration is based on pure speculation and conjecture of what a hypothetical inmate or visitor might do in some future case. Such speculation is insufficient to satisfy the defendants' burden because they failed to engage in the sort of case-by-case analysis that RLUIPA requires. Ramirez v. Collier, 142 S.Ct 1264, 1280 (2021). In his declaration, Nunez, has stated that he has never physically assaulted or harmed his spouse. Nor has he ever been issued a prison misconduct or criminal charge for assaulting his spouse. He sincerely believes any sexual encounter or intimate act with his spouse must be consensual in Islam. To do otherwise is a major sin in Islam and contrary to his religious beliefs to treat his spouse with respect, kindness, and love. (Plt's App'x at 32, pages 1-2; and App'x at 1, ¶ 25, ¶¶ 28-29).

Subsequently, it is disputed that denying Nunez conjugal visits serves the legitimate penological interest asserted, when compared to his sincere religious beliefs and the controlling federal statutory law under RLUIPA and other state prisons who permit conjugal visits. See Paragraph 39, supra.

JA278

41. DISPUTED. Defendants' erronously rely upon the rational-basis standard applicable to constitutional claims under Turner v. Safley, 482 U.S. 78 (1987) and not RLUIPA's statutory strict-scrutiny standard. Whether or not the Department has a legitimate penological interest in not permitting congregational prayer between inmates and visitors, is not the issue. And the defendants cannot reference an interest asserted in a declaration to justify its actions. Rather, they have the burden to prove that the challenged policy or practice serves a compelling interest and that it is the least restrictive. 42 U.S.C. §2000cc-1(a). In his declaration, Nunez asserts that the defendants' practice prohibiting him for congregating in prayer with his visitors is neither compelling or the least restrictive way of stopping the flow of contraband from entering its prisons because SCI Mahanoy, and other SCI's all have body scanners (Plt's App'x at 21, 22, and 30), and every inmate receiving a contact visit are required to be stripped search before and after every visit. (Plt's App'x at 6). Furthermore, all vistor's entering a SCI are subject to be searched and are required to successfully pass through a metal detector before being permitted into the visiting room. (Plt's App'x at 35, page 3-4). Nunez also asserts that the department's practice is underinclusive because they do not require prison staff to pass through a body scanner before entering a SCI to stop the flow of contraband, after becoming aware that department staff do smuggle drugs and other contraband into its prisons. (Plt's App'x at 30 & 38).

42. OBJECTION. Nunez relies on and incorporates by reference his objection noted in paragraph 20, supra, as if stated in full herein. It is further asserted that defendant Bickell did not consider ANY documented evidence to suggest or infer that allowing Nunez conjugal visits with his spouse would pose a security concern before denying his RAR for conjugal visits. (Plt's App'x at 14, ¶ 21). Defendants' conclusory assertion is therefore DISPUTED.

43. DISPUTED. A least restrictive means exist to accommodate Nunez's religious practice. Nunez proposes that the Department designate a clean, designated space to pray with his visitors, away from other children and visitors, in much the same way SCI's have constructed a space for children to play. This clean designated place to pray need not be private. And cameras can be stationed or placed in such an angle as to observe Nunez and his visitors praying. With these proposed practices in place, coupled with requiring Nunez to pass through a body scanner and a strip search, would make it difficult for any inmate to conceal or smuggle contraband into any SCI. (Plt's App'x at 18).

44. ADMITTED.

45. DISPUTED. See Paragraph 43. Furthermore, Nunez's prayer(s) typically are no more than 5-10 minutes in lenghth. Such a time period is generally the same time period it takes for inmates and their visitors to have their photographs taken by another inmate, in a designated space of a loud, crowded, distracting visiting room with other inmates and visitors.

Furthermore, the visiting room in a SCI is a neutral meeting space used for religious purposes because the Department already allows such "special visits" for religious advisors. (Doc 80, Def' App'x at C, Section 2.B.2).

46. OBJECTION. Defendants' cannot rely on a conclusory assertion in such a declaration, because the declaration itself has not set out facts, evidence or information substantiating its contention. Violating Fed.R.Civ.P. 56(e). And without citing to any evidence, the declarant "speculates" that other inmates would expect the same treatment as Nunez. Such an assertion is the classic rejoinder of bureaucrats that has been rejected by the Supreme Court in Holt, 135 S.Ct at 866. The declaration relied upon by the defendants should be stricken on this disputed issue.

47. DISPUTED. Each SCI throughout the Department has different visiting hours and days. See 37 Pa.Code §93.3(h)(1)-(2). Nunez is currently housed at SCI Mahanoy were operating contact visiting hours differ by times, days, and zones. (Plt's App'x at 26).

48. DISPUTED. Nunez relies upon and incorporates by reference paragraphs 23, 29, and 43, supra, as if stated in full herein.

49. OBJECTION/DISPUTED. Defendants have not provided any evidence or specific facts to support such an assertion; violating Fed.R.Civ.P. 56(e) and should be stricken. The declaration is based on pure speculation and conjuncture of how some hypothetical inmates may respond to a granted exemption to policy. Such speculation is insufficient to satisfy the defendants' burden under RLUIPA. See Ramirez, 142 S.Ct at 1280; and Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir.2008)(Conclusory affidavits that do not affirmatively show personal knowledge of specific facts are insufficient).

50. OBJECTION/DISPUTED. Nunez relies upon and incorporates by reference paragraph 49, as if stated in full herein. Furthermore, such an assertion is in direct conflict with defendant Bickell's actual belief because he informed Department staff via memo that Muslim inmates are not required to have a prayer rug to pray. (Plt's App'x at 12).

51. DISPUTED. During discovery, defendant Bickell, did not articulate a "security" concern as an underlying compelling interest to prevent Nunez from praying with his visitors. (Plt's App'x at 14, ¶ 16). Indeed, he did not even suggest it when denying Nunez's RAR. (Plt's App'x at 29). Nor did the former Secretary John Wetzel. (Plt's App'x at 15, ¶¶ 21-22). To present such a "sham declaration" now without explaination for the conflicting views, suggest they are offering the declaration solely to substantiate their summary judgment motion.

Sterner v. Siemens Med.Solutions United States, 706 Fed.App'x 772, 776 (3d Cir.2017)(Judges can disregard contradictory or sham affidavits). Assuming defendants have shown a compelling interest (which Nunez disputes), they have still failed to show they considered a least restrictive way to accommodate Nunez and his visitors in a manner proposed in paragraphs 41, 43, and 45, supra.

52. ADMITTED.

53. ADMITTED.

54. OBJECTION. Defendants rely upon a declaration that is not based on "personal knowledge" and speaks on security procedures and custody levels without further information or explanation. Violating Fed.R.Civ.P. 56(e). Such a conclusory assertion of a medical physician who is asserting a "belief" on Department Security matters is clearly beyond the scope of the declarants knowledge and should be stricken under Fed.R.Civ.P. 56(c)(2) and (c)(4). Compounding matters, defendants merely reference the declaration as a whole with no specific citation to particular parts of material in the record to support its alleged assertion of fact. Violating Fed.R.Civ.P. 56(c)(1)(A).

55. ADMITTED.

56. ADMITTED.

57. ADMITTED.

58. ADMITTED.

59. ADMITTED.

60. OBJECTION/DISPUTED. The declaration relied upon by the defendants is not based on "personal knowledge". Violating Fed.R.Civ.P. 56(c)(2) and (c)(4). It merely offers a conclusory assertion on the cost of circumcision surgery. The declarant has not asserted that they researched the cost of surgery and appears to only "speculate" what a traditional circumcision surgery will cost without properly supporting that asserted fact. Violating Fed.R.Civ.P. 56(e).

61. DISPUTED. Nunez wants to be circumcised because he has converted to Islam uncircumcised and he sincerely believes when on converts to the religion of Islam, they must be circumcised. (Plt's App'x at 5). Keeping his genital area clean is only one reason why circumcision is necessary in Islam; But not the only reason. (Plt's App'x at 5, page 100-102, and 104-105; App'x at 1, ¶ 36).

62. DISPUTED. Nunez relies upon and incorporates by reference paragraphs 61, noted supra, as if stated in full herein.

63. OBJECTION. The declaration relied upon by the defendant is not based upon "personal knowledge". Violating Fed.R.Civ.P. 56(c)(2) and (c)(4). Furthermore, the declarant has not properly supported its assertion of fact with any admissible evidence. Violating Fed.R.Civ.P. 56(e).

64. OBJECTION/DISPUTED. Speculation is insufficient to satisfy the defendants burden under RLUIPA. See Ramirez, 142 S.Ct at 1280.

65. OBJECTION/DISPUTED. Speculation is insufficient to satisfy the defendants burden under RLUIPA. See Ramirez, 142 S.Ct at 1280.

