UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

|                                         |   |                        |
|-----------------------------------------|---|------------------------|
| Fernando Nunez, Jr.,                    | . | Third Circuit: #22-3076 |
|                                         | . |                        |
| Appellant,                              | . |                        |
|                                         | . |                        |
| V.                                      | . |                        |
|                                         | . |                        |
| Tom W. Wolf,                            | . |                        |
| George Little,                          | . |                        |
| Tabb Bickell, Regional                  | . |                        |
| Secretary of DOC,                       | . |                        |
|                                         | . |                        |
| Appellees.                              | . |                        |

.....................................

        Transcript from the audio recording of the oral argument held November 1, 2023 at the United States Courthouse, 601 Market Street, Philadelphia, Pennsylvania. This transcript was produced by Writer's Cramp, Inc., certified court transcribers for the United States Court of Appeals.

BEFORE CIRCUIT JUDGES:

THE HONORABLE CHERYL ANN KRAUSE
THE HONORABLE ARIANNA J. FREEMAN
THE HONORABLE TAMIKA R. MONTGOMERY-REEVES

APPEARANCES:

| For Appellant: | Dino L. LaVerghetta, Esq. |
|                | Sidley Austin |
|                | 1501 K Street NW |
|                | Washington, DC 20005 |

| For Appellees: | Abby N. Trovinger, Esq. |
|                | Pennsylvania Department of Corrections |
|                | Office of Chief Counsel |
|                | 1920 Technology Parkway |
|                | Mechanicsburg, PA 17050 |

Transcribing Firm:        Writer's Cramp, Inc.
                                1027 Betty Lane
                                Ewing, NJ 08628
                                609-588-8043

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1        JUDGE KRAUSE:  We'll be hearing the case of <u>Nunez vs.</u>
2   <u>Wolf, et al.</u> and #22-3076.  And we will start with Mr.
3   LaVerghetta.

4        MR. LAVERGHETTA:  Yes.

5        JUDGE KRAUSE:  Am I pronouncing that correctly?  And
6   just to clarify, because I don't see on a brief, per se, are
7   you a student or are you with a --

8        MR. LAVERGHETTA:  No, I'm a partner in Sidley.  The
9   partner that was supposed to be arguing was hit by a medical
10  condition, and so I was asked to replace her for the argument.

11       JUDGE KRAUSE:  Very good.  A very youthful partner.

12       MR. LAVERGHETTA:  Thanks.

13  (Laughter)

14       MR. LAVERGHETTA:  Well, good morning, Your Honor.  I
15  appreciate the compliment.  May it please the court, Dino
16  LaVerghetta for Mr. Nunez, the Appellant.  I'd like to request
17  five minutes of time for my rebuttal.

18       JUDGE KRAUSE:  Granted.

19       MR. LAVERGHETTA:  Through RLUIPA, Congress has
20  mandated that burdens on inmates' religious exercise be
21  subject to strict scrutiny.  Congress has forbidden the
22  government from imposing substantial burdens on religious
23  activity unless it demonstrates, with evidence, that the
24  burden imposed on that specific person in that specific
25  circumstance furthers a compelling governmental interest and

1   is the least restrictive means of furthering that interest.

2   Here, however, the DOC and the district court below failed to

3   properly apply that demanding standard in relation to Mr.

4   Nunez's request to 1) engage in congregate prayer 2) receive

5   religious circumcision and 3) consummate his marriage.  In --

6          JUDGE KRAUSE:  Can you start with congregate prayer?

7   Because I take the positions of the parties that

8   notwithstanding the transfer to SCI Mahanoy, that when it

9   comes to the policies for conjugal visits or circumcision,

10   that that would apply across the board.  But at least as

11   proffered to us, although not in the record, per se, it

12   appears that there are some different conditions, such as the

13   availability of virtual communal prayer at Mahanoy.  How

14   should we factor that in?  Is the claim moot as to Huntington?

15   And how do we account for what we've been told that's not

16   currently part of the record?

17          MR. LAVERGHETTA:  Thank you, Your Honor.  So first

18   I'd like to begin, that statement was made in a letter brief

19   submitted in relation to a question of mootness as a result of

20   a question from this court.  The state did not -- admitted on

21   the circumcision claim and on the conjugal visit claim that

22   there was no mootness.  They also, if you read the letter

23   carefully, did not say that the case was moot because of the

24   allowance of virtual prayer.  What they did is use it as an

25   opportunity to try to submit a least-restrictive means

1    analysis or option that they never submitted as part of the

2    case.  I think it's too late.  It's clear that they didn't

3    consider the virtual prayer as an actual alternative means,

4    otherwise they would have brought it up.  Second point on this

5    is that virtual prayer is not what Mr. Nunez is asking for.

6    The Supreme Court is clear that it doesn't matter if somebody

7    is allowed to get -- engage in some other form of religious

8    exercise.  The question is, is their exercise here being

9    burdened.

10           JUDGE KRAUSE:  I appreciate that --

11           MR. LAVERGHETTA:  Yes.

12           JUDGE KRAUSE:  -- and, you know, as we've all lived

13   through COVID, I think we all have an appreciation for the

14   differences between a Zoom interaction and an in-person

15   interaction.  But if we're to consider here, you know, what's

16   been offered either in terms of whether it constitutes a

17   substantial burden or least-restrictive means, and the current

18   facility has some different conditions, how can we talk about

19   that in this appeal?

20           MR. LAVERGHETTA:  I mean, I respectfully submit that

21   the fact that they are offering virtual prayer is not relevant

22   here.  Religion -- there's a corporal component to religion

23   which is recognized throughout different religions.  Here what

24   he requires is congregate prayer.  That's specifically what he

25   asks for, not some other form of prayer.

1          JUDGE MONTGOMERY-REEVES:  Let me ask you a question.
2     Did the DOC ever point to a system-wide policy to explain why
3     it denied this accommodation?

4          MR. LAVERGHETTA:  Excuse me?

5          JUDGE MONTGOMERY-REEVES:  Did the DOC ever point to
6     a system-wide policy to explain why it denied this
7     accommodation?  So, for example, it's clear with respect to
8     the circumcision and the conjugal visits that there is a
9     policy that applies across all prisons, no matter what.  I'm
10    wondering if there's anything like that with respect to
11    congregate prayer.

12         MR. LAVERGHETTA:  I'm not sure, Your Honor.  In the
13    case at hand, the only interests that the state has advanced
14    are generalized interests related to security and contraband,
15    nothing specific to Mr. Nunez.  And they haven't -- there's
16    been no mention in this entire case of this virtual prayer
17    option, so of course there's been no sort of analysis as to
18    whether that is actually the least restrictive means.  The
19    Supreme Court has been very clear on this that the state bears
20    the burden of proving both 1) that it is a compelling interest
21    specific to this individual by offering evidence, and on the
22    least-restrictive means prong has to show that it considered
23    and rejected all reasonable alternative means.  Again, the
24    record is barren on this, and the only alternative means that
25    they submitted on congregate prayer was in the letter brief,

1    which again is a different form of exercise, not what Mr.

2    Nunez requested.

3            JUDGE KRAUSE:  But does the availability of virtual

4    congregate prayer go to the substantiality of the burden?

5            MR. LAVERGHETTA:  I'm sorry, can you repeat that,

6    Your Honor?

7            JUDGE KRAUSE:  Does the availability of virtual

8    congregate prayer go to the substantiality of the burden?

9            MR. LAVERGHETTA:  I don't believe so, Your Honor.

10   The state's rationale for banning congregate prayer here was

11   largely based upon the idea of contraband.  Mr. -- the record

12   is clear, and there is no dispute, that Mr. Nunez has never

13   violated any sort of prison rule related to contraband or --

14           JUDGE KRAUSE:  I'm asking a slightly different

15   question, which really goes to the prima facie case, and that

16   is if what's needed is in part to be engaged in prayer

17   simultaneously with the ability to see and exchange views and

18   auditory prayer with others, many of those things are provided

19   through virtual congregate prayer, and fully appreciating that

20   there are differences in being in person, but does that --

21   does the availability of that affect the substantiality of the

22   burden?

23           MR. LAVERGHETTA:  I do not believe so.  Again, I

24   think that virtual -- I think as we say in our brief, virtual

25   congregate prayer is an oxymoron.  The request here was to be

1   in the presence of a loved one or visitor and pray together.

2   Mr. Nunez advanced alternative means to do this.  He has said

3   if you are concerned about contraband, you can place us

4   further apart in the room.  You can have increased searches.

5   But again, as the court said in <u>Holt</u>, the question is not

6   whether the inmate can engage in some form of religious

7   exercise, it's whether or not his requested religious exercise

8   here was burdened.  And here that religious exercise was

9   congregate prayer, meaning actually to congregate with fellow

10  believers and pray.  Respectfully, the virtual prayer is not

11  an alternative.  That's --

12          JUDGE KRAUSE:  Well, counsel, isn't he able to do

13  that with other inmates?  This claim seems to relate to

14  congregate prayer with visitors during the visitor time

15  period.  And -- but although in other places there are some

16  general statements about an inability to engage in any

17  congregate prayer.  Which is it?

18          MR. LAVERGHETTA:  So, Your Honor, I do not know what

19  the prison's policies are related to congregate prayer with

20  fellow inmates.

21          JUDGE KRAUSE:  What's your client's claim?

22          MR. LAVERGHETTA:  I'm sorry?

23          JUDGE KRAUSE:  Is your client's claim as to

24  visitors?

25          MR. LAVERGHETTA:  He is not able to engage in

1     congregate prayer with visitors.

2          JUDGE KRAUSE:  Okay, but he is able to engage in

3     congregate prayer with other inmates, correct?

4          MR. LAVERGHETTA:  That I do not know, Your Honor.

5          JUDGE KRAUSE:  In the supplemental brief that -- I'm

6     sorry, in the supplemental complaint that he had offered up to

7     the court, he makes reference to Jumu'ah and to the Friday

8     prayers and placement of body oil before going to that Friday

9     prayer.  And ADM 819, the religious activity policy that's

10    mentioned in some of the responses and the grievances, talks

11    about that in a context that certainly makes it sound like

12    there is a weekly communal prayer.  Is that your understanding

13    of the record?

14         MR. LAVERGHETTA:  Again, that has -- you know,

15    prayer with other inmates is not what's at issue at the case

16    is what I'd argue.  Again, I think RLUIPA requires to look

17    very specifically at what this inmate is claiming, not -- the

18    state has not claimed during this litigation -- or has not

19    questioned his sincerely-held religious beliefs, right?  His

20    sincerely-held religious belief here is that he needs to pray

21    with his visitors, that he needs to engage in a specific

22    congregate prayer with them by getting -- there's a 14-step

23    prayer that he must do.  The state never said he didn't

24    believe that or never said that's part -- not part of his

25    religious obligation.  So with that being said, and then that

1  practice is banned, and as the court recently said in <u>Davis v.</u>
2  <u>Wigen</u>, if a prohibition is not a substantial burden, then
3  nothing is.  And I think that's how we have to take it.  The
4  state here never said, oh, well, he could pray with other
5  individuals; this is not really his religious belief.  Or he
6  can pray with other individuals; this is not a substantial
7  burden.  That claim was never made.

8          JUDGE KRAUSE:  I see, but you may be missing the
9  softball.  That is, if that is available in terms of communal
10 prayer, in that context, does that assist your argument in the
11 sense of there -- it's being provided you elsewhere, but not
12 being provided for the communal prayer with visitors?

13         MR. LAVERGHETTA:  Well, yes, Your Honor, I would say
14 that the Supreme Court has said that if you allow other
15 activities that allegedly endanger the same interest, then you
16 have to allow the religious activity as well.

