**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-3076
_____

FERNANDO NUNEZ, JR.,
Appellant

v.

TOM W. WOLF; GEORGE LITTLE; TABB BICKELL,
Regional Secretary of DOC
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:15-cv-01573)
District Judge: Honorable Jennifer P. Wilson
_____

Argued on November 1, 2023

Before: KRAUSE, FREEMAN, and MONTGOMERY-
REEVES, *Circuit Judges*

(Opinion filed: August 27, 2024)

Ellen Crisham-Pellegrini
Dino L. LaVerghetta                          **[ARGUED]**
Cody L. Reaves
Gordon D. Todd
Sidley Austin
1501 K Street NW
Washington, DC 20005

*Counsel for Appellant*

Abby N. Trovinger                            **[ARGUED]**
Pennsylvania Department of Corrections
Office of Chief Counsel
1920 Technology Parkway
Mechanicsburg, PA 17050

*Counsel for Appellees*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

The freedom to exercise one's religion, a right enshrined in the very first amendment to our Constitution, extends to all citizens of this nation, whether they are at liberty or behind bars. *Cruz v. Beto*, 405 U.S. 319 (1972) (per curiam). Building on that constitutional safeguard, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., provides heightened protection to inmates to

ensure that they are not denied religious freedoms without a compelling reason. Here, Appellant Fernando Nunez, Jr. brought suit against a number of officials associated with the Pennsylvania Department of Corrections (the "DOC") and claimed that the Pennsylvania state prisons in which he has been housed violated RLUIPA by denying him religious accommodations to consummate his marriage and have ongoing conjugal visits, to engage in congregate prayer with visitors, and to be circumcised. Concluding that the DOC had established compelling interests to deny those requests and that there were no less restrictive alternatives available, the District Court granted summary judgment in its favor. We conclude, however, that the District Court did not put the DOC to its burden, so we will vacate that judgment and remand for the DOC to have the opportunity to supplement the record in view of this opinion.

## I.    <u>Background</u>

Since his incarceration and conversion to Islam in the early 2000s, Nunez has been a "devout and practicing Muslim," JA 5, who endeavors "to live by the principles of his faith," JA 41. In 2013, Nunez married his now-spouse, Jenny E. Nunez, but although DOC policies allowed him to lawfully marry while incarcerated, they did not allow him to consummate his marriage in accordance with his religious beliefs. They also prevented him from engaging in group prayer with visitors or becoming circumcised—other important tenets of his faith. So, two years after his marriage, while housed at SCI-Huntingdon, Nunez requested a series of religious accommodations.

A.    Nunez's Requested Accommodations

Three of those accommodations are the subjects of this appeal.  First, Nunez sought a conjugal visit to consummate his marriage, as well as ongoing conjugal visits to satisfy his religious obligations as a husband.  To consummate his marriage, Nunez would need to "lead a congregational prayer with his spouse" and then "spend three consecutive nights with [her]."  JA 42.  And to fulfill his continuing spousal duties, Nunez asked for "weekend conjugal visits (Saturday and Sunday) twice a month."  JA 45.  These visits, he proposed, would involve "touching, caressing, kissing, fondling, and sexual intercourse" and, for obvious reasons, would need to "take place privately, behind closed doors."  JA 42.

Second, Nunez requested an accommodation to engage in congregate prayer with his family during contact visits.  That prayer would have fourteen steps and would involve standing, bowing, "rising from bowing, [and] prostrating on all seven limbs."  JA 49.  It could take place either in a private room, or "in a secured area of the visiting room where non-contact or legal visits are held when those rooms are unoccupied and available."  JA 50.

Third, Nunez sought a religious circumcision.  According to his complaint, circumcision is one of five mandatory "characteristics of fitrah," JA 53, that Muslims must practice, and "anyone who converts to [Islam] is commanded to get circumcised as early as possible," JA 54.  Because Nunez remains uncircumcised, he lives in "constant fear that his acts of worship . . . will not be accepted."  JA 322.

While it remains unclear whether Nunez would be willing to cover the costs of the surgery itself, he did offer to sign an "informed consent waiver" to assume the expense of any post-surgical complications.  JA 56.

B.    The DOC Denies Accommodation

The DOC rejected all of Nunez's proposed accommodations, consistent with its pre-existing policies.

In denying his request for conjugal visits, the DOC cited safety, security, and health concerns.  It pointed out that its existing policies permitted, at most, a brief kiss after marriage, as well as a kiss and short embrace during visitation.  And while it acknowledged that some states have developed conjugal visit programs, it noted that most states, including Pennsylvania, have not.

Nunez's request for congregate prayer with visitors was also denied.  The DOC expressed concern that group prayer in the visiting room could create safety issues and distract other inmates visiting with loved ones.  It also pointed to resource constraints, in that it lacked the capacity to provide all inmates with private visiting rooms for group worship.  As an alternative, it suggested that Nunez and his visitors participate in "a seated, quiet prayer" that does not distract others.  JA 248.