66. DISPUTED. Defendants conceeded in its brief that preventing Nunez from having circumcision surgery for a religious reason, places a substantial burden on his sincere religious practice. (Doc 78, at page 21). But they continue to grant him an exemption to Department policy consistent with 42 U.S.C. §2000cc-3(e). Contrary to what they believe, administrative inconvenience and cost savings are not compelling government interest. Memorial Hospital v. Maricopa County, 415 U.S. 250, 262-69 (1974). That is because RLUIPA requires the government to incur expenses under 42 U.S.C. §2000cc-3(c). A genuine factual dispute therefore exists as to whether the defendants can continue to substantially burden Nunez's religious exercise.

12

JA283

Respectfully submitted,

By: _____

Fernando Nunez Jr.
#FM8959
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

Date: July 15, 2022

JA284

## CERTIFICATE OF SERVICE

    I, certify to have served the foregoing,"Counter Statement of Material Facts," upon the person(s) and addresses noted below via first class mail, postage prepaid.

Office of The Clerk
U.S. Middle District of Pennsylvania
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108

Abby N. Trovinger, Esq.
Pa. Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

Date: July 15, 2022

s/ _Fernando Nunez_
Fernando Nunez Jr.
#FM8959
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

JA285

PRESS FIRMLY TO SEAL

 

INMATE MAIL
PA DEPT OF
CORRECTIONS



quadient
PRIORITY MAIL
IMI
$008.95⁹
07/20/2022 ZIP 17932
043M31230995
US POSTAGE



# UNITED STATES
## POSTAL SERVICE ®

# PRIORITY®
# MAIL

FROM: Fernando Nuñez Jr.
# FM 8459
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

■ Expected delivery date specified for domestic use.

■ Most domestic shipments include up to $50 of insurance (restrictions apply).

■ USPS Tracking® included for domestic and many international destinations.

■ Limited international insurance.**

■ When used internationally, a customs declaration form is required.

RECEIVED
HARRISBURG, PA

JUL 21 2022

PER _____
DEPUTY CLERK

*Insurance does not cover certain items. For details regarding claims
Domestic Mail Manual at http://pe.usps.com.

** See International Mail Manual at http://pe.usps.com for availabil



USPS TRACKING #

9114 9014 9645 0147 4435 18

TO: Office of The Clerk
U.S. Middle District of Pennsylvania
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108

# FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

# TRACKED ■ INSURED

PS00001000014

EP14F May 2020
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; May 2020. All rights reserved.

JA286

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FERNANDO NUNEZ, JR. | : | CIVIL ACTION |
| Plaintiff, | | NO. 3:15-cv-01573 |
| v. | : | ( Judge Jennifer P. Wilson ) |
| | : | |
| TOM W. WOLF, et al., | : | |
| Defendants. | : | |

## DECLARATION BY FERNANDO NUNEZ JR.

I, Fernando Nunez Jr., hereby declare under penalty of perjury in accordance with 28 U.S.C. §1746, that the following statements are true and correct based upon my own personal knowledge, information, and sincere religious beliefs:

1. I am a devout Muslim who has converted to the religion of Islam in 2003. As a Muslim, I follow the commands of Allah set forth in the Noble Qur'an in accordance with the Sunnah ("way") and teachings of Prophet Muhammad as was taught and understood by his rightous predecessor.

2. As a devout Muslim in Islam, I have been commanded to marry, because by doing so, I complete half of my religion.

3. I married my spouse, Jenny E. Nunez, on August 13, 2013 while incarcerated at SCI Rockview. (Doc 66, at ¶ 8).

4. Notwithstanding my ability to marry, I was prohibited from consummating my marriage after my marriage ceremony consistent with my religious beliefs and practices. (Doc 34, at ¶¶ 10-13).

1

JA287

5. Although Department policy, DC-ADM 812 (Governing Inmate Visiting Privileges) & DC-ADM 821 (Governing Inmate Marriages) permit me and my spouse to share a "brief kiss and embrace" when meeting and departing, such an intimate act places a substantial burden on my religious beliefs because as a Muslim, any form of intimacy with one's spouse must be done in private - behind closed doors - away from small children and other adults. (Doc 34 at ¶ 12, ¶ 45, ¶ 56, ¶ 59, and ¶ 60); (Plt's App'x at 3, pages 28-29 & 133).

6. Intimacy with one's spouse as defined and understood in Islam is broad and covers all forms of intimacy like: light talk, love expressions, touching, caressing, kissing, fondling, and sexual intercourse. (Doc 34 at ¶¶ 11-12).

7. All contact visits throughout the Department SCI's are held in large dormitory room settings and are more often then not loud and overcrowded. (Doc 34 at ¶¶ 53-55).

8. Per Department visiting policy, visiting room officers can assign specific seating location for an inmate and his visitors. (Plt's App'x at 35, page 1).

9. Department visiting policy and local visiting rules permit minor visitors as young as five years of age to be held on an inmate's lap with no specified time limit.

10. Before going to and coming back from a contact visit, Department policy and local visiting rules require EVERY inmate to be stripped searched for contraband, (Plt's App'x at 6; App'x at 9), and also require ALL inmates to pass through a full body scanner, after a contact visit. (Plt's App'x at 30, ¶ 7).

11. After an inmate is stripped searched in a manner outlined in Department policy (Plt's App'x at 6), he is given a state issued jumpsuit and shoes before entering a contact visiting room. (Doc 80 at App'x C, DC-ADM 812 Section 1.B.9) and (Plt's App'x at 9).

JA288

12. All visitors enter Department facilities and the visiting area at their own risk. The Department will assume no liability for any injuries or damage or loss of property as a result of a person entering a visiting area or any other area within a facility. (Plt's App'x at 35, page 1; App'x at 8).

13. Department visiting policy may limit, suspend, or restrict any visitor's privileges, if information becomes available suggesting the individual visitor poses a threat to the safety and security of any Department facility. (Plt's App'x at 35, page 6).

14. Before entering a Department facility for a contact visit, a visitor must be on the inmate's visitor list and regardless of their age, are subject to be searched. If a visitor refuses to be searched before entering the prison, visiting privileges may be denied. If a visitor refuses to be searched while in the prison or upon leaving the prison, they may be detained until the appropriate law enforcment arrives. (Plt's App'x at 35, page 4).

15. Every visitor must successfully pass through a metal detector in order to be permitted into the visiting room. Facilities may use dogs to conduct passive drug screenings or special devices to detect illegal drugs. Failure to pass those screenings could result in a visit being denied. (Plt's App'x at 35, page 4).

16. As of January 2019, the Department has implemented an enhanced ion scanning technique through the use of Rapiscan and has placed at least two systems in each facility. The systems are placed at ingress points for both staff and visitors as well as outside service units. (Plt's App'x at 30, ¶ 8).

17. Nunez is currently held in a Custody Level 3 (CL-3), medium security state facility at SCI Mahanoy. He is a CL-3 inmate. (Plt's App'x at 35; App'x at 33).

3

18. A CL-3 is a level assigned to inmates who are permitted reasonable freedom of movement within designated areas of the facility. A CL-3 inmate exhibit "non-assaultive" behavior. See Department Policy 11.2.1. Reception & Classification Glossary.

19. During a contact visit every inmate and visitor are subject to continuous surveillance by several surveillance cameras and officers positioned throughout the visiting room.

20. At SCI Mahanoy, there are three non-contact visiting rooms that do not have surveillance cameras within them. Each room has a seating area and desk that is seperated by a glass partition to prevent contact, and a door to enter & exit.

21. At SCI Mahanoy there is a podium/control booth where at least one officer will sit; others will walk throughout the contact visiting room.

22. The Department's visiting policy permit facilities to create space for a children play area and to provide toys and books. (Doc 80, at App'x C, DC-ADM 812 Section 1.A.4). At SCI Mahanoy a large space has been designated as a children play area within its contacting visiting room. It is filled with toys, books, and TV. There is also two surveillance cameras mounted on the ceiling to continously monitor the area. (Plt's App'x at 20 & 24).

23. Nunez and his spouse is prohibited from even engaging in the smallest form of intimacy. Such as snuggling against one another, holding hands or grooming one another. (Plt's App'x at 35, page 7). Nunez can't even wipe away his spouse tears or whisper in ear to avoid other inmates and visitors from over hearing his light talk with her about intimate and personal matters. (Doc 34, at ¶¶ 43-45 & ¶¶ 55-56).

4

JA290

24. Any physical contact between Nunez and his spouse, beyond the brief kiss and embrace, before and after every contact visit is considered "excessive" and may cause his visit to be terminated, suspended for a period of time, and cause to discipline Nunez himself. (Plt's App'x at 35, page 7).