17         JUDGE KRAUSE:  So is it your understanding of the
18 record that that is made available by the prison?

19         MR. LAVERGHETTA:  Based on the citations there, it
20 sounds like it, Your Honor, but I will get back to that on
21 rebuttal.

22         JUDGE KRAUSE:  I'm sure the prison can address that,
23 too.  We've only delved into a bit of congregate prayer and
24 I'm not sure we've even finished there.  So let me ask that we
25 add 20 minutes to both sides.  And you will have a green light

1    to continue.

2           MR. LAVERGHETTA:  Okay, I appreciate it.  So let me

3    just kind of set the table on -- basically there are four

4    major errors that we believe infect this case and nearly every

5    claim.  So the first is that the Supreme Court held in <u>Ramirez</u>

6    and <u>Mast</u> that broad formulations of harm are insufficient.

7    The government --

8           JUDGE FREEMAN:  <u>Ramirez</u> and <u>Mast</u>?

9           MR. LAVERGHETTA:  <u>Ramirez</u> and <u>Mast</u>, yes.

10          JUDGE FREEMAN:  So you're referring to the

11   concurrence in <u>Mast</u>?

12          MR. LAVERGHETTA:  Yes.

13          JUDGE FREEMAN:  I'm not sure I would characterize

14   that as a holding of the Supreme Court --

15          MR. LAVERGHETTA:  Okay.

16          JUDGE FREEMAN:  -- but a one-Justice concurrence.

17          MR. LAVERGHETTA:  Well, the government -- we can

18   rely on <u>Ramirez</u>.  The government has -- the Supreme Court has

19   said that the government may not rely on a broad interest, and

20   it's not a compelling interest in having a policy generally,

21   it's a compelling interest in not granting the exception

22   sought by a specific individual, given his or her specific

23   circumstances.

24          JUDGE KRAUSE:  Counsel, help us think about the

25   issue of slippery slope.

1        MR. LAVERGHETTA:  Yes.

2        JUDGE KRAUSE:  And part of what we've been hearing

3   for congregate prayer as well as the other relief your client

4   seeks is that if it's allowed, that it would be requested by

5   many other inmates --

6        MR. LAVERGHETTA:  Yes.

7        JUDGE KRAUSE:  -- and that the resources and burden

8   and security issues that would follow create a compelling

9   interest on the part of the DOC.  We're to look at this

10  specific case, but we're also told that we can take account of

11  the fact that this is in a prison setting.  Is there room to

12  account for a slippery slope concern after Holt and Ramirez?

13       MR. LAVERGHETTA:  Respectfully, I would argue no.  I

14  think the way that the Holt court characterized this was the

15  retort of bureaucrats throughout history.

16       JUDGE FREEMAN:  Well --

17       MR. LAVERGHETTA:  And Ramirez said you must --

18       JUDGE FREEMAN:  Is that in Ramirez?  Because I saw

19  that in Mast.

20       MR. LAVERGHETTA:  I'm sorry, I said --

21       JUDGE FREEMAN:  Was that in Ramirez?

22       MR. LAVERGHETTA:  I said Holt.

23       JUDGE FREEMAN:  In Holt.

24       MR. LAVERGHETTA:  Yes.

25       JUDGE FREEMAN:  Okay.

1          MR. LAVERGHETTA:  So -- and the court there said

2     we've rejected that rationale over and over again and we're

3     doing it yet again here.  And <u>Ramirez</u> said we have to take

4     each case one at a time.

5          JUDGE MONTGOMERY-REEVES:  So I just want to make

6     sure.  So is it your position that aggregate cost is never a

7     proper consideration?

8          MR. LAVERGHETTA:  No.  No, Your Honor.  So I -- what

9     the analysis has to be, so for example here, Mr. Nunez's

10     requested circumcision, the cost of that is argued somewhere

11     to be between $800 and $3,500.  The question here is whether

12     or not, right, the state can bear that cost.  They've been no

13     -- there's been no showing of fact here that the government's

14     resources have been strained.  Now down the line, should the

15     state get additional requests or resources become more

16     strained by accommodations, that can be taken into account,

17     but you have to in each individual case conduct a search and

18     inquiry as to whether or not the granting of the exception

19     would actually impact those interests, and --

20          JUDGE MONTGOMERY-REEVES:  So the -- based on your

21     position, they would have to pay for the procedure or whatever

22     is the issue until their resources are strained?

23          MR. LAVERGHETTA:  If in a future case, and I think

24     that's an important concept to stress here, right, in grant --

25     we would argue that the law requires a finding for Mr. Nunez

1  in all three claims.  But that doesn't require a broad policy

2  change.  And I think that the Supreme Court is clear on this

3  in <u>Ramirez</u>.  You have to analyze each claim one at a time.  So

4  he -- so Mr. Ramirez may be granted an exception here.  So the

5  state will have to pay for the circumcision.  They'll have to

6  allow him to engage in congregate prayer.  They'll have to

7  allow him to consummate his marriage.  However, that does not

8  mandate a change to the state's general policy.  And down the

9  line another inmate can come and if they ask for similar or

10  different accommodations, at that point the state will have

11  another chance at the -- another bite at the apple to try to

12  actually provide what it should have provided here which is

13  evidence of a burden.  But that burden analysis, that analysis

14  of the expenses has to be done in each individual case.

15        JUDGE KRAUSE:  As to circumcision, is it correct,

16  your client -- you point to the, for example, elective

17  termination of pregnancy --

18        MR. LAVERGHETTA:  Yes.

19        JUDGE KRAUSE:  -- provision in the policy, but that

20  provides explicitly that the inmate and family would cover all

21  the costs.  Has Mr. Nunez offered to cover costs of the

22  circumcision?

23        MR. LAVERGHETTA:  I would say that the -- that

24  that's unclear in the record.  The state, though, has not --

25  the state could have said we'll allow circumcision but we

1   can't afford it, they could have offered that alternative.  I

2   don't think that's been done here.  And also I would point to

3   the fact that I believe another -- so -- let me start over.

4   In <u>Holt</u>, Roman Catholic Diocese of Brooklyn (indiscern.), the

5   court has made clear that you can't allow secular conduct that

6   endangers the same interest as the conduct -- the religious

7   conduct that you're -- that the state is prohibiting.  And so

8   here, elective abortion was one, and I acknowledge that the

9   policy does say that that would not be paid for by the state.

10  But the other procedure that is relevant here is gender

11  reassignment surgery, and I believe there is a cite in

12  footnote 15 of our opening brief here where the state has paid

13  for a gender reassignment surgery.

14          JUDGE KRAUSE:  That's on the basis of it being

15  deemed medically necessary.  Is it your position that RLUIPA

16  puts spiritual health on the same level as medical health?

17          MR. LAVERGHETTA:  Yes, Your Honor.  I think that was

18  the value judgment made by Congress in passing RLUIPA, and I

19  think if we look at <u>Holt</u>, <u>Holt</u> is a perfect example of this.

20  There the prison system allowed individuals to grow beards for

21  medical reasons, so where that was medically necessary to do

22  so.  And the court looked at that and said, well, if you're

23  allowing if for that -- for medical reasons, then you have to

24  allow it for religious reasons.  So yes, I think any time the

25  state allows -- and I think this is clear in the law, is that

1   any time that the state bans a religious activity, they can't

2   then say -- they can't say it's compelling if they're allowing

3   other activities that endanger the same interests.  Here,

4   cost, medical complications, et cetera.

5           JUDGE KRAUSE:  Would it satisfy your client's claim

6   for the prison to allow him to proceed with circumcision at

7   his own cost?

8           MR. LAVERGHETTA:  I think that could have been -- I

9   think that would have been an alternative means that could

10  have been proposed, Your Honor, but I would also say that

11  under the law, if they're paying for gender reassignment

12  surgeries, they should also -- they shouldn't treat religious

13  conduct more harshly.

14          JUDGE FREEMAN:  Is that in the record that they're

15  paying for gender reassignment surgeries?

16          MR. LAVERGHETTA:  Again, I think it's footnote 15 of

17  our brief.  I don't think it was mentioned in the record

18  below.

19          JUDGE FREEMAN:  And the documentation about what

20  they paid for and whether the procedures that actually took

21  place or gender reassignment or perhaps some other gender

22  reaffirming treatments, right?  I found it -- I know you sent

23  us to a link with a very short I think press release about

24  this.  I didn't see much of a record on that.

25          MR. LAVERGHETTA:  That is the record that we're

1    aware of, and on that piece I will also say that the state had

2    an obligation to consider these facts when it was deciding

3    whether or not to allow Mr. Nunez's exceptions.  The state

4    knew that it was gender reassignment surgery.  The state knew

5    they allowed elective surgery.  They never bothered to try to

6    explain how those two things didn't endanger the very same

7    interests of Mr. Nunez's circumcision.

8         JUDGE FREEMAN:  Okay, so Cutter vs. Wilkinson, there

9    the Supreme Court said that courts are to give deference to

10   the experience and expertise of prison and jail administrators

11   in conducting an RLUIPA analysis.  How does that deference

12   play a role in our evaluation of these claims?

13        MR. LAVERGHETTA:  I think -- well, post Holt, I

14   think in Holt the -- you know, one of the key findings or one

15   of the key holdings there of the Supreme Court is that you

16   shouldn't give unquestioned deference to prison officials.

17   And I would argue that the pass -- I think the Supreme Court

18   there was really just clarifying what RLUIPA was intended to

19   do in the first instance.  The Supreme Court in Turner had

20   given deference to prison officials and advanced a standard

21   where -- the legitimate penological interest standard.

22   Congress did not feel that it afforded enough protection,

23   enough religious liberty protection to inmates, and so it

24   passed RLUIPA explicitly to overrule that standard, and it

25   chose strict scrutiny.  We're all familiar with strict

1    scrutiny.  It's used in the context of the First Amendment,

2    it's used in the context of racial discrimination, it --

3         JUDGE FREEMAN:  But Cutter was about RLUIPA, right?

4    So is it your position that after Holt that the section of

5    Cutter that applies to deference to prison officials is no

6    longer binding authority from the Supreme Court?

7         MR. LAVERGHETTA:  Yes, Your Honor.

8         JUDGE KRAUSE:  How do you reconcile that with the

9    statements in Holt that RLUIPA affords prison officials ample

10   ability to maintain security, that courts should not blind

11   themselves to the fact that the analysis is conducted in a

12   prison setting?

13        MR. LAVERGHETTA:  Yes.  And the -- I think the --

14   you can reconcile those statements.  The state has the

15   opportunity to put forward evidence that it would be -- that

16   there is a compelling interest and that this is the least

17   restrictive means given those interests.  Here, for example,

18   the state could have, if it existed, they could have put forth

19   evidence and said, you know, Mr. Nunez has introduced drugs or

20   broken a rule of contraband, could have said that Mr. Nunez

21   had some sort of disciplinary record that mandates denying

22   this.  They didn't.  But the opportunity is there.  They could

23   have come --

24        JUDGE KRAUSE:  Well, they did, right?  I mean, there

25   is an affidavit that asserts that he is a particular concern

1    for transfer of contraband.