Nunez's request for a circumcision fared no better.  The DOC denied this request because the procedure is deemed "elective" and "not medically necessary" under its religious activities and health care policies.  JA 263.  And, again, the

DOC pointed to resource constraints—in this instance the burden of "assum[ing] the costs of elective surgery for all inmates, including the medical expenses which it would incur if medical complications ensued following elective surgery." *Id.*

C.    Nunez Files Suit

In 2015, Nunez filed a complaint in the Middle District of Pennsylvania against several DOC employees and state officials, claiming they violated his civil rights under 42 U.S.C. § 1983 and RLUIPA.  Nunez amended his complaint in 2019, voluntarily dismissing two prison officials from the action, and a third, Governor Tom Wolf, was dismissed by the District Court.    Following discovery, the remaining two DOC defendants, John Wetzel, Secretary of the DOC, and Tabb Bickell, the DOC's Regional Deputy Secretary, moved for summary judgment.[1]

D.    The District Court's Ruling on Summary Judgment

The District Court granted summary judgment to the DOC defendants on all counts.

---

[1] In May 2022, the District Court replaced DOC defendant John Wetzel with George Little, the current Secretary of the DOC, with respect to the aspects of the complaint concerning prospective and injunctive relief.

Regarding conjugal visits, the District Court concluded that Nunez failed to disprove that the DOC's ban was the least restrictive means of furthering the prison's compelling interests in safety, security, health, and resource allocation.[2] To reach this conclusion, the District Court relied on an affidavit from the DOC's Chief of Security, Major Scott Woodring, which asserted—albeit without discussion of existing or potential inspection procedures—that visiting rooms are the primary avenue to introduce contraband into Pennsylvania prisons and that, per department policy, all contact visits need to take place under official supervision. The DOC offered no data concerning the costs, personnel, or logistical burdens involved in establishing a conjugal visit program. Nonetheless, the District Court hypothesized that such a program would be costly. And although the Court acknowledged that other states had successfully developed such programs, it did not inquire into the feasibility of the DOC's doing so because it concluded that "application of the compelling interest standard is context-specific and deferential

---

[2] The prison's compelling interests and related justifications are primarily sourced from two affidavits it prepared for summary judgment: one from Major Scott Woodring, the DOC's Chief of Security, and one from Dr. Arlene Seid, the Chief of Clinical Services at the DOC. With regard to Nunez's conjugal visits claim, the District Court focused primarily on the interests asserted in Woodring's affidavit, including security and resource constraints. Below, we address those interests, as well as the health and safety interests raised in Dr. Seid's affidavit.

to the prison authorities' decisions about how to run their institution."[3]  JA 11-12.

In denying Nunez's claim regarding his request for congregate prayer with visitors, the District Court likewise deferred to the general safety and security concerns asserted in Woodring's affidavit.  Specifically, it found that Nunez "failed to refute" the DOC's assertion that visitors are the main channel of contraband into the prison, or to disprove that the DOC's existing policy allowing quiet, seated prayer in the public visiting room was the least restrictive means to further its interests.[4]  JA 13-14.

Finally, as to Nunez's religious circumcision claim, the District Court reasoned that the DOC is "not precluding [Nunez] from fulfilling this religious obligation when it is possible for him to do so, but is merely asserting that it [is] not possible for him to have the procedure while he is incarcerated and at the public's expense."  JA 15-16.  Because it agreed with the DOC that it would be unreasonable to allocate taxpayer

---

[3] The District Court also stated that Nunez did not challenge whether the DOC's interests in safety, security, and health were, in fact, compelling, and that the DOC did not challenge whether Nunez established a *prima facie* claim under RLUIPA. Because the record reflects otherwise, we will address those arguments below.

[4] The District Court was also mistaken in stating that the DOC defendants did not challenge whether Nunez established a *prima facie* case for this claim under RLUIPA.  In any event, the Court ultimately resolved the claim in their favor.

money to elective surgeries for incarcerated persons, the Court held that the DOC's policy prohibition of such surgeries was the least restrictive means of avoiding that expense. This appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291. We exercise plenary review over a grant of summary judgment, *Rush v. City of Philadelphia*, 78 F.4th 610, 619 (3d Cir. 2023), viewing the facts, and all reasonable inferences drawn from them, in the light most favorable to the non-movant, *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125 (3d Cir. 2022). Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and [] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    Discussion

On appeal, Nunez contends the District Court erred when it granted summary judgment to the DOC on each of his RLUIPA claims. We agree the DOC failed to demonstrate that its denial of Nunez's requests furthered its asserted compelling interests, or that its outright denials were the least restrictive means of doing so. We proceed by outlining RLUIPA's strict scrutiny test, applying that test to each of Nunez's claims, and then providing guidance for remand as to the showing needed to satisfy RLUIPA's exacting standard.

A.    RLUIPA's Strict Scrutiny Standard

RLUIPA, as the Supreme Court has described it, "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [the Court's] precedents." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Because "[t]he whole point of . . . RLUIPA is to make exceptions for those sincerely seeking to exercise religion," *Yellowbear v. Lampert*, 741 F.3d 48, 62 (10th Cir. 2014) (Gorsuch, J.) (emphasis omitted), Congress defined "religious exercise" expansively to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," 42 U.S.C. § 2000cc-5(7)(A), and stipulated that the statute "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by . . . the Constitution," *id.* § 2000cc-3(g).