25. I have never been issued a prison charge for smuggling drugs into any prison. Nor have I ever been issued a prison mis-conduct for violating any visiting policy rule

26. Because I cannot consummate my marriage, I am being compelled to modify my religious exercise by practicing celibacy. Which is a sinful act prohibited in Islam. (Doc 34, at ¶ 61).

27. I have no STI's and have received all 3 vacination shots for Hepatitis. (Plt's App'x at 11).

28. In Islam, it is a sin for me to force my spouse to engage in any intimate act with me against her will. (Plt's App'x at 3, page 133; App'x at 32, page 1-2).

29. I have no criminal conviction for domestic violence. Nor have I ever acted violently towards my spouse during our contact visits.

30. My spouse has never been prevented from visiting me and she has never posed a threat to prison security when having contact visits with me.

31. During contact visits with my spouse, we cannot congregate in prayer in a clean space of the visiting room, when we are scheduled to pray our afternoon (Asr Or Zhuhur) prayers because the defendants prevent us from doing so. (Plt's App'x at 29). As a consequence, I am being compelled to modify my religious exercise by not congregating in prayer with another muslim, and delaying the prayers until the end of my visit. Causing me to sin. (Plt's App'x at 19).

5

JA291

32. In Islam, two or more Muslims is considered a congregation prayer. (Plt's App'x at 4, page 2 ¶ 2). And the prayer in congregation is twenty times Superior to the prayer performed by a person alone. (Plt's App'x at 4, page 2 ¶ 4). The Scholars in Islam have all agreed that the congregational prayer is obligatory upon Muslim men, and to not pray in congregation is a sin that would lead me to the hellfire. (Plt's App'x at 4, page 3 ¶¶ 5-6).

33. As a Muslim, I am obligated to "stand" for prayer. Not sit down. To not do so invalidates my prayer. (Plt's App'x at 4, page 3 ¶¶ 7-8).

34. Praying in congregation with my visitor will require me to lead any prayer with them standing next to me or behind me.

35. To pray in the manner the defendants suggest, places a substantial burden on my religious exercise because it causes me to modify my religious exercise in a way that disobeys Allah and his messenger. See Noble Qur'an at 33:36 & 72:23. Leading me to be punished in hell after death.

36. When I converted to Islam, I was uncircumcised. And because of that reason I'm requesting to be circumcised in a manner noted in my amended complaint. (Doc 34 at ¶¶ 91-93 & ¶ 96); (Plt's App'x at 5, pages 97-98 & 100-102).

37. I am requesting that Department pay for my circumcision surgery.

38. Denying me circumcision surgery, places a substantial burden on my religious exercise for the reasons I asserted in my RAR. (Plt's App'x at 5).

By: _____
Fernando Nunez Jr.
#FM8959

Date: July 15, 2022

6

JA292

CERTIFICATE OF SERVICE

I, certify to have served the foregoing,"Declaration of Fernando Nunez Jr," upon the person(s) and addresses noted below via first class mail, postage prepaid.

Office of The Clerk
U.S. Middle District of Pennsylvania
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108

Abby N. Trovinger, Esq.
Pa. Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

Date: July 15, 2022

s/ _Fernando Nunez Jr._
Fernando Nunez Jr.
#FM8959
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

7

FILED
HARRISBURG, PA

JUL 28 2022

PER_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

NO. 3:15-CV-1573

FERNANDO NUNEZ, JR.

Plaintiff,

Vs.

TOM W. WOLF, et al.,

Defendants.

---

### PLAINTIFF REPLY BRIEF TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Date: July 15, 2022

Fernando Nunez Jr.
I.D.# FM8959
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

JA294

# TABLE OF CONTENTS

|                                                    | PAGE |
|----------------------------------------------------|------|
| Table of Citations                                 | ii   |
| Counter Statement of The Case                      | 1    |
| Counter Statement of Relevant Factual History      | 2    |
| Standard of Review                                 | 2    |
| Counter Statement of Questions Presented           | 4    |
| Argument                                           | 4    |
| Conclusion                                         | 27   |
| Verification                                       | 28   |
| Certificate of Service                             | 29   |

i

JA295

## TABLE OF CITATIONS

CASES                                                                          PAGE

Anderson v. Liberty Lobby, Inc. 477 U.S. 242 (1986)                           2, 3

Celotext Corp. v. Catrett, 477 U.S. 317 (1986)                                2

Christopher v. Smithkline Beecham Corp., 132 S.Ct 2156 (2012)                 14

Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,
508 U.S. 520 (1983)                                                           19

Cutter v. Wilkinson, 125 S.Ct 2113 (2005)                                     4

Holt v. Hobbs, 135 S.Ct 853 (2015)                                            5-19

Paladino v. Newsome, 885 F.3d 203 (3d Cir.2018)                               9

Ramirez v. Collier, 142 S.Ct 1264 (2021)                          5, 9, 16, 18

Shakur v. Schriro, 514 F.3d 878 (9th Cir.2008)                                17

Smith v. City of Allentown, 589 F.3d 684 (3d Cir.2009)                        3

Thomas v. Corbett, 206 A.3d 686 (Pa.Cmwlth.Ct.2019)                           11

Washington v. Klem, 497 F.3d 272 (3d Cir.2007)             4-5, 8-9, 15, 17

Waterman v. Farmer, 183 F.3d 208 (3d Cir.1999)                                10

Williams v. Wetzel, 222 A.3d 49 (Pa.Cmwlth.Ct.2019)                           14

Williams-Yulee v. Fla.Bar.,135 S.Ct 1656 (2015)                               13

Yellowbear v. Lampert, 741 F.3d 48 (10th Cir.2014)                            13

Knott v. Mclaughlin, 2019 U.S.Dist.LEXIS 51364 (MD.Ga.Mar.27, 2019)

Williams v. Beard, 2016 U.S.Dist.LEXIS 65245 (MD.Pa.May 18,2016)

Cannon v. Moore, 2021 U.S.Dist,LEXIS 11883 (MD.Pa.Jan 21,2021)

Vega v. Lantz, 2013 U.S.Dist.LEXIS 167797 (D.Conn.Nov 26,2013)

Tormasi v. Lanigan, 363 F.Supp.3d 525 (D.N.J.Jan 28,2019)

REGULATION

37 Pa.Code §93.3(h)(6)                                                        14

JA296

| STATUTES | PAGES |
|---|---|
| 42 U.S.C. §2000cc-1(a)(1)-(2) | 5, 12 |
| 42 U.S.C. §2000cc-5(7)(A) | 4 |

| RULES | |
|---|---|
| Fed.R.Civ.P. 56 | 2-3, 17 |
| Fed.R.E. 210(f) | 11 |

iii

## I. Counter Statement of The Case

Plaintiff, Fernando Nunez Jr.,("Nunez"), is state prisoner confined within the Pennsylvania Department of Corrections ("Department"). He filed the operative amended complaint ("AC") in this case on April 9, 2019. (Doc 34). Remaining defendants' are the Secretary of the Department, George Little, and then regional deputy Secretary Tabb Bickell. In his AC, Nunez asserted that his religious exercise is being substantially burdened, in three ways, by several policies of the Department, in violation of The Religious Land Use Institutionalized Persons Act ("RLUIPA"). First, he alleges the Departments' policy prohibiting private conjugal visits with his spouse violates his sincere Islamic beliefs. Specifically, he avers that he was permitted to marry in 2013, but was prohibited from consummating his marriage consistent with his religious beliefs. (Doc 34 at ¶¶ 7-10). He is seeking on-going conjugal visits to allow them to privately engage in intimate acts with one another consistent with Islamic practice. Such as: light talk, love expressions, touching, caressing, kissing, fondling, and sexual intercourse. (Doc 34 at ¶¶ 11-13). Second, he is seeking to be able to engage in group prayer in a designated space in the visiting room with his visitors. (Doc 34 at ¶ 68 & ¶ 73). Third, he seeks a circumcision for religious reasons and to have the defendants' incur the costs for the surgery. (Doc 34 at ¶¶ 90-95, ¶ 99 & ¶ 101).

Nunez is seeking injunctive relief in the form of enjoining the defendants from enforcing the Department policies at issue so as to not continue to substantially burden his sincere religious beliefs and order the defendants in this action to implement a family/conjugal visit program, and execute policies and practices that will accommodate his religious beliefs. (Doc 34 at ¶ 106).