2         MR. LAVERGHETTA:  So yes, but there was no evidence

3    or detail as to Mr. Nunez on that point.  And I would argue

4    that that is actually the level of detail required.  And I'll

5    cite back to Ramirez.  So there, on vocal prayer, the state

6    raised a legitimate interest and they said, well, we're

7    concerned that pastors might not just speak to the inmate,

8    they might speak to witnesses, they may create disturbances,

9    et cetera.  The court said that could be a compelling interest

10   generally.  But the state here has failed to show that this

11   particular pastor, who is supposed to be in the death chamber,

12   posed any of those specific risks.  And that is how searching

13   the Supreme Court is now conducting this inquiry, and how

14   strict of a standard they are holding to the state.  If -- in

15   that case, the state had to show that a particular pastor

16   posed a risk.  Here, the state had the obligation to show that

17   Mr. Nunez posed a specific risk, with evidence, that they

18   claim in this litigation.

19         JUDGE KRAUSE:  But they -- going back to congregate

20   prayer for a moment, they do talk about the specific risks

21   associated with people from the outside being in proximity,

22   not being at a table where their hands can be seen, but rather

23   being, you know, prone on the floor and moving in ways that

24   could obscure the transfer of contraband.  Why isn't that

25   sufficient, given whatever remains of the deference we pay for

1  security concerns?

2  MR. LAVERGHETTA:  Well, I think there are a couple

3  of pieces on this.  Mr. Nunez has pointed in the record to the

4  fact that the prison has set aside rooms for play rooms that

5  would present the same interest, playing with children on the

6  floor, their accoutrements and toys.  The state never, as it

7  was required to, explained why it could set aside rooms for

8  playing with children and could not do it for congregate

9  prayer.  And I think that was their obligation to do so.

10  JUDGE KRAUSE:  Do they really need to spell out the

11  differences in risk between a child on transferring contraband

12  and an adult from the outside?

13  MR. LAVERGHETTA:  They -- the state has the burden,

14  yes, of addressing these issues.  If there is a substantial

15  difference and if they can point to evidence that contraband

16  has been introduced in one way or not the other and that there

17  is a difference there, they could have done it.  They never

18  even responded to Mr. Nunez's point about the play rooms.

19  JUDGE KRAUSE:  What about the specific medical

20  evidence that's available as to concerns about complications

21  that follow from -- that can follow from circumcision, and the

22  -- we've talked a little bit about costs, but those costs

23  would grow exponentially with complications.

24  MR. LAVERGHETTA:  So a couple of points on that.  So

25  again, complications from surgery are interests that are also

1    posed by other conduct allowed, again the elective abortion

2    and gender reassignment.  Two, Mr. Nunez offered to -- if

3    there were complications, and this is in our briefing, that he

4    would be responsible for those costs, and would be willing to

5    sign a liability waiver.

6         JUDGE KRAUSE:  Is that really meaningful?  I mean,

7    if he ran out of funds, was indigent, I mean, the Eighth

8    Amendment would still require that treatment be provided,

9    right?

10        MR. LAVERGHETTA:  Perhaps, Your Honor, but there

11   also is very little in the record that Mr. Nunez, there's

12   anything about his health that would make him likely to have

13   any sort of complications from a circumcision.  Circumcision

14   is a large -- is a relatively simple procedure, particularly

15   compared to the others that are allowed.  And so, you know, no

16   one is denying that costs or potential complications

17   generally, you know, it can be an important interest.  The

18   question is whether or not there's anything in the record here

19   that just allowing this one exception for Mr. Nunez to get a

20   religiously required circumcision would burden the state.

21        JUDGE KRAUSE:  Unless my colleagues have more

22   questions on those two, let's just talk about the conjugal

23   visit request.

24        MR. LAVERGHETTA:  Okay.

25        JUDGE KRAUSE:  Is it your -- is your client

1    requesting at this time both the consummation of marriage
2    visit and the ongoing biweekly visits?

3         MR. LAVERGHETTA:  Yes, and I think the -- in the
4    Amended Complaint, paragraphs 13 and 14 it talks about this.
5    There's consummation, which requires three nights together
6    with his wife, and then his faith requires him to be with his
7    wife every three days unless it is clear to both spouses that
8    the absence is temporary and involuntary.  And so I think
9    there are two pieces to this, the initial consummation, being
10   allowed to consummate his marriage with his wife, and then the
11   ongoing conjugal visits.  And I'll mention that, again, in
12   this case, nobody has questioned that that's a sincerely held
13   belief, or that it isn't part of his religious beliefs.

14        JUDGE KRAUSE:  Go ahead.

15        JUDGE MONTGOMERY-REEVES:  The DLC points us to, I
16   believe it's a statute, and says that they are obligated to
17   monitor all visits.  And it's my understanding from -- that
18   Mr. Nunez's position is that any acts of intimacy have to take
19   place in private, even a kiss.  I guess my first question for
20   you is, did Mr. Nunez challenge the underlying law that the
21   DOC is pointing to as part of the original -- the case below?

22        MR. LAVERGHETTA:  I think what Mr. Nunez was arguing
23   there is that the policy as applied to him burdens his
24   religious liberty, and therefore there should be an injunction
25   against the enforcement of that policy against him.

1          JUDGE MONTGOMERY-REEVES:  So both the DOC policy and

2     the underlying reason for the policy.

3          MR. LAVERGHETTA:  To the extent that DOC is arguing

4     that it has to monitor the prisoners, it has the option at

5     that point to find a less restricted means than a complete ban

6     to conjugal visits.

7          JUDGE KRAUSE:  Even the four schemes that you point

8     us to have very specific eligibility requirements.  First of

9     all, can we take judicial notice of your client's criminal

10    record?

11         MR. LAVERGHETTA:  Yes, Your Honor.

12         JUDGE KRAUSE:  And that criminal record, does that

13    include first degree murder and other violent offenses?

14         MR. LAVERGHETTA:  I believe so, yes, Your Honor.

15         JUDGE KRAUSE:  To clarify, is his sentence a life

16    sentence, and is it with or without parole?

17         MR. LAVERGHETTA:  Your Honor, I'm not familiar with

18    that fact.  I'm not sure.

19         JUDGE KRAUSE:  Okay.  Given that even with the

20    legislative, or policy schemes to which you pointed us as

21    examples, that someone with that background might be excluded,

22    does -- is there really anything more than that criminal

23    history that the state would need to point to to show that a

24    total ban was the least restrictive means in this

25    circumstance?

1            MR. LAVERGHETTA:  What I would argue, Your Honor, is
2    that that was never an argument made in this case.  If they
3    thought that that was a compelling interest to deny his
4    conjugal visits, they had the information to do it, they could
5    have made that argument and they didn't.  Here the state
6    itself, in -- early on in the grievance process, you know,
7    noted that there were six other states that allow conjugal
8    visits, at least six, based on I think what they called brief
9    research.  The state made no effort, despite knowing about
10   that, to argue why those states could allow conjugal visits,
11   at least in some circumstances, and in several cases broad
12   circumstances, but they couldn't offer that to Mr. Nunez here.
13           JUDGE KRAUSE:  Are you representing there are six?
14   What is there besides --
15           MR. LAVERGHETTA:  The --
16           JUDGE KRAUSE:  -- California, New York, Connecticut
17   and Washington?
18           MR. LAVERGHETTA:  Let me give you the cite.
19           JUDGE KRAUSE:  I recognize they said that at one
20   point --
21           MR. LAVERGHETTA:  Right, yes.
22           JUDGE KRAUSE:  -- but I'm asking you, are you
23   representing that there are six other jurisdictions?
24           MR. LAVERGHETTA:  No, Your Honor, I'm representing
25   that California, New York, Washington and Connecticut allow,

1    but the state itself said that after brief research it appears
2    that six states allow conjugal visits, and the only response
3    to that is that that shows that we're not -- that we're in the
4    majority.  But that's, again, not what RLUIPA requires.  Given
5    the fact that the state was aware that six other states
6    allowed conjugal visits, it had the burden of showing why it
7    could not offer a similar exception here.

8         JUDGE KRAUSE:  Holt says that RLUIPA doesn't require
9    a prison to, you know, grant the accommodation as soon as a
10   few other jurisdictions do, but when so many offer an
11   accommodation, then they must offer these persuasive reasons.
12   So how many is so many?

13        MR. LAVERGHETTA:  Well, I -- the way I interpreted
14   that in Holt, because I've, you know, kind of struggled with
15   that as well, is that, you know, it -- just because one state
16   does it doesn't necessarily mean that another state has to do
17   it as well, or a couple.  But I think the sentence that
18   follows is that the state then has to provide persuasive
19   reasons, right, why it cannot do what that state did.  So it's
20   not an automatic one-to-one, just because one state has chosen
21   to allow this that another state has to.  All the state has to
22   do, which the state failed to do here, is say we're aware that
23   these other states do this; this is why we can't do it here,
24   and offer persuasive reasons and evidence to do so.  And
25   again, this is just another circumstance where the state has

1   failed to meet the burden.  They might be able to do so in
2   another case with another Defendant, but they haven't done so
3   here.  No specific evidence as to Mr. Nunez regarding the
4   compelling interest.  No addressing the fact why they allowed
5   certain secular conduct but not analogous religious conduct.
6   No discussion as to why they -- other states can allow each of
7   these sought items.  The -- no showing that they considered
8   and rejected, as required under Washington v. Klem, different
9   alternatives.  The law is very clear on each of these four
10  points, and the state failed on each one.
11          JUDGE KRAUSE:  Does the inference cut the other way?
12  If -- there -- when there are other jurisdictions that allow
13  that practice, there's this sort of heightened showing that
14  needs to be made.  Does the absence of other jurisdictions'
15  allowance of the practice cut the other way?
16          MR. LAVERGHETTA:  I would argue no, Your Honor, and
17  again, I would -- the reason why is that I would go back to
18  the inquiry here not being whether or not the general policy
19  of the state is motivated by a compelling interest.  The
20  compelling interest analysis goes to making the exception.
21  And where the conduct of other state {sic} comes into play is
22  making that exception.  Is it possible to make that exception
23  for this prisoner, for that religious reason this one time?
24  Can -- is there a way to do it?  This is not an analysis as to
25  whether generally a state may want to allow conjugal visits or

     1    whatever the conduct may be.  It -- go ahead.

     2              JUDGE KRAUSE:  Sorry.

     3              MR. LAVERGHETTA:  No, no, that -- I'm good.

     4              JUDGE KRAUSE:  Following up on Judge Montgomery-

     5    Reeves' question, is there any other type of visit that you

     6    can point us to where there is not some kind of monitoring,

     7    whether it's by, you know, in-person surveillance or by video?

     8    And the two examples that you do point us to for special

     9    visits, the religious advisor or lawyer, aren't those subject

    10    to monitoring?

    11              MR. LAVERGHETTA:  I believe so, Your Honor.

    12              JUDGE KRAUSE:  Is there any example of a

    13    circumstance where prisons allow completely unmonitored

    14    visits?

    15              MR. LAVERGHETTA:  I believe in the states that allow

    16    conjugal visits, there are circumstances where inmates have

    17    privacy to engage in intimate affairs.  In terms of the

    18    specific prison system at issue here, that I'm not sure of.

    19              JUDGE KRAUSE:  Other questions?  I -- just one

    20    moment.  Are you familiar with the death bed and visitation

    21    policy?

    22              MR. LAVERGHETTA:  At the present I am not, Your

    23    Honor.

    24              JUDGE KRAUSE:  Okay.  And a final question, I'd ask

    25    you to at least think about and you can discuss further on

1    rebuttal is, to the extent that we agree with you on the state

2    not making the type of evidentiary showing that is required

3    under RLUIPA, if we were to reach that conclusion, what's the

4    appropriate disposition here?  Would that warrant a remand for

5    the district court to apply a standard that had been

6    articulated in more detail by this court and renewed motions,

7    perhaps even cross motions for summary judgment?  Or would it

8    simply be vacating and remanding for the case to proceed to

9    trial?