RLUIPA thus affords inmates even "greater protection" than that provided by the First Amendment. *Holt v. Hobbs*, 574 U.S. 352, 357 (2015). Under the latter, a prison regulation that substantially burdens religious exercise is subject to intermediate scrutiny and thus must be "reasonably related to legitimate penological interests," *Turner v. Safley*, 482 U.S. 79, 89 (1987); under RLUIPA, however, that regulation is subject to strict scrutiny, requiring the government to prove that it "is the least restrictive means of furthering [a] compelling governmental interest," 42 U.S.C. § 2000cc-1(a)(2). As explained below, that burden is a heavy one and carries unique implications in the prison context for both the interests

recognized as compelling and the acceptable means to accomplish them.

1.    *The Government's Burden is a Heavy One*

Congress made explicit in RLUIPA that, while the plaintiff "shall bear the burden of persuasion on whether the [challenged policy] substantially burdens the plaintiff's exercise of religion," the government bears the burden in all other respects. *Id.* § 2000cc-2(b). Thus, in practice, once the plaintiff shows that his religious exercise has been substantially burdened, "the burden flips and the government must demonstrate that the imposition of the burden on that person is the least restrictive means of furthering a compelling governmental interest." *Ramirez v. Collier*, 595 U.S. 411, 425 (2022) (cleaned up).

As for the government's burden, "[w]e do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter*, 544 U.S. at 722, and it remains the case that RLUIPA "affords prison officials ample ability to maintain security," *Holt*, 574 U.S. at 369; *see Washington v. Klem*, 497 F.3d 272, 283 (3d Cir. 2007) ("Interests of safety and health play a particularly important role in the institutional setting."). Still, the government's "mere say-so" is not enough to carry its burden, *Holt*, 574 U.S. at 369, and, where, as here, the government is required to demonstrate that its policy furthers a "compelling governmental interest" and is the "least restrictive means" to further that interest, *Cutter*, 544 U.S. at 717, the meaningful

deference that traditionally attends prison's policy decisions is not unlimited.

While the prison need not await the occurrence of a substantial disruption or other harm, it still bears the burden of demonstrating through "experience," or other sources, that "the accommodation brings with it genuine [] problems that can't be addressed at a reasonable price." *Yellowbear*, 741 F.3d at 58. Thus, a prison cannot rely on bare "supposition," *Mast v. Fillmore County*, 141 S. Ct. 2430 (Mem), 2433 (2021) (Gorsuch, J., concurring), "conclusory" statements, or "speculation," *Ramirez*, 595 U.S. at 429-30, to support its policy choices. Instead, as in the First Amendment context, where a "rigorous and fact-intensive" inquiry is required, *Bruni v. City of Pittsburgh*, 941 F.3d 73, 89 (3d Cir. 2019) (citation omitted), RLUIPA demands that the government "prove with evidence that its rules are narrowly tailored to advance a compelling state interest with respect to the specific persons it seeks to regulate," *Mast*, 141 S. Ct. at 2433 (Gorsuch, J. concurring).

2.    *The Compelling Interest Must Be Examined Case-By-Case*

To satisfy RLUIPA's compelling interest prong, the government may not rest on only "broadly formulated [institutional] interests," *Ramirez*, 595 U.S. at 427 (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)); it instead must identify its policy objectives with respect to "the particular claimant whose sincere exercise of

religion is being substantially burdened,"[5] *Holt*, 574 U.S. at 363 (quoting *Burwell*, 573 U.S. at 726).  But at the same time it requires courts to evaluate the interests proffered on a "case-by-case" basis, *Ramirez*, 595 U.S. at 430, RLUIPA must be applied "consistent with consideration of costs and limited resources," *Cutter*, 544 U.S. at 723 (citation omitted).  Thus, although there is arguably some tension between requiring that courts take RLUIPA cases "one at a time" considering only "the particular claimant," *Ramirez*, 595 U.S. at 432-33 (quoting *Holt*, 574 U.S. at 363), and that they account for institutional burdens deserving of deference, we reject the notion that courts may not consider the cumulative effect that multiple accommodations would have on prison resources.  To the contrary, as we read *Ramirez*, it remains the case that compelling interests can exist in "cost control or program administration," *Holt*, 574 U.S. at 368, and that RLUIPA does

---

[5] *See, e.g.*, *Washington*, 497 F.3d at 283 ("[T]he mere assertion of security or health reasons is not, by itself, enough . . . . [T]he particular policy must further this interest."); *Fox v. Washington*, 71 F.4th 533, 537 (6th Cir. 2023) ("[S]peculation cannot carry the Department's burden because RLUIPA requires a case-by-case inquiry."); *Tucker v. Collier*, 906 F.3d 295, 301 (5th Cir. 2018) ("For both prongs of its strict scrutiny test, RLUIPA mandates an individualized inquiry."); *Rodriguez v. Burnside*, 38 F.4th 1324, 1332-33 (11th Cir. 2022) ("[A] prison may also need to justify its denial of specific exemptions to particular religious claimants under RLUIPA's focused inquiry." (citations omitted)); *Smith v. Owens*, 13 F.4th 1319, 1328-29 (11th Cir. 2021) (same).

not require prisons "to impose unjustified burdens on other institutionalized persons[] or jeopardize the effective functioning of an institution," *Cutter*, 544 U.S. at 726; *see also Holt*, 574 U.S. at 369 ("[C]ourts should not blind themselves to the fact that the [RLUIPA] analysis is conducted in the prison setting").