1

## II. Counter Statement of Relevant Factual History

Nunez is a devout Muslim who converted to the Islamic faith in 2003. (Doc 34 at ¶ 7). When incarcerated at SCI Huntingdon he submitted three religious accommodation requests ("RAR") for: (1) private conjugal visits with his spouse; (2) to congregate in prayer with his visitors during contact visits, and (3) to be circumcised. (Doc 34 at ¶ 15). His RAR for conjugal visits was denied due to safety, security, and health concerns. (Plt's App'x at 29). His RAR for congregational prayers with his visitors was denied because the request creates a safety concern, pose a major distraction to families of other inmates, and lack of space to accommodate every inmate. Id. Lastly, his RAR for circumcision was denied because it is medically unecessary, considered elective surgery, and costly. Id. Nunez filed seperate grievances for each denial and all of them were denied for the same reasons noted in defendant Bickell's April 6, 2015 denial notification. (Doc 80, Defs' App'x at B, I, K).

## III. Standard of Review

Summary judgment is only appropriate where the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). Facts that could alter the outcome are "material facts", and disputes are "genuine" if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The initial burden is on the party seeking summary judgment to identify evidence that demonstrates an absence of a genuine issue of material fact by citing to particular parts of materials in the record to satisfy its burden under Fed.R.Civ.P. 56(c)(1)(A). Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

2

After the party moves for summary judgment, the nonmoving party must answer by setting forth genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. Anderson, supra, at 250. This can be shown by showing that the materials cited by the defendants do not establish the absence of a genuine dispute. Fed.R.Civ.P. 56(c)(1)(A)-(B). Furthermore, a party opposing a motion for summary judgment must comply with Local Rule 56.1. If a party fails to properly support an assertion of fact, or address another party's assertion of fact, the court may consider the fact undisputed for the purpose of the motion. Fed.R.Civ.P. 56(e)(2). In ruling on a motion for summary judgment, the court must use the same evidentiary standard that would apply to trial. Anderson, supra, at 252. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed.R.Civ.P. 56(c)(2). Inadmissible hearsay should not be considered during summary judgment. Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir.2009). Declarations used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated. Fed.R.Civ.P. 56(c)(4). Declarations must also contain facts demonstrating a basis for the declarant's claim that the statements are based on their personal knowledge. Maldonado v. Ramirez, 757 F.2d 48, 50-51 (3d Cir.1985). Conclusory, self-serving declarations lacking in specific fact, have no probative value and are insufficient. Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir.2018).

3

## IV. Counter Statements of Questions Presented

1. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ'S CONJUGAL VISIT CLAIM; FACTS ARE IN DISPUTE AS TO WHETHER THE DEFENDANTS MET THEIR BURDEN IN PROVING A COMPELLING GOVERNMENTAL INTEREST AND LEAST RESTRICTIVE MEANS TO JUSTIFY ITS POLICY PROHIBITING PRIVATE CONJUGAL VISITS.

2. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ'S CONGREGATIONAL PRAYER CLAIM; FACTS ARE IN DISPUTE AS TO WHETHER THE DEFENDANTS MET THEIR BURDEN IN PROVING ITS ALLEGED COMPELLING GOVERNMENT INTERESTS AND LEAST RESTRICTIVE MEANS TO JUSTIFY ITS POLICY PROHIBITING NUNEZ FROM CONGREGATING IN PRAYER WITH HIS VISITORS DURING A CONTACT VISIT.

3. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ CIRCUMCISION CLAIM BECAUSE GENUINE FACTS ARE IN DISPUTE AS TO WHETHER THE DEFENDANTS HAS MET THEIR BURDEN IN PROVING A COMPELLING INTEREST IN DECLINING NUNEZ CIRCUMCISION SURGERY.

## V. Arguments

To prevail on his RLUIPA claims Nunez must establish his religious belief is sincerely held and that the defendants actions created a "substantial burden" on the exercise of his religious beliefs. Cutter v. Wilkinson, 125 S.Ct 2113, 2124 (2005). "Religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."42 U.S.C. §2000cc-5(7)(A) Nunez has the initial burden of proving that his religious exercise has been burdened, and that the burden is "substantial". In Washington v. Klem, 497 F.3d 272 (3d Cir.2007) the Third Circuit Court of Appeals held that:

> [a] substantial burden exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs. Id. at 280.

JA301

RLUIPA's substantial burden inquiry asks whether the government has substantially burdened a religious exercise, not whether the RLUIPA claimant is able to engage in other forms of religious exercise. Holt v. Hobbs, 135 S.Ct 853, 862 (2015). If Nunez proves that the government substantially burdened his religious beliefs, the burden then flips and the government must demonstrate that imposition of the burden on Nunez is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. §2000cc-1(a). Under RLUIPA, the government cannot discharge this burden by pointing to "broadly formulated interest." Ramirez v. Collier, 142 S.Ct 1264, 1278 (2021). It must instead "demonstrate that the compelling interest test is satisfied through application of the challenged law to the particular claimant whose sincere exercise of religion is being substantially burdened. Id. A conclusory statement is not enough. Washington, supra, at 283. And a Court can not defer to a government's mere "conjecture" or "speculation". Ramirez, supra, at 1280 (speculation is insufficient to satisfy the government's burden, and fails to engage in the sort of case-by-case analysis that RLUIPA requires). In this case, the government defendants has not carried its burden under RLUIPA "demonstrating" that they have a compelling interest in refusing to grant all three of Nunez's RAR's. And they certainly failed to prove that refusing those RAR's is the least restrictive means of furthering any compelling interest.

## PRIVATE CONJUGAL VISITS

A. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ'S CONJUGAL VISITS CLAIM BECAUSE GENUINE FACTS ARE IN DISPUTE AS TO WHETHER THE DEFENDANTS MET THEIR BURDEN IN PROVING A COMPELLING GOVERNMENT INTEREST OR LEAST RESTRICTIVE MEANS TO JUSTIFY ITS POLICY PROHIBITING PRIVATE CONJUGAL VISITS.

JA302

From the outset, it is worth noting here that the defendants have not challenged the sincerity Of Nunez's religious beliefs or practices. But they do argue that his religious exerise to be intimate with his spouse is not being substantially burdened, despite his inability to have sexual contact with her, because the Department's marriage and visiting policies do permit him and his spouse to share a brief kiss and embrace after marriage. (Doc 80 at Def's App'x C, DC-ADM 812 Section 1.D.1 ; App'x D, DC-ADM 821 Section 2.B.5). In so arguing, they ignore the fact that such an intimate act like "kissing and embracing" is an intimate act itslef which Nunez sincerly believes must be done in private, behind closed doors, away from small children and other adults. (Plt's App'x at 1, ¶¶ 5-6). And further ignores : Nunez sincere beliefs that he must consummate his marriage with his spouse by first leading a congregational prayer with her, BEFORE, he can even be intimate with her. (Doc 34 at ¶¶ 10). Furthermore, because Department policies prohibit Nunez from having sexual contact with his spouse after marriage, he is being compelled to modify his religious beliefs by practicing celibacy. A sinful act prohibited in Islam. (Plt's App'x at 1, ¶ 2). Yet, the defendants would have this court believe allowing Nunez to engage in an intimate act like "kissing or embracing" his wife after their marriage and contact visits - when meeting and departing - is acceptable. It is not!

Nunez and his spouse is prohibited from even engaging in the smallest form of intimacy such as snuggling against one another, holding hands or grooming one another. Nunez can't even wipe away his spouse's tears or whisper in her ear to avoid other inmates and visitors from over hearing his light talk with her about intimate and personal matters. (Plt's App'x at 1, ¶ 23). If Nunez were to do any of the above intimate acts during a contact visit, he risks having his visit terminated, suspended, or receiving a misconduct. (Plt's App'x at 35, page 7).

JA303

The Department's marriage and visiting policies certainly places a substantial burden on Nunez's sincere religious beliefs and practices because if he contravenes those policies and engage in intimate acts with his spouse during a contact visit, he will face disciplinary action. The defendants policies therefore puts substantial pressure upon Nunez to modify his religious exercise in such a way as to substantially burden his religious exercise. Holt, supra, at 862 (A prison policy that puts substantial pressure on an inmate to modify his religious exercise under threat of disciplinary action substantially burdens one's religious exercise under RLUIPA).

Notwithstanding, the defendants argues, in the alternative, that they have several legitimate penological interest in preventing Nunez from having private conjugal visits. None of which they proved to be "compelling governmental interests", because they merely allege hypothetical concerns of security, health, and safety, without demonstrating how the policies at issue is satisfied when applying their asserted "compelling interest" to Nunez. As explained in Holt, supra, RLUIPA requires a reviewing Court to scrutinize the asserted harm of granting specific exemptions to a particular religious claimants and to look to the marginal interest in enforcing the challenged government action in that particular context. Holt, supra, at 863. In this case, that means the enforcement of the Department's policies categorically banning conjugal visits. Defendants here argue that placing a categorial ban on private conjugal visits serves a general in prison security, safety, and health. And that there is really no least restrictive alternative to Nunez's request for private conjugal visits. Nunez will address each of their broadly formulated interest infra.