10           MR. LAVERGHETTA:  Would you like my answer now, or

11   should we wait for rebuttal to --

12           JUDGE KRAUSE:  If you have an answer now, we'll take

13   it.

14           MR. LAVERGHETTA:  Okay.

15           JUDGE KRAUSE:  If you'd like to think about that,

16   you're welcome to do it.

17           MR. LAVERGHETTA:  It's something I've given quite a

18   lot of thought to and we've discussed, and I would say here

19   the proper course would be to reverse and let the case proceed

20   to trial.  The record is the record.  The state had its

21   obligation and had its opportunity to present the evidence.

22   It didn't do so.  If this case were remanded for further

23   consideration of legal issue, because the record is fixed, the

24   -- and the law is so clear, the district court below would

25   have to reach the same conclusion that I believe that this

1    court has to reach.  Second point is Mr. Nunez has been

2    litigating this case for close to a decade, and it's close to

3    a decade where he hasn't been able to exercise his religious

4    beliefs.  This is a case of justice delayed, justice denied,

5    and I think it's -- the law is clear enough, the record is

6    barren enough that that's the proper course.

7         JUDGE FREEMAN:  So I understand you would like us to

8    direct the district court to have the case proceed to trial,

9    but would anything limit the district court from permitting

10   additional discovery within its discretion?

11        MR. LAVERGHETTA:  That's a question, Your Honor,

12   that I'll have to think about for rebuttal.

13        JUDGE KRAUSE:  Now what if, for example, on the

14   issue of, you know, conjugal visits and the carve-out for -- a

15   carve-out for those who committed violent crimes.

16   Circumstances, and we have nothing in this record, about the

17   criminal history or any disciplinary history, but if

18   hypothetically there were such evidence that came to light,

19   wouldn't the district court at some point, even, you know,

20   mid-trial be able to determine as a matter of law that the

21   standard had been satisfied?  Is it really appropriate to say

22   this just goes to trial?

23        MR. LAVERGHETTA:  If you'll permit me, let me think

24   about that and take that back on rebuttal.

25        JUDGE KRAUSE:  Thank you.  Ms. Trovinger.

1          MS. TROVINGER:  Wow, seeing that 35 is a little

2     intimidating.  Good morning, Your Honors, and may it please

3     the court.  My name is Abby Trovinger.  I am counsel for the

4     Pennsylvania Department of Corrections and also the

5     Corrections Defendants in this case.  As Your Honors are

6     already well aware of the standard used in this case and the

7     parties have fully briefed that, I'm not going to go into it.

8     But I would like to just clarify one point that I think the

9     district court judge may have missed.  The Department is not

10    conceding that Mr. Nunez has shown a substantial burden with

11    regard to both the congregate prayer issue and also the

12    conjugal visits issue.  It's our position, although it seems

13    that the district court judge may have assumed that we did,

14    you'll see from the briefing and what was discussed below some

15    of the points that Your Honors raised, and particularly I'd

16    like to start with the congregate prayer with visitors issue.

17         It is the Department's position and the Department

18    Defendants' position in the case -- I guess I should refer to

19    them as Appellees -- that Mr. Nunez has plenty of

20    opportunities to do nearly exactly what he's asking for in

21    this case.  He states he is a Muslim and we indeed don't

22    challenge that sincerely held belief.  However, he indicates

23    that he needs to pray in a congregate manner following the 14

24    steps that my colleague mentioned, with visitors in a private

25    setting.  Now that sort of evolved from when he first made the

1    request.  He was first asking for it in the visiting room at

2    the institution, and then it evolved to -- he sort of conceded

3    that well, that might be a little too disruptive, and so I

4    need a private area to do that.  But it's the Department's

5    position that he can pray before or after the visit.  These

6    visits aren't really more than about an hour in length

7    generally, to comply with his need as a Muslim to pray five

8    times a day.  And he can also visit -- or he can also pray in

9    -- specifically in a congregate fashion when he goes to

10   Jumu'ah on Fridays with the other inmates in that type of

11   setting.  He just can't pray in a private room with visitors,

12   you know, in the visiting room area --

13          JUDGE FREEMAN:  You know, it seems that he also put

14   on the record that his faith says that his prayers are not

15   heard by God as well when he prays alone.  I think something

16   along the lines of they're 20 times stronger if they're with

17   other people.  And he specifically, of course, talks about the

18   prayer that he needs to engage in with his wife.  So would you

19   agree that if he's unable to have his prayers heard with the

20   strength with which that he intends to offer them, then that

21   would be a substantial burden?

22          MS. TROVINGER:  I would concede, Your Honor, that

23   that's a burden.  I would not concede that it's a substantial

24   burden, based on how the courts, both the Third Circuit and

25   the United States Supreme Court, have defined that.

1          JUDGE KRAUSE:  And what's the line between a burden

2     and a substantial burden?

3          MS. TROVINGER:  Well, I think you'll see as the

4     courts in past have examined this issue under RLUIPA that

5     substantial burden -- and I'll just not use my own words, but

6     perhaps use the words of someone much smarter than me, it's

7     "when a follower is forced to abandon the precepts of his

8     religion and forfeit benefits otherwise available to other

9     inmates."  That doesn't really come into play here, because

10    this isn't something that's available to other inmates, the

11    ability to have a private visiting area to pray with their

12    loved ones.  "Or the government puts substantial pressure on

13    in an inherent to substantially modify his behavior and

14    violate his beliefs."  Again, inside the institution where

15    he's not coming into contact with visitors and so forth, he

16    may pray by himself, he may pray with others, other inmates,

17    he may pray at Jumu'ah where several -- sometimes several

18    hundred inmate of a Muslin faith are gathering together and

19    performing these prayers.  So he has this opportunity for

20    congregate prayer, which really seems to be the heart of what

21    he's looking to do.

22         JUDGE FREEMAN:  Is the record clear that the

23    visiting hours do not interfere with the times of day when he

24    needs to pray?

25         MS. TROVINGER:  It's not.  I believe the information

1   in the record is that it's -- you know, I think it's from 7

2   a.m. t 7 p.m. seven days a week.  Now that again was in

3   relation to the prison that he was at at the time, but I don't

4   think there's much variation from prison to prison.  But those

5   times are pre-scheduled by the folks who are coming to visit.

6   I believe the visitation policy indicates that they're

7   scheduled in advance, a couple of days in advance.  And again,

8   they're for about an hour.  So it's my understanding people of

9   the Muslim faith pray five times a day, generally speaking,

10  and there's a window of time for each one of those prayers.

11  So Mr. Nunez and his family could certainly schedule a time

12  that's not going to conflict with that mandatory prayer time.

13  They could pray as they wish, he could pray as he wishes, and

14  they could engage in visitation in the visiting room, which is

15  really what's it's intended for in its general neutral

16  purpose.

17          JUDGE KRAUSE:  There is already a private room

18  that's available for -- and is in fact used for congregate

19  prayer among inmates, and there is already a sort of protocol

20  for monitoring and security of that collective prayer.  Why

21  can't that be provided with sort of minimal additional burden

22  for the prison, for Mr. Nunez and visitors?

23          MS. TROVINGER:  So I think it's important for the

24  court and I appreciate that question, but it's important to

25  consider that that type of congregate prayer would take place

1    inside the institution.  I'm using that word kind of loosely.

2    But, you know, behind the prison walls where we're talking

3    about only corrections employees and inmates being present.

4    The type of accommodation that Mr. Nunez is seeking is very

5    different.  He's asking to pray in a private area, perhaps off

6    the visiting room area, where people from the general public

7    are permitted to come in, visit with their loved ones and

8    friends and family members and so forth.  While there is

9    surveillance of that area and there are, you know, folks

10   watching what's going on, that, I think from the prison's

11   perspective, is a much more dangerous, much more untenable

12   area of the prison because you have all of these folks coming

13   in from the outside.  And so while there are security measures

14   in place, Lieutenant Woodring in his declaration at the lower

15   court made very clear that visitors coming into the

16   institution is the main avenue of introduction of contraband,

17   whether that be cell phones or some sort of controlled

18   substance.  We know that things come in, even beyond -- even

19   taking into consideration all of the security measures that

20   the Department has in place.

21            JUDGE MONTGOMERY-REEVES:  So the declaration says

22   that Mr. Nunez has shown himself to pose a direct threat

23   regarding the introduction of contraband into the DOC, into

24   the prison.  Is there any evidence in the record to support

25   that assertion?

1          MS. TROVINGER:  That is our main assertion with

2     regard to Mr. Nunez, in particular that he poses a particular

3     security risk with regard to introducing contraband into the

4     facility.

5          JUDGE MONTGOMERY-REEVES:  I mean, I see that in the

6     Declaration.

7          MS. TROVINGER:  Yeah.

8          JUDGE MONTGOMERY-REEVES:  But my question to is do I

9     have -- is there anything in the record to show a past history

10    of misconduct charges?  Is there anything else other than that

11    assertion to back up that assertion?

12         MS. TROVINGER:  There is not, Your Honor, and I

13    think the rationale behind that from a security perspective

14    was that perhaps it's not appropriate to put some of that

15    information out there to the public sphere who can access it.

16         JUDGE KRAUSE:  Well, but that is evidence that could

17    have been put before the district court, even under seal,

18    right?  On what basis could a court conclude from that

19    assertion that the risk he poses is anything greater than any

20    other prisoner?

21         MS. TROVINGER:  Well, there -- again, there is

22    information that he poses a particular security risk, which I

23    think points Your Honors to him in particular.  But I would

24    concede that most --

25         JUDGE KRAUSE:  But where is that information in this

1  record, and now that we're in -- you know, in the realm of
2  Holt and Ramirez, isn't it your obligation to demonstrate,
3  that is make an evidentiary showing, not just the say-so, that
4  he poses a particular security risk?

5         MS. TROVINGER:  I would concede to the court there
6  are no misconducts, you know, there are no particular
7  investigations or things of that nature that would delve into
8  the specific concerns of Mr. Nunez and the security risk that
9  he poses.  Most of the implications from this case arise from
10 security's need to look both backward and forward, right.
11 Security personnel from the Department are looking at things
12 that have happened in the past with a particular inmate, with
13 other inmates at that institution, et cetera, and trying to
14 mitigate risk.  They're also, as Your Honors acknowledged in
15 the questions, I think, to my colleague, they're also required
16 to look forward, right.  They're in the job of anticipating
17 risk.  And when you're talking about something in Holt which
18 was, you know, the inmate having a short enough beard to
19 conceal contraband, the facts are important in that case, and
20 I think the main reason the United States Supreme Court
21 overturned that case and held that RLUIPA was violated were a
22 couple of reasons.  First of all, as my colleague pointed out,
23 medically necessary -- if it is was medically necessary for an
24 inmate to have a longer beard, the Department permitted that.
25 In addition, the Magistrate Judge --

1          JUDGE MONTGOMERY-REEVES:  Before you move off from

2     that point, why is that different than the fact that this room

3     on the side is used for other visits?

4          MS. TROVINGER:  I'm sorry, can you repeat that, Your

5     Honor?

6          JUDGE MONTGOMERY-REEVES:  As I understand it, the

7     room that was being referred to is used for visits with

8     attorneys, for example, is that incorrect?

9          MS. TROVINGER:  I'm not sure exactly the room that

10    Mr. Nunez was referring to.  I know that he raised the issue

11    with -- that was also raised today with an area where parents

12    can visit with their children, et cetera.  I can tell the

13    court that that is not its own room.  That is an area within

14    the overarching visitation room.  The same is true for

15    meetings with religious advisors.  That takes place in the

16    main visiting room, you know, in a -- like in the corner of a

17    visiting room or something that might be a little bit quieter.