Together, these cases teach that a prison's bare interest in "avoiding other and additional accommodations—a slippery slope—is usually insufficient," *Ackerman v. Washington*, 16 F.4th 170, 187-88 (6th Cir. 2021), as "is a bureaucratic desire to follow the prison system's rules" or "[s]aving a few dollars," *Schlemm v. Wall*, 784 F.3d 362, 365 (7th Cir. 2015).  Indeed, RLUIPA expressly contemplates that its strictures may "require a government to incur expense" to avoid burdening religious exercise.  42 U.S.C. § 2000cc-3(c).  But on the other hand, "slippery-slope arguments might be persuasive when there is a 'compelling interest in cost control or program administration,'" *Ackerman*, 16 F.4th at 188 (quoting *Holt*, 574 U.S. at 368)), so if the government can demonstrate—with evidence, not just say-so—that an accommodation would be too costly on its own or would snowball in a way that would meaningfully impede prison functions, it may still satisfy the compelling interest test.

3.    *Least Restrictive Means*

To satisfy RLUIPA's "least restrictive means" test, a prison must "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]."  *Holt*, 574 U.S.

at 364-65 (quoting *Burwell*, 573 U.S. at 728). This "standard is exceptionally demanding," *Burwell*, 573 U.S. at 728, and requires the government, proactively, to identify and rebut less restrictive policy alternatives,[6] *Ramirez*, 595 U.S. at 432

---

[6] Before *Ramirez*, some courts interpreted *Holt* to suggest that prisons need only address the particular alternatives raised by the inmate. *See Faver v. Clarke*, 24 F.4th 954, 960 (4th Cir. 2022) (requiring a prison to "demonstrate that it considered and rejected the alternatives brought to [its] attention" (internal quotation marks and citation omitted)); *Williams v. Annucci*, 895 F.3d 180, 193 (2d Cir. 2018) ("To establish that its chosen policy is the least restrictive means, the DOC must prove that each of the inmate's proffered alternatives is too burdensome." (citing *Holt*, 574 U.S. at 367)). While *Ramirez* does not address the breadth of alternatives they must consider, it does make clear that it is the prison's burden to identify and consider at least some less restrictive means and that to place that burden on the inmate "gets things backward." *Ramirez*, 595 U.S. at 432. *Accord Al Saud v. Days*, 50 F.4th 705, 713 (9th Cir. 2022) ("[T]he government cannot disclaim its burden to show that its policy is narrowly tailored by putting the onus on the plaintiff . . . ."); *Couch v. Jabe*, 679 F.3d 197, 203 (4th Cir. 2012) ("[T]he government, in the RLUIPA context, cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." (citations omitted)); *Jehovah v. Clarke*, 798 F.3d 169, 177 (4th Cir. 2015) (requiring a prison to explain why an absolute ban is the least restrictive measure available).

(noting that it is the government's obligation to "rebut . . . obvious alternatives" and demonstrate that there are no "less restrictive means," and that to conclude otherwise "gets things backward" (citation omitted)). *Cf. Bruni v. City of Pittsburgh*, 824 F.3d 353, 367 (3d Cir. 2016) (holding that to satisfy its "narrow-tailoring burden" in the First Amendment context, the government had to "back up [its] assertion [that other approaches have not worked] with evidence of past efforts and the failures of those efforts . . . or otherwise demonstrate its serious consideration of, and reasonable decision to forego, alternative measures that would burden substantially less [protected activity].").

By way of example, if other institutions accommodate a particular religious practice, "the prison must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Holt*, 574 U.S. at 369; *Washington*, 497 F.3d at 285 ("[T]he failure of a defendant to explain why another institution with the same compelling interests was able to accommodate the same religious practices may constitute a failure to establish that the defendant was using the least restrictive means."). Similarly, if the prison accommodates secular activities that implicate its allegedly "compelling interests," it must explain "why the same flexibility extended to others cannot be extended to [the claimant]." *Mast*, 141 S. Ct. 2430 at 2432 (Gorsuch, J., concurring); *see Fulton v. City of Philadelphia*, 593 U.S. 522, 542 (2021) (The defendant "offers no compelling reason why it has a particular interest in denying an exception to [plaintiff] while making them available to others."); *Burwell*, 573 U.S. at 730 (noting that the

government "itself has demonstrated that it has at its disposal an approach that is less restrictive" because it "has already established an accommodation" for others).[7]

The bottom line is: If a less restrictive means that satisfies the government's compelling interest is reasonably available, the prison "must use it." *Holt*, 574 U.S. at 365 (quoting *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000)).

B.    RLUIPA's Application to this Case

We next consider how the DOC's policies in this case fare under the standards now explicated. The DOC does not challenge the sincerity of Nunez's beliefs, and its policies precluding the religious practices necessarily constitute a

---

[7] *See also Sabir v. Williams*, 52 F.4th 51, 62-63 (2d Cir. 2023) ("[I]t seems highly unlikely that [the policy restricting group prayer] is narrowly tailored considering the fact that . . . comparable secular activities—including inmate-led fitness classes and card games—do not face similar restrictions."); *Williams*, 895 F.3d at 193 ("[U]nexplained disparate treatment of 'analogous nonreligious conduct' leads us to suspect that a narrower policy that burdens [plaintiffs] to a lesser degree is in fact possible.").

substantial burden.[8]  The only issue on appeal, therefore, is whether the government on this record has met its burden to show, with more than its "bare say-so," *Yellowbear*, 741 F.3d at 59; *cf. Bruni*, 941 F.3d at 89, that its proffered interests in denying Nunez's accommodations are compelling and that the DOC's existing policies are the least restrictive means to further those interests.  While the DOC may very well be able to make this showing with additional evidence, thus far, it has not, as we discuss separately for each of the three accommodations requested.