7

## 1. Security

It is simply insufficient to permit prison officials to defeat a RLUIPA claim merely by asserting a general interest in prison security. Of course prison officials have an interest in security, but that is not the question. Invocation of such "broadly formulated interest," standing alone is not enough. Washington, supra, 497 F.3d at 283 (Even in light of deference to prison authorities, the mere assertion of security or health reasons is not enough for the Government to satisfy the compelling governmental interest requirement). RLUIPA contemplates a "more focused" inquiry and "requires the Government to demonstrate that the compelling interst test is satisfied through application of the challenged law to the person" - the particular claimant whose sincere exercise of religion is being substantially burdened. Holt, supra, 135 S.Ct at 863. In otherwords, the question is whether the defendants' categorical ban on private conjugal visits is the least restrictive means of furthering a compelling interest. In this case, the defendants has argued that prohibiting private conjugal visits is necessary to prevent the smuggling of contraband into the Department and goes on to suggest that it would be very difficult to monitor whether any contraband was being passed between the parties during long kisses, long embraces, and/or sexual acts. In attempt to substantiate its security concern, they have appended the declaration of the Chief of Security, Scott Woodring, (Doc 80 Def's App'x at E), who merely expresses hypothetical ways in which contraband can be passed between inmates and visitors. He offers no fact based record evidence that Nunez himself or his spouse has smuggled contraband into the Department or that Nunez or his spouse actually is a threat to security. Nunez, however, has explicitly stated in his declaration that his spouse has never been prevented from visiting him and she has never posed a threat to security so as to prohibit her from visiting him, and he has never been

8

issued a prison charge for smuggling drugs into any prison. Nor has he ever been issued a prison misconduct for violating any visiting policy or rule. (Plt's App'x at 1, ¶ 25 and ¶ 30). Therefore, the defendants argument and reliance on Woodring's declaration comes down to conjecture regarding what an inmate, in general, might do in some future case if private conjugal visits were allowed. The Supreme Court in Ramirez has rejected such hypothetical fears. While noting,"Such speculation is insufficient to satisfy [defendants] burden, and fails to engage in the sort of case-by-case analysis the RLUIPA requires. Ramirez, 142 S.Ct at 1280. Here, Nunez is seeking private conjugal visits with his spouse. Not some girlfriend or random friend. The defendants hypothetical fears of what some random inmate or visitor, in general, might do is simply irrelevant. That is because Nunez's RLUIPA claim must be evaluated in light of the specific concerns presented by Nunez as an individual. Holt, supra, 135 S.Ct at 863 (RLUIPA requires Courts to scrutinize the asserted harm of granting specific exemptions to particular religious claimants and look to the mariginal interest in enforcing the challenged government action in that particular context). Contrary to what defendants would have this court believe, Nunez does not pose a direct threat regarding the introduction of contraband into the Department. They have presented no direct or admissible evidence to substantiate that assertion other than the vague conslusory statement made in Woodring's declaration. (Doc 80 at ¶ 11, ¶ 21 and ¶ 30). That is not enough. Washington, supra, 497 F.3d at 283 (Noting even in light of the substantial deference given to prison authorities, the mere assertion of security and conclusory statement is not enough to satisfy defendants burden under RLUIPA). Nor, is it sufficient evidence during summary judgment. Paladino v. Newsome, 885 F.3d 203, 209 (3d Cir.2018)(self-serving statments that do not point to specific facts is insufficient to survive summary judgment). Indeed, such a vague conclusory

JA306

statement, is not even supported by factual evidence in the summary judgment record. Woodring's declaration, is merely a general hypothesis of what Defendants believe might be true. Waterman v. Farmer, 183 F.3d 208 (3d Cir.1999)(deference to the decisions that prison officials make based on the facts, but not their statements of what the facts are). Defendants' know full well that drugs and other contraband are smuggled into its facilities in a variety of ways, (Plt's App'x at 30), but by far, its mainly smuggled into its prison by Department staff. (Plt's App'x at 38, page 3-4, 7-8). And also by incoming mail. (Plt's App'x at 16 and 23). defendants' have all publicly stated that,"The safety and security of staff and inmates is paramount to the Department." (Plt's App'x at 21, page 2/11). And further stated "[a]ny risk of drugs entering a prison is too much. Having drugs come in and having our staff exposed and inmates overdose is unacceptable...We'll use whatever means necessary to stop that." (Plt's App'x at 38, page 3). Yet, they have not terminated contact visits. (Plt's App'x at 24-25). But has added security measures such as doubling all staff in visit rooms, body scanners, and Ion scanners. (Plt's App'x at 30, ¶ 3, ¶ 5, and ¶ 7-8 ; Also see App'x 1, ¶ 10, ¶ 16). However, unlike inmates, Department staff are not required to pass through a body scanner before entering any Department facility. Although the Defendants proclaimed objectives are to stop the flow of contraband. (Plt's App'x at 16, page 66-67; And App'x 38)

Defendants go on to rely on Woodring's declaration to defend its marriage and visiting policies that limits physical contact. Reasoning, that denying Nunez request for conjugal visits serves the legitimate penological interest of preventing contraband from entering the prison via private contact visits. (Doc 80 Def's App'x at E, ¶ 21). But as already noted above, those assertions amount to nothing more than conjecture and speculation that has not been substantiated by any facts or evidence.

10

JA307

Nunez on the other hand introduces comments made by the defendants' to the general public and news media detailing the steps the Department has taken to combat the smuggling of drugs and other contraband into its prisons. (Plt's App'x at 21, page 2/11 - 5/11; App'x at 22, page 9/11; App'x at 30). This Court can take judicial notice of such information under Fed.R.E. 210(f) because it suggest the technological advances made by the Department are sufficiently adequate to address its security concerns in a least restrictive way to combat the smuggling of drugs and other contraband from entering its visiting rooms throughout all their prisons. A point of fact never argued or even considered in the case of Thomas v. Corbett, 206 A.3d 686 (Pa.Cmwlth.2019).

In response to Nunez's interrogatory responses defendants stated that requiring Nunez's spouse to pass through a body scanner, before every conjugal visit, will not satisfy their security concerns. (Plt's App'x at 14, ¶ 20 ; App'x at 15, ¶ 3). But they did not elaborate why. But they did admit that they did not consider or review any documented evidence - other than Nunez's RAR and Department policy - when denying Nunez's RAR for conjugal visits. (Plt's App'x at 14, ¶ 11 & ¶ 23).

Installing body scanners in all its prisons serves as a least restrictive means of achieving the Departments desired goal of stopping drugs and other contraband from entering its prisons through the contact visiting rooms. And Nunez suggest that the Department's current visiting policies now in place is sufficient to serve as a least restrictive means. Indeed, full body scanners have been installed in many prisons across the nation to detect and stop the flow of drugs and contraband from entering its prisons. (Plt's App'x 18). A fact, defendants themselves recognized when announcing its findings to the public. (Plt's App'x at 30).

JA308

At SCI Mahanoy, a Custody Level 3 ("CL-3") prison, where Nunez is confined currently requires ALL inmates to be stripped searched before every contact visit consistent with Department policy DC-ADM 203, (Plt's App'x at 6), and given clean visiting clothes prior to each visit. (Plt's App'x at 9, page 17). After every contact visit, ALL inmates must pass through a full body scanner and then stripped searched for contraband before being allowed to return back to their housing unit. (Plt'a App'x at 1, ¶¶ 10-11 & ¶ 17). Nunez suggests that these security practices are sufficient to satisfy the Departments security concerns in a way that is least restrictive. Similar to other prisons across the nation. The defendants failure to prove that its marriage and visiting policies is the least restrictive fails to satisfy RLUIPA's mandate under 42 U.S.C. §2000cc-1(a).

Indeed, the Department's contact visitation policy also proves to be substantially underinclusive, because it allows small children, (5 years or younger) to be held by an inmate on his/her lap, for an unspecified amount of time. (Plt's App'x at 35, page 5). But Department policy prohibits Nunez and his spouse from snuggling, holding hands, embracing eachother for long periods of time, or wipe away eachothers tears. (Plt's App'x at 1, ¶ 9, ¶ 23-24 and; App'x at 35, page 7). It is difficult to reconcile how allowing a small child to sit on an inmate's lap, for an unspecified amount of time, is less of a security concern than allowing Nunez and his spouse to snuggle, hold hands, or embrace one another (beyond the meeting and departing period). Surely, drugs and other contraband can just as likely be passed from a small child to an inmate no different from any other adult visitor. Which is exactly what the defendants "speculate" what would happen if they allow Nunez and his spouse to engage in even the smallest form of intimacy like long embraces. (Doc 78 at page 11).