18          JUDGE KRAUSE:  But those are -- there is in the

19    prison an area that is set off for, for example, meetings with

20    counsel, right?

21          MS. TROVINGER:  Yes, that is true, Your Honor.

22          JUDGE KRAUSE:  And he has raised the prospect of

23    being in one of those no-contact rooms where the congregate

24    prayer could even been across the table from each other.  How

25    is that any greater of, you know, a risk, a compelling need,

1    than meetings with counsel in that room or, you know, visits

2    outside, that is, in the main room?  But in the side room it

3    addresses the concerns that have been raised by the prison

4    about distracting others.

5         MS. TROVINGER:  I think my best response to that,

6    Your Honor, is importantly in Cutter vs. Wilkinson, when the

7    U.S. Supreme Court was addressing a facial challenge to

8    RLUIPA, Justice Ginsberg talked about, you know, this idea of

9    non-beneficiaries of this particular accommodation being

10   negatively impacted.  When you're talking about

11   attorney/client rooms, they're hot ticket items, right.  Many

12   inmates want to meet with their attorneys.  They want to do it

13   in confidentiality, entirely understandably.  And so if we say

14   that an inmate can utilize that room to meet with visitors and

15   pray, you're then taking away that opportunity for an inmate

16   to use that room to meet confidentiality with --

17   confidentially with his attorney in that area.

18        JUDGE KRAUSE:  That may be so, but isn't that

19   exactly the point that -- to demonstrate that there is in fact

20   a compelling need and that the ban is the least restrictive

21   means to do it that the state has to put in evidence, like the

22   number of rooms, the times that they're available, then, you

23   know, if they're booked all the time for -- you know, for

24   attorney visits, and so those places, you know, are not

25   available.  You know, issues around effects that that might

1  have on the rest of the population.  The risks that a

2  particular prisoner poses because of disciplinary history, or

3  as you were describing earlier, incidents with others at the

4  prison.  But we don't have any of that on this record.  So how

5  can we say that the district court in, you know, concluding

6  that the state had met its burden was properly applying Holt

7  and Ramirez?

8        MS. TROVINGER:  So I think it's important to

9  consider and, you know, Justice Sotomayor very eloquently,

10  much more eloquently than I could say, in the concurrence to

11  Holt talks about the idea of the government not necessarily --

12  in the least restrictive means analysis, not necessarily

13  needing to refute every possible option that could exist in

14  the realm of the prison system, right, for this to happen.

15  What the prison is expected to do is consider the

16  alternatives, I'll call them, that the inmate poses.  I don't

17  recall Mr. Nunez in any of the religious accommodation

18  requests nor the grievance -- and my recollection may be

19  failing me, because I see Your Honor is diligently writing

20  this down -- or the Amended Complaint talking about -- well,

21  the Amended Complaint would have been past due; the Department

22  would have already had to make a decision at that point.  But

23  in the religious accommodation process and the grievance

24  process, I don't recall him saying, hey, if there is an

25  attorney/client room and if it's not in use, and if you,

1    Department, require me to schedule this, you know, a week, two

2    weeks in advance, then can't you accommodate me?  And so

3    that's not something that the Department responded to.

4           JUDGE FREEMAN:  But Holt and Ramirez says that

5    that's not his burden.  It says -- it's very specific.  "It is

6    now the government's burden under RLUIPA to consider

7    reasonable alternatives and explain why they're rejecting

8    them."  So let's just assume that that's the case, that's what

9    the cases say.  So why didn't the Department do that here?

10          MS. TROVINGER:  I guess all I can do is refer Your

11   Honor to language in Holt where Justice Sotomayor says "I do

12   not understand the court's opinion to preclude deferring to

13   prison official's reasoning when that deference is due, that

14   is when prison officials offer a plausible explanation for

15   their chosen policy that is supported by whatever evidence is

16   reasonably available to them."  And she goes on to talk about

17   this least restrictive analysis, and she says "Nothing in the

18   court's opinion suggests that prison officials must refute

19   every conceivable option to satisfy RLUIPA's least restrictive

20   means analysis."

21          JUDGE KRAUSE:  But where -- oh, go ahead.

22          JUDGE MONTGOMERY-REEVES:  But you just read that it

23   has to be -- according to the concurrence that you just read,

24   supported by evidence available to them.  There are statements

25   in this -- in the affidavit.  Where is the support by evidence

1    available to them?  So, for example, you know, Judge Krause

2    just gave you a list of things that probably could have been

3    said that would support the statement that, you know, well,

4    there could be an issue with other attorneys who want to visit

5    with their attorneys during -- other inmates who want to visit

6    with their attorneys during that time.  Where is the evidence

7    that supports that?

8         MS. TROVINGER:  So the Department's ability to

9    present evidence in this case I think has to be considered in

10   the context of the fact that this doesn't -- isn't currently

11   in existence, right.  There are no prisons in Pennsylvania

12   that have a private visiting room for folks to -- for inmates

13   to meet with their family members for religious purposes.  It

14   just doesn't exist.  So everything the Department --

15        JUDGE KRAUSE:  That's entirely circular.  The

16   question is why can't rooms that are available, for example,

17   with -- for meetings with counsel, be used for this purpose?

18   To say they're not used for this purpose doesn't really help

19   us with, you know, understanding why those options weren't

20   considered by the state.

21        JUDGE MONTGOMERY-REEVES:  And to piggyback on that,

22   to say there is no evidence doesn't help us either, because

23   Judge Krause just went through a list of things, presumably

24   those are being used to meet with attorneys.  How often?  When

25   do the attorney meetings happen?  Are they during the visiting

1  hours?  Is it such that the rooms are never available because

2  it's such a hot ticket item?  Why couldn't that type of

3  evidence be presented?

4        MS. TROVINGER:  Because I would submit to the court

5  that, you know, there is evidence that could have been

6  presented below that would have made this a more robust

7  record.  But as it stands, even if the Department, let's say,

8  hypothetically had an attorney/client room available, and it

9  was at the exact same time that Mr. Nunez wanted to visit with

10  his family, we still have the compelling government interests

11  that I would argue outweigh the option of an attorney/client

12  room because we're talking about someone who's asking to meet

13  with several members of the public, to pray in certain ways

14  that are going to obfuscate what he may or may not be doing

15  with his hands, and we haven't really talked about this at

16  all, but we have the Department's concern with scarcity of

17  resources.  If this inmate is permitted to go use that room to

18  visit with family and friends, the Department would have no

19  other choice but to allocate a one-to-one person watching

20  what's going on and trying to glean whether there's any sort

21  of contraband involved, et cetera.  When prisons are designed

22  and built in Pennsylvania, and this is in Lieutenant

23  Woodring's declaration, they're designed in such a way that

24  the visiting room is specifically considered for the reasons

25  I've already raised to Your Honors.

1          JUDGE KRAUSE:  What about an attorney room being

2     used for Mr. Nunez to meet with one family member and pray

3     together?  And what's the size of the room?  What's the --

4     there's a table typically in between for counsel.  If they're

5     on different sides of the table but in that same room praying

6     together, how does that pose any more of a security risk than

7     the inmate meeting with his attorney?

8          MS. TROVINGER:  They're good questions.  Through the

9     course of this litigation I think my colleague mentioned the

10    initial Complaint was filed in 2013, I believe.  Then Mr.

11    Nunez filed an Amended Complaint in 2019.  When I went back

12    and looked at his -- where he's moved from prison to prison in

13    response to the court's question about mootness, last week,

14    he's been to several different prisons.  Prison layouts are

15    all different.  So, you know, to be able to answer Your

16    Honor's question about how big is the room and how often is it

17    available, that would have changed, right, since the motions

18    for summary judgment and the evidence was presented below,

19    because Mr. Nunez is now at a different location and a

20    different prison with probably different types of

21    accommodations.

22         JUDGE FREEMAN:  So even if we were to accept that

23    the Department put on evidence of compelling reasons, isn't

24    there a material dispute as to whether Mr. Nunez has in fact

25    shown himself to pose a direct threat regarding introduction

1    of contraband?  Because -- and I see -- I mean, that is what

2    Major Woodring says in his affidavit, but we also have a sworn

3    declaration from Mr. Nunez saying that he's never been issued

4    a prison charge for smuggling drugs into any prison, he's

5    never been issued a misconduct for violating any visiting

6    policy rule, and that he is a CL3 inmate, which is someone who

7    has non-assaultive behavior.  So wouldn't that alone require

8    the district court to deny summary judgment?

9            MS. TROVINGER:  I don't believe so, Your Honor.  I

10   think the district court in this case considered all of that

11   evidence and considered the Department's compelling government

12   interests and safety and security with regard to the

13   congregate prayer issue and took Lieutenant's -- Lieutenant

14   Woodring's assertion that Mr. Nunez poses a specific threat

15   over and above all of the other factors that were raised that

16   created a security risk for the Department with regard to the

17   congregate prayer and said this is enough to meet RLUIPA.

18   They've shown a compelling government interest, and they've

19   shown the least restrictive means here, which is,

20   unfortunately, that Mr. Nunez can't engage in congregate

21   prayer in the visiting room or in a private room with his

22   family.

23           JUDGE FREEMAN:  So it was appropriate for the

24   district court to make that decision as a matter of law,

25   notwithstanding any disputes of fact?

1       MS. TROVINGER:  The government filed the motion for

2   summary judgment, we submitted our evidence to the court.  As

3   Your Honors are aware, you know, that's the time for Mr. Nunez

4   to respond and create, you know, a response to the

5   government's position along with all of the other filings that

6   are part of the record in the case.  And the court can make

7   that decision as to what material facts to believe and not to

8   believe when they're evaluating it based on summary judgment.

9       JUDGE KRAUSE:  But we have here a burden of

10  persuasion that shifts.  This isn't just a burden of

11  production.  And you had stated earlier that the state only

12  needs to respond to alternatives that the inmate raises.

13  That's no longer the case after Holt and Ramirez.  That burden

14  is on the state to consider, you know, identify and consider

15  alternatives and give an explanation.  Doesn't have to be

16  exhaustive, as you've pointed out, you know, with some of the

17  concurrences that they were, you know, making clear that

18  that's -- but there has to be some consideration of

19  alternatives.  And here, it doesn't appear that the state has

20  even responded to the particular alternatives that were raised

21  by Mr. Nunez.

22      MS. TROVINGER:  I would just --

23      JUDGE KRAUSE:  An example in the area of congregate

24  prayer, all right.  I'm sorry, conjugal visits.  With conjugal

25  visits, he's offered up a number of things that would seem to

1  go, you know, to address the security interests, additional
2  screening, a -- you know, a button for -- sort of panic button
3  if there were a problem in the room, someone monitoring
4  outside.  Those aren't even addressed by the state.  So given
5  the burden that's on the state, how do we not have a disputed
6  issue of fact here?

7  MS. TROVINGER:  So I think what -- if I'm getting to
8  the conjugal visits issue, Your Honor, in that -- the context
9  of that discussion, rather, I would concede that the
10  Department is agreeing that an outright ban is the only least
11  restrictive means in the case where Mr. Nunez is asking for a
12  private visit with his spouse unsupervised, et cetera.  There
13  really is no least restrictive means but for the government to
14  say no, given all of these compelling government interests
15  that are at stake.

16  JUDGE FREEMAN:  But how can that be true when
17  somewhere between two and six states allow inmates to have
18  conjugal visits?