### 1.    *Conjugal Visits*

According to the DOC, its denial of religiously required conjugal visits does not violate RLUIPA because the DOC has "several legitimate penological interests in preventing Nunez" from engaging in sex acts with his wife, Answering Br. 23, and "total prohibition is the least restrictive means" to fulfill those interests, *id.* at 25.  As a threshold matter, that misstates the test, as RLUIPA raised the bar from "legitimate penological interest" to a "compelling government interest."  And applying the proper test, the DOC has not even attempted to put forward

---

[8] The DOC disputes whether Nunez's religious exercise is substantially burdened with regard to his requests for conjugal visits and congregate prayer.  But the DOC's denials have forced him to "substantially modify his behavior and to violate his beliefs," so Nunez easily satisfies this requirement. *Washington*, 497 F.3d at 280.

actual evidence that denying Nunez's request furthers its interests, or that there are no less restrictive means available.

While it describes generally four interests that allegedly cannot be satisfied by anything less than a total ban on marriage consummation and ensuing conjugal visits, i.e., without exception for religious mandates, the DOC's arguments are not supported by more than its "bare say-so." *Yellowbear*, 741 F.3d at 59.

First, the DOC asserts that, as the body "responsible for the safety and security of all inmates," it has a duty to prevent the introduction of contraband into prisons; passage of contraband during intimacy would be "difficult to monitor"[9]; and that Nunez, in particular, poses "a direct threat regarding introduction of contraband into the Department." Answering Br. 23. No doubt, prisons have a compelling interest in "staunch[ing] the flow of contraband into . . . [their] facilities," *Holt*, 574 U.S. at 363, but, here, the DOC failed to provide more than conclusory assertions that Nunez himself presents a particular risk. And it turns out, as the government conceded at oral argument, the reason it failed to identify any disciplinary infractions, warnings, or investigations of Nunez is that there

---

[9] We recognize the potential for overlap between RLUIPA's "compelling interest" and "least restrictive means" tests, and that an institution's compelling interests for denying an accommodation could be viewed, for example, as rebuttals to an inmate's proposed less restrictive alternatives. Here, and in the discussions to follow, we analyze the DOC's arguments in the "compelling interest" context in which it raised them.

are none.  Oral Arg. Tr. 36:5-14.  Nor does the DOC address
why granting Nunez's request would "pose a meaningful
increase in security risk," *id.* at 368, beyond that posed by other
types of contact visits that are permitted, or why Nunez's
proposed alternatives, like "post[ing] extra security outside the
private visitation space," or "regulat[ing] the types of clothing
and accessories that his partner could wear," Opening Br. 50,
would be inadequate to mitigate any increased risk.  *Ramirez*,
595 U.S. at 432 (requiring the government to consider
"obvious alternatives" if its compelling interest can be
"reasonably addressed by means short of banning *all*" religious
exercise).

    The DOC's second argument likewise falls short.  The
DOC argues that "denying Nunez's request for conjugal visits
serves the legitimate penological interest of preventing
sexually transmittable infections from entering and spreading
around the prison population."  Answering Br. 24.  Applying
the proper "compelling interest" test, it is certainly the case that
inmate health "play[s] a particularly important role in the
institutional setting."  *Washington*, 497 F.3d at 283.  But,
again, the DOC has failed to explain why the denial of an
accommodation for Nunez is the least restrictive means to
satisfy this interest or even how this interest is compelling *with
regard to Nunez*: At no point does it contend that Nunez
presents a particular risk for STDs or acknowledge his
assertion that he and his wife are STD free.  *Holt*, 574 U.S. at
363 (prisons must "demonstrate that the compelling interest
test is satisfied through application of the challenged law to . . .
the particular claimant" (citation omitted)).  Nor does it explain

why it cannot provide Nunez and his spouse with protection or, as Nunez himself proposes, require them to take "a medical screening test as a pre-condition to being approved for a conjugal visit." JA 313-14; *Washington*, 497 F.3d at 284 (holding that RLUIPA requires a prison to "consider and reject other means before it can conclude that the policy chosen is the least restrictive means").[10]

The DOC also raises safety concerns, asserting that it "would have no way of ensuring that the sexual encounters were consensual at any given moment, which could result in a crime being committed at the prison." Answering Br. 24-25.

---

[10] Relatedly, the DOC objects that security officers overseeing Nunez's conjugal visits would be put in a "very precarious situation" because all contact visits are required "to take place under official supervision." JA 237 (citing 37 Pa. Code § 93.3(h)(6)). On appeal, however, the DOC has not meaningfully developed this argument or even discussed what is required for "official supervision" under § 93.3(h)(6). On remand, the DOC may be able to distinguish other visitation polices that contemplate an individualized determination as to the level of staffing and supervision required, but on this record, it has not done so. For example, for deathbed visits, the manner in which visits are carried out depends on "the degree of supervision that is required for *each individual inmate*," and, while those visits take place in locations that "allow" for "visual supervision" with officers within "close proximity for intervention if necessary," the officers are "typically not posted inside [the] room." ECF No. 55 at 1 (emphasis added).