In his declaration Nunez has asserted that light talk, love expressions, touching, and caressing are all small forms of intimacy, (Plt's App'x at 1, ¶ 6) and therefore considered a religious practice under Islam. (Plt's App'x at 1, ¶ 5 & ¶ 23). Indeed, Nunez sincerely believes to engage in any intimate act with his spouse is a noble act of obedience to Allah to which he acquires good deeds by virtue of honoring his spouses religious rights over him for, inter alia, kind treatment, entertaining her, fairness, company and intimacy. (Doc 34 at ¶¶ 39-44, ¶¶ 46-49). Yet, defendants argue otherwise, despite the fact that their policies limits or prohibits Nunez and his spouse from engaging in any physical contact beyond meeting and departing. (Plt's App'x at 1, ¶¶ 23-24 and; App'x at 28), but they do not place those same limitations on small children visitors who are permitted to sit on an inmates lap for an unlimited amount of time. Under such circumstances, a prison's policy "underinclusiveness" is relevant to the issue of a compelling interest. Williams-Yulee v. Fla. Bar., 135 S.Ct 1656, 1668 (2015)(Stating,"Underinclusiveness can also reveal that a law does not advance a compelling interest). Thereby, raising an inference that the prison's claimed interest in "security" isn't actually so compelling after all. Yellowbear v. Lampert, 741 F.3d 48, 60 (10th Cir.2014). If a policy is underinclusive, the prison must provide "an adequate explanation for its differential treatment" in order to avoid the conslusion that the policy does not serve a compelling interest. In otherwords, a policy that is substantially underinclusive because it permits the prohibited conduct for some inmates but not others, cannot satisfy strict scrutiny unless the government provides an adequate explanation for the discrepancy. Holt, supra, 135 S.Ct at 865-866. Defendants has done none of that.

13

Instead, they argue that the Pennsylvania Administrative Code prohibits Nunez from having "private visits" with his spouse because all contact visits in Pennsylvania are required to take place under "official supervision" under 37 Pa.Code §93.3(h)(6). This Court should not be pursuaded by such an argument because the defendants interpretation of the relevant admininstrative code is plainly erroneous, and inconsistent with its Department visiting policy that do permit Official visitors to meet "privately" with ANY inmate in their cell or room where they are confined. (Doc 80 Def's App'x at C, DC-ADM 812 Section 2.B.4). Clearly, the defendant's interpretation of the regulation at issue, is nothing more than a convenient litigation position, and should not be given any deference. Christopher v. Smithkline Beecham Corp., 132 S.Ct 2156, 2166 (2012); Williams v. Wetzel, 222 A.3d 49, 55 (Pa.Commw.2019)(finding Department's interpretation of regulation unreasonable because it was not free from doubt). If anything at all, this Court should find the Department's visiting policy substantially underinclusive, because the Department permits official visitors to meet privately with an inmate in their cell or room where they are confined, for nonreligious conduct, but categorically prohibits Nunez and his spouse from privately visiting one another to engage in religious conduct. Furthermore, unlike regular contact visits, non-contact visiting rooms are not monitored or recorded by surveillance cameras. (Plt's App'x at 1, ¶¶ 19-20). Nunez has proposed allowing him and his spouse to use the non-contact visiting room booth in such a way as to allow them to be intimate with one another in private, away from small children and other adults, but the defendants has not even considered it as a least restrictive means. (Plt's App'x at 14, ¶ 25; and App'x at 15, ¶ 13 & ¶ 25).

14

Nor have they considered family/conjugal visitation programs in other state prisons in states like, California, Washington, and New York. (Doc 34 at ¶¶ 26-27). A fact they themselves admitted when responding to Nunez's interrogatories. (Plt's App'x at 14, ¶ 12 & ¶ 24; App'x at 5, ¶ 12). Subsequently, defendants have not satisfied their burden in showing that the Department's policy categorically banning private conjugal visits is a least restrictive means in protecting its "broadly formulated" interest in security. Particularly, since several prisons across the nation permit some form of private family/conjugal visits, despite such security concerns. (Plt's App'x at 34, pages 5-6, and; App'x 31, pages 1-4). The defendants failure to explain why other state prisons across the nation, with the same compelling interest in security, are able to accommodate the same practice demonstrates that the defendants failed to use the least restrictive means available so as to not substantially burden Nunez's religious exercise. See Holt, supra, 135 S.Ct at 866 (Explaining when other prisons allow a specific practice, either for any reason or a religious reason, is a relevant factor to a determination that the Department could satisfy its security concerns through a means less restrictive then denying a prisoner the exemption he seeks) also see Washington, supra, 497 F.3d at 385 (same).

## 2. Health

From the outset, Nunez has consistently maintained that he has no sexually transmittable infections ("STIs") to spread and has received all three (3) vacination shots for Hepatitis. (Plt's App'x at 1, ¶ 27). A fact apparent in his medical file which the Department possess. (Plt's App'x at 11). Yet, defendants argue otherwise. Asserting that the Department has a general interest in protecting the health of inmates in general from contracting or spreading STIs throughout its prisons. (Doc 79 at page 12-13).

15

The problem with the defendants argument is that its based on pure speculation. And not based on any facts or evidence within the summary judgment record. So the defendants reliance on the declaration of Arlene Seid do not substantiate their fears. That is because the declaration speaks in general terms on how STIs can be spread and physical complication on one's health "if" one contracts an STI. Amounting to nothing more than a 'broadly formulated' interest, coupled with speculation on how inmates health may be placed in danger if conjugal visits were allowed. That sort of fear and speculation is insufficient to satisfy the defendants burden, and fails to engage in the sort of case-by-case analysis that RLUIPA requires. Ramirez, 142 S.Ct at 1280. Here, Nunez has shown he has no STIs to spread. And that he is not seeking conjugal visits with some random visitor. His request for conjugal visits is confined to having such visits with his legal spouse, to engage in intimate acts with her in private.

When Nunez suggested to have his spouse undergo a medical screening test as a pre-condition to being approved for a conjugal visit, defendants denied any such suggestion as a least restrictive means. (Plt's App'x at 14, ¶¶ 14-15 & ¶ 17 ; App'x at 15, ¶¶ 8-10). And they also denied providing Nunez and his spouse with condoms would serve as a least restrictive means aswell. (Plt's App'x at 14, ¶ 18 ; and App'x at 15, ¶ 15). The defendants has essentially rejected the same practices implemented in other state prisons that require every inmate and legal spouse to undergo a medical screening test before being approved for a private conjugal visit, in order to protect the health of inmates and stop the spread of STIs. (Plt's App'x at 42, pages 4-6 ; App'x at 41, page 10). And did so without considering the policies and practices for conjugal visits in those state prisons like New York and Washington. (Plt's App'x at 14, ¶ 12 & ¶ 24, and; App'x at 15, ¶ 12)

16

Comparison between prison institutions are analytically useful when considering whether the government is employing the least restrictive means. Indeed, the failure of a defendant to explain why another prison with the same compelling interest was able to accommodate the same practices may constitute a failure to establish that the defendant was using the least restrictive means. Washington, supra, 497 F.3d at 285. Also see Shakur v. Schriro, 514 F.3d 878, 890-91 (9th Cir.2008). In sum, Nunez has shown that requiring him and his spouse to undergo a medical screening test for STIs qualifies as a least restrictive means which protects the defendants interest in health.

Additionally, the defendants fleeting reference to "cost concerns" should be rejected outright. They failed to present specific facts and evidence to substantiate those concerns pursuant to Fed.R.Civ.P. 56(e)(1). The conclusory statement made in Woodring & Seid's declarations are simply not enough. (Doc 80 Def's App'x at E, ¶ 37 & ¶ 41 ; App'x at F, ¶ 18). Shakur v. Schriro, 514 F.3d 878, 890 (9th Cir.2008)(conclusory declarations that do not affirmatively show personal knowledge of specific facts are insufficient). Such is the case when considering the fact that the Declaration of Arlene Seid, is not even based on "personal knowledge". She merely avers that her declaration speaks on matters "[t]o the best of knowledge, information and belief." (Doc 80 Def's App'x at F, page 6).

3. Safety

The defendants go on to "speculate" that if private conjugal visits were allowed, there is the potential for a crime of sexual assualt to occur on government property. They go on to reference the declaration of Arlene Seid, generally, (Doc 78 at page 14), who offers no specific facts, or evidence to substantiate her conslusory statement in that regard. Nor any statistical evidence.