19  MS. TROVINGER:  So as Your Honors mentioned earlier,
20  there's not a lot of evidence on the record about this.  Mr.
21  Nunez, you know, brings up the point I think in a grievance
22  that he filed and the Department responds as was mentioned by
23  my colleague is that there was -- he believed in his basic
24  research that there were around six.  It's my understanding,
25  based on the court's assertion, that there are now four.  I

1    would suggest to the court that in the 1990s you can take

2    judicial notice of the fact that there were about 19 states

3    that allowed conjugal visits in the United States of America,

4    and in that timeframe it has been whittled down to four.  And

5    if you look at the policies of those individual states,

6    they're very, very restrictive as to what inmates can engage

7    in this behavior.  And as Your Honor has noted earlier, just

8    because another state does something doesn't mean that

9    Pennsylvania is required to do it as well.  We've got

10   information --

11           JUDGE MONTGOMERY-REEVES:  If you think Pennsylvania

12   isn't required to do it, why not put in evidence?  So if you

13   know, if you can do a quick Google search and figure out that

14   19 states used to have it and now that's dwindled down to

15   four, why not -- why doesn't the burden require the state to

16   put in some evidence to explain, there are budgetary concerns,

17   here's what that looks like, here are specific concerns from

18   the, what is it, 15 states that no longer do this.  Here is

19   evidence of that, and here -- to give us some evidence to

20   satisfy that burden?

21           MS. TROVINGER:  I mean, I think that we could all

22   look back on a case that we had and think of other evidence we

23   could have submitted, respectfully, to the court.  At the time

24   we submitted information from security personnel and from a

25   medical -- I think it was the director of the medical

1    department with the Department at the time.  Because those

2    were the two primary compelling government interests at stake,

3    you know, with various bullet points underneath of each one.

4    But, you know, I think at some point we do have to defer to

5    prison officials when they're saying we have a lack of

6    resources, this would require -- in the case of congregate

7    prayer, this would require us to alter the way that

8    visitations occur within the prison and perhaps even add onto

9    the prison.  And, you know, RLUIPA is an interesting animal.

10   I've been working with it now for about seven years, and my

11   take is this.  It's impossible to consider an inmate's

12   position in a vacuum with RLUIPA.  Yes, the cases say you have

13   to consider his individual situation, and yes, that needs to

14   be done in each case.  But from the prison's perspective, as

15   soon as -- let's say hypothetically Mr. Nunez's accommodation

16   was granted with regard to the congregate prayer issue.  As

17   soon as the Department grants that, that then moves the ball,

18   right.  That then is the least restrictive means.  So there is

19   no way to say to inmates, two, three, four, five hundred, six

20   hundred, who now ask for this accommodation, I'm sorry, we

21   can't do that because this particular prison doesn't have the

22   space available.

23            JUDGE FREEMAN:  Well, that doesn't sound consistent

24   with what Ramirez said.  Because Ramirez, to me, says that the

25   prison gets to express a compelling reason as to the

1    individual applicant for an exemption, right.  So if Mr. Nunez

2    were granted an exemption for one of his three requests, then

3    the next person who comes along, if they had, say, a history

4    of bringing contraband into the prison or something, like

5    then, of course, the Department would be able to consider

6    that.  So I don't think it's automatic that every applicant

7    would get the same exemption for religious reasons as Mr.

8    Nunez.

9         MS. TROVINGER:  Perhaps not, Your Honor, but I think

10   it does make it much more difficult for the government to ever

11   argue that the least restrictive means analysis does not work

12   in the inmate's favor in that case.  In Ramirez, Your Honor --

13        JUDGE FREEMAN:  Unfortunately, I think, though, that

14   is the point of RLUIPA, that it does -- it necessarily works

15   in the inmate's favor, and that the government -- I mean,

16   that's what the statute said by its plain terms, and then we

17   have these cases that, you know, three of them I guess, Cutter

18   and Holt and Ramirez saying that this really, really means

19   what it says, like the prison has to show why these people who

20   can't -- who have limited freedom to exercise religion on

21   their own because of their incarceration, can't exercise and -

22   - their faith, right?  So, I mean, that is what has landed in

23   your lap as, you know, representative of the Commonwealth.  So

24   I guess, you know, I see pretty limited details in this record

25   as to Mr. Nunez specifically, in the Major Woodring

1    declaration, you know, that one conclusory statement about how

2    he has shown himself to pose a direct threat.  So if we assume

3    that you -- I kind of want to take you here to one of the

4    questions that Judge Krause asked of your friend on the other

5    side which was, you know, just assuming for the moment, if we

6    were to find that summary judgment was not warranted on any of

7    these three requests, then, you know, where does that take us?

8    You know, I would imagine that you would want to put

9    additional evidence in the record.  Would that be appropriate?

10        MS. TROVINGER:  We think it would, Your Honor.

11   Obviously this court can clarify exactly what is necessary

12   under RLUIPA in these circumstances.  These are novel issues,

13   and I would argue that Ramirez vs. Collier, and even Holt were

14   very different, because those were -- Ramirez was an execution

15   chamber case where the prison in question had for many years

16   allowed religious advisors to come into the execution chamber

17   to pray over inmates who were about to be executed, to lay

18   hands on them, et cetera.  That's not the case here at all.

19   This is not the type of accommodation -- none of them -- none

20   of the three requests Mr. Nunez is making are the type of

21   accommodation that the Department of Corrections in

22   Pennsylvania has allowed.  And they are the type of

23   accommodations that would be far reaching beyond Mr. Nunez's

24   particular circumstance.

25        JUDGE KRAUSE:  Well, it may be a different scenario

1    or a different type of relief in this -- in that sense, but

2    aren't there general lessons that are to be drawn from those

3    cases?  For example, that you can't just say we've got

4    generalized concerns about having someone inside the execution

5    chamber, that the state could perhaps address that by putting

6    certain limits and restrictions on what they can do and when

7    they can do it, and that the state needs to address those.

8    Why would we -- if we were to say that that wasn't done here,

9    why would that be -- why is that saying anything new, and why

10   wouldn't sending it back for some additional fact finding

11   other than by a trier-of-fact at trial just be giving the

12   Department of Corrections a second bite at the apple on

13   summary judgment?

14           MS. TROVINGER:  So the general tenets absolutely --

15   legal tenets absolutely apply from those cases to this case,

16   and to answer Judge Freeman and your question, Judge Krause,

17   if the court were to remand the case, that would be exactly

18   what the Department would intend to do.  We would try to,

19   based on the court's analysis of what has already happened, an

20   application of RLUIPA and et cetera, this court's analysis,

21   the Department would add -- seek to file a supplemental motion

22   for summary judgment with additional evidence which Mr. Nunez

23   could respond to in kind, applying the RLUIPA standards, and

24   that's how we would move forward -- that's how we would seek

25   to move forward in the case.

1          JUDGE KRAUSE:  And what's your authority for that,

2     for just having the opportunity to supplement the record where

3     the legal standard under which you developed the initial

4     record was already established?

5          MS. TROVINGER:  So I think it's entirely -- every

6     judge wants to get it right, right, and if wanting to get it

7     right means that there is more information that needs to be

8     known about the particulars of the prison that Mr. Nunez is

9     located at now, or the virtual visitation policies that Your

10    Honors keyed in on earlier, or any of these changed

11    circumstances since the original motion for summary judgment

12    was filed, then it's entirely appropriate for the government

13    to supplement the record.  Because the district judge wanted

14    to get it right, just like Your Honors wanted to get it --

15    want to get it right.  And if that means there are more --

16    there's more factual development that needs to take place, you

17    know, we can -- there are many options.  The court can

18    entertain the Department's request for a second motion for

19    summary judgment.  I've done that in cases where my initial

20    motion for summary judgment was procedural in nature.  Or, I'm

21    sorry, I guess I'm talking about motion to dismiss, was

22    procedural in nature and then I filed a substantive one later

23    on.  Or we could have an evidentiary hearing --

24         JUDGE KRAUSE:  Here, given --

25         MS. TROVINGER:  -- with testimony.

1        JUDGE KRAUSE:  -- what the state put in, that is

2   three affidavits that by their terms are talking about

3   legitimate penological interests, if we were left with the

4   impression that there are just, you know, genuine issues of

5   material facts that are in dispute here, why would there be

6   just another try at summary judgment?  I mean, isn't the fact

7   finding that it would need to be remanded for the resolution

8   of those genuine issues of material fact at trial?

9        MS. TROVINGER:  I think, respectfully, on remand,

10  the district court judge would have the opportunity,

11  especially in, you know, reading the arguments here, in

12  attempting to discern exactly what's going on at the prison

13  that Mr. Nunez is located at now, could certainly entertain

14  the government's position that more evidence would assist in

15  the court's determination of whether summary judgment was

16  appropriate in this case, based on Mr. Nunez's circumstances,

17  the prison's layout, and all of the points that Your Honors

18  have honed in on today, and what that means in regards to the

19  RLUIPA analysis and least restrictive alternatives that may be

20  available.

21       JUDGE KRAUSE:  What do you say to your colleague's

22  point, to the extent we have discretion and, you know, if,

23  hypothetically, we were vacating and remanding and giving, you

24  know, instructions one way or another in terms of moving

25  forward to trial or just further development of the record,

**1**   what do you say to the point that this case has been in the

**2**   making for 10 years now and as it may be the case that justice

**3**   delayed is justice denied.  Does that proverb apply here, and

**4**   is it one that should affect our thinking in any exercise of

**5**   discretion in the disposition of this case?

**6**        MS. TROVINGER:  I don't think it does, Your Honor.

**7**   As I indicated earlier, Mr. Nunez, who is filing pro se, filed

**8**   his original Complaint I believe back in 2013.  There were,

**9**   you know, procedural mechanisms, motion to dismiss, et cetera,

**10**   and he chose to continue filing Amended Complaints, the most

**11**   recent one of which was 2019.  The government has not delayed

**12**   this case and I would argue should not be {quote, unquote}

**13**   "punished" for the length of time that it's taken.  Of course

**14**   we had a pandemic in there in the mix of all of that which may

**15**   have, you know, I don't know, I'm speculating at this point,

**16**   but may have affected the court's ability to review the record

**17**   and timely -- not timely -- and respond, et cetera.  But, you

**18**   know, Mr. Nunez ate up at least five years of that 10 year

**19**   period, and the government has responded timely to every

**20**   filing that it's filed in the case.

**21**        JUDGE KRAUSE:  I'm sorry, what were the five years

**22**   of filings that you're referring to?

**23**        MS. TROVINGER:  My recollection is -- and I don't

**24**   have the entire history at the lower court level before me,

**25**   but my recollection is that his original Complaint was filed

1    in 2013, that his -- I believe it was Amended, not Second

2    Amended, Complaint was filed in 2019.  The parties engaged in

3    summary judgment motions.  I believe there was also -- in fact

4    I know that there was a motion to dismiss with regard to

5    Defendant Tom Wolf.  He was dismissed from the case for lack

6    of personal involvement.

7            JUDGE KRAUSE:  What went on for the first six years

8    before the Amended Complaint and the motion practice that's

9    now before us?

10           MS. TROVINGER:  I'm sorry, was Your Honor's question

11   what happened in that first five years?

12           JUDGE KRAUSE:   In those six years between 2013 and

13   2019?

14           MS. TROVINGER:  I'd have to look at the docket to

15   give Your Honor an accurate description of, you know, things

16   that may have been filed in the case.  In fact, it wasn't even

17   my case at that time, that's probably why I don't have

18   personal recollection of it.

19           JUDGE MONTGOMERY-REEVES:  I have a question for you

20   that I think I know the answer to, but I want to hear --

21           MS. TROVINGER:  Yes.

22           JUDGE MONTGOMERY-REEVES:  -- hear you say it.  Mr.

23   Nunez has been moved.  In his current prison does he have the

24   ability to engage in congregate prayer with his visitors?