Yet again, the DOC has not tied this particular interest to Nunez,[11] nor has it addressed the less restrictive alternatives he proposes,[12] which include "regulat[ing] the types of clothing and accessories that his partner could wear," "post[ing] extra

---

[11] Notwithstanding its assertion that Nunez himself presents a particular risk, the DOC has not identified any disciplinary infractions by Nunez while in prison, any circumstances of his offense, or any other aspect of his background suggesting Nunez poses a safety threat.  It may attempt to remedy those omissions on remand, but because it "fail[ed] to conduct an individualized inquiry," we are compelled to conclude, at this point, that "the Department's decision-making process was deficient."  *Fox*, 71 F.4th at 539; *Tucker*, 906 F.3d at 302 (finding individual inmate's security risk to be an important consideration under RLUIPA).

[12] Nunez offered additional alternatives in his opposition to the DOC's motion for summary judgment, including that his wife undergoes heightened security checks prior to conjugal visits, and that he and his spouse meet in non-contact booths, which "are not monitored or recorded by surveillance cameras."  JA 311.

security outside the private visitation space," or "giv[ing] the visitor [an] emergency alert device."[13]  Opening Br. 50.

Finally, the DOC contends that if it granted Nunez's request for conjugal visits, "all inmates would expect the same," straining prison resources.  Answering Br. 23-24.  This argument potentially has force, for without state legislation to structure and fund a conjugal visit program, the cost of granting

---

[13] Indeed, the DOC neglects to address a single one of Nunez's proposed alternatives and, without more, asks us to adopt a Pennsylvania Commonwealth Court's reasoning in an unreported decision denying claimant conjugal visits, *Thomas v. Corbett*, No. 458 M.D. 2013, 2019 WL 1312873 (Pa. Commw. Ct. Mar. 22, 2019).  We decline to do so.  As Nunez argues, the DOC defendants cannot satisfy their burden "simply by pointing to a different case from a different court, involving a different plaintiff with a different request." Opening Br. 50 (emphasis omitted).  "For *both* prongs of its strict scrutiny test, RLUIPA mandates an *individualized* inquiry." *Tucker*, 906 F.3d at 301 (emphasis added).  And, without taking a position on whether the defendants in *Thomas* properly discharged their burden, it is apparent from the decision that claimant's specific request—conjugal visits with multiple wives, arguably in violation of state law against bigamy—and claimant's criminal history informed the court's decision. *Thomas*, 2019 WL 1312873, at *3.  Here, the DOC does not discuss Nunez's criminal history. *See supra* note 13. Nor does it contend that permitting conjugal visits will always result in crime.

an onslaught of exceptions might well overwhelm prison resources, and, as a matter of common sense given the accommodation at issue, it is not hard to imagine "untold numbers of . . . prisoners lined up waiting to join [Nunez]." *Yellowbear*, 741 F.3d at 62. But imagination cannot stand in for data, and when it comes to RLUIPA, we cannot rely on "milquetoast musing that granting one request might lead to others," *id.*, or the "classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions," *Holt*, 574 U.S. at 368 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)). Moreover, as Nunez points out, other states, like California and New York, have successfully developed conjugal visit programs. *See Mast*, 141 S. Ct. at 2433 (Gorsuch, J., concurring) (noting that other jurisdictions' policies may be instructive as to the least-restrictive-means inquiry). Yet the DOC "does not even attempt to quantify the costs it faces, let alone try to explain how these costs impinge on prison budgets or administration." *Yellowbear*, 741 F.3d at 59; *cf. Bruni*, 941 F.3d at 89 (requiring a "rigorous and fact-intensive inquiry" where protected rights are "significant[ly] burden[ed]" (internal quotation marks omitted)).

At bottom, the DOC has not made *any* evidentiary showing to move this interest from "broadly formulated" and "speculat[ive]" to compelling, for example, by even identifying the number of married inmates or estimating the costs of procuring additional space and staff. *Ramirez*, 595 U.S. at 427, 429-30; *Washington*, 497 F.3d at 283 ("[a]

conclusory statement is not enough" to satisfy RLUIPA's compelling interest test).  While RLUIPA does not require prisons "to grant a particular religious exemption as soon as a few other jurisdictions do so . . . [c]ourts must hold prisons to their statutory burden" and cannot simply "*assume* a plausible, less restrictive alternative would be ineffective."[14]  *Holt*, 574 U.S. at 369 (emphasis added) (citing *Playboy*, 529 U.S. at 824).

## 2.    *Congregate Prayer with Visitors*

The DOC contends that denying Nunez's request for congregate prayer furthers several compelling interests and summarily concludes that its existing policy, which permits Nunez to engage in quiet, seated prayer, is the least restrictive alternative.  Again, the DOC satisfies neither prong of strict scrutiny.

---

[14] The DOC separately argues that "[p]risoners have no constitutional rights while incarcerated to contact or conjugal visits."  Answering Br. 19.  But Nunez does not claim a general right to conjugal visits for all prisoners under the Constitution; he claims a religious exception to the general ban on conjugal visits for himself under RLUIPA.  And the cases cited by the DOC in support of its position do not deal with exceptions under RLUIPA, and that statute "mandat[es] a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims."  *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006) (internal quotation marks omitted).