JA314

Seperate and apart from the fact that her declaration is not based on her "personal knowledge", she is simply not competent to speak on such matters relating to human behavior. Her declaration should thus be striken under Fed.R.Civ.P. 56(c)(4). Especially since academic research on the issue demonstrates that conjugal visits correlate with fewer sexual assualts in prison. (Plt's App'x at 37 and; App'x at 39, page 5-9). In fact, academic scholars who researched this issue has shown permitting conjugal visits leads to positive inmate behavior and strengthens family ties and eases a prisoner's transition home upon release. (Plt's App'x at 34, page 5-6). A fact recognized by prior Department officials and politicians as far back as 1987. (Plt's App'x at 17).

Defendants fears are unfounded and indeed speculative. They have not evaluated Nunez's RLUIPA claim in light of the alleged safety risk they claim Nunez poses if he is allowed to have private conjugal visits with his spouse in a manner RLUIPA requires. Indeed, they have stated as much when responding to Nunez's interrogatories. (Plt's App'x at 14, ¶ 11 & ¶ 22). Nor have they presented specific facts or evidence to suggest that Nunez poses a safety risk to his spouse if they were allowed to visit one another privately. Therefore, their argument comes to conjecture regarding what Nunez may hypothetically do to his spouse in the future. Such speculation is insufficient to satisfy defendants burden, and fails to engage in the sort of case-by-case analysis that RLUIPA requires. Ramirez, supra, 142 S.Ct at 1280.

Furthermore, Nunez has specifically asserted in his declaration that it is a sin for him to force his spouse to engage in any intimate act with him against her will and he has no criminal conviction for domestic violence or ever acted violently towards his spouse. In fact, the Department itself has classified Nunez as a CL-3 inmate who exhibit "non assaultive" behavior. (Plt's App'x at 1, ¶ 18, ¶¶ 28-29).

JA315

Defendants arguments aside, their visiting policy is substantially underinclusive because they permit "official visitors" to privately meet with inmates in their cell or seperate room, (Doc 80 Def's App'x at C, DC-ADM 812 Section 2.B.4.a-b.), a non-religious practice, but they prohibit Nunez and his spouse from engaging in that same practice for a religious reason. Notwithstanding, that the Department has expressed that they will assume no liability for any visitors injuries or damage to property or loss of property as a result of a person entering a visiting area or any other area within a facility. (Plt's App'x at 35, page 1 ; App'x at 8). Such evidence of the Department's policy underinclusiveness casts significant doubt on both whether the government's asserted interest is compelling and whether their policy actually is the least restrictive means of furthering that interest. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547 (1993)(A law cannot be regarded as protecting a compelling interest when it leaves appreciable damage to that supposedly vital interest unprohibited)(Cited in Holt, supra, 135 S.Ct at 866).

At bottom, the defendants ; failed to show that a categorical ban on private conjugal visits with Nunez's lawful spouse, is the least restrictive means of accomplishing any of their asserted goals because they have done nothing to rebut obvious alternatives. Such as reconfiguring non-contact visiting room booths in such a way as to allow Nunez and his spouse to intimately entertain one another in complete privacy or to place module/mobile homes on prison grounds, to accommodate such conjugal visits. Similar to other states. Such as: New York (Plt's App'x at 42), California (Plt's App'x at 43, page 3) and Washington. (Plt's App'x at 41, page 2-3 and; App'x at 34, page 5).

19

PRAYING IN VISITING ROOM WITH NUNEZ VISITORS

B. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ'S CONGREGATIONAL PRAYER CLAIM BECAUSE FACTS ARE IN DISPUTE AS TO WHETHER DEFENDANTS MET THEIR BURDEN IN PROVING ITS ALLEGED COMPELLING GOVERNMENT INTERESTS AND LEAST RESTRICTIVE MEANS TO JUSTIFY ITS POLICY PROHIBITING NUNEZ TO CONGREGATE IN PRAYER WITH HIS VISITORS DURING A CONTACT VISIT

It should be noted that the defendants seems to analyze all of Nunez's RLUIPA claims under the Turner's "legitimate penological interest" test. Rather, than the "compelling government interest" test. That is significant because RLUIPA is subject to the lower standard of a "legitimate penological interest" standard and provides greater protection for "any exercise of religion" than Turner. The Supreme Court made that clear in Holt, supra, 135 S.Ct at 862 (Noting RLUIPA provides greater protection for religious exercise that Turner). When analyzing Nunez's claim under RLUIPA, it is apparent that the defendants has not met its burden in "demonstrating" a compelling interest or least restrictive means.

Initially, when Nunez's RAR was denied, defendant Bickell NEVER asserted that his denial was grounded on a "security" concern. (Plt's App'x at 29). And certainly did not assert as much when responding to Nunez's interrogatory request. (Plt's App'x at 14, ¶ 16). Not even the former Secretary for the Department claimed a security concern when responding to Nunez's interrogatories. (Plt's App'x at 15, ¶¶ 21-22). The Defendants has consistently alleged a "safety" concern and nothing more. Suggesting that the defendants are merely advancing a "security" interest as afterthought. When in reality, it is merely an exaggerated concern based on nothing more than conjecture.

20

At any rate, their security interest is not compelling for the same reason Nunez argued why their asserted security concern, relating to his conjugal visit claim isn't compelling. See Pages 8-12, supra. The defendants reliance on the declaration of Scott Woodring, simply can not be relied upon to suggest otherwise. Particularly since he only articulates a general concern of how security maybe implicated, in general, if inmates were allowed to pray with their visitors during a contact visit. Thereby, asserting a "broadly formulated interest" in security. But as Nunez argued, supra, that is not enough. RLUIPA contemplates a more focused inquiry and requires the government to demonstrate that the compelling interest test is satisfied through application of the challenged law to the person's (Nunez). See page 8-10, supra.

In this case, Nunez is seeking to congregate in prayer with his visitors during his contact visit, in a designated space in the visiting room. Away from other children and visitors. (Doc 34 at ¶ 73). And his reasoning for doing so is because the defendants has implemented a state-wide policy that prohibits him from congregating in prayer with his visitors during their contact visit. Id. at ¶ 68. Nunez's religious faith ("Islam") considers a valid "congregational prayer" to consist of two or more Muslims gathering to pray. (Plt's App'x at 4, page 2 ¶ 2). When gathering to pray, Muslims must perform their prayers consistent with the pillars of the prayer. (Doc 34 at ¶ 67). One such pillar requires a Muslim to "stand". Not sit. Standing in prayer is mandatory and to do otherwise, without a valid excuse, invalidates the prayer and constitutes a sin. (Plt's App'x at 4, page 3 ¶¶ 7-9). And for a muslim to not congregate in prayer with another muslim, when an obligatory prayer is called, leads that Muslim to hell. (Plt's App'x at 4, page 3 ¶ 5 & ¶ 8).

21

As a result of the defendants general "no standing for prayer" policy, Nunez and his spouse can   not consummate their marriage. To consummate one's marriage as a Muslim, Nunez's faith requires him to lead a congregational prayer with is spouse, before he can even intimately approach her in private, following their marriage ceremony. (Doc 34 at ¶ 10). And are compelled to deviate from their sincere religious practice to congregate in prayer together during the prescribed times to pray. Causing me t delay my prayers (Dhuhr & Asr). (Plt's App'x at 1, ¶¶ 31-32).

Notwithstanding, what Nunez sincerely believes, the defendants would have this court believe that his religious exercise is not being substantially burdened because he can pray privately by himself in his cell or quietly in a seated position with his visitor in the designated visiting area. (Doc 78 at page 15). But those suggestions requires Nunez's to modify his religious practice in such a way as to invalidate his prayer and sin in the process. As Nunez stated in his declaration, congregating in prayer with his visitors, while standing, is obligatory. Not optional. (Plt' App'x at 1, ¶¶ 32-35). The defendants argument in that regard should be rejected. Holt, supra, 135 S.Ct at 863 (RLUIPA's substantial burden inquiry asks whether the government has substantially burdened religious exercise, not whether the RLUIPA claimant is able to engage in other forms of religious exercise).

As to Nunez's request to congregate in prayer with his spouse in private, Nunez has only requested it because he has not consummated his marriage. And the prayer with his spouse, is a pre-condition religious act that must be performed, before they can be intimate with one another. (Doc 34 at ¶ 10). It was also suggested as a least restrictive way to pray with his spouse in the same room where they can also entertain one another in private, away from other visitors.