25           MS. TROVINGER:  No, he does not.

 1          JUDGE MONTGOMERY-REEVES:  Okay.

 2          MS. TROVINGER:  Unless, and I failed to mention this

 3     earlier, unless you consider the Department's visitation

 4     policy that visitors and inmates can engage in prayer in a

 5     seated, quiet position in the main visiting room.  That is an

 6     option for him, just like it would be for anyone of any faith

 7     proclivity.

 8          JUDGE FREEMAN:  I have one more question for you.  I

 9     want to ask you the same question that I asked Mr. LaVerghetta

10     about Cutter.  So in 2005 in Cutter the Supreme Court said

11     that courts considering RLUIPA claims have to accord due

12     deference to the experience and expertise of prison and jail

13     administrators.  And then, of course, there has been quite

14     significant developments with Holt and then, you know, more

15     recently Ramirez that make clear that, you know, that the

16     prison officials must consider alternatives, even if they

17     haven't been suggested, and so on.  And so what do we do with

18     that line from Cutter about due deference?  How do we

19     reconcile that with the guidance that we got from the court in

20     Holt and Ramirez?

21          MS. TROVINGER:  So my recollection of the analysis

22     in Ramirez was not that they didn't give the government's

23     position due deference based on the fact that they know how to

24     -- their prison -- they know how to more properly run their

25     prison, et cetera, it was that that deference is not

1    unfettered.  The government can't just say, for example, no,
2    we're not allowing this accommodation at the prison level, and
3    then through the course of litigation, you know, counsel say,
4    well, there's this compelling government interest and there's
5    that compelling government interest.  There has to be a little
6    meat on those bones for the court to look at and provide an
7    analysis of that compelling government interest in the least
8    restrictive alternatives argument.  I don't think that the
9    Court at all was saying we don't provide some deference in
10   circumstances where prison officials are involved.  I think
11   they were saying it's got to be a weighted analysis.  We're
12   not going to, as a court, just take what you're saying
13   blindly.  We're going to do that analysis and determine what
14   we think is the most appropriate circumstance.

15        I would argue that I think the government's position was
16   somewhat undercut in Ramirez, respectfully, to that prison
17   system, with what I've already mentioned earlier, which is
18   that -- and the court mentions this several times throughout
19   their opinion, that praying, you know, over someone who is
20   about to die in the execution chamber has been something
21   that's allowed for a long time.  The government really didn't
22   -- in fact, I think their own policy even permitted it to an
23   extent, and they just said no to that inmate.  And then, you
24   know, through the development of the record there was
25   discussion about, well, this could happen or that could

1    happen.  That's speculation.  We don't have that in this case.

2    We have a security official saying -- and I'll just go back to

3    the congregate prayer issue because that's kind of what we've

4    been focusing on during my portion of the argument.  We had a

5    security official saying we're talking about a visiting room

6    where we know is the main avenue of contraband.  We're talking

7    about a type of accommodation where this inmate is asking to

8    do things in such a way that it will be very hard to view what

9    is going on among those visitors and that inmate in the

10   visiting room at the time.  We also have a scarcity of

11   resources issue that I mentioned earlier, and this is all

12   developed somewhat in the record through the security

13   personnel that -- look, we only have so many corrections

14   officers to devote, and I think the Court in Watson v.

15   Christo, we didn't really talk about that case today, but they

16   very -- the Third Circuit has very clearly acknowledged, you

17   know, scarcity of resources is a legitimate thing for the

18   Department to put forward.  I seem to recall reading a line in

19   Ramirez where the government wasn't arguing that, which sort

20   of makes sense, right, because we're talking about an

21   individual in an execution chamber.  It doesn't cost the

22   government any money to allow his religious advisor to come in

23   and pray over him.  But in this type of case it's a very real

24   consideration for the Department, which is why it was put

25   forth at the lower level.  Not only do we have a scarcity of

1    resources when it comes to corrections officers who would need

2    to now be diverted from their other role or perhaps added to

3    the role on that day to watch what's going on in this private

4    visiting room, but we also have the very real implication that

5    prisons would have to adapt if the Court found that Mr. Nunez

6    -- that RLUIPA required the Department to accommodate Mr.

7    Nunez in the way he's asking for.  Prisons across Pennsylvania

8    would have to adapt to that and that would be an expensive

9    endeavor to undergo.  Same with the conjugal visits case, the

10   arguments are very similar.

11           JUDGE KRAUSE:  You're on our time now, and I had a

12   couple questions for you.

13           MS. TROVINGER:  Yes.

14           JUDGE KRAUSE:  One about the conjugal visits, and to

15   better understand non-religious circumstances where it appears

16   the Department does allocate these resources and allow for

17   private visits, and that is the deathbed visitation policy.

18   Are you able to speak to that policy?  Because it appears --

19           MS. TROVINGER:  It's not something I deal with very

20   often, Your Honor.  It's not something I remember reviewing

21   from the record.  If -- I know Department DC-ADM 812 talks

22   about visits in generally -- in general, rather.  Did Your

23   Honor -- if I may ask you a question --

24           JUDGE KRAUSE:  Sure.

25           MS. TROVINGER:  -- did you see that --

```
 1              JUDGE KRAUSE:  Section --

 2              MS. TROVINGER:  -- in the visitation clause?

 3              JUDGE KRAUSE:  Section five of ADM 812 seems to

 4    provide for private viewing or deathbed visit with staff

 5    escorting the inmate even outside of the facility, providing

 6    the transportation needed, and I would imagine providing

 7    security that's needed as well.  And I was interested in your

 8    views on why what's being requested here really poses more of

 9    a burden than what seems to be available in section five.

10              MS. TROVINGER:  So as I'm reviewing this, Your

11    Honor, my recollection -- and it is -- it does being at joint

12    appendix 220 of the record and goes on there through section

13    five.  This I believe is referring to a process the Department

14    undergoes if I am an inmate in a correctional facility and my

15    mother is dying, there is a furlough process that I, if

16    permitted, and there are certain circumstances where it may

17    not be.  I'm not super familiar with that, but if it is

18    permitted, then there is this process that, you know, of

19    course the inmate has to be taken off the grounds, they have

20    to have security when that occurs.  Very similar to if an

21    inmate had to go to an outside hospital for their own medical

22    procedure or something like that, then that would be afforded.

23              JUDGE KRAUSE:  So doesn't RLUIPA elevate the

24    religious exercise to, you know, at least that level of

25    importance, and where consummating a marriage, for example, is
```

1    required as part of the -- an inmate's faith, why would

2    accommodating that pose any more burden than the private

3    viewing or deathbed visit?

4         MS. TROVINGER:  I guess I would argue that the

5    circumstances are different there.  You're talking about an

6    inmate perhaps having one last opportunity to see a loved one

7    before they pass away.  I don't think it's very analogous to

8    the situation where Mr. Nunez is asking for, you know, a

9    private room on prison grounds to engage in sexual conduct

10   with his wife.  There are, of course, all of these other

11   compelling government interests with that interaction that are

12   laid out in the declarations below, but I guess my response,

13   Your Honor, would be that from our perspective, they're not

14   analogous situations.

15        JUDGE KRAUSE:  Are you -- in responding, are you

16   differentiating at all between the consummation of the

17   marriage and his request for ongoing visitation?

18        MS. TROVINGER:  They are different, without a doubt,

19   but it's the Department's position that the compelling

20   government interests that apply to one also apply to the

21   other.

22        JUDGE KRAUSE:  Isn't the burden significantly

23   different if you're talking about a one-time event versus

24   biweekly indefinitely?

25        MS. TROVINGER:  The burden is different, without a

1   doubt.  I think I would submit to the Court, and this is part

2   of the record, Mr. Nunez and his wife married after he was

3   incarcerated so it's no secret, you know, his circumstances

4   and not being permitted to engage in sexual acts.  They still

5   chose to marry one another which is perfectly fine, and the

6   Department permitted that, based on its rules.  But the

7   consummation of marriage, you know, so violates the

8   government's compelling government interests in this case

9   which is why the Department did not -- engaged in an outright

10  ban of that type of conduct.

11          JUDGE FREEMAN:  Well, unfortunately, now that you've

12  been up there longer I thought of another question for you.

13          MS. TROVINGER:  Great.

14          JUDGE FREEMAN:  But I think this really will be my

15  last one.  The -- Major Woodring's affidavit refers to 37

16  Pennsylvania Code 93.3 --

17          MS. TROVINGER:  Yes.

18          JUDGE FREEMAN:  -- for the proposition that inmates

19  in general population will be permitted contact visits under

20  official supervision, and it refers to also the inmate

21  handbook.  Is there anything in the inmate handbook that

22  delineates what official supervision means?

23          MS. TROVINGER:  Oh, gosh, I think you stumped me on

24  that one, Your Honor.  I don't know exactly what's in the

25  inmate handbook about that particular issue.  It's definitely

1   the government's primary concern that if conjugal visits were

2   permitted in Pennsylvania as it stands, they would have to be

3   supervised.  That, you know, has a whole -- opens a whole

4   other can of worms when it comes to requiring a corrections

5   officer to watch what's going on.  It of course wouldn't meet

6   Mr. Nunez's requirements that he states that it needs to be an

7   entirely private interaction and it would be an affront to his

8   religion if it was not.

9           JUDGE FREEMAN:  I guess one of my questions is

10   whether -- you know, to me the term official supervision is

11   fairly broad and could it perhaps encompass an officer being

12   posted outside of a closed door, for instance?

13           MS. TROVINGER:  I don't think so.  I don't think

14   that that was what was intended by the Pennsylvania Code

15   provision there.

16           JUDGE FREEMAN:  Okay.

17           JUDGE KRAUSE:  Can you clarify on the viewing and

18   deathbed visits which are described in the policy as private,

19   are those in fact conducted without supervision in the room?

20           MS. TROVINGER:  I don't know, but if I had to --

21   well, I don't want to guess.

22           JUDGE KRAUSE:  I don't want to ask you to guess.

23           MS. TROVINGER:  No, I don't want to guess, yeah.

24           JUDGE KRAUSE:  But perhaps the parties could submit

25   supplemental briefing on that particular point and we'll put

1    out a more specific order in terms of the details.  And the

2    other area I wanted to ask you about was on circumcision and

3    the burden relative to other non-religious, you know, medical

4    interventions that are permitted, specifically the elective

5    termination of pregnancy, appreciating that may be different

6    at this point post-<u>Dobbs</u>, but to the extent it has been

7    historically provided, and the medical procedures that go to

8    gender affirming care.

9            MS. TROVINGER:  So I think to focus the discussion

10   when it comes to circumcision on the fact that it's an

11   elective surgery is very important and Your Honor has keyed in

12   on that.  The transgender issue I think is entirely

13   inapplicable.  That is the Department's -- first of all, there

14   is not much on the record at all about that, but that is the

15   Department's accommodation under the Eighth Amendment, medical

16   deliberate indifference standard for medically necessary types

17   of procedures and surgeries.  It's not at all in comparison to

18   the standards under RLUIPA and comparably the First Amendment

19   when it comes to someone's religious beliefs.

20           JUDGE KRAUSE:  Is it the Department's position that

21   even after RLUIPA that spiritual health is a less important

22   interest than physical health?