The DOC points to two compelling interests, but neither passes muster as applied to Nunez.  First, it raises the familiar specter of contraband, this time asserting that it would be difficult for staff to see whether contraband is being exchanged while Nunez and his visitors move together in prayer in a private room.  But, as already noted, the DOC fails to show that Nunez himself poses a risk concerning contraband, and it neglects to explain why Nunez's alternative—spacing out him and visitors during prayer—is inadequate.  In addition, Nunez points to several other DOC policies that "undermine the compelling nature" of the DOC's concerns about contraband, Opening Br. 33 (emphasis omitted), including Section 1 of the DOC's Inmate Visiting Procedures Manual, which states that "[i]f space permits, a children's play area will be provided with toys and books," JA 195.  Toys, books—and even children— could feasibly be used to obscure the transfer of contraband, regardless of whether the playroom is under supervision, and the DOC does not explain why its playroom policy could not apply just as well to congregate prayer.[15]

Next, the DOC points to resource constraints, arguing that granting Nunez's request will prompt such requests from

---

[15] *Cf. Mast*, 141 S. Ct. at 2432 (Gorsuch, J., concurring) ("[T]he [state] must offer a compelling explanation why the same flexibility extended to others cannot be extended to [the claimant]."); *Washington*, 497 F.3d at 283-84 (noting that an "educational purposes" exception to a ten-book limitation policy "undermine[d] the *compelling* nature of the ten-book limitation.").

other inmates, "result[ing] in the need to supply a virtually limitless number of [private] rooms at or near the same time, and to staff each one with security personnel." Answering Br. 17. As the DOC would ultimately be required to "choose [which inmates] get[] to use" the available space, it argues this could generate "feelings of resentment" between inmates that could "manifest into assaults[.]" *Id.* at 6. The DOC also argues that inmates would demand prayer-related "accoutrements," like prayer rugs or books, which would be "simply unworkable."[16] *Id.* at 17.

Again, however, the DOC is obligated to consider requests on a "case-by-case" basis, *see Ramirez*, 595 U.S. at 430, or show how denial of any such request serves a compelling interest in "cost control or program

---

[16] The DOC relatedly argues that permitting Nunez to pray in the *public visiting room* will reduce available visiting times and "convert[] a currently neutral meeting space" into a religious one, "given the noise and distraction." Answering Br. 16. But Nunez does not seek to pray out in the open, in front of other inmates and visitors. He seeks "a designated area for prayer in each facility visiting room to allow the Plaintiff and his visitors to congregate in prayer . . . [a]way from other inmates and their visitors," or, in the alternative, to "congregate in prayer . . . in a secured area of the visiting room where non-contact or legal visits are held when *those rooms* are unoccupied and available." JA 50 (emphasis added). We cannot accept the DOC's position without more information to support it, especially when it is untethered to Nunez's actual request.

administration," *Holt*, 574 U.S. at 368, and here, it has done neither.  To this point the record neither contains actual evidence that granting Nunez's *individual request* for congregate prayer with visitors will strain prison resources, *Holt*, 574 U.S. at 363, nor suggests that doing so would reasonably "forecast" an onslaught of requests from similarly situated inmates, *Tinker*, 393 U.S. at 514; *Yellowbear*, 741 F.3d at 62.

The DOC also neglects to discuss why Nunez's less restrictive alternatives are deficient,[17] instead arguing that Nunez's request is not feasible and that it has already "afforded him a least restrictive alternative"—"pray[ing] with [visitors] sitting down quietly in the visiting room."  Answering Br. 17.  That retort ignores the substance of Nunez's request—for Nunez, "[s]tanding in prayer is mandatory."  JA 318.  Again, the government's "mere say-so," *Holt*, 574 U.S. at 369, is insufficient to meet RLUIPA's "exceptionally demanding" standard, *Burwell*, 573 U.S. at 728.

---

[17] Nunez suggests, among other things, that he be permitted to use non-contact visitation rooms to pray when they are empty, and that the DOC "exercise its considerable latitude to schedule Nunez's visits in a way that is both conducive to good prison administration and reduces the likelihood that feelings of 'resentment and hatred' could arise and 'manifest into assaults.'"  Opening Br. 39 (quoting JA 239-40).

3.    *Circumcision*

Turning to Nunez's final accommodation request, a religious circumcision, the DOC again has failed to carry its burden as to compelling interests or narrow tailoring.[18]

According to the DOC, it is only authorized by the Department's Access to Health Care policy to pay for "medically necessary" surgeries.  Answering Br. 9.  Prison resources are finite, it contends, so the DOC must draw the line somewhere—here, at "cosmetic surgery or services," JA 264 (listing "Non-Provided Medical Services"), including circumcision.[19]  But this argument fails to distinguish between cosmetic circumcision and religious circumcision, and the DOC has not shown how its interest in conserving resources is advanced by denying Nunez a lone religious exemption from the policy.  It hardly seems a reasonable forecast that granting

---

[18] The DOC does not dispute the sincerity of Nunez's religious beliefs or whether his religious exercise is substantially burdened concerning his circumcision claim, so, it is not clear why the DOC asserts that "[p]roper hygiene techniques allow for clean genital areas without the need to be circumcised," Answering Br. 28, given the distinction between cleanliness for purposes of personal hygiene and spiritual cleanliness.