JA319

Even more uncompelling, the defendants suggest that other inmates may request the same accommodations to pray with their visitors at the same time. Thereby, converting a neutral meeting space into one used for religious purposes. (Doc 78 at 16). For starters, the defendants has failed to offer any specific facts or evidence to prove that those asserted fact are valid. They only speculate such a concern. But as the Supreme Court made clear in Ramirez,"[S]peculation is insufficient to satisfy defendants burden, and fails to engage in the sort of case-by-case analysis the RLUIPA requires". Ramirez, 142 S.Ct at 1280. And to the extent that the defendants argument is that Nunez's request is administratively burdensome because it would lead to more requests for accommodation from inmates, such an argument is the "classic rejoinder of bureaucrats throughout history" rejected by the Supreme Court in Holt, supra, 135 S.Ct at 866. In fact, narrowing the pool of potential accommodations is what the sincerity requirement accomplishes: it ensures that accommodations are only available to the few who sincerely hold protected beliefs. Id at 866-67 (noting if prison officials suspect inmates are using accommodations in bad faith "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic). What the defendants fail to admit is that the Department's visiting policy : : currently creates a meeting place for religious and/or spiritual advisors to meet with inmates. (Doc 80 Def's App'x at D, DC-ADM 821 Section 2.B.2.)

In this case the defendants here as failed to meet its burden in proving that they considered an alternative least restrictive. Nunez, however, has proposed to have the defendants construct or designate a clean area in the visiting room to allow him and his visitors to pray, away from other other visitors. (Doc 34 at ¶ 71).

23

JA320

He has also proposed to allow him and his visitors to congregate in prayer with his visitors inside a non-contact visiting room when those rooms are unoccupied and available as readily available alternative. (Doc 34 at ¶ 73). But the defendants rejected each of those proposals. (Plt's App'x at 14, ¶ 16 and; App'x at 15, ¶¶21-22). Notwithstanding, that the Department has permitted prisons to construct or designate children play areas in visiting rooms per policy. (Doc 80 Def's App'x at C, DC-ADM 812 Section 1.A.4.). At SCI Mahanoy, where Nunez is held, they have constructed a large children play area, filled with toys, books, and TV's, that is constantly monitored with surveilance cameras. (Plt's App'x at 1, ¶ 22 ; App'x at 20).

The defendants has not explained why they cannot construct or designate a clean space Nunez and his visitors to congregate in prayer. And to the extent they have done so for non-religious activities, supports a finding that their asserted interests in "safety & security" is not so compelling after all. Especially, since the department has already made techological advaces throughout the department to stop the smuggling of drugs and other contraband from entering its prisons as noted in pages 10-12, supra. Indeed, with the defendants exaggerated security and safety concerns aside, one cannot seriously dispute that the Department's general rule prohibiting Nunez ; and his visitor from congregating in prayer, is substantially underinclusive. Given the fact that small children can have a designated space to play, and sit on an inmate's lap, for an unlimited time period, for a nonreligious reason, but yet refuse to construct or designate a clean area for Nunez and his visitors to pray for religious reasons, while under official supervision. The defendants has therefore failed to met its burden that denying Nunez's religious accommodation serves a compelling interest in security and safety, and that they considered alternatives that is least restrictive.

24

C. DEFENDANTS SHOULD BE DENIED SUMMARY JUDGMENT ON NUNEZ'S CIRCUMCISION CLAIM BECAUSE GENUINE FACT ARE IN DISPUTE AS TO WHETHER THE DEFENDANTS HAS MET THEIR BURDEN IN PROVING A COMPELLING INTEREST IN DECLINING NUNEZ CIRCUMCISION SURGERY

Nunez has alleged that he sincerely believes that circumcision is one of Allah's highest commandments and a sunnah ("way") of Prophet Muhammad, which all Muslims who convert to the religion of Islam must do as early as possible. (Doc 34 at ¶¶91-93). And because he converted to Islam uncircumcised he has difficulty in keeping his genitals clean. Leaving him in constant fear that his acts of worship, such as prayers, will not be accepted. (Doc 34 at ¶¶ 94-95). However, he maintains in his declaration that he is not seeking circumcision surgery solely to keep his genital area clean. He is requesting to be circumcised because it is obligatory for new Muslims who convert to Islam to be circumcised. (Plt's App'x at 1, ¶ 36). That is because getting circumcised is one of the clear and apparent practices that distinguishes Muslims from non-muslims. And also a means of completing and perfecting the fitra upon which Allah created all people. (Doc 34 at ¶¶ 91-92).

Despite acknowledging that Nunez's religious practice is being substantially burdened by denying him circumcision surgery, (Doc 78 at page 21), they assert that they have a compelling interest in avoiding administrative cost burdens. But administrative cost burdens is not so compelling under RLUIPA. Because RLUIPA explicitly acknowledges that it may be necessary to incur expenses in order to avoid placing substantial burdens on a prisoner's religious exercise. See 42 U.S.C. §2000cc-3(c). Leaving one to question whether administrative convenience and costs savings are actually compelling government interests. Memorial Hospital v. Maricopa County, 415 U.S. 250, 262-69 (1974). Particularly in this case.

25

JA322

Largely because the defendants rely on a conslusory declaration of Arlene Seid. Who's declaration is not even based on "personal knowledge". That is troubling because she has not explained that she researched the cost of circumcision surgery or how she came to know what traditional circumcsion surgery cost. Nor has presented any evidence to substantiate her alleged facts. She merely "speculates" The cost of circumcision surgery and "speculate" that complications and government resources may be spent if Nunez's surgery isn't successful. For his part, Nunez disputed the compentency of her declaration under Fed.R.Civ.P. 56(c)(2) and (c)(4). And has further argued that such speculative fears and concerns are insufficient under Ramirez, supra, 142 S.Ct 1280. Because she has not presented any facts or evidence to substantiate her fears.

Nunez has argued throughout his administrative grievance appeals that he will sign an "informed consent waiver" and assume any medical or liability risk that may or may not occur after surgery. To alleviate any concerns of the Department noted in defendant Bickell's denial notification. (Plt's App'x at 29). Yet, the defendants has not considered his proposal as a least restrictive means.

They simply rely on Vega v. Lantz, 2013 WL 6191855 (D.C.Conn.2013) to suggest that the same reasoning should apply. But fail to recognize that the decision in Vega was reached after a trial was held and a verdict was found in the defendants favor. Not only is Vega distinguishable on th facts, but its legal reasoning is in question aswell. Particularly, since it predates the Supreme Court's decision in Holt and appears to apply the Turner's "legitimate penological interest" test to Vega's RLUIPA claim which is not the governing standard under RLUIPA. Warsoldier v. Woodford, 418 F.3d 989, 997-98 (9th Cir.2005)(RLUIPA replaced the Turner test with a compelling government interest test).

26

JA323

Genuine material facts are in dispute as to whether the defendants has raised a comeplling interest in costs and administrative burdens and whether a least restrictive means is available to accommodate Nunez's religious exercise. Since Nunez has said, if the Department pays for his circumcision surgery, he will assume the risk or any complications is such was to occur.

## CONCLUSION

For the reasons argued, supra, the defendants motion for summary judgment should be denied.

Date: July 15, 2022

By, _Fernando Nunez_

Fernando Nunez Jr.

27

JA324

VERIFICATION

I, Fernando Nunez Jr., the plaintiff in this case, hereby verifies to have prepared the foregoing reply brief in response to the defendants motion for summary judgment, and that the statements of fact made herein are subject to the penalties of 28 U.S.C. §1746 (relating to unsworn falsification to authorities).


Date: July 15, 2022                    By: _____
                                           Fernando Nunez Jr.
                                           #FM8959
                                           SCI Mahanoy
                                           301 Gray Line Drive
                                           Frackville, PA 17931

## CERTIFICATE OF SERVICE

__ I, certify to have served the foregoing,"Reply Brief to Defendants' Motion For Summary Judgment," via first class mail, postage prepaid, upon the person(s) and addresses noted below.


Abby N. Trovinger, Esq.
Pa. Department of Corrections
1920 Technology Parkway
Mechanicsburg, PA 17050

Office of The Clerk
U.S. Middle District of Pennsylvania
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108


Date: July 15, 2022

s/ _Fernando Nunez_
Fernando Nunez Jr.
#FM8959
SCI-Mahanoy
301 Gray Line Drive
Frackville, PA 17931

JA326

Fernando Nuñez Jr.
#FM8959
SCI Mahanoy
301 Gray Line Drive
Frackville, PA 17931

INMATE MAIL
PA DEPT OF
CORRECTIONS

RECEIVED
HARRISBURG, PA

JUL 28 2022

PER _____
DEPUTY CLERK

Office of The Clerk
United States District Court
Middle District of Pennsylvania
U.S. Courthouse
228 Walnut Street
P.O. Box 983
Harrisburg, PA 17108



JA327

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of April, 2023, I caused a copy of this Joint Appendix – Volume II to be filed with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users, including:

Abby N. Trovinger
Chase M. Defelice
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050
atrovinger@pa.gov
chdefelice@pa.gov

/s/ *Ellen Crisham Pellegrini*
Ellen Crisham Pellegrini