23           MS. TROVINGER:  It's just not one that's directly

24   comparable from the Department's perspective.  I mean, the

25   processes by which -- well, first of all, medically

1    necessarily surgery is much more immediate, right.  It's

2    sometimes a life or death situation that the inmate needs to

3    engage in.  The religious health, spiritual health, whatever

4    we want to call it, there is a process that an inmate applies

5    for an accommodation.  It's not considered an emergency

6    process.  It is something that is thoroughly vetted by the

7    Department in the form of religious accommodation request and

8    then a grievance review if the accommodation is denied.  I

9    don't want to say that the Department considers it any less

10   important, it's just a different process.  It's of course a

11   different assessment and analysis that the Court would do in

12   analogizing the issue under Eighth Amendment versus the issue

13   under religious rights of an inmate.

14             JUDGE KRAUSE:  The specific interest that had been

15   put forward, I mean, if we think of them in connection with

16   the elective pregnancy termination or the gender-affirming

17   surgery seem to address the same concerns.  I mean, the

18   circumcision is a fraction of the cost, right, of something

19   like gender-affirming surgery.  And to the extent the concern

20   is that there might be, you know, complications that follow, I

21   mean, that's certainly true of the other surgeries that are

22   allowed under prison policies.  So how should we think of

23   that, other than that there is disparate treatment here of the

24   surgery requested for religious purposes?

25             MS. TROVINGER:  I think it's important to note that

1   at the lower court level, Mr. Nunez was unclear who was going

2   to pay for the surgery, and the court kind of keyed in on that

3   as well in the questions to my colleague.  The government

4   therefore had to assume that he was asking to use government

5   funds for an elective or cosmetic surgery that wasn't

6   medically necessary.  Department policy does not provide for

7   an ability for the government to use funds for elective

8   surgery.  We really go down a --

9           JUDGE KRAUSE:  You say elective, but I --

10          MS. TROVINGER:  Go ahead.

11          JUDGE KRAUSE:  -- we're confronting RLUIPA.  RLUIPA

12  provides statutorily that to accommodate religious exercise it

13  contemplates the additional cost may need to be bourne by the

14  prison system.  So why isn't it statutorily mandated here?

15          MS. TROVINGER:  So we didn't argue, if you noticed

16  at the beginning when I started a little while ago, we didn't

17  argue that Mr. Nunez wasn't substantially burdened on this

18  circumcision prong.  We conceded that he made a -- he's saying

19  it's a sincerely held religious belief and that because the

20  government is saying no, we're not going to pay for that and

21  any ramifications that come from it, that he is substantially

22  burdened.  It's an outright no from the government's position.

23  But the compelling government interests here presented below

24  were that, you know, elective surgeries aren't considered

25  medically necessary from the Department's perspective, and,

1   you know, there are all of these things that could go wrong

2   with the circumcision surgery, and in that case, even if Mr.

3   Nunez was providing for the pay -- the $3,500 or whatever it

4   would cost to do the initial circumcision, the government is

5   on the hook for any complications that may arise from that.

6   And again, we've got -- there's not unlimited funds within the

7   government at the Department of Corrections.  You know,

8   they've got to sort of pick and choose with thorough analysis

9   what's medically necessary after doctors reviewed it in the

10  case of transgender issues, after a whole board reviews, you

11  know, the complex issues that go into that type of analysis.

12          JUDGE KRAUSE:  How does that apply to the elective

13  termination of pregnancy?

14          MS. TROVINGER:  I'm not as familiar with that in the

15  policy, Your Honor.  I apologize, but I don't have more to

16  provide the court on that.  You know, I imagine the rationale

17  is we can't force a woman to have -- I mean, to carry a

18  pregnancy to full term, and so if she decides that she doesn't

19  want to do that, that that's within her ability to do so.

20          JUDGE KRAUSE:  Unless my colleagues have other

21  questions at this point, we appreciate your stamina and long

22  argument and your assistance to the court in addressing these

23  questions, and we will have -- hear from you, Mr. LaVerghetta

24  with rebuttal.

25          MS. TROVINGER:  Thank you, Your Honors.

1          MR. LAVERGHETTA:  I thank the Court for taking all
2     this time today to discuss these issues because I truly do
3     believe that they're important, and that importance is what
4     I'd like to talk about on rebuttal, and I'll be mercifully
5     short on this, at least try.  First, just on the procedures.
6     I just want to make clear that when it comes to gender
7     affirming care and to abortions, nobody -- we're not saying
8     whatsoever that the state shouldn't allow those procedures.
9     That's a legitimate decision for the state to make.  All we
10    are saying is that under the law, the Supreme Court has been
11    very clear that if you allow those procedures, that you cannot
12    then ban a religiously motivated procedure.  And, you know, I
13    think -- I would object to the characterization of
14    circumcision as a cosmetic procedure.  For millions of
15    Americans, Jewish, Muslim, it's a religious mandate, it's not
16    cosmetic.  And the distinction between medically necessary or
17    elective, et cetera, I would argue that doesn't matter.  Those
18    -- a state can't get around the requirements of RLUIPA through
19    these categories and deem one category more valuable than
20    another.  And so without addressing, you know, kind of every
21    argument made over time, I guess I would just say this, is
22    that I think what the argument here today by the state has
23    shown and what the barren record has shown is that the state
24    doesn't take the religious exercise of inmates seriously or
25    their responsibilities under RLUIPA.  When Congress overturned

1    the Turner Standard by passing RLUIPA, it made a value

2    judgment that religion and free exercise by inmates is

3    something worth protecting.  It's a value of the highest

4    order.  Over time, some courts got it right, some courts

5    didn't.  But the Supreme Court recently, in cases like Mast,

6    like Ramirez, like Holt, they reaffirmed we mean what we said,

7    Congress meant what it said, religion is important.  And you

8    need to show an extraordinarily high compelling interest in

9    order to burden that exercise, and you have to make sure that

10   there is no way around it.

11          JUDGE KRAUSE:  So what we've been hearing, I think,

12   from your colleague is that the Department of Corrections

13   could make that showing on remand, and given that there's

14   been, you know, transfers among different facilities where the

15   facts on the ground are now different, that before moving

16   forward to trial it would only make sense to develop the

17   record further as to the current circumstances and this is --

18   as applied to him in particular, rather than just going to

19   trial, about these sort of restrictions in the abstract.

20          MR. LAVERGHETTA:  So again, I think that the court

21   has been very clear, the statute is clear itself, the court

22   has been very clear, the state bore the burden on these

23   issues.  They've had their attempt and they didn't take it

24   seriously.  It's not that they just missed the mark.  I mean,

25   there are a lot of questions that neither side could answer

1    today, very good questions, because the record is bare.  The

2    state did nothing to put forward evidence on a compelling

3    interest, did not address obvious alternatives which they're

4    required to do, and nothing is more obvious than what other

5    states do.  I mean, we could go on.  We've talked about all of

6    this.  They did not take their burden seriously.  And what I

7    would submit is that unless courts say to the lower courts and

8    to the states, no, again, they meant what they said; you're

9    stuck with this record in this particular instance in regards

10    to this particular claimant, you failed.  Going forward,

11    that's the only way lower courts and states are going to

12    actually take their obligations under RLUIPA seriously.

13    Otherwise we end up in the situation like we have here where a

14    litigant has spent a decade trying to vindicate basic and

15    pretty simple religious beliefs, including praying with other

16    people, getting a circumcision, and consummating a marriage.

17          JUDGE KRAUSE:  Ms. Trovinger has pointed out

18    correctly that these are policies that are long-standing on

19    the books for many prisons with something like the conjugal

20    visits, there's only four instances that you've pointed us to.

21    For communal prayer with visitors, there is no other

22    jurisdiction to which you've pointed us.

23          MR. LAVERGHETTA:  I'm sorry --

24          JUDGE KRAUSE:  So if we were to discuss the kinds of

25    additional findings that might be needed or, you know,

1    additional evidence that -- and categories of evidence that

2    might be required, why wouldn't that be expounding on the

3    standard in a way that would make it appropriate for the

4    district court to address in the first instance on a record

5    developed with that new standard in mind?

6         MR. LAVERGHETTA:  I mean, I think again the state

7    knew that it had the burden of putting of forth this evidence,

8    and it just didn't do so.  I think -- and so again, RLUIPA,

9    this is -- the impact of the decision in this case and you

10   know, to quell some of the fears I think that are being

11   expressed by Ms. Trovinger, they're are not broad implications

12   into finding for Mr. Nunez in this case.  The implications are

13   limited to Mr. Nunez getting the circumcision, which costs

14   somewhere between 8 and 35 hundred dollars; him getting to

15   pray in a room that already exists and is used for other

16   means; and for him getting to -- him getting to consummate his

17   marriage, where other states do this.  This is -- this does

18   not set a precedent -- this does not require the state to

19   change their policy generally.  And I would just keep going

20   back to the state had its -- had an obligation opportunity in

21   the litigation to put forth that evidence.  Giving --

22   repeatedly giving the state another bite of the apple to post-

23   hoc justify denials that came several years ago seems

24   inappropriate.  And on the state's issue, I mean, the --

25   again, the DOC was aware that other states allowed this type

1    of conduct.  It's -- the conjugal visits, of course, we've

2    talked about, but they also cite in their own briefing to the

3    case -- the <u>Vega</u> case.  I think it's 2009 2013 District of

4    Connecticut.  They cited it to support the proposition that

5    congregate prayer wasn't allowed, but actually in that

6    particular circumstance the prisoner sought to engage in

7    congregate prayer five times a day.  Broadly speaking,

8    Connecticut permitted congregate prayer until, again, it shows

9    that the state was aware of that when they made their

10   arguments.  And this is another burden shifting.  Ms.

11   Trovinger said in her argument, well, we have to respond to

12   what the inmates bring up.  That's inappropriate, but it's

13   particularly inappropriate with what other states do.  This is

14   a penal system.  This -- like they -- an inmate cannot be

15   expected to be a scholar on the laws of 50 states.  What can

16   be expected is that when a prison system denies a request from

17   a religion observant, that they check what other states do.

18   They didn't do that here.  If they did, they chose not to

19   address it.

20            JUDGE KRAUSE:  At the risk of your mercifully short

21   rebuttal extending a little bit longer, let me just ask you,

22   what -- how does it really move the ball forward for us to say

23   it goes back and goes straight to trial?  Even in -- and this

24   is where we ended last time, I mean, wouldn't the district

25   court be in a position to grant a directed verdict, given

1   evidence that could be put in as simple as a history of

2   disciplinary infractions, for example?

3        MR. LAVERGHETTA:  It may be.  It may be that the

4   district court -- if the case -- if the lower court were

5   reversed and there were instructions to go to trial, that

6   there could be factual -- additional factual development

7   allowed and the litigation would play out, and I won't predict

8   as to how it would go, but in other words, how does it move

9   the ball?  I think in terms of giving incentives to the

10  state's two prison systems, to take their obligations

11  seriously, moving to trial -- they should move to trial at

12  this point.  There was an obligation -- in general, parties do

13  not get second bites of the apple when it comes to summary

14  judgment.  You get it right, maybe you realize afterwards that

15  you could have presented additional evidence and now you're

16  preparing for trial, and that's the way it goes.  And I think

17  that's the appropriate course here.

18       JUDGE KRAUSE:  All right, we thank both counsel for

19  excellent argument today and the time that you've taken with

20  us this morning on this very important issue.  We will take

21  the case under advisement and we will request that a

22  transcript be prepared and include that in the order that we

23  put out as well.

24       (Court adjourned)

25

1    CERTIFICATION
2  I, Lewis Parham, certify that the foregoing is a correct
3  transcript from the electronic sound recording of the
4  proceedings in the above-entitled matter.
5
6
7                                            11/28/23
8
9  _____        _____
10 Signature of Transcriber              Date