[19] The DOC provides no evidence to substantiate why it categorizes a religious circumcision as "elective," "cosmetic," or "medically unnecessary."  Its Access to Health Care policy states that "[m]edical services not provided by the Department include . . . cosmetic surgery or services."  JA 264.  But the policy does not define the terms "cosmetic" or "elective."

him an accommodation would prompt a multitude of other prisoners to request religious circumcision. *Cf. Tinker*, 393 U.S. at 514. And as to Nunez, the DOC estimates that circumcision would cost the prison $3,500 but does not explain why this figure is cost prohibitive. *Yellowbear*, 741 F.3d at 59 ("[T]he prison does not even attempt . . . to explain how [the] costs impinge on prison budgets or administration."); *Ackerman*, 16 F.4th at 187-88 ("[S]lippery-slope arguments might be persuasive when there is a 'compelling interest in cost control or program administration.'" (quoting *Holt*, 574 U.S. at 368)).

The DOC also fails to rebut obvious alternatives to reduce its cost, like offering to split costs with Nunez or proposing a payment plan, *see Ramirez*, 595 U.S. at 432, or to explain why Nunez's offer "to assume any medical or liability risks that may occur after the surgery" would not sufficiently

mitigate expenses,[20] Opening Br. 58; *Mast*, 141 S. Ct. at 2433 (Gorsuch, J., concurring) ("It is the government's burden to show [the] alternative won't work; not the [plaintiff's] to show it will.").

Nor did the DOC acknowledge, much less address, Nunez's evidence that at least one other jurisdiction has permitted this procedure "without compromising [its] interests in areas such as cost and health."[21]    Opening Br. 63.    While

---

[20] As Nunez points out, the DOC's Access to Health Care policy indicates that inmates may receive other "elective" surgeries, like elective termination of pregnancy.  Opening Br. 10 n.2 (citing JA 270).  That procedure "will be provided at the inmate's request" on the condition that the inmate covers costs, including those resulting from "medical complications."  JA 270.  The DOC does not explain why imposing that condition here could not suffice to mitigate its cost concerns in Nunez's case.  *Cf. Mast*, 141 S. Ct. at 2432 (Gorsuch, J., concurring) ("[T]he [state] must offer a compelling explanation why the same flexibility extended to others cannot be extended to [the claimant].").  Though the policies might be distinguishable, it is the prison's burden to make that showing, and it has not yet done so.  *Williams*, 895 F.3d at 193 ("[U]nexplained disparate treatment of analogous nonreligious conduct leads us to suspect that a narrower policy that burdens [plaintiff] to a lesser degree is in fact possible." (internal quotation marks omitted)).
[21] *Inmate Gets First Circumcision in A Florida Prison*, Stanford Law School (Oct. 16, 2013), https://perma.cc/78SR-LZB9.

RLUIPA does not automatically require a prison to grant an exception simply because others have done so, *Holt*, 574 U.S. at 369, it must at least explain "why another institution with the same compelling interests was able to accommodate the same religious practices,"[22] *Washington*, 497 F.3d at 285 (quoting *Warsoldier v. Woodford*, 418 F.3d 989, 1000 (9th Cir. 2005)).

\* \* \*

In sum, this record as it currently stands does not support the District Court's entry of summary judgment in the DOC's favor as it is lacking, for example, *any* reports, statistics, testimony, or affidavits concerning the estimated cost of granting Nunez's accommodations or the amount of additional supervision, staffing, or space those accommodations would require; evidence concerning the DOC's ability—whether financial or otherwise—to procure additional staffing or space; a basis to believe that Nunez himself poses particular risks, such as his criminal history, mental health status, or disciplinary record while incarcerated;

---

[22] The DOC's briefing makes a passing reference to compelling interests in inmate health and safety. *See* Answering Br. 29 ("Appellees have several compelling health and safety interests in denying Nunez's request for a circumcision . . . ."). But the DOC does not develop this argument, and to the extent it is concerned about post-surgery complications, the crux of this concern lies in DOC's interest in controlling costs. *Id.* at 28 ("If Nunez were able to get the procedure done, he would then come back into the prison with the potential for further complications, which the Department would have to pay for.").

information concerning the number of similarly-situated inmates who can be reasonably forecast to seek the same exceptions; or data to justify denying an inmate religious accommodations when the DOC accommodates secular activities that implicate the same compelling interests, *see Mast*, 141 S. Ct. 2432 (Gorsuch, J., concurring), or when similarly-situated prisons have offered analogous accommodations, *see Holt*, 574 U.S. at 369.

To be clear, we are not holding that the DOC's denials of Nunez's requests cannot satisfy strict scrutiny if properly supported on remand. What we do hold is that this determination cannot be made on the current record and that, as we have now clarified the nature of its burden, the DOC should have the opportunity to supplement the record before renewing its motion for summary judgment. We remand for that purpose, and to avoid additional delay in the resolution of this case, we encourage the District Court to expedite those proceedings.

## IV.    <u>Conclusion</u>

For the foregoing reasons, we will vacate the District Court's grant of summary judgment and remand for further proceedings consistent with this opinion.